```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3
   UNITED STATES OF AMERICA,
 4
                     Plaintiff,
 5      vs.                        Case No. 18-20454
                                   Hon. Stephen J. Murphy, III
 6      LESLY POMPY,

 7                   Defendant.
   _____/
 8              JURY TRIAL EXCERPT: VOLUME 2

 9
          BEFORE THE HONORABLE STEPHEN J. MURPHY, III
10              United States District Judge
          Theodore Levin United States Courthouse
11              231 West Lafayette Boulevard
                 Detroit, Michigan  48226
12              Monday, November 28, 2022

13   APPEARANCES:

14   For the Plaintiff         WAYNE F. PRATT
     United States of America: ANDREW J. LIEVENSE
15                             U.S. Attorney's Office
                               211 W. Fort Street
16                             Suite 2001
                               Detroit, Michigan  48226
17                             313-226-9100

18   Also Present:            CHRISTINE OUELLETTE
                              Paralegal Specialist
19
     For the Defendant        GEORGE B. DONNINI
20   Lesly Pompy:             JOSEPH E. RICHOTTE
                              Butzel Long
21                             201 W. Big Beaver
                               Suite 1200
22                             Troy, Michigan 48084
                               313-225-7000
23
                              (Appearances continued next page)
24

25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant          RONALD WILLIAM CHAPMAN, II
      Lesly Pompy:               Chapman Law Group
 3                               1441 West Long Lake Road
                                 Suite 310
 4                               Troy, Michigan 48098
                                 248-644-6326
 5
      Also Present:             VICTORIA MURDOCH
 6                              Senior Paralegal

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
              To obtain a certified copy of this transcript, contact:
24             Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
                            Official Court Reporter
25                  (313) 234-2616 • www.transcriptorders.com
```

TABLE OF CONTENTS

Government Witnesses:                                        Page

Excerpt 1:

JENNIFER NASH

    Direct Examination by Mr. Pratt                         5

| | EXHIBITS | | |
|---|---|---|---|
| | Identification | Offered | Received |
| 3 | Government Exhibit No. 1, | 20 | |
| | Medical records of "James Stewart" | | |
| 4 | | | |
| | Government Exhibit No. 7, | 20 | 35 |
| 5 | Medical records of Robin Oldham | | |
| 6 | Government Exhibit No. 8, | 20 | |
| | Medical records of Lisa Kohlman | | |
| 7 | | | |
| | Government Exhibit No. 13, | 20 | 21 |
| 8 | Medical records of Brianna Lindhorst | | |
| 9 | Government Exhibit No. 15, | 20 | |
| | Medical records of Michelle Bunker | | |
| 10 | | | |
| | Government Exhibit No. 130, | 14 | 14 |
| 11 | Photograph of two computer screens | | |

```
1              Detroit, Michigan
2              Monday, November 28, 2022
3                        -  -  -
4              Excerpt 1:
5               (Proceedings in progress at 12:56 p.m., all parties
6              present, jury present)
7              THE COURT:  And I believe we have our first
8     government witness, correct?
9              MR. PRATT:  Yes, Your Honor.  May it please the
10    Court, the United States calls Jennifer Nash.
11             THE COURT:  Jennifer Nash.  Let's have Ms. Nash come
12    on up front here.  How are you this afternoon?
13             THE WITNESS:  Good, thank you.
14             THE COURT:  Good.  Raise your right hand.
15                       J E N N I F E R   N A S H
16    was called as a witness herein, and after being first duly
17    sworn to tell the truth and nothing but the truth, testified on
18    her oath as follows:
19             THE WITNESS:  I do.
20             THE COURT:  Okay.  Great.  Have a seat, relax.  Speak
21    toward the mic but not too close.
22             Mr. Pratt, the floor is yours.  Go right ahead.
23                       DIRECT EXAMINATION
24    BY MR. PRATT:
25    Q.  All right.  Ms. Nash, will you please state your full name
```

1    for the court reporter?

2    A.   Jennifer Marie Nash.

3    Q.   And how do you spell your last name?

4    A.   N-a-s-h.

5    Q.   All right.  Now, Ms. Nash, can you begin by telling us a

6    little bit about yourself?  Can you tell us where you were born

7    and raised?

8    A.   I was born and raised in Monroe, Michigan.

9    Q.   Okay.  And tell us a little bit about your education.  Did

10   you -- did you go to high school in Monroe?

11   A.   I did.  I went to Monroe High.

12   Q.   You graduated from there?

13   A.   Graduated in 1993.

14   Q.   Okay.  Did you eventually get some additional education

15   after you graduated from Monroe High School?

16   A.   I did.  I went to online school through --

17        THE COURT REPORTER:  Ms. Nash, please slow down.  I'm

18   taking this all down.  "I went to online school," start from

19   there.

20   A.   I went to online school through University of Phoenix

21   where I obtained my bachelor's and associate's degree in

22   healthcare administration.

23   Q.   Okay.  And I don't need all the details, but can you tell

24   me when you -- when you studied healthcare administration, is

25   that different from actually -- from actually getting training

1    in like how to actually treat patients?

2    A.  Yes.

3    Q.  All right.  Tell me what you -- tell me what your degree

4    and what your education was in.

5    A.  It was in healthcare administration which is pretty much

6    admitting patients into a hospital setting or a Medicare

7    setting.

8    Q.  Okay.  Does it have to do more with records than...

9    A.  Yes.

10   Q.  All right.  All right.  So you got the -- you got the

11   education.  Did you go -- did you get a -- did you get a

12   position in that field right away?

13   A.  No, I did not.

14   Q.  Okay.  As a matter of fact, you eventually worked for Dr.

15   Pompy, is that right?

16   A.  I did.

17   Q.  All right.  Where did you work right before working for

18   Dr. Pompy?

19   A.  I worked at Walmart's.

20   Q.  Okay.  Do you recall -- you recall when it was you started

21   working for Dr. Pompy?

22   A.  Back in 2015, August of 2015.

23   Q.  All right.  How did you find that -- out about the job,

24   the job opening working with -- for Dr. Pompy's office?

25   A.  My daughter went to school with one of her friends and one

1   of her friends got me in to see with Dr. Pompy.

2   Q.  Okay.  And we're going -- we're going to make sure we

3   talking slowly enough.

4        Okay.  So -- so it was through your daughter's

5   friend.

6        And so tell me how the -- tell me how the application

7   or interview process went.  What did you do to get a job with

8   Dr. Pompy?

9   A.  She just told me to go in, take my resumé in to Dr. Pompy

10  and talk to him and see what -- what he would say.

11  Q.  Okay.  And so what happened when you took your resumé in

12  and saw Dr. Pompy?

13  A.  He looked over my resumé, said it looked good and asked

14  when I could start working for him.

15  Q.  Okay.  And what position were you hired to work for?

16  A.  Medical assistant.

17  Q.  All right.  Did you have any experience as a medical

18  assistant before?

19  A.  No, I did not.

20  Q.  Okay.  Tell us a little bit -- tell us a little bit about

21  what training you got as a medical assistant once you started

22  working for Dr. Pompy.

23  A.  I inputted information into the computer system for the

24  patients before Dr. Pompy would see them, learned how to

25  take vitals.

1    Q.  Well, before we go into that, can you tell us was there

2    any kind of formal training before you started working or was

3    it right into the being a medical assistant?

4    A.  It was being a medical assistant but I was trained as I

5    went along.

6    Q.  Okay.  And who was the -- who were the people, person or

7    people that would give you training in this medical assistant

8    job?

9    A.  Her name was Marcia.

10   Q.  Okay.  She was someone who'd already -- was working there?

11   A.  Yes.

12   Q.  All right.  Was this -- was this a full-time or a

13   part-time job for you?

14   A.  This was a full-time job.

15   Q.  Okay.  Can you tell us what the -- what -- what your hours

16   would be?

17   A.  Sometimes it would start at 7:00, 7:30 in the morning and

18   go till 10:00, 11:00 o'clock some nights.

19   Q.  All right.  And were there other days where you worked

20   fewer hours?

21   A.  Yes.

22   Q.  What would be some of the other -- what would be the hours

23   when it wasn't one of those really long days?

24   A.  It would be like 7:00 to 8:00 o'clock in the morning till

25   6:00, 7:00 o'clock at night.

1    Q.   Okay.  And did you work how many days a week typically?

2    A.   Monday through Friday.

3    Q.   All right.  Did you work -- did you ever work any Saturday

4    hours?

5    A.   Not that I'm aware of.

6    Q.   Okay.  All right.  So as a medical assistant -- I think I

7    stopped you but now I kind of want you to explain to that.  As

8    a medical assistant, what was your -- what was your job, what

9    was your role in -- in patient care?

10   A.   To take vital signs, input patient information into the

11   computer before the doctor would see them and make sure

12   everything was ready for the doctor before he came in as far as

13   their scripts, their urine tests, make sure everything was

14   done.

15   Q.   Okay.  And so I want to get some idea, first of all, can

16   you tell us how busy Dr. Pompy's office was?

17   A.   It was very busy.

18   Q.   All right.  And -- and -- and very busy can cover a -- can

19   cover a broad range.  So I want you to give me, if you can,

20   your best estimate of -- of what would be kind of a normal day

21   in Dr. Pompy's office and what would be the busiest days.

22   A.   Busy day would range anywhere from 150 to 300 patients a

23   day depending on what the patient needed to be seen for.  If it

24   was just refills, it was anywhere between two and three minutes

25   visit; he would look over the prescriptions and move on.

1    Q.   Okay.  So right now I want to focus on the numbers.  So
2    you're saying it could be -- could be over 200 patients on some
3    days?
4    A.   Correct.
5    Q.   All right.  And I want you to explain to us what your role
6    is.  Did you personally serve as an MA for 200 patients a day?
7    A.   Not all 200, no.
8    Q.   No.  How did that work then, what -- what slice of the
9    patients would you deal with?
10   A.   It depended on how many patients there were per day and
11   how many were scheduled, so it depended on who was -- who had
12   finished first and who would start the next patient.
13   Q.   All right.  So you were -- I guess the question is were
14   there other people that would work as a MA or medical assistant
15   at the same time you were?
16   A.   Yes.
17   Q.   All right.  How many people, how many other MAs would be
18   working on an average day in Dr. Pompy's office?
19   A.   It depended.  Sometimes there were seven of us, sometimes
20   there was more, sometimes there was less depending if there's
21   any people that didn't show up for work.
22   Q.   Okay.  So you have a number of them, and I guess you end
23   up -- you end up then dividing and you only see certain
24   patients, correct?
25   A.   Yes.

1    Q.  All right.  You started to talk about -- I want you to

2    explain -- when you say you had all of these patients, I want

3    you to explain to us what all those patients made the -- made

4    the waiting room and made the hallways look like.  How -- how

5    crowded was it?

6    A.  There was people sometimes standing in the hallways,

7    people standing in the -- in the waiting room.  Sometimes the

8    waiting room was so packed that there was standing room only.

9    Q.  Okay.  And let me ask you this.  Did -- did -- did

10   everything run on time or were the patients typically required

11   to wait?

12   A.  There was some patients that had to wait.  Not everything

13   was always on time.

14   Q.  All right.  What are the types of waits that patients

15   would often have when they were trying to see Dr. Pompy?

16   A.  If they had more than a prescription refill, if they were

17   a new patient.

18   Q.  Okay.  How long would they have to -- how long would the

19   wait times be though?

20   A.  Sometimes there was people that waited three to four hours

21   at a time to see him.

22   Q.  Okay.  What would be kind of a more normal or a more

23   typical wait time?

