```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION


 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5       vs.                             Case No. 18-20454
                                         Hon. Stephen J. Murphy, III
 6       LESLY POMPY,

 7                        Defendant.
      _____/
 8
                      JURY TRIAL EXCERPTS: VOLUME 3
 9
              BEFORE THE HONORABLE STEPHEN J. MURPHY, III
10                     United States District Judge
              Theodore Levin United States Courthouse
11                    231 West Lafayette Boulevard
                       Detroit, Michigan  48226
12                    Tuesday, November 29, 2022

13    APPEARANCES:

14    For the Plaintiff        WAYNE F. PRATT
      United States of America: ANDREW J. LIEVENSE
15                             U.S. Attorney's Office
                               211 W. Fort Street
16                             Suite 2001
                               Detroit, Michigan  48226
17                             313-226-9100

18    Also Present:           CHRISTINE OUELLETTE
                              Paralegal Specialist
19
      For the Defendant       GEORGE B. DONNINI
20    Lesly Pompy:            JOSEPH E. RICHOTTE
                              Butzel Long
21                            201 W. Big Beaver
                              Suite 1200
22                            Troy, Michigan 48084
                              313-225-7000
23
                              (Appearances continued next page)
24

25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant          RONALD WILLIAM CHAPMAN, II
      Lesly Pompy:               Chapman Law Group
 3                               1441 West Long Lake Road
                                 Suite 310
 4                               Troy, Michigan 48098
                                 248-644-6326
 5
      Also Present:             VICTORIA MURDOCH
 6                              Senior Paralegal

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
             To obtain a certified copy of this transcript, contact:
24            Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
                           Official Court Reporter
25                (313) 234-2616 • www.transcriptorders.com
```

TABLE OF CONTENTS

Government Witnesses Continued:                          Page

Excerpt 2:

JENNIFER NASH

   Direct Examination Continued by Mr. Pratt        4

Excerpts 3 and 4:

JEANETTE BEELER

   Direct Examination by Mr. Pratt                  36
   Redirect Examination by Mr. Pratt               69

EXHIBITS

| Identification | Offered | Received |
| --- | --- | --- |
| NONE | | |

```
 1              Detroit, Michigan
 2              Tuesday, November 29, 2022
 3                          -  -  -
 4              Excerpt 2:
 5              (Proceedings in progress at 9:06 a.m., all parties
 6              present, jury present)
 7              THE COURT:  Ms. Nash is back here.  You can come back
 8    up on the stand if you'd like.  We'll take a break, then have
 9    our lunch around 11:15 or 11:30, and then finish the day after
10    that, all right?
11              Okay.  Mr. Pratt is here and ready to go.
12              MR. PRATT:  All right.
13                   J E N N I F E R   N A S H
14    was recalled as a witness herein, and after being previously
15    first duly sworn to tell the truth and nothing but the truth,
16    resumed the stand and testified on her oath as follows:
17                   DIRECT EXAMINATION CONTINUED
18    BY MR. PRATT:
19    Q.  Good morning, Ms. Nash.
20    A.  Good morning.
21    Q.  All right.  I think yesterday I was about to talk about
22    one of those drugs, that Subsys drug.  Do you remember that?
23    A.  Yes.
24    Q.  All right.  What -- what was different about Subsys
25    than -- than other drugs that you were aware of when you worked
```

```
 1    for Dr. Pompy?
 2    A.   You were only allowed to be on Subsys and not a narcotic.
 3    Q.   Okay.  Let me ask you this.  Were there any people that
 4    you knew at the office were associated or worked with this drug
 5    Subsys?
 6    A.   Yes.
 7    Q.   All right.  Who was -- who was that?
 8    A.   One was John Bae.
 9    Q.   And how do you -- and how do you spell Bae, if you know?
10    A.   I think it's B-a-e if I'm not mistaken.
11    Q.   Okay.  John Bae.
12         And was there someone else who was with the Subsys
13    company?
14    A.   I believe her name is Darcy.  I don't remember her last
15    name.
16    Q.   Okay.  And so you knew these people that were with the
17    company.  What did they -- what did they do in the office when
18    would they come there and what would they do?
19    A.   They would do prior authorizations with me with the
20    Subsys.
21    Q.   Okay.  So was -- and so explain to me what prior
22    authorizations dealt with -- with -- specifically with Subsys.
23    A.   You would have to have a prior authorization for the
24    insurance to cover.
25    Q.   Okay.  What help, if any, did they give you?
```

1   A.   Sometimes they filled it out and then I'd just send it in.

2   Q.   Okay.  Now, was there ever any issues or any concerns you

3   have regarding whether the prior authorization was done

4   correctly for Subsys patients?

5   A.   I didn't question 'cuz I didn't know a whole lot about it.

6   Q.   Okay.  Let me ask you this.  Did Dr. Pompy prescribe

7   Subsys without trying other medications first?

8   A.   On some occasions I do believe so.

9   Q.   All right.  And was -- what was the -- the prior

10  authorization for that, did that reflect that or did -- was the

11  prior authorization correct or incorrect?

12  A.   The prior --

13          MR. DONNINI:  Your Honor, she already said she

14  doesn't know a whole lot about it.

15          MR. PRATT:  I -- I still think I can ask her if she

16  knows that, Your Honor.

17          THE COURT:  I'll let her -- I'll let her -- let the

18  government try to clear that up a little bit.

19          Go right ahead.  You can answer if you remember the

20  question.

21  A.   Can you repeat the question please?

22  BY MR. PRATT:

23  Q.   Yeah.  The question was do you know if there was

24  anything -- you know, you -- you talked about the prior

25  authorizations, whether they were accurate or inaccurate.  Were

7

1  some of them inaccurate regarding whether other drugs had been

2  tried?

3  A.  That I do not remember.

4  Q.  Okay.  And I know it's been some time.  As a matter of

5  fact, Ms. Nash, you were -- not only has it been a while, but

6  you were interviewed I think about five years ago, I think it

7  says on May 2nd, 2017, correct?

8  A.  Correct.

9  Q.  And -- and that wasn't just an interview.  They

10  actually -- actually recorded that interview, if you recall,

11  correct?

12  A.  Correct.

13  Q.  All right.  And you've had the opportunity to review a

14  report which kind of summarizes that interview, correct?

15  A.  Correct.

16  Q.  All right.  If I showed you a particular portion of that

17  report, might it refresh your memory as to the particular point

18  about Dr. Pompy and these -- trying these prior drugs?

19  A.  Yes.

20       MR. PRATT:  All right.  Your Honor, may I approach

21  the witness?

22       THE COURT:  Yes, go right ahead.

23       MR. PRATT:  Defense counsel, I'm looking at -- it's

24  labeled at the bottom page 8 out of 10, and it's going to be

25  the third -- I'm sorry --

1           THE COURT REPORTER:  I can't hear you, Mr. Pratt.

2           MR. PRATT:  I'm sorry.  I'm -- I'm -- I'm thinking

3   and walking.  It's going to be the second paragraph on page 9

4   out of 10.

5           (Brief pause)

6   BY MR. PRATT:

7   Q.  Does that refresh your memory?

8   A.  Yes.

9   Q.  All right.  And can you tell us then, were some of those

10  prior authorizations incorrect about the trying other drugs?

11  A.  I didn't do some of the prior authorizations.  They were

12  just given to me and I sent them in.

13  Q.  All right.  And when you sent them in, did they indicate

14  that he'd tried prior drugs with everybody?

15  A.  On some of them, no.

16  Q.  All right.  So those ones at least were inaccurate?

17  A.  Correct.

18  Q.  What -- these two representatives, Mr. Bae and Darcy, did

19  they do anything for Dr. Pompy, did they provide him --

20  anything for him or anyone else in the office?

21  A.  Other than just provided food and -- on certain days.

22  Q.  Okay.  Where did they -- where did they work when they

23  were at the office?

24  A.  They worked across from the desk.

25  Q.  Okay.  What kind of facility was that, what kind of space

1    were they given?

2    A.   I think they had their own little desk across from where

3    the patients sign in.

4    Q.   Okay.

5            THE COURT REPORTER:   Ms. Nash, you can back away from

6    that.  Thank you.

7            THE WITNESS:   Okay.

8    Q.   All right.  I want to talk about -- I know we spent -- I

9    know we spent a while talking about medical records, but

10   unfortunately I'm going to talk about medical records some

11   more, okay?

12           Tell us a little bit, what I -- one of the things I

13   want to talk about or have you explain to us is -- is the

14   accuracy of the medical records.  Can you tell us -- I know you

15   explained a lot about what they were looked at and what was

16   created, but tell us what procedures, if any, Dr. Pompy had to

17   make sure what ended up in the patient chart was accurate.

18   A.   As we did the information for the patients, he would

19   sometimes check the records.  He would come over to my computer

20   and check the records, make sure everything was correct.

21   Q.   Okay.  And I want to get a sense, did he -- did he sign

22   off or approve your record -- every record for every patient?

23   A.   Not that I'm aware of.

24   Q.   Okay.  So you say sometime.  When you say sometimes,

25   sometimes is a pretty vague word.  How often would he check

1    your records, that's what you can testify to, as to see whether

2    or not they were accurate?

3    A.  He hardly ever looked at our records.  We put all the

4    information in the computer, so whether he went back and

5    checked on the records when he was in his office, I'm unaware.

6    Q.  Okay.  And I think I want to raise the question of --

7    so -- so it's mostly on the medical assistant then, correct?

8    A.  Correct.

9    Q.  So these medical records are in a sense -- they're not --

10   they're not created by Dr. Pompy, they're created by the

11   medical assistant?