24   A.  Oh, about an hour some days.

25   Q.  Okay.  I want to ask you, was that -- was that kind of

1   long wait times, was there -- was there -- was there some

2   scheduling -- do you know -- do you know did they schedule --

3   did Dr. Pompy's office schedule more than one patient in a

4   particular time?

5   A.  Yes.  There was -- sometimes there was three to four

6   patients scheduled at one time for that same time slot.

7   Q.  And was that an accident or was -- was this a regular

8   over -- I guess we'll call it overbooking.  Was that -- was

9   there regular overbooking?

10  A.  On certain days, yes.

11  Q.  All right.  And I'm going to show you --

12         MR. PRATT:  Ms. Ouellette, if you could pull up

13  Proposed Government's Exhibit 130.

14  BY MR. PRATT:

15  Q.  You -- where did you work, where did you work in Dr.

16  Pompy's office?

17  A.  I worked in the room with two -- with two computers.

18  Q.  Okay.  And if you look at the screen in front of you, can

19  you identify this location in the office?

20  A.  Yes.

21  Q.  What -- what are we seeing here?

22  A.  One is the patient portal which shows what time the

23  patients are due for their appointment.

24  Q.  That's on the left screen?

25  A.  Yes.

```
1   Q.  All right.  And you talked about that they made --
2           MR. DONNINI:  Your Honor, I apologize.  Just as a
3   matter of procedure since we're -- this is our first witness --
4           THE COURT:  Yes.
5           MR. DONNINI:  -- first exhibit, this is a proposed
6   exhibit.
7           THE COURT:  Yeah.
8           MR. DONNINI:  It's up on the screen.
9           THE COURT:  Right.
10          MR. DONNINI:  I don't think I'm going to have a
11  problem with it, but I thought --
12          THE COURT:  Okay.
13          MR. DONNINI:  -- we'd have it here first with the
14  witness and then go up, but, again --
15          THE COURT:  Yeah.  Thank you.  Are you going to move
16  its admission?
17          MR. PRATT:  Yeah, I'll move -- I'll move the
18  admission at this time, Your Honor.
19          THE COURT:  Okay.  Is there an objection?
20          MR. DONNINI:  There's not on this, Your Honor.
21          THE COURT:  Okay.  All right.  Thank you very much.
22  And we'll receive No. 130.
23          So I don't know, I haven't -- we haven't practiced
24  this in a while, but maybe the government paralegal and Linda
25  can meet after court, but we can -- we can allow the
```

1   government, the defense and the witness to view the document,

2   address its foundation, admission and things of that nature

3   without it being shown to the jury, and then I can unveil it,

4   if you will, for the jury after it's admitted if it is.  So

5   maybe we can figure out how to do that after court today.

6           But in general, and I know you know this, Mr. Pratt,

7   we will reserve showing the material to the jury until it's --

8   until it's received in evidence.  But you go right ahead.

9   Thank you.

10  BY MR. PRATT:

11  Q.  All right.  All right.  So now that we've -- now that 130

12  is officially in evidence, do you -- can you point out, if we

13  can see this through this kind of overbooking or scheduling

14  people at one time, do we see that on that left computer?

15  A.  Yes.

16  Q.  And how do you tell -- how do you see it?

17  A.  Because there's like three or four patients all in one row

18  and on top of one another.

19  Q.  Okay.  Let me -- let me address -- let me address then,

20  and I think you started to get to that in your testimony, Dr.

21  Pompy had -- had different types of patients, they were there

22  for different reasons essentially, correct?

23  A.  Yes.

24  Q.  All right.  Can you tell us what -- can you tell us what

25  most patients were there for?

```
1    A.   Most patients were there for refills.

2    Q.   All right.  And refills of what?

3    A.   Narcotics.

4    Q.   Okay.  Dr. Pompy was running a pain practice, correct?

5    A.   Correct.

6    Q.   All right.  So most of them were there for refills.

7              And I want to address the question, when you say

8    most, is this like a little bit more than half or is this like

9    pretty much -- pretty much --

10   A.   About 95 percent of his business was pain.

11   Q.   Was pain and was the refill people?

12   A.   Correct.

13   Q.   All right.  So I want to break it down a little bit then.

14   I want to talk right now just about these kind of refill --

15   refill people, okay?  Can you give the jury a sense both in

16   time and in terms of what would happen when Dr. Pompy would

17   come in the room as to how long he would spend with a pain

18   refill patient?

19   A.   If it was just a refill and there was no questions, it was

20   like a two- to three-minute ordeal.

21   Q.   Okay.  In that two or three minutes would be involved,

22   what would be -- what would be involved, what would take up the

23   two or three minutes for a typical refill visit?

24   A.   Just Dr. Pompy coming in, addressing the patient, going

25   over the refills and signing the re -- or signing the refills.
```

```
1    Q.  All right.  And so you say that would take two or three
2    minutes.  Could it sometimes take a minute or less?
3              MR. DONNINI:  Objection.  Leading.
4              THE COURT:  That's sustained.
5              Go ahead, Mr. Pratt, if you want to rephrase.
6    BY MR. PRATT:
7    Q.  What's the -- what's the lowest, what's the smallest time
8    you recall seeing patients?
9    A.  About two minutes.
10   Q.  Okay.  Let's do a little bit of -- let -- let's do a
11   little bit of -- if you'll help me.  Math may not be your
12   strong suit, it may not be mine.  But if -- if the defendant,
13   if the doctor was seeing patients for a half hour, okay --
14   A.  Right.
15   Q.  -- and he's working, say, you talked about a 12-hour
16   shift, he would have seen -- would it be correct, he would have
17   seen about how many patients a day?
18   A.  Anywhere between 150 and 300.
19   Q.  Yes.  But if he -- if he gave each of them a half hour,
20   would you agree it was only like 20 -- he could only see 24
21   patients?
22   A.  Correct.
23   Q.  All right.  Did that happen, that he would see people
24   every -- his whole population for a half hour?
25   A.  No.  There was certain people that, like I said for
```

1    refills, they would only -- he would only be in there two to

2    three minutes.

3    Q.  All right.  And if we do the math, I guess, again, I don't

4    want to do it, but, you know, if -- if you -- if you even said

5    five minutes, that would be 12 patients an hour, correct?

6    A.  Correct.

7    Q.  And so if you had 12 hours, that still might be 144.

8    Still doesn't get you there, does it?

9    A.  No.

10   Q.  Okay.  All right.  You talked about as the medical

11   assistant you had -- you had certain duties, certain things you

12   had to do before Dr. Pompy came in the room to see the patient,

13   correct?

14   A.  Correct.

15   Q.  And I want to break those down a little bit, specifically

16   in terms of the paperwork that's involved, okay?  So tell me

17   what your job was and what paperwork you would deal with when

18   the patient came in for one of these visits.

19   A.  There was a stack of paperwork the -- the patient would

20   fill out.

21   Q.  All right.  And let's stop right there.  You said there

22   was a stack of patient work, paperwork.  The patient would fill

23   this out before they ever came back to the room, correct?

24   A.  Correct.

25   Q.  All right.  And do you have a name for that or you would

1   call that the -- the thing they would have to fill out?

2   A.  We just call it the paperwork.

3   Q.  All right.  All right.  And if I showed you -- if I showed

4   you one of those patient questionnaires, would you be able to

5   identify it?

6   A.  Yes.

7   Q.  All right.

8           MR. PRATT:  Your Honor, I believe that the defense

9   has no objection to the -- to the patient charts at this time,

10  and with the Court's permission, even though we haven't gone

11  through the formal list, I would like to be able to display for

12  the witness and the jury portions of the government's patient

13  charts.

14          THE COURT:  Okay.  First of all, I figured out how to

15  address the process I mentioned earlier, and if the government

16  wants to screen a document for the defense and the witness and

17  the Court, I -- I've got that taken care of up here.

18          But with regard to the patient files, I'm sure you've

19  all been over them together before.  If you'd like to make an

20  offer, we can hear from Mr. Donnini and perhaps make a -- a

21  sweeping admission at this time.

22          Go ahead, Mr. Pratt.  What do you -- what would you

23  like to offer to the Court?

24          MR. PRATT:  Your Honor, we'd like to do something

25  sweeping.

```
 1              THE COURT:  Yes.
 2              MR. PRATT:  Not sure we have the numbers written
 3    down, so I guess maybe we can address that at the end of the
 4    day.
 5              THE COURT:  Right.
 6              MR. PRATT:  But for right now I would ask that,
 7    without objection, Government's Exhibits I think it's going to
 8    be 1, 8, 7, 13 and 15, which are all patient charts from the
 9    defendant's records system, can be admitted and can be used to
10    examine this witness.
11              THE COURT:  Okay.  1, 8, 13 and 17 [sic].  Mr.
12    Donnini, are you going to have an objection to those?
13              MR. DONNINI:  Your Honor, I don't believe so.  It
14    would be helpful, since the Court has said that you can make
15    this toggling, if I can just see it just for a moment.  He
16    doesn't have to do any foundation.  I just want to be able to
17    see 7 before I say yes, and then I'm sure it's going to be yes,
18    yes, yes.
19              THE COURT:  Okay.
20              MR. DONNINI:  And then at the conclusion of the day I
21    think we will be able to preadmit a number of documents.
22              THE COURT:  Okay.  Good, good, good.  Why don't you
23    put Mr. -- or Mr. Pratt, if you would have your staff put
24    No. 7 --
25              MR. PRATT:  Your Honor, I'd start with -- I think we
```

```
 1    will start with 13.
 2              THE COURT:  You going to put that on the screen?
 3              MR. PRATT:  So Exhibit 13, page 124.
 4              THE COURT:  Okay.  You recognize that, witness?
 5              THE WITNESS:  I do.
 6              THE COURT:  Is there going to be an objection?
 7              MR. DONNINI:  No, Your Honor.
 8              THE COURT:  Okay.  So 13 is received.
 9    BY MR. PRATT:
10    Q.  Can we tell --
11              (Brief pause)
12              THE COURT:  Oh, all right, okay.  That should be
13    there.  All right.  Go right ahead.
14              MR. PRATT:  There we go.
15              THE COURT:  Yep.
16    BY MR. PRATT:
17    Q.  All right.  Now, this is the -- this is the first page of
18    what document?  You call it the paperwork?
19    A.  Yes.  It's a questionnaire.
20    Q.  Okay.  And that's a -- it's not just one page, is it?
21    A.  No, there should have been several.
22    Q.  All right.  Well, we can -- we can show you -- we can show
23    you the rest.  But for this first page, what -- what does the
24    patient fill in there at the top that identifies them and tells
25    us what date we're talking about and that sort of thing?
```

1    A.  Their patient name and address and phone number.

2    Q.  All right.  And this particular -- this particular patient

3    indicates a Brianna Lindhorst, is that correct?

4    A.  Correct.

5    Q.  And the date is May 9th, 2016, correct?

6    A.  Yes.

7    Q.  All right.  And is there a place for the patient to

8    indicate what they're there for?

9    A.  Yes.

10   Q.  And where do we see that?

11   A.  Right under where it says "Reason For Today's Visit."

12   Q.  All right.

13          MR. PRATT:  Could you blow -- could you expand that,

14   Ms. Ouellette?

15   BY MR. PRATT:

16   Q.  So I see there's an X on the top, top left, is that

17   correct?

18   A.  Yes.

19   Q.  "Renew current medication at same dose," is that -- is

20   that a recommendation that's coming from you as the MA?

21   A.  No, that was from the patient that they want their same --

22   same medication, the same dose.