12   A.  Correct.

13   Q.  All right.  I want to ask you about things like -- I'm

14   going to use the word cutting or pasting, but it's basically

15   copying or carrying over, you know, from a previous record,

16   okay?  Was that something that was technologically possible on

17   this system, could you do that if you wanted to?

18   A.  I'm not remembering if you could correct -- or if you

19   could copy and paste or not.

20   Q.  Okay.  Let me ask you, was that part of the stand --

21   that -- then was that part of the standard protocol that you

22   did or did you do everything by -- do everything from scratch?

23       MR. DONNINI:  Your Honor, again she said, "I don't

24   remember," and now he's asking her a question about something

25   she doesn't remember.

1      MR. PRATT:  I'm asking if she did her records from

2   scratch, Your Honor, and I think that's a new question.

3      THE COURT:  Agree.  That's overruled.  Go ahead and

4   answer if you can, witness.

5   A.  I just inputed what was on the patient's records.

6   BY MR. PRATT:

7   Q.  Okay.  I'm going to show you -- and I think we have

8   already admitted this, and this is not your patient record but

9   it's Government's Exhibit 15.

10      MR. PRATT:  If you could please, Ms. Ouellette, pull

11   up Government 15, which for the record is the chart of Michelle

12   Bunker, and which page you already knew, page -- page 781.

13   Okay.

14   BY MR. PRATT:

15   Q.  And so if we can indicate at the top what date -- what

16   date -- for the record, what date this is.

17   A.  Looks like Sunday, October 2nd, 2016.

18   Q.  That's -- that's not -- that's not the visit date.

19   A.  Oh, I'm sorry.  8-4-2016.

20   Q.  Okay.  And you're familiar with this.  This is -- this is

21   the -- this is the patient chart that gets generated, correct?

22   A.  Correct.

23   Q.  All right.

24      MR. PRATT:  And so I want to go down to the

25   subjective part, if you could highlight that.

```
1    BY MR. PRATT:
2    Q.  I know you can read it but the rest of us can't 'cuz
3    you're closer to your screen, okay?
4            MR. DONNINI:  Your Honor, I apologize, but can we
5    just confirm that this witness -- first of all, this witness --
6    the question was she didn't deal with this patient, so that's
7    number one.
8            But number two, I'm not even sure she was employed as
9    of this time.  She may have been.  She left in August of '16,
10   so was she even there?
11           THE COURT:  Well, you can question her on that when
12   you cross-examine her, but this is -- the -- the record is in
13   evidence and the government lawyer can question her about it to
14   the extent of her knowledge of what's in there.
15           So I don't know if you want to note that or not, Mr.
16   Pratt, but -- but -- but go right ahead.
17           MR. PRATT:  That's fine.
18   BY MR. PRATT:
19   Q.  So when we're dealing with a subjective part, it's got a
20   couple initials there.  Do you know what those stand for, the
21   CC/HPI?
22   A.  Continuous care.
23   Q.  All right.  Essentially can you tell us what -- when you
24   create records, what you put in here under "Subjective Notes,"
25   what are you supposed to put in here?
```

1   A.  This is what the patient fills out on their paperwork and

2   it states what their pain is, so it's -- it's everything that

3   they fill out that we put in here.

4   Q.  All right.  And you're supposed to put in what was going

5   on that particular day, correct?

6   A.  Correct.

7   Q.  'Cuz it's subjective as to that day?

8   A.  Correct.

9   Q.  All right.  All right.  And I'm not -- so it has the pain

10  level.  You don't have to read the whole thing.  I would note,

11  I wanted to -- all right.  I want to go -- point to -- and

12  again, nobody gets graded on typing, but I want to go to the

13  very last line of this.  It's a little bit of a -- little bit

14  of typo there at the bottom.  You have a period on "medication"

15  and then there's not a capital P on "patient."  You see that?

16  A.  Correct.

17  Q.  And then if you could read that entire last sentence for

18  the record.

19  A.  "Patient states currently not employed an disabled since

20  2006."

21  Q.  Instead of "and" it says "an disabled."  That looks like

22  another typo, doesn't it?

23  A.  Yes.

24  Q.  Okay.  Fine.  Nothing wrong with typos.

25          Let's go to -- let's go to the next visit for this

1   patient, patient record 793.

2           MR. PRATT:  And Ms. Ouellette, if you could put both

3   of those up at the same time.

4   BY MR. PRATT:

5   Q.  All right.  So if we can look on the right one and figure

6   out what the date of this patient note is.

7   A.  August 25th, 2016.

8   Q.  Okay.  So that's about 20 days later after the first one,

9   correct?

10  A.  Correct.

11  Q.  All right.  And on this -- on this date, the subjective

12  record is supposed to indicate what the patient's condition was

13  on this date, correct?

14  A.  Correct.

15  Q.  All right.  Can we compare the two, the two Subjective

16  Notes on the two dates and see whether or not there's any

17  similarity between the two?

18  A.  Looks like the same thing.

19  Q.  It's the same thing.  And that even includes the typo with

20  the "patient" not being capitalized, correct?

21  A.  Correct.

22  Q.  And includes the typo with "and" being spelled without the

23  d?

24  A.  Correct.

25  Q.  Okay.  Now, I suppose if somebody copied it over in some

1    way, I suppose that's efficient if it's accurate, correct?

2    A.   Yes.

3    Q.   What if it's not accurate?

4    A.   It's supposed to be from that day and how they were

5    feeling.

6    Q.   Okay.  And is there a way we can check out and determine

7    whether or not -- whether or not this was accurate?

8    A.   It should have been different.

9    Q.   It should have been different.

10            You know -- you know it's different 'cuz people don't

11   have the same complaints --

12   A.   Correct.

13   Q.   -- day after day.

14            MR. PRATT:  All right.  Let's look at -- if you

15   could go to Michelle Bunker's chart, the patient questionnaire

16   from this day in 2000 -- at page 0262.

17   BY MR. PRATT:

18   Q.   All right.  And just so we're correct, let's look at the

19   date at the top.  We'll make sure we're talking about the right

20   day.

21   A.   August 25th, 2016.

22   Q.   Same date, right?  It's the second one.

23   A.   Mm-hmm.

24   Q.   All right.

25            MR. PRATT:  And let's -- if you could pull up that

1   same paragraph from the previous -- from the same day, the

2   patient record, and again highlight the subjective complaint.

3   BY MR. PRATT:

4   Q.  Okay.  And so that's what supposedly is happening for this

5   patient today.  It says the pain level is -- occurs

6   continuously.  Now, is there a part on the patient chart that's

7   supposed to tell you whether the patient is claiming continuous

8   pain?

9   A.  Yes.

10       MR. PRATT:  Can you highlight that portion, Ms.

11  Ouellette?

12  BY MR. PRATT:

13  Q.  All right.  It's in the section "About Your Pain,"

14  correct?

15  A.  Correct.

16  Q.  All right.  And there's a place for that patient to

17  indicate whether or not their pain was continuous, correct?

18  A.  Correct.

19       MR. PRATT:  Can you get lower?

20  BY MR. PRATT:

21  Q.  And did the patient -- did Ms. Bunker on this date check

22  that her pain was continuous?

23  A.  She said it stayed the same.

24  Q.  Yeah.  But there's a place right below "stayed the same,"

25  it says "continuous."  That's not checked, is it?

1    A.   No.

2    Q.   So the patient chart is not correct when saying the

3    patient claimed their pain was continuous, is it?

4    A.   No.

5    Q.   All right.  How about -- how about in the Subjective Note,

6    "pain is worse in the a.m. and the p.m.," there's a place for

7    the patient to check whether or not that's true?

8    A.   Yes.

9    Q.   And are they checked in this chart?

10   A.   No.

11   Q.   And so the patient chart we have is not reflecting what

12   the patient really was going on that day?

13   A.   Correct.

14   Q.   All right.

15        MR. PRATT:  Let's -- let's go to the next page of the

16   patient questionnaire, page 263, if you can pull that up, and

17   if you can highlight and also continue to pull back up the --

18   the original patient chart with that same paragraph.

19   BY MR. PRATT:

20   Q.   Okay.  And there's a section on the patient chart where

21   the patient can indicate what makes their pain feel better,

22   right?

23   A.   Correct.

24   Q.   And according to the official patient chart, let's see,

25   "pain is alleviated by alcoholic drinks."  Is that what the

1   patient actually said on that day?

2   A.  No.

3   Q.  How about sitting, did they say that made it feel better

4   this day?

5   A.  No.

6   Q.  How about sexual activity?

7   A.  Yes.

8   Q.  But that's not in the -- that's not in the patient chart,

9   is it?

10  A.  No, it's not.

11  Q.  And how about distractions and -- and hobbies?  I'm sorry,

12  we'll get down to the next question, the next section, "Coping

13  Methods."  According to the patient chart, coping methods are

14  prayer, medication, correct?

15  A.  Correct.

16  Q.  Any mention of distraction of hobbies -- or hobbies in the

17  patient chart?

18  A.  Just hobbies and distractions.

19  Q.  All right.  But that's in what the patient said, that's

20  not in what the -- what the visit note says.

21  A.  Correct.

22  Q.  All right.  And so I guess what I'm saying -- asking you,

23  you -- you're finding that there's a number of things where the

24  copying basically did what here?

25  A.  Copy and paste.

1  Q.  All right.  And -- and I want to go back to now page --

2  the first page of this -- of the patient questionnaire, and

3  right in the middle of the first section there's some

4  handwritten that says "2A oxycodone."