23   Q.  Okay.  So the patient says this is going to be one of

24   those refill visits?

25   A.  Correct.

1    Q.  Okay.  All right.  Let's go forward to page 125, which

2    would be the second page.

3            MR. PRATT:  And if you can blow up -- if you could

4    blow up the top half, Ms. Ouellette.

5    BY MR. PRATT:

6    Q.  Okay.  And so there's a number of questions about

7    describing pain and -- and coping methods and that sort of

8    thing, correct?

9    A.  Correct.

10   Q.  All right.  And the patients were expected to fill out

11   this paperwork before they came to you, the medical assistant,

12   correct?

13   A.  Correct.

14   Q.  All right.  Let me ask you this.  Were there ever any

15   times where any patients, that they -- that they left out

16   sections or didn't -- didn't fill it all in?

17   A.  Yes.

18   Q.  Okay.  It sounds -- you -- you say that.  Is that a rare

19   thing or did that happen quite a bit?

20   A.  There were some patients that either forgot about it or

21   just didn't fill it out until they got back to the room.

22   Q.  All right.  And as a medical assistant, what was your

23   responsibility when the patient doesn't fill -- doesn't fill

24   all the sections in?

25   A.  We go through every section to make sure it was supposed

1    to be filled out.  If it wasn't, then we talk to the patient

2    and filled it out.

3    Q.  Okay.  That -- that's what you're supposed to do?

4    A.  Correct.

5    Q.  Okay.

6         MR. PRATT:  Could you please move to the next page,

7    126 I think.  All right.  And if you could -- could again blow

8    up the top half.  All right.

9    BY MR. PRATT:

10   Q.  I notice it says up near the top for Ms. Lindhorst's

11   social state, social history, there's a question in the second

12   line there.  And just so you know, this is -- this is not

13   your -- this is not your patient visit, okay?  I'm asking you

14   the way procedures work, okay?  See the second line on the

15   left?  Can you read that for the record?  What does it say?

16   A.  It says "Currently pregnant."

17   Q.  Okay.  And what did Ms. Lindhorst indicate as to whether

18   she was currently pregnant?

19   A.  She did not.

20   Q.  Okay.  So that's one of these things that you say

21   sometimes people leave off, correct?

22   A.  Correct.

23   Q.  All right.  And I -- I hate to go back to page 1, but can

24   we assume that this woman was in her -- this woman was in her

25   20s and would be childbearing years if her birth date was in

```
1    1988?

2    A.  Yes.

3    Q.  Okay.  All right.

4         MR. PRATT:  So let's move to the next page and do the

5    bottom half please.

6    BY MR. PRATT:

7    Q.  I notice on page 127 it's like we have the -- we have the

8    pregnancy question again on the bottom left.  Do you see that?

9    A.  Yes.

10   Q.  Do you know, is there any reason that the question would

11   be asked twice on -- on the forms?

12   A.  That I have no clue.

13   Q.  Okay.

14   A.  But it's still not filled out.

15   Q.  Okay.  And so again Ms. Lindhorst on this date says

16   pregnant, there's no box checked, correct?

17   A.  Correct.

18   Q.  What's that thing right above it?  It says "Last menstrual

19   period."  What -- what's supposed to go there?

20   A.  Her -- the date of her last menstrual period.

21   Q.  Okay.  And that -- that, of course, is information as an

22   MA you'd want to have, correct?

23   A.  Correct.

24   Q.  All right.  I see that's blank too, correct?

25   A.  Correct.
```

1    Q.  All right.  Did you have any -- did you have any special

2    training from Dr. -- from Dr. Pompy that -- that this or any

3    other question was one that was really important that it be

4    filled in or was it just -- tell -- tell us what your training

5    was on that point.

6    A.  Our training was to make sure everything and every section

7    of the paperwork was supposed to be filled out.

8    Q.  Okay.  Nothing more important than other parts?

9    A.  Correct.

10   Q.  Okay.  All right.  Let's -- let me go back to, if you

11   could, for Government's Exhibit 130.  And is this in -- was

12   this in an area, an office where -- that you -- that you were

13   working or was this someone else's office?

14   A.  I can't tell 'cuz there was a couple different offices

15   that had those kind of setup.

16   Q.  Okay.  All right.  Well, whether or not it's yours, can

17   you describe what the setup was in the office that you had?

18   A.  I had two computers.  One, like I said, was for the

19   patient portal and the other one was for the patient's

20   information.

21   Q.  Okay.  And were you the only person that worked in this

22   office or was there someone else who worked in the same office

23   with you?

24   A.  No, there was somebody that worked in the same office as

25   me.

```
1    Q.  Did they have their own desk and their own two computers
2    as well?
3    A.  No, not two computers.  The only one that had that was me.
4    Q.  Okay.  Why did you have two and other people had one?
5    A.  One was to do prior authorizations for medications.
6    Q.  Ah, okay.  You mentioned the word patient portal.  What --
7    what -- I'm going to detour a bit.  What's a patient portal and
8    what -- what's used -- that used for?
9    A.  That tells us the patient -- what patient is to be seen at
10   what time and what they're supposed to be there for.
11   Q.  Okay.  Did it give you access to the patients's medical
12   chart?
13   A.  Yes, we had -- we had medical information for that.
14   Q.  Okay.  All right.  So you had the two people, you each had
15   a computer, you had two computers because of your prior
16   authorization.  Where would the patients come in to be -- to be
17   seen by you and then by Dr. Pompy?
18   A.  They would come in through the office and sometime there
19   was a side door that they would come through.
20   Q.  Okay.  I'm talking about specifically where you were when
21   you first saw them, okay?
22   A.  When I first saw them they came through the office.
23   Q.  All right.  And was your office -- did your office have a
24   door and four walls or was it --
25   A.  Yes.
```

1    Q.  All right.  And you say there were two.  Was the other
2    woman in there -- what was her job title?
3    A.  MA.
4    Q.  All right.  So you had two MAs in there.
5            What would happen in terms of patients, was it one
6    patient at a time?
7    A.  Yes.  There was never two patients in one room at one
8    time.
9    Q.  Okay.  But sometimes they would be your patients?
10   A.  Yes.
11   Q.  And sometimes --
12   A.  We would trade on and off.
13   Q.  And there would be other MAs' patients?
14   A.  Correct.
15   Q.  Can you describe what the other -- can you describe what
16   the other offices were for -- the other examining rooms, if you
17   will, what they looked like that the other MAs used?
18   A.  Some just had a curtain on them, some had doors.
19   Q.  Okay.  When you say some had a curtain on it, can you
20   describe that in a little more detail?
21   A.  Just like a emergency room door, curtain is what they had.
22   Q.  Okay.  And that's where these other MAs would sometimes
23   see the patients?
24   A.  Correct.
25   Q.  All right.  Okay.  So -- so the patient -- the patient

1    gives -- do they give you the -- the form?

2            MR. PRATT:  You can put that down.

3    BY MR. PRATT:

4    Q.  Do they give you the patient form, the -- the print -- the

5    written patient form that they filled out?

6    A.  Yes, they gave -- they hand it to us and we input all the

7    information into the computer.

8    Q.  All right.  So it's your job then.  How do you put the

9    information on that patient form in the computer?

10   A.  We type everything in their spots that ask the different

11   questions and we type it all in.

12   Q.  Okay.  Does the -- that questionnaire we saw, does that

13   get scanned in somehow?

14   A.  Yes.

15   Q.  Who does that?

16   A.  The MAs, we're supposed to.

17   Q.  Okay.  So you scan that in and then you also make entries

18   typed in the computer?

19   A.  Correct.

20   Q.  All right.  I want to make sure I get an idea of all the

21   other paperwork.  So you're doing this before Dr. Pompy even

22   comes around, right?

23   A.  Correct.

24   Q.  All right.  What else do you do before Dr. Pompy comes

25   around?

1   A.  We run a MAPS on some patients and we do urine drug

2   screens.

3   Q.  Okay.  Let's break those two down.  When you say run a

4   MAPS, what -- you said on some patients.  Can you tell me why

5   it would be that you would run a MAPS on this patient and not

6   on that patient?

7   A.  Sometimes we would get a phone call saying certain

8   patients were selling their drugs, and so we would run a MAPS

9   to see if they were getting multiple prescriptions from other

10  doctors or other pharmacies as well.

11  Q.  Okay.  So you'd have a specific tip that maybe -- maybe I

12  ought to run the MAPS and see what else is going on?

13  A.  Correct.

14  Q.  If there wasn't a specific tip, would you generally run

15  MAPS or just sometimes?

16  A.  Just sometimes.

17  Q.  Okay.  And then now you said you had another -- you had

18  another document.  What was that?

19  A.  The urine drug screen.

20  Q.  Okay.  Tell me what's going on with the urine drug screen,

21  how is that -- how is that document generated?

22  A.  If they were on prescription drugs, we would run a drug

23  screen to make sure they were taking the required medication

24  that Dr. Pompy put them on.

25  Q.  Okay.  And so if you could look at Government's Exhibit --

1      MR. PRATT:  If you could put up Government's

2  Exhibit 13, same exhibit which has been admitted, page 245.

3  BY MR. PRATT:

4  Q.  All right.  Can you see that?

5  A.  Yes.

6  Q.  And can you identify that?

7  A.  Yes.

8  Q.  What is it?

9  A.  The Opioid Monitoring Prelim Report.

10  Q.  Okay.  And that is something you would get from the people

11  that were doing the drug screens in the office?

12  A.  Correct.

13  Q.  All right.  And you'd have that before the patient --

14  typically before the patient was seen?

15  A.  Yes.

16  Q.  All right.

17      MR. PRATT:  Your Honor, I would move the admission of

18  page -- it's not up.

19      THE COURT:  Which one, what number is this?

20      MR. DONNINI:  This one is in, right?

21      MR. PRATT:  Yes.

22      THE COURT:  Oh.

23      MR. PRATT:  It's still 13, it's still 13; it's just a

24  different page of 13.  You have Exhibit 13.

25      THE COURT:  Sorry about that.

```
 1              MR. PRATT:  It's page 245.
 2              THE COURT:  If that's in, it's now in front of the
 3    jurors.  Go right ahead.
 4              MR. PRATT:  All right.  So if you can focus on the
 5    top half, Ms. Ouellette, so we can -- at least we can see it.
 6    BY MR. PRATT:
 7    Q.  So we're still in Ms. Lindhorst's patient file, and it
 8    has -- it has a date -- it has the date the sample was
 9    obtained, is that correct?
10    A.  Yes.
11    Q.  And this particular one is -- would be September 8, 2015.
12              And I see something written, handwritten there, 2A
13    and 2B.  Can you tell me what 2A and 2B stands for?
14    A.  2 -- the 1B is for illicit substance, which is positive
15    for THC.
16    Q.  Okay.  So that's going to be marijuana?
17    A.  Correct.
18    Q.  And in 2015 that was an illicit substance, correct?
19    A.  Correct.
20    Q.  All right.  And then the 2A, what does that stand for?
21    A.  2A's not up here.  I can't see that.
22              MR. PRATT:  All right.  If you could lower -- if you
23    do the -- lower -- lower it a little bit.
24    A.  And 2A is appropriate prescribed substance, which was she
25    was negative for, which means she was not on the medication she
```

1   was prescribed.

2   BY MR. PRATT:

3   Q.  Okay.  So -- and I see a handwritten RX Percocet means

4   what?