5  A.  Yes.

6        MR. PRATT:  If you can highlight that.

7  BY MR. PRATT:

8  Q.  All right.  And what was the -- if you can remind us

9  again, what does 2A oxycodone mean?

10  A.  They had drug counseling for that.

11  Q.  Ah.  But what does the 2A part mean?

12  A.  That I don't remember.

13  Q.  All right.  But was -- was that a drug -- was that a drug

14  test result that was inconsistent?

15  A.  Yes.

16  Q.  So it was a problem.

17        All right.  So I guess the question is -- understand

18  that drug counseling is checked on the -- on here, but how do

19  we know that drug counseling was actually done?

20  A.  We don't.

21  Q.  Because we're relying on -- drug counseling should --

22  basically if there was a two-way problem, drug counseling

23  should have been done?

24  A.  Correct.

25  Q.  But whether it happened or not we can't tell, can we?

```
 1              MR. DONNINI:  Your Honor, it's leading, it's asked
 2    and answered.
 3              THE COURT:  It is leading.
 4              MR. PRATT:  All right.
 5              THE COURT:  So I'll sustain it.
 6              Go ahead and rephrase, Mr. Pratt.
 7    BY MR. PRATT:
 8    Q.  All right.  I guess the overall question is in terms of
 9    what actually happened in the -- in the patient meeting, in the
10    patient encounter, what do we have to rely on?
11    A.  Lies 'cuz there's some stuff that's not appropriate and
12    it's not -- it's not true.
13    Q.  Okay.  I want to ask you a question and I want to continue
14    talking about records.  I think there is a -- do you recall an
15    incident where patients would sometimes come back and it would
16    be like three weeks before they were supposed to get drugs
17    again?
18    A.  Yes.
19    Q.  All right.  And what would happen when a patient came back
20    three weeks early sometimes, I mean three weeks early, and was
21    wanting their controlled drugs?
22    A.  We would ask them why they were coming back early.
23    Q.  All right.  And --
24              MR. PRATT:  Just a minute, Your Honor.
25              (Brief pause)
```

1    Q.  And were those patients ever actually able to get their

2    drugs early?

3    A.  Some were, yes.

4    Q.  All right.  How did that happen that they were able to get

5    their drugs early?

6    A.  It depended on what they were -- if they were back for --

7    like, if it was -- if there were stolen medications, if the

8    prescription wasn't working.

9    Q.  All right.  I'm going to ask you again -- we have a report

10   from your recorded interview, correct?

11   A.  Yes.

12   Q.  I'm going to ask you to look at page -- for the record,

13   page 8 of 10, the third paragraph, and ask you to read it to

14   yourself.

15          MR. DONNINI:  Your Honor?

16          THE COURT:  Yes.

17          MR. DONNINI:  The testimony was that patients who

18   were able to refill their prescriptions early were those few

19   instances where they said the patient -- the prescription was

20   stolen or not working.

21          THE COURT:  Yeah.

22          MR. DONNINI:  So I don't think there's any memory to

23   refresh here, Your Honor.

24          MR. PRATT:  Well, then -- then maybe I'm -- I'm still

25   going to ask her whether she said something different, possibly

1    said something different on a different occasion, Your Honor,

2    and that's what I'm asking her to review.

3              THE COURT:  Okay.  You can impeach or draw out the

4    prior inconsistent statement, and I'll instruct the jury

5    it's -- the prior inconsistent statement is being shown, being

6    raised to show that prior testimony was different than the

7    testimony on the stand, which is generally a matter of

8    truthfulness, but I take it that Mr. Pratt also wants to lay a

9    foundation to commit the defendant -- the witness to one set of

10   facts or another.

11             So go right ahead if you'd like to do that, Mr.

12   Pratt.

13             MR. DONNINI:  Your Honor, may I ask that the -- the

14   document be retrieved from the witness?  The witness is reading

15   the document during that whole colloquy.

16             THE COURT:  That's probably appropriate.  That's

17   probably appropriate.  Go ahead, Mr. Pratt.

18   BY MR. PRATT:

19   Q.  All right.  Now, when you were interviewed, were you asked

20   questions or did you make a statement about people who came,

21   were not due for another three weeks?

22   A.  Yes.

23   Q.  All right.  And what did you -- do you recall what you

24   said in the interview about the patient was not due for three

25   weeks?

```
1    A.  I do not recall.
2    Q.  Okay.  Did looking at that report refresh your memory as
3    to what you said back then?
4    A.  I didn't get to look at it 'cuz I was listening to you.
5    Q.  Oh, you were listening to us.  Okay.
6         MR. PRATT:  I'm going to -- Your Honor, may I
7    approach the witness?
8         THE COURT:  Yes, of course.  Yep, go right ahead.
9    BY MR. PRATT:
10   Q.  It's the third paragraph, third paragraph.
11        THE COURT:  So now the lawyer is confronting the
12   witness with the prior -- with a prior statement to help
13   refresh her recollection because she answered that she
14   couldn't -- she couldn't recall, so she's going to look at that
15   interview transcript and -- and see if that happens to remind
16   her of what the answer to the question is.  Don't read it but
17   go ahead and let us know when you're ready, witness, please.
18        MR. DONNINI:  Your Honor, while she's reading, can I
19   make one point that I think is important?
20        THE COURT:  Yes.
21        MR. DONNINI:  That this statement is not her
22   statement.  This is a interview report created by the police --
23        THE COURT:  That's true.
24        MR. DONNINI:  -- that was recording what they
25   believed to be the statements and it's only a summary; it's not
```

1    all of her testimony.

2         THE COURT:  That's true, but if it helps her

3    remember, it's fine, that's fine.  Okay.  Go right ahead.

4    A.  Go ahead.  What was your question?

5    BY MR. PRATT:

6    Q.  Have you read that?

7    A.  Yes.

8    Q.  Does that refresh your memory as to what happened with

9    these patients?

10   A.  Yes.

11   Q.  All right.  What happened with the patient that would come

12   back three weeks early?

13        MR. DONNINI:  Your Honor, I'm fine with her keeping

14   it there so we don't have to walk back and forth, but really

15   should -- she shouldn't be reading from it.  She needs to turn

16   it over and put it down and testify based on her recollection.

17        THE COURT:  Right.  Don't -- don't read the record,

18   but go ahead and answer the question from your own independent

19   recollection now, witness.  Go right ahead.

20   A.  The prescriptions were filled.

21   BY MR. PRATT:

22   Q.  Okay.  Three weeks early?

23   A.  Yes.

24   Q.  And how were they able to be filled three weeks early,

25   what did you have to do?

1    A.   We had to alter the records.

2    Q.   Okay.  Who told you to alter the patients' records so that

3    they could get their drugs three weeks early?

4    A.   Dr. Pompy.

5    Q.   All right.  Did you -- did you have any kind of -- did you

6    say anything about that, did you kind of question that or did

7    you just do it?

8    A.   I just did it 'cuz that was my job.

9    Q.   Okay.

10   A.   I just did what I was told.

11   Q.   Okay.  Are you familiar with something called a narcotics

12   contract in the patient files?

13   A.   Yes.

14   Q.   All right.  Did everyone have to have a narcotics

15   contract?

16   A.   Yes.

17   Q.   All right.  And I think if you remind me from yesterday,

18   how many patients during the time you were there, the year you

19   were there, were actually like dismissed and kicked out of the

20   practice?

21   A.   Two.

22   Q.   Okay.

23   A.   That I'm aware of.

24   Q.   That you're aware of.  Okay.

25         Did -- did the narcotics contract warn patients what

1   they could be kicked out for?

2   A.  I don't recall.

3   Q.  All right.

4        MR. PRATT:  Well, could we put up please from

5   Government Exhibit 1 the James Stewart patient file, page 35?

6   BY MR. PRATT:

7   Q.  Does this -- does this look like the narcotics -- or one

8   of the narcotics agreements that they used?

9   A.  I believe so.

10  Q.  Okay.

11       MR. PRATT:  And let's -- let's look at paragraph

12  number 2, if you could highlight that, Ms. Ouellette, at the

13  bottom, in the middle, paragraph 2.

14  BY MR. PRATT:

15  Q.  Okay.  And for the record, can you tell us what the

16  warning is if people get drugs from more than one doctor?  You

17  can go ahead and read that into the record.

18  A.  It says, "If it is found that I received a prescription

19  for narcotic medication from someone other than Dr. Pompy, I

20  may be discharged from Interventional Pain Management and any

21  prescriptions for narcotic medication will be discontinued."

22  Q.  All right.  Did you, in fact, have patients that got drugs

23  from more than one doctor?

24  A.  Yes.

25  Q.  And were they discharged for that reason?

1    A.  No.

2    Q.  All right.  Let's go to the next -- the paragraph number

3    7, if you could high -- if you could read those -- read the

4    warning in paragraph 7 for the record.

5    A.  "I agree to take periodic drug tests for all the

6    medications and drugs when Dr. Pompy orders them.  I understand

7    that if I test positive" --

8            THE COURT REPORTER:  Wait, wait.  Slow way down.  "I

9    understand that if I test positive..."

10   A.  "I understand that if I test positive for illegal drugs, I

11   will be put into a drug abuse program.  If I refuse testing, I

12   will be discharged from Interventional Pain Management and any

13   prescriptions for narcotic medication will be discontinued."

14   Q.  All right.  That part about if you test positive for

15   illegal drugs you'll be put in a drug abuse program, did that

16   happen for everybody?

17   A.  No.

18   Q.  Some people tested positive for drugs and what happened to

19   them?