5   A.  Percocet.

6   Q.  She was prescribed Percocet?

7   A.  Correct.

8   Q.  But according to this initial drug screen, the -- she's --

9   she's not -- she doesn't have any Percocet in her urine?

10  A.  Correct.

11  Q.  All right.  Was that something that was unusual that you

12  saw or was that a fairly common occurrence in this practice?

13  A.  Fairly common occurrence with -- with some patients.

14  Q.  Okay.  So you'd have -- you'd have this information.  What

15  would you -- what other -- what other documents would you deal

16  with before Dr. Pompy even saw the patient?

17  A.  We'd make sure the prescriptions were ready so all he had

18  to do was sign them.

19  Q.  Okay.  So when you say you'd make sure the prescription

20  was ready, what would you do?

21  A.  We'd print them out and then Dr. Pompy would come in and

22  look at them, sign them, make sure it was for the correct

23  amount.

24  Q.  Okay.  So I'm a little bit wondering, it's like you

25  have -- and again, this wasn't your thing, but you -- you

1    have -- you have the questionnaire that may -- may or may not

2    have empty things, you have a urine drug screen that says

3    the -- the drug is not in the urine, and it was the practice

4    that you -- that you do what with the -- with the

5    prescriptions?

6    A.   Correct.

7    Q.   That -- that you do what, what was your job?

8    A.   Our job was to print the prescriptions out.

9    Q.   Okay.  So you've already printed the prescriptions out as

10   if they're going to get the medication anyway?

11   A.   Correct.

12   Q.   All right.  So they're all ready for him to sign when he

13   comes in the room?

14   A.   Correct.

15   Q.   All right.  Was there a different type of drug test result

16   that you would -- that you would have access to?

17   A.   Not that I recall.

18   Q.   All right.  Well, let me see if -- I'm going to show you

19   something, and again this is going to be from, let's see,

20   Government's Exhibit 7, so we can --

21            MR. PRATT:  And this is a new one, Your Honor.

22            THE COURT:  Okay.  Let's take a look at 7.

23            MR. PRATT:  Look at 7, page 1 -- if you could look at

24   page 179, Ms. Ouellette.

25            THE COURT:  Are you familiar with that, witness?

1      MR. DONNINI:  Your Honor, the -- there's no objection

2   to Government Exhibit 7.

3      THE COURT:  Okay.  7 appears to be a patient chart

4   for Ms. Oldham and we'll receive that.  Thank you, Mr. Donnini.

5      And go right ahead, Mr. Pratt.

6      MR. PRATT:  Okay.

7   BY MR. PRATT:

8   Q.  Is this a different type of drug test result?

9   A.  Yes.

10  Q.  All right.  And what type of drug test result is this?

11  A.  This one I'm not quite positive about because I don't

12  remember this one.

13  Q.  Okay.  You don't remember that type of form?

14  A.  No.

15  Q.  But were -- were there something called confirming drug

16  tests?

17  A.  Yes.

18  Q.  All right.  Tell me what the confirming drug test was.

19  A.  It would confirm whether they were on the prescription

20  drug that they were prescribed.

21  Q.  Okay.  Because the one, the first one we saw with the

22  handwritten, that was just in the office?

23  A.  Correct.

24  Q.  How would you get access to the confirming drug tests?

25  Obviously that's not going to be the same -- is that going to

1    be the same day the patient's there?

2    A.  They had to send it off --

3    Q.  Okay.

4    A.  -- to the lab.

5    Q.  All right.  So how are you going -- when and how are you

6    going to access one of these confirming drug tests?

7    A.  It should have been in the patient's chart.

8    Q.  All right.  And so whose responsibility was it to look and

9    see if there was a -- if there was a confirming drug test in

10   the patient's chart?

11   A.  Should have been the MA.

12   Q.  All right.  Should have been you, right?

13   A.  Yes.

14   Q.  And if we look on this particular one, if you could look

15   on the middle, okay, we see here in the middle of the page,

16   the -- the top one it says -- on the report says "Detected:

17   Cocaine; Illicit: Yes; Test Outcome: Positive."  Is that

18   correct?

19   A.  Correct.

20   Q.  All right.  And did that happen sometimes during the

21   patients you saw at Dr. Pompy's clinic?

22   A.  Yes, some would come back with cocaine.

23   Q.  All right.  And I'm asking you if a -- if you see a test

24   result with cocaine, does that change anything in terms of

25   whether or not you're supposed to have the prescription all up

```
1    and ready for him to sign?

2    A.  It should, yes.

3    Q.  All right.  How -- what changes?

4    A.  I should not print the prescription out.  You should talk

5    to the doctor and let him know what the test results were.

6    Q.  Okay.  And then the doctor will make a decision given that

7    it's the MA's job to alert him?

8    A.  Correct.

9    Q.  All right.  In your experience, did people who were

10   positive for cocaine, were they still able to get a

11   prescription for controlled drugs?

12   A.  Yes.

13   Q.  Would that be just rarely or would that be pretty much --

14   how -- how -- how -- what -- what percentage?

15   A.  It was not all the time.

16   Q.  How close to all the time?

17   A.  I would say roughly less than half the time.

18   Q.  Okay.  Okay.

19            MR. PRATT:  Let's -- let's go to -- back to

20   Government's Exhibit 13 and if you could pull up page 253.

21            Oh, I'm sorry.  Before we do that, let's go back

22   to -- let's go back to Ms. Oldham.  I wanted to get the date,

23   the same page, 179.

24   BY MR. PRATT:

25   Q.  Can we get the date on that?
```

1   A.  The collection date was 5-24 of 2016.

2   Q.  Okay.  All right.

3          MR. PRATT:  And -- and could you look then in the

4   same chart, page number 1262?

5   BY MR. PRATT:

6   Q.  All right.  And on the collection date, that shows -- that

7   shows what for 5-24-16?

8   A.  I'm sorry, what was your question?

9   Q.  The question was what does this show happened on 5-24 of

10  2016?

11  A.  That she was prescribed Percocet.

12  Q.  Okay.  All right.  Now I want to go ahead to Government

13  Exhibit 13, Brianna Lindhorst, page 253.

14         MR. PRATT:  And could you do the test results in the

15  middle of the page?

16  A.  Test results were negative but positive for cannabinoids

17  and cocaine.

18  BY MR. PRATT:

19  Q.  All right.  So negative.  This is one of those where not

20  positive for -- not positive for the drug prescribed, correct?

21  A.  Correct.

22  Q.  All right.  And if someone was not positive for a drug

23  prescribed, would you still -- would the MA still print up the

24  prescription and have it ready for the doctor?

25  A.  They should not have.

1    Q.  Okay.  And if the doctor made a decision to go ahead and

2    prescribe even though it's not there, that would be the

3    doctor's decision?

4    A.  Correct.

5    Q.  All right.  And what's the date we have on this?

6          MR. PRATT:  Could you go to the top?

7    A.  Collection date was 5-16-2016.

8    BY MR. PRATT:

9    Q.  Okay.  All right.  Let's go to -- let's go on Ms.

10   Lindhorst.  Let's -- let's go back to the -- the question

11   you -- we had about we noticed on Ms. Lindhorst that at least

12   on one date the pregnancy questions were not filled in,

13   correct?

14   A.  Correct.

15   Q.  All right.  And you're saying that would not have been the

16   proper procedure for an MA like yourself?

17   A.  Correct.

18   Q.  What's Dr. Pompy's role in that?  Does Dr. Pompy look at

19   the -- at the four-page questionnaire and say, hey, there's a

20   problem here?

21   A.  No.

22   Q.  Why not?

23   A.  It was our job to make sure everything was filled out for

24   him.

25   Q.  Okay.  Does Dr. Pompy look at the four-page questionnaire?

1          MR. DONNINI:  Your Honor, asked and answered.

2          MR. PRATT:  I don't --

3          THE COURT:  I'll allow it.  If you know the answer,

4    go ahead, witness.

5          THE WITNESS:  Can you repeat the question please?

6    BY MR. PRATT:

7    Q.  Yes.  Would Dr. Pompy look at that four-page questionnaire

8    when he's typically seeing a patient?

9    A.  No, it should already have been filled out and everything

10   been put in the computer already before he got in the room.

11   Q.  Okay.  So he's not looking at it.  So -- so what does he

12   look at?  What does he have access to when he's in the room

13   with the patient?

14   A.  The prescriptions and any urine drug screen that we pull

15   up.

16   Q.  Okay.

17   A.  And any MAPS.

18   Q.  All right.  And you're going to have that in paper form

19   for him?

20   A.  Correct.

21   Q.  All right.  If there was some sort of question or he

22   wanted to check back and see what happened the last month or

23   the month before or the month before, does he have any way that

24   he could do that if he wanted to?

25   A.  It should have been in the patient's chart.

1   Q.  All right.  And how does he access the patient chart when
2   he's in the room with the patient?
3   A.  Sometimes he would come over and look at the computer with
4   me.
5   Q.  Okay.  So you had that patient portal and you could do
6   that?
7   A.  Correct.
8   Q.  Did he also have an electronic device that gave him access
9   to the patient charts?
10  A.  I believe he had a small computer.  I'm not sure.  I don't
11  remember back that far.
12  Q.  Okay.  All right.  And so now, Ms. -- let -- let me ask
13  you about what -- what documents you typically did not have
14  access to or did not review as an MA, okay?  Would you -- would
15  you as an MA typically go through the entire patient file and
16  see everything that was there before you saw the patient?
17  A.  Yes.
18  Q.  All -- all -- if they've been coming for years, you would
19  look at every single --
20  A.  No, not every single one; just the -- just the month
21  prior.
22  Q.  Okay.  That's what I wanted to get to.  All right.  And
23  how about if there was something called patient notes or
24  hospital consultation, would that be something that the -- that
25  you would look for?

```
 1    A.  Not that I'm aware of.

 2    Q.  All right.  And if I could show you again, this is part of

 3    the admitted exhibit, Government's Exhibit 13, page 1413 in the

 4    patient record.

 5            MR. PRATT:  All right.  If you go up at the top.  All

 6    right.

 7    BY MR. PRATT:

 8    Q.  And does this -- this kind of form look familiar to you at

 9    all?

10    A.  No.

11    Q.  Not the type of thing that MAs would have access, would

12    normally review?

13    A.  Not that I'm aware of, no.

14    Q.  Okay.  I notice halfway down at the bottom of this it says

15    a date of service of November 3rd, 2015.  You see that?

16    A.  Yes.

17    Q.  And it says "Hospital Inpatient Services"?

18    A.  Yes.

19            MR. PRATT:  All right.  If we could go down and blow

20    up rest of it, Ms. Ouellette.

21    BY MR. PRATT:

22    Q.  Okay.  So we have -- we have -- for Ms. Lindhorst we have

23    in the middle there "History of Present Illness."  You see that

24    section?

25    A.  Yes.
```

1    Q.  And it says on the middle line after -- under "History of

2    Present -- Present -- Present Illness," it says "s/p,

3    c-section."

4    A.  Yes.

5    Q.  Correct?

6          And then the line before that it says "history of

7    chronic pain, opioid dependence," correct?

8    A.  Correct.

9    Q.  All right.  And this was not the type of thing that the

10   MAs would look at or bring to the doctor's attention?

11   A.  No.

12   Q.  All right.  Let me ask you, were there people that as an

13   MA you knew were opioid dependent?

14   A.  Yes.

15   Q.  And how did you know that?

16   A.  Someone come in just looking just like they were drugged

17   up.

18   Q.  Okay.  So there were those people.  What percentage of the

19   practice was that?