20   A.  They were just -- still got their medications.

21   Q.  Okay.  Let's go to number 8, if you can read for the

22   record what the warning is there.

23   A.  "I know what illegal drugs are and will not use any

24   illegal drugs.  I know if I do, I may be discharged from my

25   health plan."

1    Q.   Okay.  And again, were people who tested positive for

2    illegal drugs, were they discharged?

3    A.   No.

4    Q.   All right.

5            MR. PRATT:  And then if we could go to the next page

6    of this, Ms. Ouellette, page 36.  Lower than that, the bullet

7    part.

8    BY MR. PRATT:

9    Q.   Okay.  Could you read the bullet part for the record?

10   A.   "I understand that I could be dismissed from

11   Interventional Pain Management if I do not follow the

12   agreements in this contract."

13   Q.   All right.  And was that enforced as to all but those two

14   patients?

15   A.   No.

16   Q.   Okay.  The -- did you ever observe anything about

17   patients -- did Dr. Pompy ever obtain controlled substances

18   from patients?

19   A.   Just during the pill count.

20   Q.   Okay.  And then he would give it back to them, correct?

21   A.   Sometimes, unless it was just a recently filled

22   prescription and they were asking for something else.

23   Q.   Ah.  And explain about that.  So those circumstances where

24   he would actually keep the patient's prescription, correct?

25   A.   Correct.

Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

1    Q.  All right.  If you know, what did he do with the drugs

2    that he was taking back from the patients or keeping from the

3    patients?

4    A.  I am unaware.

5    Q.  Do you know where he put it?

6    A.  No, I do not.

7    Q.  Okay.  All right.  And if you -- if you made a prior

8    statement in your interview that indicated you did know where

9    he put them, would that refresh your memory on this matter?

10   A.  Yes.

11   Q.  Do you have that in front of you?

12   A.  I do.

13   Q.  If you could look at -- if you could look at page -- and

14   the pages, we have the pages at the bottom, if you could look

15   at page 9, paragraph 6.

16   A.  It says he put them in his office.

17   Q.  And are you remembering that now?

18   A.  Yes.

19   Q.  It refreshed your memory?

20   A.  Correct.

21   Q.  All right.  I appreciate that.

22        We talked a little bit yesterday about the Suboxone

23   patients, the ones that were -- or Zubsolv, the ones that were

24   there for addiction treatment.  Do you remember that?

25   A.  Yes.

Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

1   Q.  And we talked about -- we talked about being over a limit,

2   which you did not know that number.  But were you able -- can

3   you tell us how many patients you think he had at that time in

4   the treatment program?

5   A.  I would say probably about 95 percent.  I'm not quite

6   accurate on the numbers.

7   Q.  All right.  And -- and I'm going to ask you again, I know

8   you gave the interview more than five years ago, but do you

9   recall if you gave them a specific number of those patients

10  back then?

11  A.  I don't remember.  I don't recall.

12  Q.  All right.  Would looking at the report refresh your

13  memory on that?

14  A.  Yes.

15  Q.  All right.  If you'd look at page 10, the second

16  paragraph.

17  A.  It says 300 patients.

18  Q.  And is that your recollection, that refreshes your

19  recollection?

20  A.  Yes.

21  Q.  All right.  And again, I realize that was -- that was

22  within a year of the events so your memory was a lot fresher

23  then?

24  A.  Yes.

25  Q.  All right.  I want to talk a little bit about referrals.

1   Did Dr. Pompy make any referral -- any of his patients, his

2   pain patients, any referrals to do other things?

3   A.   Not that I'm aware of.

4   Q.   Okay.  What did he do at his other office for those

5   patients?

6   A.   He did pain blocks.

7   Q.   All right.  And did you work over at the other office?

8   A.   I was -- only worked there one day.

9   Q.   One day.  All right.

10          But what was your -- if you know, from that one day,

11  what went on with the patients over there?

12  A.   He was just doing pain blocks to help alleviate their

13  pain.

14  Q.   Okay.  All right.  Did -- as to -- and I know this may

15  be -- you know, may be a silly question but I'm going to ask it

16  anyway.  Who was the boss of the practice?

17  A.   Dr. Pompy was.

18  Q.   Was there any other doctor who worked there?  Was there

19  any other medical doctor who worked in the practice and saw

20  patients?

21  A.   There was one but I don't recall what his name was.

22  Q.   Okay.

23  A.   But he was -- I think he was like a trainee I think.

24  Q.   Ah.  Okay.  Who -- who ran -- who ran the office?

25  A.   Dr. Pompy did.

1    Q.   And that was -- was that true of both locations, the --

2    A.   Diana ran the one at the hospital.

3    Q.   Okay.  When I say ran it, I'm talking about the overall

4    boss.

5    A.   It was Dr. Pompy.

6    Q.   Okay.  And so it would be fair to say that he -- he used

7    both offices?

8    A.   Yes.

9    Q.   And when I say maintain them, I don't mean he did the

10   janitorial work, but basically he was responsible for if

11   anything went wrong or anything needed to be ordered?

12   A.   Yes.

13   Q.   Okay.  Did Dr. Pompy treat -- treat any employees for

14   their medical issues?

15   A.   Yes.

16   Q.   All right.  If you know, did he provide controlled

17   substances to some of his employees?

18   A.   Yes.

19   Q.   All right.  Did -- as someone who had access to the

20   patient portal, not saying you did, but if you wanted to, would

21   you have had access to the employees' patient files?

22   A.   Yes.

23   Q.   All of them?

24   A.   Not all of them.

25   Q.   Why not?

1   A.  A couple of them were locked.

2   Q.  And what do you mean by locked?

3   A.  They were locked so no one could get the information or

4   see any information.

5   Q.  All right.  Do you recall the names of the jobs of any of

6   the employees whose patient files were locked?

7   A.  Diana.

8   Q.  Diana.  And what was her last name?

9   A.  Knight.

10  Q.  Okay.  And her position again was what?

11  A.  Office manager.

12  Q.  All right.  Did Dr. Pompy ever say anything to you to

13  indicate he had some kind of concern or belief he was being

14  investigated?

15  A.  Yes.

16  Q.  Tell me what happened.

17  A.  We had a patient in our office one day, and after the

18  patient left he closed the door, he said, "Now you know what an

19  undercover cop looks like."

20  Q.  I'm sorry, you spoke a little too fast for me.  He said

21  what?

22  A.  He said, "Now you know what an undercover cop looks like."

23  Q.  And can you express, can you tell us, you know, what his

24  attitude was about that?  Was he joking, was he serious, was he

25  concerned, what was his --

Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

```
1    A.   He was serious and concerned.
2    Q.   He was -- pardon?
3    A.   Serious and concerned.
4    Q.   All right.  'Cuz he believed what?
5    A.   He thought he was being looked after.
6    Q.   How did your employment at Dr. Pompy's office end?
7    A.   I had quit two weeks prior to him getting busted.
8    Q.   Okay.  So that would have been in approximately what,
9    August or September?
10   A.   August.
11   Q.   Of which year?
12   A.   2016.
13   Q.   All right.  Why did you quit?
14   A.   'Cuz I knew there was things that were not right so I
15   quit.
16   Q.   Okay.  Did you have any kind of personal grudge or
17   animosity toward Judge Pompy, towards Dr. Pompy?
18   A.   No, I did not.
19   Q.   Has your testimony here been affected by any bad feelings
20   you have toward him?
21   A.   No.
22   Q.   What happened -- what happened with your last paycheck
23   that you were due and owing for your work?
24   A.   I never received it.
25   Q.   Okay.  And why didn't you receive it?
```

Case 2:18-cr-20454-SJM-RSW   ECF No. 78, PageID.1248   Filed 12/05/22   Page 35 of 72
Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

35

1    A.   I guess the government seized his money.

2    Q.   And the government seized all the money.

3         As a matter of fact, you actually contacted the

4    police about trying to get your money unfrozen from the

5    government, right?

6    A.   Correct.

7    Q.   And -- and you did that.

8         And did -- did your money ever get unfrozen, did you

9    ever get it, if you know?

10   A.   No.

11   Q.   All right.  And do you hold a grudge against the

12   government for messing up one of your paychecks?

13   A.   No.

14   Q.   Has that affected your testimony here today?

15   A.   No.

16   Q.   All right.

17        MR. PRATT:  Thank you, Your Honor.  I have no further

18   questions from this witness.

19        (Excerpt 2 concluded at 9:45 a.m.)

20                        —  —  —

21

22

23

24

25

```
 1              Excerpt 3:
 2              (Proceedings in progress at 10:53 a.m., all parties
 3         present, jury present)
 4         THE COURT:  We're back at it with our next government
 5    witness.  Mr. Pratt?
 6         MR. PRATT:  Yes, Your Honor.  The United States calls
 7    Jeanette Beeler to the stand.
 8         THE COURT:  Ms. Beeler, right this way.  You can stay
 9    right there.
10                    J E A N E T T E   B E E L E R
11    was called as a witness herein, and after being first duly
12    sworn to tell the truth and nothing but the truth, testified on
13    her oath as follows:
14         THE WITNESS:  I do.
15         THE COURT:  Very good.  Have a seat.  Relax if
16    possible.  Speak toward the mic but don't get too close.
17         And Mr. Pratt, you go right ahead.
18                    DIRECT EXAMINATION
19    BY MR. PRATT:
20    Q.  Good morning, Ms. Beeler.
21    A.  Good morning.
22    Q.  How are you feeling?
23    A.  Nervous.
24    Q.  Okay.  Tell us a little bit -- first can you begin by
25    spelling your full name for the court reporter?
```

1    A.   J-e-a-n-e-t-t-e B-e-e-l-e-r.

2    Q.   Now, Ms. Beeler, can you tell us a little bit about

3    yourself such as where you were born and raised?