20   A.  I'm going to say not even -- not half, but I mean we have

21   our normal patients that would -- that would walk in and, like

22   I said, for the regular refills.

23   Q.  All right.  Not half, like what?

24   A.  Maybe three-quarters maybe or not -- no, not even half.  I

25   wouldn't say half were drugged up because half of them weren't

```
 1   drugged up, but there was a majority of them that looked like
 2   they were just higher than a kite.
 3   Q.  Okay.  So you didn't really need this -- this hospital
 4   chart?
 5          MR. DONNINI:  Your Honor, leading.
 6          MR. PRATT:  All right.  I'll move on, Your Honor.
 7          THE COURT:  Okay.
 8          MR. PRATT:  Could we go down to the bottom of this --
 9   this exhibit page before we cover it?
10          (Brief pause)
11          All right.  All right.  I'm sorry, that's enough --
12   that's enough for that.
13   BY MR. PRATT:
14   Q.  So -- so we have this note from the hospital's consult,
15   Dr. Pompy's hospital call -- consult on November 3rd, 2015.
16   Let me ask you this.  If we go back less than a month in this
17   patient chart --
18          MR. PRATT:  Ms. Ouellette, could you pull up page
19   1060 from Ms. Lindhorst's patient chart and blow that up for
20   us?
21   BY MR. PRATT:
22   Q.  Can you tell us what that is?
23   A.  A prescription for Ultram 50 mg tablet.
24   Q.  Okay.  And how did these prescriptions get in the patient
25   chart of Ms. Lindhorst or any other patient?
```

1    A.   It would have had to have been done either by an MA or by

2    Dr. Pompy himself.

3    Q.   Okay.  I'm just talking about the recordkeeping part.  How

4    is it -- do they get scanned in, do they get -- how do they get

5    fed into the computer, the -- the -- into the patient portal?

6    A.   They should have got scanned in.

7    Q.   Okay.  By who?

8    A.   By the MA.

9    Q.   All right.  So here we have -- here we have a Dr. Pompy

10   prescription for Ultram on October 8th, which is less than a

11   month before that C-section report, correct?

12   A.   Correct.

13   Q.   All right.

14          MR. PRATT:  And could you go to the next page, Ms.

15   Ouellette?

16   BY MR. PRATT:

17   Q.   And what is this?

18   A.   Percocet.

19   Q.   Okay.  And so that's also one of these opioid pain

20   medications?

21   A.   Correct.

22   Q.   And it was also prescribed for Ms. Lindhorst on what date?

23   A.   October 8, 2015.

24   Q.   And again we're talking about a little less than a month

25   before the C-section report?

Case 2:18-cr-20454-SJM-RSW   ECF No. 77, PageID.1176   Filed 12/05/22   Page 46 of 83
Jury Trial Excerpt: Volume 2 • Monday, November 28, 2022

46

1    A.   Correct.

2    Q.   All right.  Let -- me ask you this.  In your practice --

3    in your work there as an MA, did you ever experience this?  Did

4    you ever see someone who was getting controlled drugs a month

5    before they gave --

6    A.   No, I did not.

7         THE COURT REPORTER:  Wait, wait.  You cut him off.

8    "...before they gave..."

9         MR. PRATT:  Delivery.

10        THE COURT REPORTER:  Thank you.

11   Q.   Was this something that was ever brought to your attention

12   in training as kind of a warning, like we've had this problem,

13   we need to be really careful about this?

14   A.   No.

15   Q.   And Brianna Lindhorst is not a name that sort of rings a

16   bell of someone that there was a big -- big training or a big

17   concern about in the practice?

18   A.   No.

19   Q.   Okay.  I think you were -- I think you were prescribing --

20   you were talking about describing the -- the patient population

21   a little bit.  You said some people appeared to be basically --

22   you described some patients seemed to be impaired in some way?

23   A.   Yes.

24   Q.   All right.  Let me ask you -- let me ask you this.  Can

25   you describe the patients in another -- in -- in other terms?

1   What -- what kind of -- what kind of ages are we talking about

2   for the patient population?

3   A.   There was different ages.  It ranged -- excuse me --

4   ranged from young to older.

5   Q.   Okay.  So -- so was there -- was there a young element

6   segment of the population?

7   A.   There was a few, yes.

8   Q.   All right.  How about how well people got around?  And

9   again, I know it's going to be a range, but can you describe

10  what you saw in terms of whether people could walk in, walk

11  out?

12  A.   There were some that came in in wheelchairs.  Most of our

13  population, patient population walked in through the doors with

14  no assistance needed.

15  Q.   Okay.  So you're saying most, but there were some people

16  that needed assistance?

17  A.   Correct.

18  Q.   All right.  I know that you -- you talked -- about we

19  spent quite a bit of time talking about the pain patients and

20  talking about the -- the people that were there for their

21  refills.  Did Dr. Pompy have another aspect of his -- of his

22  practice, treated people for another thing other than the pain?

23  A.   He would do pain blocks.

24  Q.   Okay.  But that was for the pain patients?

25  A.   Correct.

Case 2:18-cr-20454-SJM-RSW  ECF No. 77, PageID.1178  Filed 12/05/22  Page 48 of 83
Jury Trial Excerpt: Volume 2 • Monday, November 28, 2022

48

1    Q.  Were there other patients that were not there specifically

2    for the pain?

3    A.  They were there for withdrawals too.

4    Q.  Withdrawals.  Okay.

5         And if you can help us out, people who are there who

6    have -- when you say they're for withdrawals, what was their

7    issue?

8    A.  They were coming off of -- they needed to come off of like

9    cocaine or whatever they were on.

10   Q.  Okay.  They needed to come off.

11        And they were -- and how did Dr. Pompy treat the

12   patients that were addicted and trying to be not addicted?

13   A.  He would put them on a certain medication.

14   Q.  All right.  And then do you recall the name of that

15   medication or recall the name --

16   A.  I want to say Subsys.

17   Q.  Could it be Suboxone or --

18   A.  Suboxone, yes.

19   Q.  -- or Zubsolv?

20   A.  Yes.

21   Q.  Okay.  All right.  I know the names are confusing, to me

22   at least.

23        And so he had some people that were there to get

24   their medication because -- to treat their addiction basically?

25   A.  Correct.

1    Q.  All right.  So those are -- and as compared to the people

2    that are there for pain, are we talking about -- you -- you --

3    I think you said before most are there for pain.  What -- what

4    percentage would be there for this addiction treatment?

5    A.  About 50 to 75 percent.

6    Q.  Of the whole patient population?

7    A.  For the substance or for the Suboxone.

8    Q.  Okay.  Do you know if there was a limit as to how many of

9    those patients he could have?

10   A.  There was a limit but I don't remember what that number

11   was.

12   Q.  You don't remember what the number was.

13          Was there ever a problem with that limit while you

14   were working there?

15   A.  Yes.

16   Q.  What was the problem?

17   A.  There was too many patients that were coming in for that.

18   Q.  So over the limit?

19   A.  Over the limit.

20   Q.  Or under?

21          All right.  What were you asked to do?  Were you

22   asked to do anything about that if he has too many of these

23   addiction patients?

24   A.  We were told to put them -- put them down for pain.

25   Q.  Okay.  I need to have you break that down a little bit,

1    okay?  So when you say put them down for pain, what does that

2    mean?

3    A.  Instead of them coming in for being -- coming off the

4    medication, they would put them down for pain so they could see

5    more patients.

6    Q.  Okay.  So this would be an entry in the patient chart?

7    A.  Correct.

8    Q.  It would be the reason they were getting prescribed this

9    particular opiate?

10   A.  Correct.

11   Q.  And your instructions from -- were from who?

12   A.  Dr. Pompy.

13   Q.  And what did Dr. Pompy want you to do in the patient

14   record?

15   A.  Just to put that they were there for pain.

16   Q.  All right.  And was that true?

17   A.  No.

18   Q.  So he wanted you to put something that wasn't true in the

19   patient chart?

20   A.  Correct.

21   Q.  And that was because he had this -- and why did he want

22   you to do that?

23   A.  There was too many patients coming in for -- being treated

24   for being on opiates.

25   Q.  All right.  So you made these -- you made -- you made

1   these false entries?

2   A.   Yes.

3   Q.   And why did you do that?

4   A.   I was told to do so.

5   Q.   Okay.  By who?

6   A.   Dr. Pompy.

7   Q.   Were there patients that sometimes would check a different

8   box on the form?  Instead of a renewal they might want -- they

9   might want increased medications of some kind.

10  A.   Correct.

11  Q.   All right.  That -- that was an option on the form, right?

12  A.   Correct.

13  Q.   And what would happen with those kinds of patients?

14  A.   Those patients would take longer to see 'cuz they wanted

15  their medications changed.

16  Q.   Okay.  And what would be the -- what would be the end

17  result of patients saying, "Look, I want either a stronger

18  medication or another medication"?

19  A.   Sometimes it was changed and sometimes he would do a pill

20  count for them.

21  Q.   Okay.  What's a pill count?

22  A.   A pill count is once you're prescribed a medication, say

23  if it was one week prior or a month prior, he might ask you to

24  bring the medication in for a pill count to make sure that

25  they're not taking too much of one.

1    Q.   Okay.  In your experience, were the pill counts done on

2    the date of the visit?

3    A.   No, not always.

4    Q.   Not always.  Okay.

5         Sometimes they were done not on the date of the

6    visit?

7    A.   Correct.

8    Q.   Okay.  At the end of all this, can you give me an idea of

9    how often if somebody wanted more pain medication, what

10   percentage of times he'd go ahead and write them another

11   script?

12   A.   Not all the time, not even half of the time.

13   Q.   Okay.  All right.  Let's -- let's talk about those.  I

14   want to go back and talk briefly about those patients that were

15   on the Suboxone or on the detox, the addicted patients, okay?

16   A.   Okay.

17   Q.   Did you ever get any calls from pharmacies about those

18   particular patients?

19   A.   Yes.

20   Q.   All right.  Tell us, tell us what would happen and why you

21   would be getting a call from a pharmacist.

22   A.   The patient was on too many medications when they were

23   only supposed to be on a certain medication and they were on

24   two or three different other medications along with that.

25   Q.   Okay.  So if we can break that down, I know you're saying

1  medications, but can we be more specific?  They were on the
2  Suboxone or the Zubsolv, correct?
3  A.  Correct.
4  Q.  And that was supposed to get them off pain medications --
5  A.  Correct.
6  Q.  -- correct?
7      And the pharmacist would call and say, well, they're
8  not only getting the anti-addiction drug, they're also getting
9  what?
10 A.  The narcotic.
11 Q.  So they're getting the very narcotic that they're supposed
12 to be getting off from?
13 A.  Correct.
14 Q.  And Dr. Pompy was prescribing all of those?
15 A.  Yes.
16 Q.  And so the pharmacy would call up and say what to you?
17 A.  They would tell me that there was too many -- the patient
18 was on too many medications and that they needed to be taken
19 off of some.
20 Q.  Okay.  And what did you do about that when you get that
21 kind of call from a pharmacy?
22 A.  I told Dr. Pompy.
23 Q.  And what was Dr. Pompy's response to that?
24 A.  Just to do my job and not to worry about it.
25 Q.  Did he have any particular kind of attitude towards you

1    when you said, hey, there's this problem that the pharmacists

2    are bringing up?

3    A.   It wasn't really an attitude.  He just got mad.

4    Q.   Okay.  He was mad at who?

5    A.   At me for bringing it up I guess.

6    Q.   Okay.  And in response to that when you ever brought up

7    that problem, did he -- did he ever change anything for those

8    patients, go change their -- anything?