4    A.   I was born in Monroe, Michigan and was raised there.  I

5    still reside there.

6    Q.   Okay.  Tell us about your educational background starting

7    with high school.

8    A.   I graduated from Monroe High School in 1983 and I

9    graduated from Everest Institute in 2006.

10            THE COURT REPORTER:  I'm sorry, which institute?

11            THE WITNESS:  Everest Institute.

12            THE COURT REPORTER:  Okay.  Thank you.

13   Q.   Okay.  And what is -- what is Everest Institute or what --

14   what is or was Everest Institute?

15   A.   A medical training facility.  They train medical

16   assistants, medical --

17   Q.   Okay.  And where -- where -- where did you get your

18   medical assistant training?

19   A.   In Dearborn, Michigan.

20   Q.   All right.  What -- tell -- describe a little bit what

21   that program was like.  How long was it, what did it -- was --

22   was it all book work, did it have hands-on work?  How did you

23   become trained to be a medical assistant?

24   A.   It was a year program.  I did both clinical and book work

25   and hands-on.

1    Q.   Okay.  And at the end of it they gave -- you got what?

2    A.   I got a diploma as a medical assistant.

3    Q.   Okay.  Now, has your -- has your work history been

4    entirely -- you have training in the medical field 2006.  Is

5    that your entire -- have you worked your entire career in the

6    medical field or have you worked in other places besides the

7    medical field?

8    A.   No, I -- besides working as a medical assistant I've also

9    worked in retail.  I was also a bartender for years.

10   Q.   Okay.  Did -- at some point in -- in your employment

11   history did you work for Dr. Lesly Pompy?

12   A.   Yes, I did.

13   Q.   And when was that, if you recall?

14   A.   That was in 2016.

15   Q.   All right.  Do you recall what month you started?

16   A.   I started in June.

17   Q.   Okay.  And how long did you work there?

18   A.   From June till September 26th of 2016.

19   Q.   And you remember December -- September 26th of 2016

20   because of what?

21   A.   Because of the raid on the office.

22   Q.   All right.  And when you say Dr. Pompy, you can identify

23   him in the court -- the -- the -- Dr. Pompy in the courtroom

24   here?

25   A.   Yes.

1   Q.  Can you identify him and point him --

2   A.  Yes, I can.

3   Q.  Just tell us what he's wearing.

4   A.  Dark suit, glasses, tie.

5   Q.  Okay.  You know him well basically?

6   A.  Yes.

7   Q.  All right.  Tell us a little bit about how you -- how you

8   got out -- how you found out about the job working as a medical

9   assistant for Dr. Pompy.

10  A.  A friend of mine, Angela Kawecki, had told me about the

11  position.

12  Q.  Okay.  What did you do to interview or apply for the job?

13  A.  I came in, I filled out an application, I interviewed with

14  Diana Knight and she had me wait, and then Dr. Pompy come in

15  and talked to me and I was hired.

16  Q.  Okay.  You were hired the same day you went in, same day

17  you interviewed?

18  A.  Yeah.

19  Q.  Okay.  Tell us a little bit about your -- your work hours

20  and duties there.

21  A.  We were working three days a week, 12 to 16 hours a day.

22  Q.  So that's pretty long hours.  How -- how early and how --

23  how early would you start and how late would you go?

24  A.  6:00 in the morning till about 11:00 at night.

25  Q.  That would be the 16-hour days?

1    A.   Yes.

2    Q.   How about if it was a 12-hour day?

3    A.   It would be 6:00 in the morning till 6:00 at night.

4    Q.   Okay.  Do you recall which three days a week you worked

5    typically?

6    A.   I do recall I worked Monday.  The other days I'm not

7    really sure.

8    Q.   All right.  All right.  That's fine.  Can you -- you

9    mentioned -- you mentioned I think Diana Knight.  What was her

10   position in the office?

11   A.   She was office manager.

12   Q.   All right.  Describe -- describe what your duties were as

13   a medical assistant when you worked in Dr. Pompy's office.

14   A.   I would go to the front desk, grab an intake form, call

15   the patient back, I would do their vitals, blood pressure,

16   temperature, height, weight, and then take them into the room

17   that I was working in.

18   Q.   Okay.  And what you're calling an intake form, can you

19   describe that to us?  Would that be something that the patient

20   fills out?

21   A.   Yes, they would fill it out with their name, their birth

22   date, their different information, medical information about

23   themselves.

24   Q.   Okay.  What -- what would you do if -- what would you do

25   then with that questionnaire or intake form?

1    A.   It would be entered into the computer system.

2    Q.   And how would you do that?

3    A.   I would sit down, sign in and pull up their information by

4    their name.

5    Q.   All right.  And you would make -- would you create an

6    additional document to the -- to this intake form or

7    questionnaire then?

8    A.   If they were there for procedures, we would create that

9    document.  If they were there for a prescription refill, that

10   document would be created --

11   Q.   All right.

12   A.   -- at that time.

13   Q.   And on the -- on the intake form or questionnaire, the

14   patient could tell you basically what they were there for,

15   correct?

16   A.   Yes, that is correct.

17   Q.   And most of the time most of the patients you saw, what --

18   which box would they check?

19   A.   Prescriptions.

20   Q.   Okay.  Tell us about the volume of patients that you saw

21   when you worked at Dr. Pompy's office.  How many patients a day

22   would come through?

23   A.   150 to 250, if not more.

24   Q.   Okay.  How -- how crowded did that make the office?

25   A.   The waiting room was overcrowded.  People were sitting in

1   the hallway, standing in the hallway.

2   Q.  Was that just occasional or is this just the way it always

3   was?

4   A.  It was the way it always was.

5   Q.  Okay.  How about the -- did the patients have appointment

6   times?

7   A.  Yes, they did.

8   Q.  All right.  How long did they have to wait for their

9   appointments?

10  A.  Some patients would have to wait 45 minutes, if not

11  longer.

12  Q.  Okay.  And again, was that -- was that a routine thing or

13  only now and then that they had to have long waits?

14  A.  It was all the time.

15  Q.  Okay.  You -- were you the only medical assistant that

16  would work there on a day?

17  A.  No.

18  Q.  How many other medical assistants would be there helping

19  with the employees?

20  A.  I would say at least 13.

21  Q.  Okay.  How -- where did the -- you said you'd take the

22  patient back.  Where would you take the patient back if you

23  were going to be their medical assistant for that visit?

24  A.  I would take them into an exam room.

25  Q.  Okay.  Do you know approximately how many exam rooms Dr.

1    Pompy had in his office?

2    A.   I would say ten.

3    Q.   Okay.  All right.  Were you assigned one in particular or

4    were you -- did you just sort of take one that was open?

5    A.   I was in the one next to the copy room, copy machines.

6    Q.   Okay.

7            MR. PRATT:  Ms. Ouellette, can we put Government's

8    Exhibit 130 up?

9    BY MR. PRATT:

10   Q.   Can you identify this location in Government's

11   Exhibit 130?

12   A.   This is where -- past the front desk.  It was down the

13   area where they did billing.

14   Q.   Okay.  So you were familiar with that location in the

15   office, correct?

16   A.   Yes, that is correct.

17   Q.   And tell us about the two computer screens.  What are we

18   seeing on the two computer screens?

19   A.   On the one, the computer screen on the left, that was the

20   appointment times and the numbers of patients.

21   Q.   Okay.  And let me ask you this.  Were the patients -- were

22   the patients often overbooked?

23   A.   Yes, they were.

24   Q.   And by overbooked, you mean what?

25   A.   Four patients every 15 minutes.

1   Q.   Okay.  Meaning for the -- for the same time basically, the

2   10:00 o'clock appointment?

3   A.   Yes, that is correct.

4   Q.   Okay.  Are you familiar with the second computer or was

5   that not involved with your duties?

6   A.   That was not involved with -- with myself.

7   Q.   Okay.  I want to -- I want to direct your attention to a

8   particular -- you said most of the patients were there for --

9   for the pain medications, and I want to talk specifically about

10  the -- the people there to renew or refill their pain

11  medications.  Can you describe -- obviously you had some

12  interaction with them.  Can you describe what typically

13  happened with one of those patients when Dr. Pompy actually

14  came in the room?

15          (Brief pause)

16  A.   I don't recall.  I'm sorry.

17  Q.   You -- you need -- you need to breathe.  You need to

18  breathe.  There's some water there.

19          MR. PRATT:  Your Honor, might I approach the witness?

20          THE COURT:  Mm-hmm.

21          MR. PRATT:  We'll get rid of this one.

22          THE COURT:  You okay physically, witness?

23          THE WITNESS:  (No response)

24  BY MR. PRATT:

25  Q.   All right, Ms. Beeler.

```
1          THE COURT:  So the record should reflect Ms. -- Ms.

2   Beeler had a moment of quiet.  I didn't notice, but apparently

3   she needed to take a breath and -- and -- and get a drink,

4   correct?  Are you feeling all right, witness?

5          THE WITNESS:  Yes, I am.

6          THE COURT:  All right.  Okay.  Go ahead, Mr. Pratt.

7   BY MR. PRATT:

8   Q.  All right.  Is this easy for you?

9   A.  Mm-hmm, it is.  I'm okay.

10  Q.  Tell us about one of those typical visits where people

11  would just be there for a refill, what would happen?

12  A.  They would sit with us, me and the other girl that shared

13  the office.  We would have their -- either their test reports,

14  their prescription or orders sitting on a table, and when Dr.

15  Pompy would walk in he would shake their hands, sign the --

16  sign the prescription, the test orders and walk out.

17  Q.  Okay.  And how long would it take him to do that

18  typically?

19  A.  Not even five minutes.

20  Q.  All right.  And this -- and just so we get some idea of

21  the volume of the people you had, and I know percentage is a

22  dangerous thing, but what percentage of the patients that you

23  would see in a particular day would be that type of -- that

24  type of refill patient?

25  A.  I would say 90, 95 percent.
```

1  Q.  Okay.  And -- and that was -- was that day in and day out

2  or did that vary, did that ever vary?