9    A.   No, not all the time.

10   Q.   Okay.  We -- we talked about and I already showed you one

11   of those test results where the person is negative for the

12   controlled substance.  What would typically happen when someone

13   was negative for something that should have been in their urine

14   in terms -- the -- the drug that had been previously

15   prescribed?

16   A.   They were supposed to be weaned off the medication and

17   dropped down a week or two.

18   Q.   Okay.  Well, let's talk about the dropped down a week or

19   two.  What does that mean?

20   A.   You would go from a four-week down to two weeks.

21   Q.   Okay.  So the patient's not got the drug in their

22   bloodstream, let's say it's the -- let's say it's the Percocet,

23   okay?

24   A.   Okay.

25   Q.   They're getting a four-week supply.  How many pills might

1    that be?

2    A.  Might be 90.

3    Q.  Okay.  So they don't have any Percocet in their -- in

4    their urine, so what -- what's this knocking down, what does

5    that mean?  What's the prescription look like?

6    A.  The prescription should be knocked down from a four-week

7    down to a two-week or a three-week.

8    Q.  Okay.  So they get the same drug, Percocet?

9    A.  Correct.

10   Q.  They get the same strength of drug?

11   A.  Correct.

12   Q.  They just get a fewer weeks supply of it?

13   A.  Correct.

14        MR. DONNINI:  Your Honor, are we talking about a

15   hypothetical patient or some specific patient, because there's

16   all kinds of different scenarios, Your Honor.

17        THE COURT:  It seems like we're talking about general

18   practice, but you may want to clarify that because I think the

19   point Mr. Donnini makes is a good one.  There were many

20   different patients.

21        But go right ahead, Mr. Pratt.

22   BY MR. PRATT:

23   Q.  Would you say -- would you say that was a general practice

24   of what he would do?

25   A.  Yes.

1    Q.  Okay.  How about the -- how about the option of just

2    saying no more -- no more pills and you cannot -- you cannot

3    come back to this practice?

4    A.  He's never refused anybody except for one or two patients.

5    Q.  All right.  And you worked there for how long?

6    A.  A year.

7    Q.  All right.  And maybe one or two patients he just said,

8    "We're done"?

9    A.  Correct.

10   Q.  And the rest of them, he would still deal with them?

11   A.  Yes.

12   Q.  They'd still get prescriptions?

13   A.  Yes.

14   Q.  I want to ask you about the -- about the urine sample,

15   the -- the -- the urine testing.  Now, did you -- were there

16   separate people that worked down at that part of the -- part of

17   the office?

18   A.  Yes.

19   Q.  And they were the ones that would send you the form that

20   we saw?

21   A.  Correct.

22   Q.  All right.  Would -- did you ever -- did you ever have a

23   conversation with Dr. Pompy about something that was going on

24   down there in the hallway where the urine was?

25   A.  We had told him that people are selling their -- selling

Case 2:18-cr-20454-SJM-RSW   ECF No. 77, PageID.1187   Filed 12/05/22   Page 57 of 83
Jury Trial Excerpt: Volume 2 • Monday, November 28, 2022

57

1    their urine out in the hallway.

2    Q.  All right.  Selling their urine in the hallway?

3    A.  Yes, that's what we were told.

4    Q.  All right.  And so obviously that would be -- was that a

5    concern to you at all?

6    A.  Yes.

7    Q.  Why, why was that?

8    A.  Why would you want to sell your urine just to get drugs?

9    Q.  Okay.  Did you raise that with Dr. Pompy and say --

10   what -- what -- tell us what you told him.

11   A.  I think it was another MA that had mentioned that to him,

12   that the people were out selling their urine in the hallway.

13   Q.  And what was his response?

14   A.  He just sort of giggled.  He thought it was funny.  He

15   didn't know if it was true or not.

16   Q.  Did he -- did he do anything to your knowledge in response

17   to that?

18          MR. DONNINI:  Your Honor, I'm going to object.  I

19   believe the testimony of this witness was I think some other MA

20   might have told him about this selling of urine, and then she's

21   testifying about what Dr. Pompy said in response.  She's not

22   even involved.

23   BY MR. PRATT:

24   Q.  Did you hear Dr. Pompy --

25          MR. PRATT:  Well, I'll clarify.

1          THE COURT:  All right.  Hold on.  Let me -- let me

2     rule on that.  The objection is that for her to testify as to

3     what the doctor said, we would have to establish that she heard

4     a question and an answer, and I think Mr. Pratt wants to

5     establish that foundation.  Go right ahead.

6          MR. PRATT:  Yes, sir.

7     BY MR. PRATT:

8     Q.  Did you hear -- did you hear Dr. Pompy laugh about it and

9     not believe it?

10    A.  Yes.

11    Q.  That -- that was you personally?

12    A.  Yes.  But I don't recall him saying anything else about it

13    to me.

14    Q.  All right.  And to your knowledge, did he do anything?

15    A.  That I am not aware of.

16    Q.  So you don't know one way or the other, right?

17    A.  Correct.

18    Q.  All right.  Were there ever any other patients in the

19    practice that were suspected of selling pills?

20    A.  Yes.

21    Q.  Tell me -- tell me how that arose.  How did you find out

22    that people would be suspected of selling pills?

23    A.  There was mysterious phone calls that came into his office

24    that said certain patients were selling their prescriptions.

25    Q.  And so what was the procedure when someone gets a phone

1    call, when someone says, hey, patient so and so is selling

2    their pills, what happens in that --

3    A.  We put it in their chart and then we tell Dr. Pompy.

4    Q.  All right.  And -- and what was Dr. Pompy's response to

5    that?

6    A.  To do a MAPS to see if they were getting multiple

7    prescriptions.

8    Q.  All right.  And what did he say once he ran the MAPS?

9    A.  It depended on what the MAPS came back.

10   Q.  Okay.  And what would happen if the MAPS came back, what

11   did he say about the subject of them selling pills?

12   A.  That we needed to do a pill count maybe.

13   Q.  Okay.  And he would do the pill count when they came in

14   for their next visit?

15   A.  Correct.

16   Q.  All right.  And did he say what else he could do about

17   people selling the pills?  Did he say whether it was anything

18   he could do?

19   A.  He did not say.

20   Q.  Okay.

21        THE COURT:  You have about five or ten more minutes,

22   Mr. Pratt, for the day.  How's that sound?

23        MR. PRATT:  That's okay, Your Honor.  Unfortunately,

24   I -- unfortunately, especially for the witness, I don't think

25   we're going to be able to get done, but I will --

```
 1              THE COURT:  That's all right.
 2              MR. PRATT:  I think I have a -- I think I do have
 3    five or ten more minutes worth.
 4              THE COURT:  I mean whenever it's an appropriate time,
 5    let me know, but we're up around 2:00 o'clock now.  Go right
 6    ahead, sir.
 7    BY MR. PRATT:
 8    Q.  Okay.  You mentioned early on you -- you had that -- you
 9    had that second computer, right?
10    A.  Correct.
11    Q.  And tell us again what that was for.
12    A.  For prior authorizations.
13    Q.  What's a prior authorization?
14    A.  There were certain medications that the patient had to be
15    on prior to being on like a narcotic.  We had to try certain
16    other medications before certain ones were covered.
17    Q.  Okay.  And so that's an insurance company rule basically?
18    A.  Yes.
19    Q.  So the insurance company won't pay for drug B until the
20    patient tries drug A?
21    A.  Correct.
22    Q.  All right.  And it was your job to do what then?  So
23    what's a prior authorization?  What are you telling the
24    insurance company?
25    A.  We tell the insurance company what has been tried and what
```

1    has not.

2    Q.  Okay.  And if you haven't followed their rules, then

3    they're not going to pay for drug B, right?

4    A.  Correct.

5    Q.  Did you ever have any instructions from Dr. Pompy as to

6    how you should do your prior authorization job?

7    A.  No.

8    Q.  Okay.  Were there ever times that you -- and how did you

9    communicate with the insurance company?

10   A.  By phone or by email.

11   Q.  Okay.  And did you ever give them any information about

12   patients trying drug A before B that was inaccurate?

13   A.  Yes.

14   Q.  What -- what kind of information would you give them that

15   was untrue?

16   A.  If they tried -- if they tried one medication which they

17   never tried.

18   Q.  Okay.  And why would you tell them something that was

19   inaccurate and not true?

20   A.  I was told to do so.

21   Q.  By who?

22   A.  By Dr. Pompy.

23   Q.  And this was part of the duties you had as your job.  If

24   he told to you lie to the insurance company, you did?

25   A.  Correct.

```
1    Q.   How much was he paying you?

2    A.   Nothing for that.

3    Q.   No, nothing extra, but what was your regular wage?

4    A.   I don't remember.

5    Q.   Okay.  But you didn't get anything extra for lying?

6    A.   No.

7    Q.   Okay.  And as a result of those lies, what would the

8    insurance company do then?

9    A.   The insurance company got word that they tried the one

10   drug and it didn't work and then we prescribed the second one,

11   they would okay that one.

12   Q.   So they would -- they would basically pay money that they

13   wouldn't otherwise pay?

14   A.   Correct.

15   Q.   All right.  Did Dr. Pompy have any -- to your knowledge,

16   did Dr. Pompy have any out-of-state girlfriends?

17   A.   I don't know if it was his girlfriend or not, but there

18   was one phone call that came in from New Jersey.

19   Q.   All right.  So you got a phone call from New Jersey, and

20   how do you know it's from New Jersey?

21   A.   The caller I.D.

22   Q.   All right.  And what's the woman from New Jersey say to

23   you?

24   A.   Was asking for pain refills.

25   Q.   For pain refills?
```

1    A.   Pain medication refills.

2    Q.   All right.  Meaning she's supposedly already getting them?

3    A.   Correct.

4          MR. DONNINI:  Objection, Your Honor.  Calls for

5    hearsay.

6          THE COURT:  Response?

7          MR. PRATT:  Response is this is a non-hearsay

8    purpose, Your Honor, to show the effect.  This is going to

9    be -- lead to a conversation with Dr. Pompy and therefore it's

10   a non-hearsay purpose.  Have to first find out what the message

11   was and then find out what his reaction was to being told that.

12         THE COURT:  Okay.  I will overrule the objection and

13   counsel the jury the truth of what the caller said from New

14   Jersey is not to be considered by you, but rather it is to be

15   considered by you as to the effect it would have on this

16   witness's subsequent behavior that she's going to describe in

17   her testimony.

18         Go ahead, Mr. Pratt.

19   BY MR. PRATT:

20   Q.   Okay.  So you get the phone call of someone from New

21   Jersey, a woman from New Jersey who wants drugs.  What did you

22   do with that?

23   A.   I told Dr. Pompy and he took the call himself.

24   Q.   Okay.  Do you know if that person was a patient in the

25   sense that they had a patient file that you could pull up?

1    A.   Not that I'm aware of.

2    Q.   So you had a person who did not have a patient file?

3    A.   Correct.

4    Q.   And they asked for what?

5    A.   Asked for pain medication.

6    Q.   And the call went to who?

7    A.   It went to Dr. Pompy.

8    Q.   And did you have anything to do with it after that?

9    A.   No, I did not.

10   Q.   All right.  Was there another woman out of state that you

11   saw talk with Dr. Pompy?

12   A.   Yes.

13   Q.   Tell us about -- tell us about that.

14   A.   She came out of state and he would sign prescriptions for

15   like a month out so she didn't have to come back.