3  A.  It was constant, it was consistent.

4  Q.  Okay.  I'm going to ask you some questions about some

5  particular -- some particular incidents that you recall

6  happening.  Were there ever any patients that you saw that came

7  for a refill that -- any early refill patients, people, in

8  other words, that were not due for their medications?

9  A.  Yes.

10  Q.  All right.  Do you recall that happening?  How often would

11  that happen?

12  A.  On occasion it would happen.

13  Q.  Okay.  Was it a daily occurrence?

14  A.  No, it was not.

15  Q.  All right.  Tell us what happened on occasions where

16  patients came in too early for their refills.

17  A.  When a patient would come in too early for their refills,

18  we would have to go into their chart in the computer system and

19  change the date of the last refill so that they could get their

20  current refill.

21  Q.  Okay.  So you're altering -- when you say change the date

22  of the previous prescription, you mean change the previous

23  prescription to a -- to a date that wasn't accurate?

24  A.  That's correct.

25  Q.  And why did you -- did you do that?

```
1    A.   I did on occasion.
2    Q.   And why did you do that?
3    A.   I was told to.
4    Q.   And who told you to do that?
5    A.   Dr. Pompy told us to.
6    Q.   All right.  What -- so you say "us."  You're -- do you
7    know by your own observation you weren't the only one that did
8    this?
9    A.   No, I wasn't.  I shared an office.
10   Q.   Okay.  And you saw -- so you saw another MA do that as
11   well?
12   A.   Yes, I did.
13   Q.   All right.  Did you -- did you -- what did you say to Dr.
14   Pompy when he told you to change -- change dates on the
15   computer?
16   A.   I told him that it shouldn't be done, that it would be
17   telling a lie about when their prescription was due.
18   Q.   And what was his response to you?
19   A.   To do my job.
20   Q.   Okay.  You had worked -- had you worked in a doctor's
21   office before you worked for Dr. Pompy?
22   A.   Yes, I did.
23   Q.   Did they ever do anything like that there?
24   A.   No, they did not.
25   Q.   Okay.  All right.  I'm going to ask you about some of the
```

 1   other medical assistants that you saw working for Dr. Pompy.

 2   Did -- did you -- did you draw any conclusions or make any

 3   observations about the age of some the people he had working

 4   for him?

 5   A.   Yes, I did.  There was high school students ages 16 and 17

 6   working in the office.

 7   Q.   And could you see that they were -- I understand people

 8   sometimes have interns for a day or something.  Were these

 9   people interns for a day or were they actually, to your

10   observation, doing the same job you were?

11   A.   They were doing the same job I was doing.

12   Q.   Okay.  Did that give you any kind of concerns?

13   A.   Yes, it did.

14   Q.   And why is that?

15   A.   Because I thought they were a little too young to be

16   working in a medical office.

17   Q.   Okay.  Did you -- did you ask -- did you ever raise that

18   to Dr. Pompy in terms of these people didn't seem mature enough

19   to do the job?

20   A.   I don't recall.

21   Q.   Pardon?

22   A.   I don't recall.

23   Q.   All right.  If -- you were interviewed back in 2017, is

24   that right, by the State -- at the State Police Post?

25   A.   Yes, I was.

```
1    Q.  All right.  They actually recorded that interview, if you
2    recall, correct?
3    A.  Yes, that is correct.
4    Q.  And they also made a report that kind of summarized it.
5    Would looking at that report -- you said you didn't recall.
6    Would looking at that report help refresh your -- possibly help
7    refresh your memory as to whether you talked to Dr. Pompy about
8    it?
9    A.  Yes, it would.
10            MR. PRATT:  Your Honor, may I approach the witness?
11            THE COURT:  Yes, mm-hmm.
12            MR. PRATT:  And for counsel, it's -- it's labeled
13   page 5 of 10, paragraph 4.
14   BY MR. PRATT:
15   Q.  Don't read this out loud.
16   A.  Okay.
17   Q.  Just read this fourth paragraph to yourself quietly.
18            (Brief pause)
19            All right.  Now, having reviewed that, does that
20   refresh your memory about whether you specifically talked with
21   Dr. Pompy about these 16- and 17-year-olds.
22   A.  Yes, it does.  When I brought it to his attention he told
23   me, "Don't worry about it, do your job."
24   Q.  Okay.  Now, in the -- in the office, where did most of the
25   regular patients, where did they enter the office?
```

1    A.   Through the front door.

2    Q.   And when they would come in the front door, what would be

3    there?

4    A.   It would be the waiting room with all of the chairs and

5    the -- the desk where they would check in.

6    Q.   Okay.  Were there some patients that avoided the -- that

7    avoided the -- that avoided the waiting room when they came

8    into the office that would come in the side door?

9    A.   Yes, they would be brought in through the side door.

10   Q.   Okay.  And if they went in the side door, what would

11   happen as far as checking in with the receptionist, would they

12   do that still?

13   A.   The receptionist would check them in, and I don't remember

14   who she gave their paper to.

15   Q.   Okay.  Did any of the patients in the side door, came in

16   the side door go someplace different than a regular examining

17   room?

18   A.   Yes.  They went into Dr. Pompy's office.

19   Q.   Okay.  And so when you say Dr. Pompy's office, was that an

20   exam room or was that a different type of room?

21   A.   It was a different room.

22   Q.   Can you describe that for us?

23   A.   His office was in the hallway down from the reception

24   desk, and when you would walk in there, his desk was there, his

25   bookshelves were there.

Case 2:18-cr-20454-SJM-RSW ECF No. 78, PageID.1264 Filed 12/05/22 Page 51 of 72
Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

51

1    Q.  Did it have -- so -- so it's a desk and bookshelf office?

2    A.  Yes.

3    Q.  It's not like an exam table and --

4    A.  No.

5    Q.  -- medical equipment office?

6    A.  No.

7    Q.  Okay.  So it's a -- I guess would it be a business -- kind

8    of like a business office then?

9    A.  Yes, that's correct.

10   Q.  Okay.  And some of these patients that came in the side

11   door and went in his office, what did you see after they were

12   in his office?

13   A.  When I seen them come out after they'd been in there for

14   quite a while, they came out with a small brown paper bag the

15   size of a lunch bag and left the same way they came in.

16   Q.  Okay.  And you don't know what was in the little brown

17   paper bags?

18   A.  No, I don't.

19   Q.  Was this a different protocol?  In other words, these --

20   are these people going through the regular patient protocol

21   where you sign in and fill out the paperwork and see the MA and

22   all that or is this just like into the office and out?

23   A.  It was into his office and out.

24   Q.  And how often did that -- how often did that happen?

25   A.  Quite often.

```
1    Q.  Now, do you know, did you recognize any of these patients
2    or any of these people?
3    A.  No, I did not.
4    Q.  All right.  I'm -- not by persons but by whether or not
5    they were also patients.
6    A.  No, I didn't.
7    Q.  Okay.  Did you -- did you make a statement regarding your
8    knowledge of these people previously in the interview?
9    A.  Yes, I did.
10   Q.  All right.  And do you think it would help your testimony
11   if you were -- if you looked at the report of that interview?
12   A.  Yes.
13            MR. PRATT:  Your Honor, may I --
14            THE COURT:  Yes.
15            MR. DONNINI:  You can go ahead, Mr. Pratt, but the
16   objection is she said she's not sure if they were patients.  So
17   it's not that she's not recalling; she's just saying she
18   doesn't know if they were patients.
19            MR. PRATT:  Your Honor, I think she said that looking
20   at her report would be helpful, and so whether -- whichever
21   version it is, I'd like to show it to her.
22            THE COURT:  Well, let's ask, if you looked at -- what
23   is that?  That's her statement, a statement that was given --
24            MR. PRATT:  It's the interview report from the
25   recorded interview.
```

1        THE COURT:  Interview report.  Would that help you

2   recall or answer who the patients were.

3        THE WITNESS:  Yes, it would.

4        THE COURT:  Okay.  All right.  Good.  Go ahead, Mr.

5   Pratt.

6   BY MR. PRATT:

7   Q.  All right.  And I'm going to ask you to look at page --

8   page 5 of 10, paragraph 5.

9        (Brief pause)

10       Okay.  And I'm not asking you just to tell us what's

11   on the paper.  I'm asking you to tell us now what you remember,

12   okay?  Do you remember whether these people that were going in

13   and coming out with the bags were also patients of the

14   practice?

15   A.  They were.  And I do remember now that they did come

16   through the front door on occasion and check in with the

17   receptionist.

18   Q.  Okay.  So you had both kinds, people that came to the side

19   door and in the front door, that would go into his private

20   office?

21   A.  Yes, that is correct.

22   Q.  And come out with what?

23   A.  A brown paper bag the size of a lunch bag.

24   Q.  Okay.  Are you familiar with the term pharmacy hopping?

25   A.  Yes, I am.

1    Q.   What's pharmacy hopping?

2    A.   Pharmacy hopping is where a patient gets prescriptions

3    from different doctors and they go to different pharmacies to

4    have the prescriptions filled.