16   Q.   Okay.  And was there anything particular about this woman?

17   Did she come at a particular time of day typically?

18   A.   More towards nighttime.

19   Q.   Okay.  She'd come in the nighttime.

20        And would she go through a regular process with an MA

21   like you, a regular patient visit?

22   A.   Yes, but she would come through the side door.

23   Q.   Okay.  And what was the advantage to her coming through

24   the side door?

25   A.   Just to get in faster I guess.

1  Q.  Okay.  And you mentioned that -- you mentioned that some

2  people, like if she's out of state, you said she got

3  prescriptions that were dated in a particular way?

4  A.  Yes.

5  Q.  Explain that to us.

6  A.  They were dated for the month out so she didn't have to

7  come back.

8  Q.  All right.  I'm going to ask you a question about some

9  other patients.  Were there some patients that -- that ever

10  came back too early for their drugs?

11  A.  Yes, some that said their prescriptions were stolen.

12  Q.  Okay.  Tell us -- tell us what too early means.  I mean

13  I -- you know, explain a little bit what that --

14  A.  If they were due for four weeks, they would come back in

15  two weeks and say, "Well, my prescription was stolen."

16  Q.  All right.  And can you tell us what Dr. Pompy did for

17  someone who came back too early, came back after two weeks and

18  wanted more pills?

19  A.  He would tell them that he couldn't do it because it was

20  too early and if they were stolen, that they needed a police

21  report.

22  Q.  All right.  Were there other patients that came back too

23  early that didn't claim that they were stolen?

24  A.  I don't recall.

25  Q.  All right.  Did you ever -- did you ever make any changes

1    in the medical records for patients that came early?

2    A.  I did not, but I do not remember.

3    Q.  Pardon?

4    A.  Not that I remember.

5    Q.  Okay.  All right.  I wanted to -- I wanted to ask you a

6    question about the drug Subsys, and I know that sometimes we

7    see --

8            THE COURT:  Why -- why -- why don't we -- why don't

9    we break there.

10           MR. PRATT:  All right.

11           THE COURT:  Okay.

12           MR. PRATT:  All right, Your Honor.  Thank you.

13           THE COURT:  Before you go in that direction.  All

14   right.  Thank you, Mr. Pratt.  And thank you, witness.  You're

15   very fortunate 'cuz you get to come down and see us again

16   tomorrow, so...

17           THE WITNESS:  Wonderful.

18           THE COURT:  Yeah, right.  We'll get you out of here

19   as soon as possible, and thank you for being on time here

20   today.

21           All right, ladies and gentlemen.  We -- I was a

22   little wound up to start the day, as you know.  I apologize for

23   that and I'm -- I'm sorry about it.  There's a lot to manage up

24   here but we're back on track.  We're going to make a fresh

25   start tomorrow and we're going to have a good, efficient and

1    fair trial for both sides of this dispute.

2         I did want to mention, and I think I -- I touched on

3    this, but with regard to the masks, I do not have a big policy

4    myself on -- on the masks.  If -- if you want to wear masks,

5    it's important that you feel free to wear a mask.  If you -- if

6    you don't want to wear a mask, I can understand that as well if

7    it interferes with your breathing, your sight, any of this type

8    of thing.

9         I think the policy of the court is that we are to

10   require our jurors to wear masks.  If your colleagues who

11   you're sitting nearby don't have a problem with you unmasking,

12   I -- I would not have a problem with that either.  But I think

13   this is a -- a -- a measure that was enacted by the court to --

14   to promote health and -- and, again, was given to us by the

15   Chief Judge.

16        So if you talk among yourselves, if you're -- if

17   you're comfortable without masks, bearing in mind that if

18   someone near you prefers masks and prefer -- if you prefer to

19   wear one yourself, do so.  I'll -- I'll leave that to your

20   discretion.

21        Let us effort to be here tomorrow morning at 8:30.

22   Now, again, I -- I got a little wound up about the time, and I

23   think the reason for that is that I am very sensitive about

24   your time and the fact that you're volunteering to be here.

25   The more efficient we are arriving on time and getting out on

1    time, the better off we'll be ending the trial and getting you

2    back to your lives outside the courtroom.  And indeed I thought

3    you were excellent in terms of the breaks.  Once we got started

4    today, we were very, very efficient.  So again, I'm just trying

5    to manage things as best I can for all involved.

6            If you would not talk about the case among

7    yourselves, with your friends or your family for the reasons I

8    said in my instructions today, we'd all be better off.

9            We had initial instructions, opening statements and

10   our first witness so I think we're making good progress.  I

11   thank you very, very much for your attention and your

12   compliance here today.  I thank the lawyers for their hard

13   work.  And we'll look forward to seeing you tomorrow morning at

14   8:30.

15           Let's all rise for our jurors and we'll call a recess

16   for the day.

17           JUROR NO. 4:  Thank you, Your Honor.

18           THE COURT:  Thank you, sir.  Have a good day.

19           (Jury excused at 2:09 p.m.)

20           THE COURT:  Okay.  Everybody may be seated.

21           All righty.  Well, hopefully we won't have any more

22   jury problems.

23           So with regard to the exhibits --

24           MR. PRATT:  Your Honor, can the witness step down?

25           THE COURT:  Oh, yeah.  Go ahead, Ms. Nash.  Have a

```
1    good night, be safe on the roads and we'll see you tomorrow.
2            Yes, Mr. Donnini.
3            MR. DONNINI:  Your Honor, may I make one point before
4    she leaves?
5            THE COURT:  Yes.
6            MR. DONNINI:  Can we just have an instruction from
7    the Court that witnesses should not have contact with the
8    government and also witnesses should not have contact with
9    other witnesses that are going to testify in the case?
10           THE COURT:  Okay.  You understand the admonition that
11   Mr. Donnini wants me to give to you?  Don't talk about the case
12   with the lawyers in the case during your testimony and with
13   other witnesses, and we'll see you here tomorrow morning at
14   8:30, okay?
15           THE WITNESS:  All right.
16           THE COURT:  All right.  Go ahead, Ms. Nash.
17           MR. DONNINI:  Thank you, Your Honor.
18           THE COURT:  All right.  Thank you all very much.
19           (Witness excused at 2:10 p.m.)
20           So again, I got -- I got rolling probably way too
21   fast this morning, but I'm kind of glad we did 'cuz it seems we
22   got -- we got back on -- at least marginally back on schedule.
23           In general, the government gives me a little -- one
24   of these with the exhibits, which is fine.  I don't know if you
25   have a disk or a USB insert with your exhibits on them.  If you
```

1    do, that'll help me rule on the admissibility.  And then if we

2    are able to agree upon or admit by stipulation some tranche of

3    documents, that'll help us to go more -- more quickly as well.

4              Would you like to speak to that, government lawyers,

5    at this time?

6              MR. LIEVENSE:  Your Honor, I think it would make the

7    most sense if we could talk to defense counsel and have a list

8    prepared in the morning.

9              THE COURT:  Yeah, fine.

10             MR. LIEVENSE:  Rather than try to do it in an ad hoc

11   way right now.

12             THE COURT:  Yeah, fine.  Why don't you have -- do you

13   have a witness list filed or...

14             MR. LIEVENSE:  You mean exhibit list?

15             THE COURT:  Exhibit list, I'm sorry.

16             MR. LIEVENSE:  We sent an initial one late last month

17   and we sent an updated one yesterday.

18             THE COURT:  Okay.  All right.  Why -- why don't you

19   meet and confer on your witness list, or excuse me, your

20   exhibit list.  You can provide a copy to the Court at the bench

21   tomorrow morning, and before we get started we can see what the

22   defense is willing to stipulate to and what not, and you can

23   move for the admission without objection of any agreed-upon

24   exhibits at that time.  And then if you'd like to give me an

25   electronic or binder set of all exhibits you anticipate moving

1   the admission for, you can do that as well.  Does that sound

2   pretty good?

3            MR. LIEVENSE:  Yes, Your Honor.  In fact, Ms.

4   Ouellette's absence this morning was due to burning those thumb

5   drives of exhibits for both the Court as well as for the

6   defense.

7            THE COURT:  Okay.  All right.  Great.  So I think

8   that takes care of our exhibits for the time being.

9            Mr. Donnini?

10            MR. DONNINI:  Just to add to that, there will be

11   hopefully some defense exhibits that we'll be able to agree on,

12   preadmit tomorrow morning as well.

13            THE COURT:  Yes.

14            MR. DONNINI:  So we're trying to streamline things.

15   And we too will strive to get you all of our defense exhibits

16   tomorrow morning as well on a thumb drive, and then on that

17   sheet which ones are agreeable to be preadmitted.

18            THE COURT:  That's fine, bearing in mind, of course,

19   that your case in chief won't start for a while, but if you do

20   have exhibits you want to examine government witnesses with,

21   we'd love to have a look at those in advance as well, so...

22            MR. DONNINI:  Exactly, Your Honor.

23            THE COURT:  Okay?

24            MR. DONNINI:  Thank you.

25            THE COURT:  All right.  Well, well, well.

1        MR. CHAPMAN:  And I've been quiet for a while, Your

2   Honor.  I just had to jump up and say something.

3        THE COURT:  I know.  It's like what's going on here?

4   All right.  Mr. Chapman, go right ahead.

5        MR. CHAPMAN:  I -- I was elected as the person to

6   bring up this issue, Your Honor.

7        THE COURT:  Okay.

8        MR. CHAPMAN:  But -- but we received a note related

9   to --

10       THE COURT:  Yes.

11       MR. CHAPMAN:  -- Juror No. 13.

12       THE COURT:  Yeah.

13       MR. CHAPMAN:  Thank you, Your Honor, for providing

14   that.

15       THE COURT:  Yeah.

16       MR. CHAPMAN:  Understand that the Court has

17   traditionally not considered a hardship like this a sufficient

18   excuse.

19       THE COURT:  Right.

20       MR. CHAPMAN:  But in observing Juror No. 13 and

21   coupled with this note, I do have some concerns.

22       THE COURT:  Okay.

23       MR. CHAPMAN:  Noticeably, he was the only juror that

24   didn't bring a notepad in that I could see.

25       THE COURT:  Okay.

```
1              MR. CHAPMAN:  And appeared to, you know, not be
2       taking any sort of notes.
3              I'm a little bit concerned that his hardship coupled
4       with his very clear desire not to be here, we may be in -- in
5       some problems with a juror not listening --
6              THE COURT:  Okay.
7              MR. CHAPMAN:  -- effectively to the case, which is a
8       problem for both the government and defense.
9              THE COURT:  Agreed.
10             MR. CHAPMAN:  Dr. Pompy deserves a jury that can be
11      attentive in this case.
12             I'm not suggesting removing him right now.  Going
13      down to 14 would be a significant issue.  But perhaps we could
14      label him as an alternate and then consider removing him
15      earlier.
16             THE COURT:  Okay.  Well, he is.  13 and 14 are our
17      alternates.  Flores and Rosado-Mojica, those are our
18      alternatives.  So that's one of the reasons why I -- one of the
19      reasons why I didn't kick him off immediately because --
20      because he is an -- an alternate, in the alternate seat at
21      least.  But -- but I -- I -- I agree with everything you say
22      and I'm intrigued by your proposal.  If you want to keep him
23      here and, you know, send him out early if he's -- or whatever,
24      but go -- go ahead.
25             MR. CHAPMAN:  If things are going well, Your Honor,
```

1    by the close of the government's case and we haven't removed a

2    juror --

3              THE COURT:  Yeah.

4              MR. CHAPMAN:  -- perhaps we could look at it then

5    around December 9th.