5    Q.   Okay.  So it's both different pharmacies and different

6    doctors basically?

7    A.   That is correct.

8    Q.   All right.  Did you ever -- did you ever run into some of

9    those patients while you were working as an MA for Dr. Pompy?

10   A.   Yes, I did.

11   Q.   How did you -- how did you detect those patients?

12   A.   We had received a call from one of the pharmacies in the

13   area stating that they weren't going to fill a prescription for

14   a patient, so I entered the patient's name and run a MAPS on

15   them which tells where they're getting their prescriptions and

16   who they're getting them from.

17   Q.   Okay.  And so you had the ability in the course of your

18   duties to run the MAPS, is that correct?

19   A.   Yes, that is correct.

20   Q.   And could you explain what run -- what running the MAPS

21   and what -- what do you get when you run the MAPS?

22   A.   When you run a MAPS, it tells exactly what prescriptions

23   they have, what pharmacies they're using and how many different

24   prescriptions that they're taking.

25   Q.   All right.  And this is controlled drugs, right?

1   A.   Yes, that is correct.

2   Q.   This is the narcotics?

3   A.   Yes.

4   Q.   All right.  And so you got this phone call, you ran the

5   MAPS, and what did you see, what did you see in the MAPS?

6   A.   That there was several different prescriptions for

7   narcotics from several different doctors.

8   Q.   Okay.  So having received that, what did you tell the

9   pharmacy?

10  A.   I told them that I would make Dr. Pompy aware of that.

11  Q.   Okay.  And did, in fact, they not fill -- you tell them

12  not to fill the prescription?

13  A.   I did.  I told them do not fill the prescription.

14  Q.   All right.  Did you discuss that with Dr. Pompy then?

15  A.   I did, and he told me he would take care of it, to go do

16  my job.

17  Q.   All right.  Was he happy about what you had done?

18  A.   No.

19  Q.   And what -- whatever happened to that MAPS report, the

20  pages that showed that there was a problem?

21  A.   I don't know what happened to it.  I gave it to him and I

22  don't know what happened to it.

23  Q.   All right.  So he didn't -- did he give it back to you?

24  When you say you don't know what happened to it...

25  A.   No, I never got it back.

1   Q.  So you -- did you enter -- were you able to enter it in

2   the patient file then?

3   A.  I was.

4   Q.  And how were you able to do that?

5   A.  I put in the information before I gave it to him that I

6   had run a MAPS on the patient.

7   Q.  Okay.  But the actual information, the actual pages of the

8   MAPS, did they find their way into the patient file?

9   A.  Not that I know of.

10  Q.  Okay.  In terms of -- in terms of what we see in our

11  patient charts, the date of this in the patient charts, who --

12  who's entering that data, is that going to be Dr. Pompy, is it

13  going to be you as the MA or is it going to be some kind of

14  combination?

15  A.  It's us as the MA, we enter the information into their

16  charts.

17  Q.  What about Dr. Pompy, what information, if any, would he

18  put in the chart?

19  A.  His findings of the patient.

20  Q.  Okay.  I'm just trying to get -- trying to get an idea of

21  what you're going to enter and what he's going to enter.

22  A.  We would enter all the patient information, why they were

23  there, the reason they were there, and later he would enter

24  what he found or what procedures were -- he ordered for them.

25  Q.  All right.  I'm going to ask you a particular question.

1   Are you familiar with making an entry -- you familiar with
2   sometimes patients would have inconsistent or bad urine test
3   results?
4   A.  Yes, I am.
5   Q.  Did that happen more than once?
6   A.  Yes, it did.
7   Q.  How -- how often did that happen?
8   A.  Oh, quite often.
9   Q.  Okay.  And what was the -- what was the document that you
10  would -- that Dr. Pompy would have when someone had a
11  inconsistent or wrong drug screen?
12  A.  It would be a lab report from the lab that ran the urine
13  test --
14  Q.  All right.
15  A.  -- with their findings.
16  Q.  All right.  So that'd be called what's called a confirming
17  lab report.  There'd also be a screen that was made right at
18  the office, correct?
19  A.  Yes, that is correct.
20  Q.  All right.  What would he do with the screens that were
21  made right at the office, how would he use that information?
22  A.  He would use them to decide whether to refill a
23  prescription or not.
24  Q.  Okay.  And generally speaking, if someone had a urine drug
25  screen that, for example, had showed they were not taking the

1    drug, would that normally disqualify them from getting a new

2    prescription?

3    A.   Yes, it would.

4    Q.   And how would that be noted in the file?

5    A.   That there was none of the prescribed medication in their

6    system.

7    Q.   Okay.  And so that was a pretty big deal in the patients

8    you saw?

9    A.   Yes.

10   Q.   All right.  How about the confirming result, the -- the

11   lab test result, how would he have that, what -- how would that

12   be given to him?

13   A.   It would be laid on the table along with their

14   prescription and any testing.

15   Q.   When he saw a patient, did he have access to the entire

16   patient file?

17   A.   He did through his tablet.

18   Q.   Okay.  He had an electronic tablet?

19   A.   Yes, he did.

20   Q.   And what could he -- he could pull up anything you could

21   on -- only on his tablet?

22   A.   Yes.

23   Q.   All right.  For those quick visits you described earlier,

24   do you know, did he go through complete prior patient visits on

25   his tablet?

1   A.   No.

2   Q.   All right.  I'm going to ask you -- I'm going to ask you

3   what the -- I think you mentioned before but -- so the

4   paperwork that you're having for Dr. Pompy when someone's there

5   for a renewal visit, what does that include?  He's going to

6   walk in the room, you're going to hand him what?

7   A.   We hand him the paper that they filled out, the reason

8   they were there.  We handed him the printed out prescription

9   for their visit.

10  Q.   Okay.  Well, if he hasn't seen the patient yet, how do you

11  know what prescription he might want to prescribe for them?

12  A.   It was automatic for us to print the script for the

13  refill.

14  Q.   Okay.  So it was automatic.  It was expected that you

15  would have the same prescription from the previous visit?

16  A.   Yes, that's correct.

17  Q.   All right.  And who established that, who -- who

18  established that as the way this is how they're expecting

19  the -- the -- the prescription to be the same as the previous

20  one, whose policy was that?

21  A.   It was Dr. Pompy's.

22  Q.   All right.  All right.  I want to -- I want to address a

23  situation that's a little bit different, that instead of just a

24  patient's there just for a refill, they're there wanting an

25  additional new medication, okay?  Did that happen with some

1   patients?

2   A.   It did.

3   Q.   All right.  And if that happened, that happened, what

4   would Dr. Pompy do?

5   A.   He would talk to them and find out what they would want

6   and then have us write up another -- print another prescription

7   out for what they wanted.

8   Q.   Okay.  And when you say he would find out what they want,

9   do you recall the literal word -- words that he would use to

10   that kind of patient?

11   A.   I do not.

12   Q.   Okay.  But in any event, he was pretty acceptable to that,

13   to adding the new prescription?

14   A.   Yes.

15   Q.   All right.  And was there an occasion where you had a

16   concern about that and said something about it?

17   A.   I was.

18   Q.   Pardon?

19   A.   Yes, I was.

20   Q.   All right.  What did you tell Dr. Pompy when he was adding

21   these second -- this second narcotic prescription for a

22   patient?

23   A.   I had told him that that is how my son had got hooked.

24   Q.   And I'm -- I'm sorry.

25          And -- and what was Dr. Pompy's response to you when

1  you told him that?

2  A.   That I shouldn't have said that in front of the patient.

3  Q.   Okay.  And did he give you any instructions about how you

4  should behave in the future?

5  A.   That I needed to do my job and not bring up things like

6  that.

7  Q.  All right.  Now, you talked about -- you talked about

8  having these urine drug screens or drug tests that would show

9  that there was a problem: either the patient maybe was --

10  had -- had a -- had a street drug in their system or they

11  didn't have the -- the prescribed medication in their system,

12  correct?

13  A.   Correct.

14  Q.  All right.  And you would be aware of that before the

15  patient saw Dr. Pompy, correct?

16  A.   I didn't understand your question.

17  Q.   Okay.  I'm sorry.  You would have that information that

18  this is a bad -- that this -- this person has an inconsistent

19  urine before Dr. Pompy came in the room to see them?

20  A.   Yes, that's correct.

21  Q.   All right.  Would you print up the -- would you print up

22  the prescription anyway for him to potentially sign?

23  A.   We would.

24  Q.   Okay.  Let me ask you this.  If -- if someone had a bad

25  drug screen or a -- you know, either they didn't have the drug

1   or they had a street drug in their urine, how many times did

2   Dr. Pompy discharge them from the practice and say "you're

3   gone"?

4   A.  It would depend on how many times they had a bad drug

5   screen where it would show street drugs.

6   Q.  All right.  And how many -- how many patients do you

7   recall him actually saying "don't -- go away and don't come

8   back"?

9   A.  I do recall of one.

10  Q.  Now, did you ever see Dr. Pompy do something that's called

11  a pill count?

12  A.  No, I didn't.

13  Q.  Do you know of, either yourself or even heard of, him

14  calling in a patient -- say a patient has an appointment on

15  August 1st, they got a month's supply.  They're going to come

16  back on September 1st, okay.  Doing a between visit pill count,

17  like, okay, it's August 15th, "You need to come in and show me

18  that you've used up half your pills."  Ever -- ever hear

19  anything about that, either see it or hear about it?