6              THE COURT:  Okay.

7              MR. CHAPMAN:  I also understand, Your Honor, that

8    somebody else submitted another you said unsworn statement to

9    the Court.

10             THE COURT:  Well, this was -- this was -- I'm glad --

11   I'm glad you brought that up.  Henderson rolls in an hour late

12   and says he doesn't want to serve 'cuz he has addicts in his

13   family, you know.  I -- I -- I said thank you to the law clerk

14   but -- but then let's press on, and then I said what I said.

15             So, you know, again, I didn't hear any of this last

16   week.  I said specifically to each row in the jury box, "Do you

17   have any response to this question, this question, this

18   question?"  And at the end I said perhaps twice but at least

19   once, "Is there anything else on your mind that would lead you

20   to be disqualified as a juror that we haven't asked you about?"

21   Nothing from either of these two individuals.

22             So I have to -- as you know, Mr. Chapman, you've been

23   around the block many, many times, but I have to balance the --

24   the need to get the -- to get the trial done with the fairness

25   to the parties and -- and -- and the wishes of the jurors, but

1    I don't know anything about this Henderson and what -- what

2    he's talking about.  All I know is he was sleeping or slunched

3    over with his hat on last week, and I had to correct that

4    behavior and tell him to sit up straight.  Then he came in an

5    hour late today.  And then he was muttering to my law clerk

6    about having addicts in his family and didn't want to serve.

7    So that's where we're at with that individual.

8           And, you know, again, I would hope that my words this

9    morning, which were straighten up and fly right, and my words

10   this afternoon that we'll make a fresh start and get through

11   that will -- will cure our issues.  But that's where we're at,

12   okay?

13          MR. CHAPMAN:  Thank -- thank you, Your Honor.

14          THE COURT:  All right.

15          MR. CHAPMAN:  And just one moment.  I want to confer

16   with co-counsel.

17          THE COURT:  Yep.

18          MR. CHAPMAN:  Make sure I don't have anything else.

19          THE COURT:  Okay.

20          (Brief pause)

21          MR. CHAPMAN:  All right.  That's it, Your Honor.

22   Thank you.

23          THE COURT:  All right.  Okay.  Thank you all.

24          MR. PRATT:  Your Honor, I have -- I have one thing if

25   I could, Your Honor.

```
 1              THE COURT:  Of course.
 2              MR. PRATT:   The -- we would ask, and I know it's
 3    sort of -- we would ask the Court to order the usual
 4    sequestration.
 5              THE COURT:  Yes.
 6              MR. PRATT:   If -- except for the people on this side
 7    of the bar, if you're going to be a witness, you can't be here.
 8              THE COURT:  Yep.
 9              MR. PRATT:   That's one.
10              And the second thing is I -- just for
11    clarification --
12              THE COURT:  Well, let me speak to that.  The -- the
13    general sequestration order pursuant to Federal Rule 106 or
14    whatever it is will be imposed.  If you haven't testified yet,
15    you -- you can't sit in the courtroom and observe.  If you may
16    be recalled, you can't sit in the courtroom and observe.  Those
17    who are essential to the defense or prosecution of the court --
18    case are exempted, which would include the paralegals, the
19    lawyers, the defendant and the police witness.  So -- so
20    that'll be the ruling of the Court.
21              But what's your second issue?
22              MR. PRATT:   The second issue is just that he --
23    he -- the -- Mr. Donnini said something like "and the
24    government can't have contact with witnesses."  Well, when the
25    witness comes tomorrow morning, she's certainly going to meet
```

```
1    the -- with the -- with the agents.  We're not going to discuss
2    the case with her --
3              THE COURT:  Right.
4              MR. PRATT:  -- while she's testifying, and I thought
5    that --
6              THE COURT:  Right.
7              MR. PRATT:  -- I thought that was what the Court was
8    getting at.
9              THE COURT:  Absolutely.
10             MR. PRATT:   But I just wanted it to be crystal clear
11   that we can certainly make sure that she gets here.  If her car
12   breaks down, she's going to call the government agent, you
13   know, because that's what her instruction is.
14             THE COURT:  Yes.
15             MR. PRATT:   So -- so -- so we'll do that when the
16   witnesses are on the stand, but we --
17             THE COURT:  We just don't want you coaching or
18   otherwise.
19             MR. PRATT:   No.  And I -- and I understand that --
20             THE COURT:  I know.
21             MR. PRATT:  -- one restriction while the witness is
22   on the stand.
23             THE COURT:  Right.  Okay.
24             MR. PRATT:  And that's what I understood it to be.
25             THE COURT:  Okay.  All right.  I'm glad you clarified
```

 1    that.

 2              MR. PRATT:   The other thing, and it's sort of

 3    like -- and we're going to have to address this probably fairly

 4    early tomorrow, in terms of us giving Rule 609 prior -- prior

 5    criminal history information to the defense, we've sort of at

 6    the end, in part because it's been -- it's been a little crazy,

 7    we've gone above beyond on some of these witnesses.  We've not

 8    only given their CCH, but we've also given a list of their

 9    contacts with the police department which includes when -- you

10    know, it includes things like they get called for a domestic

11    violence dispute or they got -- someone's car got stolen.  We

12    gave that all to them.  And that's why we did the protective

13    order that the Court signed, and we appreciated that.  We

14    wanted to have them to have all that information out of an

15    abundance of caution.

16              But I guess given the strictures of Rule 609 that

17    says it normally it has to be a felony offense or it has to be

18    a misdemeanor that goes to dishonesty, I guess if defense

19    counsels had time to go through that and they think that they

20    want to sail into something like, you know, there was that one

21    time that maybe somebody got arrested for domestic violence and

22    no charges were brought, we'd like an opportunity to have that

23    addressed with the Court before I rest the witness.

24              THE COURT:  All right.

25              MR. PRATT:  Because if for some reason the Court

```
1    would say we can cross-examination someone -- cross-examine
2    someone about an arrest that never even resulted in charges,
3    I'd like a chance to bring that out on direct with the witness.
4          THE COURT:  All right.  Well, my -- my sense is that
5    you're not going to have a problem of -- of that sort because
6    609 is clear and these lawyers have manipulated it and used it
7    many times in the past.
8          However, your -- your -- your idea that should
9    defense counsel wish to pursue a -- a line of impeachment
10   outside of the specific strictures set forth by 609, they
11   should discuss it with the government and get a preliminary
12   ruling on it I think is -- is -- is well taken.  But again,
13   these things are pretty clear and we all know we don't want to
14   have side mini-trials with -- with witnesses on -- on older
15   cases.
16         But felony convictions, misdemeanors, felony
17   convictions I believe within ten years, mis -- misdemeanors
18   that go to truthfulness, other evidence of truthfulness or lack
19   thereof I think are appropriate grounds for cross-examination,
20   but beyond that, they don't want to get in trouble with the
21   jury or anybody else.  So -- so we all -- I think the decks are
22   clear on that, okay?
23         MR. DONNINI:  Your Honor, look, let me just -- we'll
24   have a more -- we'll have a conversation.  I haven't looked at
25   these things yet.  I just got them late last night.
```

```
 1            THE COURT:  Yeah.

 2            MR. DONNINI:  But I will say -- and I don't have a

 3    fully formed opinion here or argument to make, but if

 4    somebody's been arrested, which is what Mr. Pratt just said,

 5    and they were not charged and there's some -- there's some

 6    potential there that they're now biased and they're trying to

 7    ingratiate themselves with the local Monroe police who's going

 8    to be a witness here in this courtroom, then that may very well

 9    go to their bias.  So even if there's not a conviction, the

10    fact that they were arrested and not charged actually could be

11    very relevant to these proceedings.  So I am not committing to

12    609 being the only argument from the defense.

13            THE COURT:  Well, I think -- I -- I didn't either.  I

14    tried to -- I tried to keep it open-ended.  But as I said in my

15    lengthy and deep order resolving 10 of the 12 motions in limine

16    this morning, these items are premature at this time.  I'm glad

17    you brought them up, but when you have something specific you

18    need a ruling on or want to impeach upon, that's when we should

19    be talking about it, okay?

20            MR. DONNINI:  Yes, Your Honor.

21            THE COURT:  All right.  Good.  All right.  Yes, Mr.

22    Chapman.

23            MR. CHAPMAN:  One final --

24            THE COURT:  Yes.

25            MR. CHAPMAN:  -- minor point, Your Honor.
```

```
1                THE COURT:  Yes.

2                MR. CHAPMAN:  Will the sequestration order also apply

3     to experts or will they be exempted from it?

4                THE COURT:  Well, I'd have to rule separately on

5     that.  If you need an expert to come in and listen to a

6     contravening expert to render opinions on the expert testimony

7     within the rules, I'd be okay with that, but we -- we'd have

8     to -- we'd have to have an exemption to the order for that

9     individual as well.  Sometimes we have experts in here to

10    prepare summaries, which is okay, but when and if you want to

11    do that, let me know and we'll hear from both sides, okay?

12               MR. CHAPMAN:  Your Honor, I -- I'd make that request

13    now in case this happens.  Dr. Murphy, our medical expert who

14    you've met before --

15               THE COURT:  Yeah.

16               MR. CHAPMAN:  -- may be in the back of the courtroom

17    to observe opposing experts and also patients, but I'd ask that

18    he not be precluded from the observing any part of the case.

19               THE COURT:  Government?

20               MR. PRATT:  Your Honor, I don't -- I guess my biggest

21    concern there is that -- for example, is that the -- the

22    witness not be identified to the jury.

23               THE COURT:  Yeah.

24               MR. PRATT:  That, for example, probably sitting in

25    the front row closest to the jury is not -- is not the place
```

```
1    that person should be, but I don't have any objection to him --
2    to him being here during the testimony of other witnesses.
3              THE COURT:  Okay.  All right.  We'll exempt Dr.
4    Murphy from sequestration.  We won't identify him as an expert
5    if and when he sits in the room.  But should he need to hear
6    testimony to form expert opinions that he wants to lodge before
7    the jury, that would be okay, bearing in mind Mr. Pratt's
8    well-intended concern or well-intentioned concern that he not
9    be tipped off to the jury as any sort of official witness for
10   one side or the other, okay?
11             All right.  Very good.  Thank you all very much.
12   We'll see you -- I'll try to get out here early tomorrow
13   morning while the jury's lining up and then we can talk about
14   the exhibits and go from there, okay?
15             All right.  Have a good evening and again thanks for
16   all your hard work.
17             THE LAW CLERK:  The Court is now in recess.
18             (Excerpt 1 concluded)
19             (Court in recess at 2:26 p.m.)
20             (Proceedings in the above-entitled matter adjourned
21             to Tuesday, November 29, 2022)
22                              -  -  -
23
24
25
```

```
 1                    C E R T I F I C A T I O N

 2          I, Linda M. Cavanagh, Official Court Reporter of the

 3   United States District Court, Eastern District of Michigan,

 4   appointed pursuant to the provisions of Title 28, United States

 5   Code, Section 753, do hereby certify that the foregoing pages 1

 6   through 82 comprise a full, true and correct excerpt of

 7   proceedings taken in the matter of United States of America vs.

 8   Lesly Pompy, Case No. 18-20454, on Monday, November 28, 2022.

 9

10                         s/Linda M. Cavanagh
                           _____
11                         Linda M. Cavanagh, CRR, RMR, RDR, CRC
                           Federal Official Court Reporter
                           United States District Court
12                         Eastern District of Michigan

13

14

15

16

17   Date: December 5, 2022
     Detroit, Michigan
18

19

20

21

22

23

24

25
```