20  A.  No, I haven't.

21  Q.  Are you -- are you familiar with a drug called Subsys?

22  A.  Yes, I am.

23  Q.  What -- what was -- what happened with Subsys in Dr.

24  Pompy's office?  That's a terrible question.  I'm sorry.

25           Was Subsys a different drug than some of the other

1   drugs that Dr. Pompy prescribed?

2   A.   Yes, it was.

3   Q.   Can you explain how it was different?

4   A.   Subsys was used for cancer patients.

5   Q.   Okay.

6   A.   Help them with the pain.

7   Q.   All right.  Was this the drug that had any -- were there

8   any representatives from the company for that drug that

9   appeared in the office?

10  A.   Yes, there was a representative.  She came in, she had

11  bought us lunch, and I got to briefly talk to her about Subsys.

12  Q.   Okay.  And it was your understanding that -- that this

13  drug was going to patients for cancer pain?

14  A.   Yes, that's correct.

15  Q.   Was there any time in Dr. Pompy's office where you had

16  information that patients were selling their medications?

17  A.   Yes.  I had walked out into the waiting room to call a

18  patient and overheard two patients saying that they hurried --

19  hoped they would hurry up and get their prescriptions so they

20  could sell them 'cuz they needed the money.

21  Q.   Okay.  And so when you see two patients right in front of

22  you having that conversation, what did you do with that

23  information?

24  A.   I took it back to Dr. Pompy.

25  Q.   Okay.  And what did you tell Dr. Pompy?

1   A.   I told him that there was a couple of patients sitting in

2   the waiting room that were talking about selling their

3   prescriptions, and he told me he would handle it.

4   Q.   Okay.  You could -- because you saw them, you could

5   identify which patients they were, correct?

6   A.   That is correct.

7   Q.   All right.  Did the patients get their medications anyway?

8   A.   Yes, they did.

9   Q.   Now, in terms of your payment, what was your -- what was

10  your regular compensation, if you remember, on an hourly basis?

11  A.   I want to say it was 9.50 an hour.

12  Q.   9.50?

13  A.   Yes.

14  Q.   Okay.  Was there a possibility or did you, in fact,

15  receive bonuses on occasion?

16  A.   Only if we saw about 800 patients a day, then there would

17  be bonuses.

18  Q.   A day or a week?

19  A.   I want to say a week.

20  Q.   Yeah.  Okay.  So if you hit 800 a week, you get what?

21  A.   I believe it was 2 or 250 for the bonus.

22  Q.   Okay.  Let me ask you, I think you testified you -- you

23  remembered the day that the officers came and executed the

24  search warrant, correct?

25  A.   I do.

1   Q.  All right.  What -- what happened, what happened after

2   that?  Did you have -- did you continue to have contact with

3   Dr. Pompy after the search warrant, after the -- after the main

4   office was closed down?

5   A.  I sure did.

6   Q.  Okay.  How -- what contact was that, what did you do?

7   A.  I went over to the clinic to help out, and after I helped

8   out for one day, I received a text message from Diana Knight

9   told -- telling me that I was no longer an employee.

10  Q.  So you were fired by text message?

11  A.  Yes, I was.

12  Q.  Were you given a reason as to why you were being fired?

13  A.  She had told me that I was fired because I talked to

14  Lieutenant Moore.

15  Q.  In other words, you talked to one of the investigating

16  officers?

17  A.  Yes.

18  Q.  Now, before you got fired for talking to Lieutenant Moore,

19  did you see an individual have a conversation with Dr. Pompy

20  about a truck?

21  A.  Yes, I did.

22  Q.  Tell us, where were you when you happened -- where were

23  you when you saw this take place?

24  A.  I was just coming into the clinic and they were in the

25  hallway, and he had told him, he said, "Here's the keys to my

1   truck if you need some way to get around while this is going

2   on."

3   Q.  Okay.  So this is -- when you say the clinic, you're

4   talking about the Stewart Road -- the Interventional --

5   A.  Yes, I am talking about the Stewart Road location.

6   Q.  Right.  And so -- so -- so he's giving him keys to a truck

7   so Dr. Pompy can have transportation while all this is

8   happening?

9   A.  Yes, that's correct.

10  Q.  And what did Dr. Pompy do when he was given this trans --

11  the keys for transportation?

12  A.  He took the transportation.

13  Q.  All right.  Did he do anything for this individual, did he

14  do anything back in exchange?

15  A.  I know he gave him his prescription.

16  Q.  Okay.  When you say he gave him a prescription, do you

17  know what it was for?

18  A.  I want to say Norcos.

19  Q.  Okay.  If -- you want to say.  You sound like -- you sound

20  like you're not as sure about that as some other things.

21          If you looked at the report of your statement from

22  five years ago, would that make you a little bit sure about

23  what drug he wrote?

24  A.  Yes, it would.

25          MR. PRATT:  Your Honor, permission to approach the

1    witness, Your Honor.

2           THE COURT:  Yes, continuing permission.  Go right

3    ahead.

4    Q.  Look at paragraph 5 on page 7.

5           (Brief pause)

6           All right.  Does that little -- make you a little bit

7    sure about what drug Dr. Pompy wrote for the man that gave him

8    the keys to his truck.

9    A.  Yes, it was OxyContin.

10   Q.  Was that a drug that was typically prescribed to most of

11   Dr. Pompy's patients?

12   A.  Yes, it was.

13   Q.  Let me ask you this.  Did Dr. Pompy ever say anything to

14   you at any time that he had any kind of concern about being

15   investigated?

16   A.  He got real nervous two weeks before the raid and he was

17   saying that things weren't being done right, things weren't

18   being entered right, and he was real nervous.

19   Q.  And by entered right, you mean what?

20   A.  That the charting wasn't done right, the information for

21   the patients wasn't entered right.

22   Q.  Okay.  And what did he say, what -- when you say he was

23   nervous, what was he concerned about?

24   A.  He was concerned about getting into trouble.

25   Q.  And he said that -- he said that directly -- he said that

1    in your hearing, he said that to you?

2    A.  Yes.

3             MR. PRATT:  Could I have one moment, Your Honor?

4             THE COURT:  Yep.

5             (Brief pause)

6             MR. PRATT:  All right.  Thank you, Your Honor.  I

7    have no further questions.

8             (Excerpt 3 concluded at 11:38 a.m.)

9                                  —  —  —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            Excerpt 4:
 2            (Proceedings in progress at 1:45 p.m., all parties
 3            present, jury present)
 4            THE COURT:  The government lawyer is going to
 5   complete a brief redirect of this witness.  And you should all
 6   know that the Court took about three and a half minutes to tell
 7   the jury an entertaining joke and kill some time but that at
 8   least one of the jurors already knew the punch line before we
 9   got to it, all right?
10            Okay.  Go ahead, Mr. Pratt.
11                       REDIRECT EXAMINATION
12   BY MR. PRATT:
13   Q.  All right.  Ms. Beeler, you were asked questions on
14   cross-examination about the conversation you heard between the
15   two women in Dr. Pompy's office, correct?
16   A.  Yes, that's correct.
17   Q.  All right.  And you -- apparently you had -- at one point
18   you remembered it as selling to each other and one point it's
19   like, well, they were both going to sell to someone else,
20   right?
21   A.  Correct.
22   Q.  All right.  Do you have any doubt that there was an actual
23   conversation about selling pills?
24   A.  No, I don't.
25   Q.  All right.  And, of course, the thing which I think was on
```

Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

70

1    the interview but was quickly cut off, after you were asked in
2    the recorded interview about the conversation, were you asked
3    in the interview about whether you told Dr. Pompy?
4    A.  Yes, I did.
5    Q.  All right.  And you told that -- you said that back in
6    2017, right?
7    A.  Yes.  I did.
8    Q.  And you said it today?
9    A.  Yes, I did.
10   Q.  Is that a detail that was important enough for you to
11   really remember?
12   A.  No.
13   Q.  No, I'm talking about the talking with Dr. Pompy part.
14   A.  Yes.
15   Q.  All right.  All right.  And when you told this man that
16   these women are having a conversation about selling pills, what
17   was his response?
18   A.  He told me he would take care of it.
19   Q.  And then what did he do with the prescriptions?
20   A.  He gave them their prescriptions.
21   Q.  And even though it's been a lot of years, you feel like
22   you have a good memory on that point?
23   A.  Yes, I do.
24        MR. PRATT:  Thank you, Your Honor.  I have nothing
25   further.

Jury Trial Excerpts: Volume 3 • Tuesday, November 29, 2022

71

```
1              THE COURT:  Okay.  Thank you very much, Mr. Pratt.
2         Do you want to follow up at all on any of that?
3              MR. DONNINI:  No, Your Honor.  Thank you.
4              THE COURT:  All right.  Thank you.  All right, Ms.
5    Beeler's your testimony's complete.  You may step down and be
6    on your way.  Thank you for coming to see us today.  Get home
7    safely and you are discharged now from your witness
8    obligations.  Okay.
9              (Witness excused at 1:48 p.m.)
10             (Excerpt 4 concluded)
11                          —  —  —
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 72 comprise full, true and correct excerpts of

7    proceedings taken in the matter of United States of America vs.

8    Lesly Pompy, Case No. 18-20454, on Tuesday, November 29, 2022.

9

10                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, CRR, RMR, RDR, CRC
11                         Federal Official Court Reporter
                           United States District Court
12                         Eastern District of Michigan

13

14

15

16

17   Date: December 5, 2022
     Detroit, Michigan
18

19

20

21

22

23

24

25
```