1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                           SOUTHERN DIVISION

3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5    vs.                                Case No. 18-20454
                                        Hon. Stephen J. Murphy, III
6    LESLY POMPY,

7                        Defendant.
     _____/
8                    **JURY TRIAL EXCERPTS: VOLUME 4**

9
          BEFORE THE HONORABLE STEPHEN J. MURPHY, III
10                  United States District Judge
          Theodore Levin United States Courthouse
11               231 West Lafayette Boulevard
                   Detroit, Michigan  48226
12               Wednesday, November 30, 2022

13   APPEARANCES:

14   For the Plaintiff          WAYNE F. PRATT
     United States of America:  ANDREW J. LIEVENSE
15                              U.S. Attorney's Office
                                211 W. Fort Street
16                              Suite 2001
                                Detroit, Michigan  48226
17                              313-226-9100

18   Also Present:             CHRISTINE OUELLETTE
                               Paralegal Specialist
19
     For the Defendant          GEORGE B. DONNINI
20   Lesly Pompy:               JOSEPH E. RICHOTTE
                                Butzel Long
21                              201 W. Big Beaver
                                Suite 1200
22                              Troy, Michigan 48084
                                313-225-7000
23
                                (Appearances continued next page)
24

25

```
 1   APPEARANCES:  Continued

 2   For the Defendant        RONALD WILLIAM CHAPMAN, II
     Lesly Pompy:             Chapman Law Group
 3                            1441 West Long Lake Road
                              Suite 310
 4                            Troy, Michigan 48098
                              248-644-6326
 5
     Also Present:            VICTORIA MURDOCH
 6                            Senior Paralegal

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
                       Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

1

TABLE OF CONTENTS

2 Government Witnesses Continued:                      Page

3 Excerpts 5, 6 and 7:

4 MICHELLE BUNKER

5 Direct Examination by Mr. Lievense              6
Redirect Examination by Mr. Lievense            55

6 BRIANNA LINDHORST

7

8 Direct Examination by Mr. Pratt               57
Redirect Examination by Mr. Pratt            116

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | EXHIBITS | | |
| --- | --- | --- | --- |
| Identification | | Offered | Received |
| Government Exhibit 85L, Prescription record for Brianna Lindhorst | | 67 | 68 |

| | |
|---|---|
| 1 | Detroit, Michigan |
| 2 | Wednesday, November 30, 2022 |
| 3 | — — — |
| 4 | Excerpt 5: |
| 5 | (Proceedings in progress at 8:50 a.m., all parties |
| 6 | present, jury present) |
| 7 | THE COURT:  So with that, I'd look to Mr. Pratt or |
| 8 | Mr. Lievense. |
| 9 | MR. LIEVENSE:  Yes, Your Honor. |
| 10 | THE COURT:  Go right ahead. |
| 11 | MR. LIEVENSE:  Yes.  The government calls Michelle |
| 12 | Bunker to the stand. |
| 13 | THE COURT:  Okay.  Excellent.  Come right on up here, |
| 14 | Michelle Bunker.  Stay right there, that's fine, and would you |
| 15 | raise your right hand? |
| 16 | M I C H E L L E   B U N K E R |
| 17 | was called as a witness herein, and after being first duly |
| 18 | sworn to tell the truth and nothing but the truth, testified on |
| 19 | her oath as follows: |
| 20 | THE COURT:  Go ahead and have a seat there in that |
| 21 | black chair, make yourself comfortable in it.  Very good.  And |
| 22 | then you're going to want to speak into that microphone but |
| 23 | don't get too close to it. |
| 24 | And Mr. Lievense, you go right ahead. |
| 25 | MR. LIEVENSE:  Thank you, Your Honor. |

```
 1                    DIRECT EXAMINATION
 2   BY MR. LIEVENSE:
 3   Q.   Good morning, ma'am.
 4   A.   Good morning.
 5   Q.   Could you please state and spell your full name for the
 6   court reporter please?
 7   A.   Michelle Bunker, M-i-c-h-e-l-l-e B-u-n-k-e-r.
 8   Q.   And how old are you, ma'am?
 9   A.   Sixty-three.
10   Q.   And are you married?
11   A.   Yes.
12   Q.   Do you have any children?
13   A.   Yes.
14   Q.   I'd like to ask just a couple of questions about your
15   background.  Where are you from?
16   A.   East Grand Rapids, Michigan.
17   Q.   And is it fair to say you've lived in a variety of places
18   during your life?
19   A.   Yes.
20   Q.   Including in Michigan and outside of Michigan?
21   A.   Yes.
22   Q.   And did you live for -- for a time in Southeast Michigan
23   in the Monroe, Michigan area?
24   A.   Yes.
25   Q.   And was there a time that you moved to Temperance,
```

1    Michigan which is sort of near Monroe?

2    A.   Actually we went from Grand Rapids or actually Allegan,

3    Michigan to Temperance, Michigan.

4    Q.   Okay.  And why did you move around at times?

5    A.   Well, at that time my husband was transferred.

6    Q.   So you followed -- you followed your husband for his job?

7    A.   I did.

8    Q.   I'd like to ask you about your education.  Did you

9    graduate from high school?

10   A.   Yes.

11   Q.   Did you attend any additional educational programs?

12   A.   Yes.

13   Q.   What was that?

14   A.   I went to college for one year or part of one year, and I

15   also went to -- I went to school to become a dental assistant.

16   Q.   And did you eventually work in a dentist's office?

17   A.   Yes.

18   Q.   And did you do dental assistant work or what type of work

19   did you do in a dentist's office?

20   A.   Primarily I was an office manager.  I also did dental

21   assisting.  But both places that I worked I did all of the

22   office work.

23   Q.   And did that office work include becoming familiar with

24   the dentist's office billing of insurance companies or billing

25   patients?

1    A.   Yes.

2    Q.   During your life how would you describe your overall

3    lifestyle?

4    A.   Eclectic.

5    Q.   Pretty active?

6    A.   Yes.

7    Q.   And before -- let me talk to you about before 2006.  Due

8    to your eclectic and active lifestyle, what -- what did that

9    result in at times?

10   A.   Injuries.

11   Q.   And what types of injuries, again talking about before

12   2006?

13   A.   Car accidents, three-wheeler accident, four-wheeler

14   accident, horse fell on me, sailboat accidents, it goes on.

15   Q.   And is it fair to say you had several broken bones?

16   A.   I believe that it's 29.

17   Q.   All right.  In approximately 2005 to early 2006, as a

18   result of these accidents, were you in some pain?

19   A.   Yes.

20   Q.   And at that point in time how did you deal with that pain?

21   A.   After my motorcycle accident --

22   Q.   I'm talking about before the auto -- before the motorcycle

23   accident.

24   A.   Before that?

25   Q.   Yeah.

1   A.   Just Ibuprofen, Tylenol, there was a little bit of

2   Vicodin, but very little.

3           THE COURT REPORTER:  Very little what?

4           THE WITNESS:  Vicodin.

5   Q.   So again, despite all of these different accidents, you

6   were managing with --

7   A.   Minimal.

8   Q.   -- minimal pain -- minimal medication?

9   A.   Yeah.

10  Q.   All right.

11  A.   Until the big one.

12  Q.   Until the big one.  All right.

13          What happened in 2006 and where were you living at

14  the time?

15  A.   We were living in Allegan, Michigan.  I had a motorcycle

16  accident.  Pretty much ended my working career and I --

17  basically my leg was threatened.  They weren't sure I was going

18  to keep it because of the motorcycle accident.

19  Q.   And can you describe the injury to your leg, like what

20  would -- what would you --

21  A.   At the time after the accident, my leg blew up to about

22  four times its size.  If you touched it, it was like a wave of

23  fluid underneath the skin, and that was the entire leg.  There

24  was severe bruising.  There was a bruise that rose to the top

25  of the skin and became hard like linoleum, it was black, and

1    that had to be -- eventually they figured out what to do about

2    it.  It took them forever.

3    Q.  You say at the time you lived in Allegan, Michigan.  Is

4    that on the west side of the state or is that on the east side

5    of the state?

6    A.  That would be southeast; no, southwest.

7    Q.  So not -- not near Monroe?

8    A.  Excuse me.  No, the opposite side.

9    Q.  At this time you weren't living anywhere near Monroe,

10   correct?

11   A.  That is very correct.

12   Q.  Okay.  Soon after the accident did you move to the

13   Southeast Michigan area?

14   A.  I did.

15   Q.  And was that when your husband's job kind of caused him to

16   move -- you guys to move there?

17   A.  That is correct.

18   Q.  After this accident were you in increased pain?

19   A.  Yes.

20   Q.  Significant?

21   A.  Once I -- the -- the nerves were damaged so badly that I

22   actually didn't feel a majority of pain or feel any of the

23   discomfort.  And then once it started to reduce in size and I

24   guess the nerves started working, it became crazy pain.

25   Q.  And at that time where did you initially go for treatment

1    for pain in your leg?

2    A.   Dr. Lora Thaxton.

3    Q.   And where were she practicing, where was her office?

4    A.   Toledo, Ohio.  Sunforest Court was the road.

5    Q.   And did you -- what types of treatment did Dr. Thaxton

6    provide for you?

7    A.   Injection in my knees because my knees were bad and -- at

8    least they were, acupuncture, some kind of light, UV therapy.

9    She referred me out to have blocks because she didn't do them

10   in my -- in my back opposed to my legs or knees.  I think

11   that's about it.  And then, of course, the medication.

12   Q.   She did prescribe you some pain medication?

13   A.   Quite a lot, yes.

14   Q.   Do you remember what type?

15   A.   Well, at one point I -- you know, I -- I -- I can't say

16   how it built, but at one point I was on a fentanyl patch, a --

17   also it -- it was either Vicodin or Norco.  It was kind of

18   during that time where it changed over: oxycodone, Fioricet,

19   Neurontin.  I think that might cover it.

20   Q.   Okay.  And were those at different times, those different

21   drugs, or all at one time?

22   A.   All at one time.

23   Q.   All right.

24   A.   It didn't start out that way but --

25   Q.   Okay.

1    A.   -- it built up to it.

2    Q.   It built up to that.

3         And you said the time it changed you think you said

4    from Vicodin to Norco, is that just the -- kind of the name of

5    the drug changed, is that what you meant by that?

6    A.   Yeah, it's when the drug changed it -- its -- its chemical

7    balance so that there wasn't as much Tylenol in it.

8    Q.   Okay.  Now, do you recall how long you treated with Dr.

9    Thaxton?

10   A.   I'm not positive.

11   Q.   Approximately?

12   A.   Maybe three years.

13   Q.   And did there come a time that you stopped treating with

14   Dr. Thaxton?

15   A.   Yes.

16   Q.   And can you tell the jury what happened that caused you to

17   not see Dr. Thaxton anymore?

18   A.   My -- she wasn't my -- my son's girlfriend and the person

19   that they had a baby with was a little on the not balanced

20   side, and she contacted Dr. Thaxton before she left.  She for

21   some reason thought I had done something to her and -- or she

22   was just angry, and she called Dr. Thaxton and said that I was

23   selling my pills.  At that point I got kicked out.

24   Q.   So just to get this right, it's your son's sort of

25   girlfriend?

1    A.   Kind of like baby mama.  I don't like that term but...

2    Q.   And they had a child together, correct?

3    A.   Yes.

4    Q.   And --

5    A.   They lived with us for a worthwhile period of time.

6    Q.   And this woman just called Dr. Thaxton and alerted and

7    told her that you were selling your pills?

8    A.   Yeah.  She was doing other things as well, but yes.

9    Q.   As she meaning the -- the woman?

10   A.   Correct.

11   Q.   And by other things you mean causing difficulties for your

12   family?

13   A.   Trying to commit suicide in front of my granddaughter, et

14   cetera.

15   Q.   Okay.  Now, based on that one report from this woman, Dr.

16   Thaxton discharged you from her practice?

17   A.   She had me come in for my appointment, and whenever I had

18   an appointment I -- I made sure that -- I mean no matter

19   what -- because she would disappear, she would leave you

20   with -- with periods of time that you had no medication because

21   she would go to Florida.  So I always put two of my pills off

22   to the side because she would give me injections and they hurt

23   so badly, and it was usually in both knees.

24          So supposedly I should have been -- and not

25   supposedly -- I should have been out of meds because of how

1    long she extended the period of time that she was treating

2    patients that should have been in during that time that she was

3    out.  And because I had the two pills and I had taken one

4    before I went there and I was going to take the other after and

5    I showed positive, I got tossed.

6    Q.  So it was two things really.  There was the report from

7    the woman that you had sold your pills and you tested positive

8    when she thought --

9    A.  I should be negative.

10   Q.  And so just from that incident, Dr. Thaxton kicked you

11   out?

12   A.  She most certainly did.

13   Q.  You -- had you tested positive for illicit drugs?

14   A.  No.

15   Q.  No?

16   A.  No.  No.

17   Q.  Did you immediately seek out another doctor?

18   A.  Oh, no, I didn't.

19   Q.  Did you manage with your pain for a period of time?

20   A.  I dealt with it.

21   Q.  You dealt with it?

22   A.  Yep.

23   Q.  And approximately how long passed?

24   A.  Well, it's a long time ago.

25   Q.  Let me ask the question a different way.

1    A.   Okay.

2    Q.   Did there come a time later on that you went to see Dr.

3    Pompy?

4    A.   Absolutely.

5    Q.   And had you gone ahead and made the appointment yourself?

6    A.   No.

7    Q.   What happened?

8    A.   My son had an appointment.  I was hurting really badly.

9    He let me go to his appointment with him, not instead of him.

10   And I -- you know, we -- we talked to the office once we got

11   there and the -- and he was an initial patient as well, and

12   they squeezed us both in or squeezed me in with his appointment

13   the day that he had an appointment.

14   Q.   And did they give you a new patient form to fill out that

15   day?

16   A.   I -- yes.

17   Q.   And did you fill that out?

18   A.   Yes.

19   Q.   And so you basically just showed up with your son and

20   asked to be fit in?

21   A.   I did.

22   Q.   Did you have a referral, did some -- had someone referred

23   you to Dr. Pompy or referred you for pain management?

24   A.   No.

25   Q.   Can you describe the waiting room or outside the reception

```
1    area on that first visit to Dr. Pompy's office?
2    A.  It was full.  The lobby was completely full and it -- it
3    was tight.  I mean they put every chair possible in there.  The
4    overflow was in the hallway, like a line of people sitting down
5    against the wall in the hall, in the benches, standing up,
6    hanging out, waiting for their turn.
7    Q.  Is it possible they were waiting for a different doctor or
8    how did you know those people in the hallway were waiting for
9    Dr. Pompy?
10   A.  Dr. Pompy had an office that was the farthest down the
11   hall, and I don't even know if other doctors were in that
12   vicinity.
13   Q.  All right.  Approximately how long did you and your son
14   wait at that first visit?
15   A.  Maybe two hours.
16   Q.  And was it during that time you filled out the new patient
17   questionnaire?
18   A.  Yes.
19   Q.  And even though the waiting room was packed, they still
20   fit you in that day?
21   A.  Yes.
22   Q.  Eventually did a medical assistant call -- call you back
23   into the -- sort of not the waiting room, in the -- the back
24   area?
25   A.  Both my son and I, yes.
```

1    Q.   Oh, so they called you back together?

2    A.   Yes.

3    Q.   Okay.  And were you put in the same room?

4    A.   Yes.

5    Q.   And so you were -- were you seen by the same medical

6    assistant?

7    A.   Yes.

8    Q.   So one medical assistant brought you and your son?

9    A.   Correct.

10   Q.   And describe for the jury what happened during that --

11   that visit --

12   A.   My son Joe had --

13   Q.   -- with the medical assistant.

14   A.   Pardon?

15   Q.   Start with just the medical assistant.

16   A.   I am.

17   Q.   Okay.

18   A.   My son Joe had his -- his form filled out so they started

19   with him.  I continued working on my form while he was being

20   assessed by the MA.  I completed what I needed to complete

21   overall or almost before Dr. Pompy came in.  I hadn't talked to

22   the MA until after Dr. Pompy came in.  He introduced himself to

23   both myself and my son.  He started talking to Joe.

24   Q.   Is Joe your son?

25   A.   Pardon?

1   Q.   You just mentioned Joe.  Is Joe your son?

2   A.   Yes.

3   Q.   Okay.

4   A.   He -- he started talking to my son, and I not only was

5   still filling out the form but the MA started talking to me at

6   that point.

7   Q.   So the medical assistant dealt with your son first?

8   A.   Yeah.

9   Q.   And then when Dr. Pompy came in to talk to your son, the

10  medical assistant shifted to you?

11  A.   Right.

12  Q.   And describe the medical -- your interactions with the

13  medical assistant if you -- to the extent you recall.

14  A.   It was pretty normal.  She asked questions, I answered

15  them, she entered a great deal into the computer, and that's --

16  that's pretty much it, unless I'm missing part of the question.

17  Q.   No.  And at some point then did Dr. Pompy shift his

18  attention from your son to you?

19  A.   Yes.

20  Q.   And what did he say to you when he came over to you?

21  A.   He assessed me, you know, the little -- like checked my

22  reflexes on my knees.

23  Q.   Did he ask you about your medical history?

24  A.   Absolutely.

25  Q.   Did you tell him that Dr. Thaxton had kicked you out of

1   her practice?

2   A.  Yes, and why.

3   Q.  You told him why?

4   A.  Yes.

5   Q.  Because someone had told Dr. Thaxton you had been selling

6   pills and also that you had tested positive for drugs when the

7   doctor thought you shouldn't have?

8   A.  Correct.  Dr. Pompy stated that "don't worry about that,

9   we're going to start over from here."

10  Q.  And was he aware that it had been several months --

11  A.  Yes.

12  Q.  -- between the time you had seen Dr. Thaxton and came to

13  him?

14  A.  Yes, because I mentioned that I was very un -- very

15  uncomfortable, I was hurting really badly, and that even -- he

16  gave me a barrage of tests I needed to do, and I mean it was a

17  lot.

18  Q.  Orders of tests that -- that you had to do later?

19  A.  That I had to do right away so that I could start seeing

20  him.  And I asked, you know, is it possible you can help me out

21  with any form of -- of relief from my pain, so they started me

22  on Vicodin.

23  Q.  So he prescribed you pain medication that first visit?

24  A.  Yes.

25  Q.  Even though you hadn't done any of those tests yet?

1    A.   Correct.

2    Q.   And even though you had told him that another doctor had

3    discharged you?

4    A.   Yes.

5    Q.   Did -- I -- you also tell him that you -- when -- when you

6    told him that you -- someone had reported you for selling

7    pills, did he inquire further about that?

8    A.   No.

9    Q.   Did he ask for any explanation as to how you tested

10   positive for a medication that you -- that Dr. Thaxton at least

11   thought you shouldn't have had in your system?

12   A.   No.

13   Q.   After that visit with Dr. Pompy did you go ahead and get

14   some of those tests done that he had ordered?

15   A.   Yeah.

16   Q.   Do you remember what those tests were?

17   A.   Some of them.  There was an MRI, blood work, urine,

18   X-rays.  We -- he pretty much did head to toe, but I also had

19   problems head to toe.

20   Q.   All right.  So let's talk about your second appointment

21   with Dr. Pompy.  Did you indeed return for a second visit?

22   A.   Yes.

23   Q.   And when you arrived can you again describe what you saw

24   in the waiting room and hallway area?

25   A.   It was the same thing.  There were a lot of people in

1   the -- in the office, in the hallway.  It was -- you know, I --

2   I always thought of it as -- as being at Disney World being in

3   line, you know, for a ride.

4   Q.  And do you recall how long you waited at the second visit,

5   approximately?

6   A.  Hour and a half to two hours.

7   Q.  And at some point -- when you went for the second visit

8   did you have to fill out a -- a -- I mean the first time you

9   filled out a new patient questionnaire, is that right?

10  A.  Yes.

11  Q.  And when you came again did you --

12  A.  There was -- there was always a form to fill out when you

13  went in.

14  Q.  And so did you fill it out that day?

15  A.  Yeah.

16  Q.  And eventually did the medical assistant bring you back

17  into the exam room?

18  A.  Yeah.

19  Q.  When you -- so you said you waited about an hour and a

20  half to two hours outside.  Was there a typical amount of time

21  that you would then spend or wait with the medical assistant as

22  well, kind of an additional wait time?

23  A.  You mean once I was taken back?

24  Q.  Correct.

25  A.  That could be anywhere from -- 15 minutes would be short,

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1307   Filed 12/05/22   Page 22 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

22

1    45 could be -- it was -- I -- I always counted on about 30ish

2    to 45 minutes back there.

3    Q.  At some point did Dr. Pompy come and see you during the

4    second visit?

5    A.  Yes.

6    Q.  And how would he greet you?

7    A.  He would say, "Hello, what can I do for you?" and shook my

8    hand.

9    Q.  And did he review the reports from the tests he had

10   ordered?

11   A.  Yes.

12   Q.  Did he talk about those with you?

13   A.  I don't recall.

14   Q.  All right.

15   A.  He -- I don't recall.

16   Q.  All right.  During the second visit did he talk to you

17   about the possible services he could provide for you?

18   A.  Absolutely.

19   Q.  What type of things were those?

20   A.  Well, for one, if I wanted to continue seeing him, I -- I

21   needed to be willing to do the blocks in my neck and in my

22   back.  As time went on, there were other things --

23   Q.  All right.  So --

24   A.  -- that were offered and suggested.

25   Q.  -- when I asked -- I asked whether he suggested various

1   services.  It sounds like he suggested blocks in your neck and

2   back?

3   A.  Yes.

4   Q.  Did he also mention things like Botox for migraines?

5   A.  Yeah.

6   Q.  Now, were you receptive to this idea of blocks at that

7   second visit?

8   A.  No, I -- I'd had them before and it made it worse and I

9   was terrified to have them done again.

10  Q.  And did you tell Dr. Pompy this?

11  A.  Yes.  He said that it could be a different experience

12  because it was a different person doing it, and if I wanted to

13  continue, I needed to do that to show that I'm trying to make

14  it better.

15  Q.  Even though you had already tried them before?

16  A.  Not with him but others, yes.

17  Q.  Right.  And was it your sense that -- again that you -- it

18  was a condition of you to do these blocks in order to continue

19  to see him?

20  A.  Absolutely.

21  Q.  Did he say anything about whether that condition of doing

22  the blocks, did it matter whether you had insurance or not?

23  A.  Yeah.  Basically when he would suggest a service, they

24  would check to see if your insurance would cover it and then

25  they would schedule you accordingly.  If your insurance wasn't

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1309   Filed 12/05/22   Page 24 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

24

1    going to cover it, they'd -- they figured something else out I

2    guess.  But I ran into that with the Botox because I -- as

3    much -- I would have loved to have had the Botox done because

4    maybe I'm a little vain because the extra they were going to

5    put somewhere else, but I did not -- my insurance did not cover

6    it whatsoever so it didn't get done.

7    Q.  And so based on your interaction with Dr. Pompy, did you

8    believe that if you wanted to get pain medication, you had to

9    do the blocks?

10   A.  Yes.

11   Q.  Did you try them with Dr. Pompy?

12   A.  Yes.

13   Q.  How did that go?

14   A.  Very badly.

15   Q.  Did you do a series of three pain blocks?

16   A.  Yes.

17   Q.  And did you hurt more or less?

18   A.  It was horrible.  I hurt a lot more.  Dr. Pompy stated

19   that it would get better in a few days and it just got worse.

20   Q.  On the second visit, backing up there, did Dr. Pompy again

21   prescribe you a narcotic pain medication?

22   A.  Yeah.  I think at that point he gave me two.  I'm -- I'm

23   not positive but I believe that it was oxycodone or, excuse me,

24   OxyContin and Norco.

25   Q.  I haven't tied this to a particular time, but I mentioned

1   in your -- I think your first visit, was that in approximately

2   2012?

3   A.   I'm sorry?

4   Q.   Was that in approximately 2012 when you first saw Dr.

5   Pompy, if you recall, 2011, 2012, or what's your recollection?

6   A.   I'm not great at the years, but at -- the time frame is

7   about right, yes.

8   Q.   So that would have been -- the second visit would have

9   been soon thereafter, within -- within a month?

10  A.   A month, within a month.

11  Q.   All right.  And did you then treat with Dr. Pompy from

12  2012 until when?

13  A.   Until he was raided.

14  Q.   All right.  I want to -- I'm not going to go visit by

15  visit, but I'd like to ask you how a typical visit went to Dr.

16  Pompy's office.  How would that go on a day you had an

17  appointment?

18  A.   Starting with going in, it would -- you'd have the wait in

19  the reception area or in the hallway.

20  Q.   Was it always busy?  I mean you've described two days

21  where it was busy and people in the hallway and the waiting

22  room.  Is that how a typical visit went?

23  A.   Always.  I think one time, like the entire time I went to

24  Dr. Pompy, I got in and out within an hour which was shocking.

25  Q.   So generally you would arrive and it would be very busy?

1    A.   Yes.

2    Q.   And you would have to fill out the questionnaire?

3    A.   Yes, or take it home with us beforehand.

4    Q.   What do you mean by that?

5    A.   You could take them home with you.  They left them out.

6    You could take them home with you and fill it out prior to your

7    appointment and just hand it to them.

8    Q.   And so would a typical wait time outside in the waiting

9    room again be about two hours, an hour and a half to two hours?

10   A.   Yes.

11   Q.   Describe the -- when you were brought back to the exam

12   room area, can you describe the exam room area?

13   A.   It was kind of like in a relatively small area.  They

14   would have not shower curtains but like medical curtains run so

15   that it was almost like stalls, and then they would have a

16   computer and table, a couple of chairs, and that's where you

17   would go with the MA.  There were a few rooms but usually I

18   ended up in those stall-like things.  There -- they made it so

19   that they could get a lot of people in there, you know, so they

20   were -- it was a small area with a lot of those stalls, maybe

21   four, in the section that I almost always ended up in.

22   Q.   You mentioned curtains.  So there were not -- for many of

23   the rooms there was no doors?

24   A.   Correct.  It was an open entrance completely and just that

25   shower curtain-like thing dividing.

1   Q.  And did you -- were you then able to see the other

2   patients or hear conversations with the other patients between

3   the patients and the medical assistants or the doctors?

4   A.  Totally.  You couldn't see them through the -- the

5   curtain.  You could see them going by to get -- go into it or

6   leaving, and you definitely could hear anything they had to say

7   because there was no closure whatsoever.

8   Q.  And so the medical assistant would go over the

9   questionnaire with you?

10  A.  Primarily they would look at the medication that you were

11  taking, how -- like later on -- I'm going to jump ahead just a

12  wee bit.  Later on Dr. Pompy brought the urinalysis into his

13  office so he had someone during the urine tests prior to your

14  appointment.  When he was doing that, that would also be

15  discussed.  But, yeah, the MA would look over the -- primarily

16  the medications, not much of anything else.

17  Q.  All right.  You've raised a point.  Would you sometimes

18  have to do a urine drug screen before your appointment with Dr.

19  Pompy?

20  A.  Yeah.  More so later once he had the urine person area

21  that he -- he integrated into his office.  At that point it was

22  every single time.  Well, I may be speaking incorrectly.  It

23  might have been every other time.

24  Q.  Would the medical assistant then prepare the

25  prescriptions?

1   A.   They would print them off.

2   Q.   And how would they know what prescriptions to print off?

3   A.   They would automatically go with what you had already, and

4   if there was a change, Dr. Pompy would inform them while he was

5   in front of you, or me.

6   Q.   And so eventually would Dr. Pompy come into the exam area?

7   A.   Yes.

8   Q.   And how would he greet you?

9   A.   Like I described, he would walk up, he would smile, he

10   would shake my hands, "How are you and what can I do for you?"

11   Q.   Did he look at any papers?

12   A.   He would look at the prescriptions that were written and

13   sign them.  He really didn't look at the papers as much as ask

14   you if there was any -- anything that needed to be changed,

15   like if anything had changed on me or if there was something of

16   concern.

17   Q.   And if you didn't raise anything, what would happen?

18   A.   He would give the greeting, he would sign the

19   prescriptions, he would be very polite and nice, and -- and

20   then he would move on to the next person.  I would have seen

21   him for what I called microscopic visit, but it was a couple of

22   minutes, two.

23   Q.   Were some visits less than that?

24   A.   Easily.

25   Q.   I'm sorry?

1    A.   Easily.

2    Q.   Were there any times he would spend, you know, more time

3    with you?

4    A.   Only if something was wrong, and -- and then he would

5    discuss what procedures could be done for you.

6    Q.   So if -- if he wanted to talk to you about additional

7    procedures, he would spend more time with you?

8    A.   That is correct.

9    Q.   With the additional time with you, would that be about

10   your -- your health condition or how would it --

11   A.   No.

12   Q.   Well, if it's about a procedure, why --

13   A.   Once I stated what was going on, sometimes he'd send me

14   out for another test, but otherwise the suggestion would be,

15   you know, a procedure that -- that either he would do -- well,

16   I believe all of them were done by him.

17   Q.   That he would want you to do?

18   A.   Yeah.

19   Q.   Or suggest to you?

20   A.   Yes.

21   Q.   And was this even after you had had the bad experience

22   with the pain blocks with him?

23   A.   Yes.  There were other types of procedures that he would

24   do.

25   Q.   He would suggest anyway?

1    A.   Pardon?

2    Q.   He would suggest them to you?

3    A.   Yes.

4    Q.   I'd like to show you, if possible -- this is Government's

5    Exhibit 15, page 234.  This is an exhibit that's been

6    preadmitted.

7    A.   Where is it?  Oh.

8         MR. LIEVENSE:  If you could highlight the top half

9    please, Ms. Ouellette.

10   BY MR. LIEVENSE:

11   Q.   What are we looking at here?

12   A.   That is a questionnaire after I'd had a pre -- after I had

13   had a block or prior -- oop, excuse me, that would be pre-block

14   so it would be prior.

15   Q.   Is this with the -- was this -- at the top it says "Pre

16   Block and Follow Up Visit Questionnaire."

17   A.   Correct.

18   Q.   Is this the type of questionnaire you'd fill out on every

19   visit?

20   A.   I don't know that they all said "Pre Block and Follow Up

21   Visit," but, yeah, it looks about right.

22   Q.   All right.  And under "Reason For Today's Visit" -- well,

23   first of all, is that your handwriting at the top?

24   A.   Yes, it is.

25   Q.   And under "Reason For Today's Visit," is that -- did you

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1316   Filed 12/05/22   Page 31 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

31

1    fill that part out?

2    A.  Yes.

3    Q.  And what did you check?

4    A.  "Renew current medication at the same dose."

5    Q.  All right.  And at the bottom right there, the check over

6    "Drug counseling," do you see that?

7    A.  I do.

8    Q.  And the handwriting there, is that your handwriting?

9    A.  No.

10   Q.  Okay.  Now, at the top it says May 26th, 2016 or, excuse

11   me, May 27, 2016, is that correct?

12   A.  Yes.

13   Q.  All right.  But that -- and that's your handwriting,

14   right?

15   A.  Yes.

16   Q.  Okay.  I will tell you that I -- when I looked through

17   your medical chart --

18          MR. LIEVENSE:  If we could look at Exhibit 15, page

19   739, and the part under -- the top half there, it says Visit

20   Note date, the dates there.

21   BY MR. LIEVENSE:

22   Q.  And it says Visit Note, May 26th, 2016.  Do you see that?

23   A.  I do.

24   Q.  Is it possible that your visit was on May 26th and not

25   May 27th, do you know, or...

1    A.   Can I see the rest of the -- the sheet?

2    Q.   Sure.

3         (Brief pause)

4    A.   It's possible.  I could have put the wrong -- the wrong --

5    the wrong date in.

6    Q.   All right.  You're one day off, right?

7    A.   Uh --

8    Q.   One day difference?

9    A.   Something was, yes.

10   Q.   All right.

11   A.   Because I wouldn't have been there twice in a row.

12   Q.   Okay.  That's really where I was going.  So it's one day

13   or the other?

14   A.   That is correct.

15   Q.   All right.  You don't recall ever going there two days in

16   a row?

17   A.   No.

18        MR. LIEVENSE:  Under "Chief Complaint" and

19   "Subjective", if you could highlight that whole section.

20   BY MR. LIEVENSE:

21   Q.   What does it say under "Chief Complaint"?

22   A.   "Bunker, Mitchell presents today for medication refill,

23   pain and drug counseling: for express scripts."

24   Q.   Do you recall ever being talked about drug counseling for

25   express scripts?

1    A.   I don't know what express scripts are, and the drug

2    counseling never happened, not to -- not to my knowledge, as in

3    unless they're considering drug counseling as asking me what

4    I'm taking.  There was never any information beyond that.

5    Q.   Were any discussions with you about, you know, the risks

6    or side effects of the drugs you were on?

7    A.   No.

8    Q.   Or potential long-term consequences of being on the drugs

9    for a long time?

10   A.   No.

11   Q.   Or how the drugs made you feel or whether you were having

12   any problems with the medication?

13        Let me ask that a different way.  Unless you raised

14   the issue, did they ever ask you?

15   A.   No.

16   Q.   And by they, I mean the medical assistant or Dr. Pompy.

17   A.   The office.  Yeah, no.

18        MR. LIEVENSE:  Can we go back to page 234 please, and

19   under the -- I guess the lower half please.

20   BY MR. LIEVENSE:

21   Q.   Where it says "Circle the Level/Intensity that best

22   applies to You," do you see that section?

23   A.   I do.

24   Q.   And what did you circle under "My Pain Intensity is at"?

25   A.   5.

1   Q.  And what did you circle for "My Activity Level"?

2   A.  8.

3   Q.  Activity level is above that, I'm sorry.

4   A.  Oh, I'm sorry.  Oh, I see.  7.

5   Q.  And what was an 8, what did you circle for 8?

6   A.  That was "My Functioning Level is at, My Social Activity

7   Level is at."

8   Q.  And both of those were 8?

9   A.  They were.

10  Q.  And an 8 -- a 7 and 8, would that mean a pretty high

11  Activity Level or Functioning Level or Social Activity Level?

12  A.  Right, I -- I got -- I was able to get out, see people.

13  Q.  And under "About Your Pain," do you -- is there a box

14  checked there, "My pain has," and there's options for

15  "Increased," "Decreased" or "Stayed the same" or "Different,"

16  is that right?

17  A.  I'm sorry, where is that?

18  Q.  Under "About Your Pain."

19  A.  Oh, I'm sorry.  Okay.  My pain has stayed the same.

20          MR. LIEVENSE:  And if we could go to page 602 please.

21  BY MR. LIEVENSE:

22  Q.  Do you recognize this?

23  A.  Yeah.

24  Q.  And what is -- is that a prescription Dr. Pompy issued to

25  you on May 26th, 2016?

1   A.   I'm sure.

2   Q.   And what was that prescription for?

3   A.   Opana.

4   Q.   Is that oxymorphone, if you know?

5   A.   I believe it is.

6   Q.   I want to back up or -- or step away from the medical

7   record for a moment, Ms. Bunker, and -- because that visit was

8   in May of 2016 and I think you said you initially saw Dr. Pompy

9   around 2012, is that right?

10  A.   Right.

11  Q.   All right.  Can you describe how you felt when you

12  regularly took the pills Dr. Pompy was prescribing to you?

13  A.   I didn't realize how messed up I was.  My husband did.  I

14  didn't catch on.  It did make me tired.  My skills were

15  impaired.

16  Q.   What do you mean, skills?

17  A.   There was a point where I stopped driving.  There was a

18  point where I stopped seeing people.  There was a point where,

19  you know, I just -- I -- my mind was fuzzy.

20  Q.   Now, when you took the pills did they make you high, did

21  you have this like euphoric feeling?

22  A.   At the beginning, yes, but once my body adjusted, no.

23  Q.   And so when you said taking them didn't make you high

24  because your body adjusted and you -- but you were kind of

25  having a detriment to your skills, how were you feeling, like

```
1   why would you -- why would you keep taking them?
2   A.  Because I hurt a lot.
3   Q.  Did -- did there come -- well, you said they weren't
4   helping you as much though, right?
5           MR. DONNINI:  Your Honor, objection.  That's not her
6   testimony at all.
7           THE COURT:  Well --
8   BY MR. LIEVENSE:
9   Q.  Were the -- were the pills helping?
10          THE COURT:  Let's -- let -- let's just let the
11  witness tell the jury what she felt.
12          Go ahead, Mr. Lievense.
13  BY MR. LIEVENSE:
14  Q.  At some -- at some point did you feel like you were
15  dependent on the pills?
16  A.  Yes.
17  Q.  Describe what that means, what that meant for you.
18  A.  What it meant was that I would be fearful that something
19  would interfere with my appointment coming up.  It would -- I
20  would be fearful that my medication would be changed because
21  that would affect me.  I don't really know how else to answer
22  that.
23  Q.  When you say you were fearful that something would
24  interfere with your appointment, how would you feel if you
25  didn't get your next prescription?
```

1   A.  I would go into withdrawal.

2   Q.  What does it mean to go through withdrawal?

3   A.  It's very uncomfortable.  You -- you sweat pro -- I sweat

4   profusely.  I'm sure other people do it differently.  You're a

5   lot more -- there's a lot more pain going on because you're not

6   receiving the -- the pills.  I don't know how else to answer

7   that.  I mean it was very uncomfortable and it was painful.  I

8   mean it was not only painful where you hurt, it was painful

9   like in your joints.

10  Q.  Did you feel at one point while being prescribed the

11  medication by Dr. Pompy that you were physically dependent on

12  getting those pills each month?

13  A.  Yes.

14  Q.  Did you feel at some point that you became addicted to

15  those drugs?

16  A.  Yes.

17  Q.  Had you gone to Dr. Pompy for him to treat your pain?

18  A.  Yes.

19  Q.  Had you gone to Dr. Pompy to -- for him to make you

20  addicted to these drugs?

21          MR. DONNINI:  Your Honor, objection.

22          THE COURT:  Sustained.

23  BY MR. LIEVENSE:

24  Q.  Were you addicted to these drugs before you began seeing

25  Dr. Pompy?

```
1    A.   No.
2    Q.   Did you become addicted to these drugs while you were
3    seeing Dr. Pompy?
4    A.   Yes.
5    Q.   After that -- I'd like to fast forward to August of 2016.
6    Is that near the end of the time you saw Dr. Pompy?
7    A.   Do you know if that was my last appointment?
8    Q.   Well, I'll get to that.
9    A.   Okay.
10            THE COURT:  He can't -- he can't testify, ma'am.
11            THE WITNESS:  Oh, I'm sorry.
12            THE COURT:  You gotta -- you gotta answer the
13   questions.
14            THE WITNESS:  I apologize.
15            THE COURT:  That's all right.
16   BY MR. LIEVENSE:
17   Q.   That's all right.
18   A.   Okay.  To answer the question, can you repeat it please?
19   Q.   Sure.
20            MR. LIEVENSE:  Let's go to page -- Exhibit 15, page
21   262.
22   BY MR. LIEVENSE:
23   Q.   And what is -- is this another one of the questionnaires
24   you filled out?
25   A.   Yep.
```

1    Q.   What is the date on this questionnaire?

2    A.   8-25-2016.

3    Q.   And what did you check for "Reason for Today's Visit"?

4    A.   "Renew current medication at the same dose."

5    Q.   All right.  And on the right hand -- by the right-hand

6    side is -- does it -- is "Drug counseling" checked?

7    A.   It is.

8    Q.   Is that your handwriting?

9    A.   Nope.

10   Q.   And what is written next to that?

11   A.   I think it says "2A oxycodone," co something.

12   Q.   All right.  Do you know what 2A means?

13   A.   No idea.

14   Q.   All right.

15           MR. LIEVENSE:  Can we go to page 296 please?

16   BY MR. LIEVENSE:

17   Q.   Have you ever seen one of these pages before during your

18   time treating with Dr. Pompy?

19   A.   No, I -- no.

20   Q.   You talked about --

21   A.   I don't think so.

22   Q.   -- you talked about how you would at times go for a urine

23   drug screen with Dr. Pompy, is that right?

24   A.   Yep.

25   Q.   And do you recall whether those -- the results of those

1  urine drug screens were available to the medical assistant or

2  Dr. Pompy when you visited with him?

3  A.  Yes.  I do know on subject that, you know, you would write

4  out all the medications you were taking before the urinalysis,

5  and there were times that, at the beginning particularly, where

6  I forgot to write Fioricet for -- because I didn't think that

7  was --

8       THE COURT REPORTER:  I'm sorry, where you forgot to

9  write what?

10      THE WITNESS:  Fioricet.

11      THE COURT REPORTER:  Okay.

12  A.  Because I didn't realize that that was a substance, and I

13  was being given that for my head.

14  Q.  Okay.

15  A.  So they eventually questioned me about it, that it was

16  showing up in my blood, or not blood, urine.

17  Q.  All right.  So you are aware at times your urine drug

18  screens showed maybe abnormal at least to what -- at least

19  that's what the --

20  A.  In reference to that, yes.

21  Q.  All right.  Are you aware of any other instances?  So for

22  example, this one is from February of 2016 and says 1C, and the

23  one I showed you before said 2A.  Do you -- were there more

24  than one instance or just the one instance that you remember?

25  A.  There was one other.

1    Q.   Okay.

2    A.   I -- can I explain it?

3    Q.   Sure.

4    A.   I'd had surgery.  My husband filled the prescription.  No?

5    Q.   Was that about a urine drug screen or was that a different

6    issue?

7    A.   That was a different --

8    Q.   I'll get --

9    A.   Sorry, that was a different issue.

10   Q.   Okay.

11         MR. LIEVENSE:  If we could go back to page 262.

12   BY MR. LIEVENSE:

13   Q.   And it says -- and again it said "2A oxycodone," is that

14   right?

15   A.   Yes.

16   Q.   And that -- that was on August 25th, 2016?

17   A.   Yep, it is.

18   Q.   All right.

19         MR. LIEVENSE:  Could we go to page 793 please and

20   highlight the middle area?

21   BY MR. LIEVENSE:

22   Q.   Under "Chief Complaint," the second sentence, could you

23   read that?

24   A.   "Patient counseled as to point of care urine drug screen

25   on 8-25-2016 and shows positive for appropriate prescribed

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1327   Filed 12/05/22   Page 42 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

42

1    drugs -- substances."  Pardon me.

2           MR. LIEVENSE:  Can we now go to page 270 please, and

3    again highlight the top half, Ms. Ouellette, please.  Thank

4    you.

5    BY MR. LIEVENSE:

6    Q.  Is this again a questionnaire that you filled out?

7    A.  Yes.

8    Q.  And what is the date on this?

9    A.  9-11-16.

10   Q.  And again, what was checked under "Reason for Today's

11   Visit"?

12   A.  "Renew current medication at the same dose."

13   Q.  And again look in the bottom right-hand corner.  Is that

14   your handwriting?

15   A.  No.

16   Q.  What is checked there?

17   A.  "Drug counseling."

18   Q.  And what is written next to that?

19   A.  "Inappropriate pill count."

20   Q.  Were you ever told that you had -- do you know what a pill

21   count is?

22   A.  It's where they count your pills.

23   Q.  Did Dr. Pompy typically do a pill count with you?

24   A.  No.

25   Q.  Do you remember him ever doing a pill count with you?

```
1    A.   Maybe.
2    Q.   All right.  Do you remember ever having an inappropriate
3    pill count?
4    A.   I don't understand that question.
5    Q.   All right.  Do you know what the difference would be
6    between an appropriate and an in appropriate pill count?
7    A.   (Nods in the affirmative.)
8    Q.   Is that a no?
9    A.   That is a no, I'm sorry.
10   Q.   All right.  Do you know why doctors do pill counts?
11   A.   To make sure you're not taking too much.
12   Q.   All right.  And so if someone had an inappropriate pill
13   count -- well, let me put it this way.  So to make sure -- if
14   you had the right number of pills would mean that you're taking
15   the medication as directed, is that right, would you agree with
16   that?
17   A.   Yeah.
18   Q.   All right.  And if someone had an inappropriate pill
19   count, what do you think that would mean?
20        MR. DONNINI:  It's a little leading, Your Honor.
21        THE COURT:  Sustained.
22   BY MR. LIEVENSE:
23   Q.   Do you know what it would mean if someone had an
24   inappropriate pill count?
25   A.   I believe it would mean that there weren't the right
```

```
1    amount of pills there.
2    Q.  Were you ever told that you had an inappropriate pill
3    count?
4    A.  I don't think so.
5    Q.  Ms. Bunker, during your -- during 2016 I think you've
6    indicated that at least one circumstance where you had an
7    abnormal urine drug screen, is that right, that you recall?
8    A.  Well, it was the -- yeah, it was the Fioricet.
9    Q.  Okay.  And the medical record may show -- do you know
10   whether -- well, let me put it this way.  And that record right
11   there just indicated that someone thought anyway you had an
12   inappropriate pill count, would you agree?
13   A.  That's what it says.
14   Q.  During 2016 did Dr. Pompy ever stop prescribing you
15   medication?
16   A.  No.
17   Q.  Did he ever threaten to stop prescribing the medication?
18   A.  No.
19   Q.  Did he ever threaten to stop you from the practice due to
20   any irregular activity?
21   A.  No, but there -- there wasn't a reason to do that.
22   Q.  Was there a time that Dr. Pompy gave you a choice of
23   medications?
24   A.  Yes.
25   Q.  Describe that.
```

1   A.  Well, toward the end there Dr. Pompy knew that he was

2   being watched by the government.  He -- he wanted to reduce

3   what I was taking and gave me the choice of two medications

4   that I'm -- that I was on.  I needed to lose one of them, I

5   needed to remove one of them.  I believe that it was Percocet

6   and Norco were the choices.  I stuck with Percocet and removed

7   Norco, and he was pleased about that because I took more of the

8   Norco than I did the Percocet.  I took three Norco a day, I

9   took two Percocet a day, and because I removed three a day,

10  that would be better for his pill count.

11  Q.  In other words, he said that would be better for the

12  amount of pills?

13  A.  He was -- he was pleased that I chose one that had more

14  pills to be removed.

15  Q.  Okay.  Was the reduction in pills based on a change in

16  your medical condition?

17  A.  No.

18  Q.  Was it based on -- that reduction in pills based on

19  anything that happened during the visit?

20  A.  No.

21  Q.  You mentioned that it was during a time that -- your

22  impression was that he thought he was being watched by the

23  government?

24  A.  Yes.

25  Q.  Why would you think that?

```
 1   A.  Because I heard the employees talking.  And then after
 2   that, when he -- when Dr. Pompy reduced the amount of pills
 3   that I was taking, he -- like I said, he was pleased that I
 4   chose the one that required more pills to be taken in a day
 5   because that would look better for him, and he indicated that
 6   would help in reference to the -- who was watching him.
 7   Q.  All right.  I'd like to ask you about your observations of
 8   other patients.  You've indicated that you waited an hour and a
 9   half to two hours in the reception area, is that right?
10   A.  Correct.
11   Q.  And did you ever see other patients express anger or
12   complaints?
13   A.  Oh, yeah.
14   Q.  Describe that please.
15   A.  Well, people get hotheaded when they're not only
16   uncomfortable but they -- they would become very inpatient.
17   They -- they -- they didn't want to be in a line like cows or
18   Disney.
19   Q.  Did you ever complain about the wait times?
20   A.  No.  It --
21   Q.  Why didn't --
22   A.  -- it wouldn't have made any difference.
23   Q.  Did you -- did you feel like you could speak up?
24   A.  I heard the office staff talk to the people that would go
25   up to them several times wanting to get a clue as to when
```

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1332   Filed 12/05/22   Page 47 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

47

```
 1   they're going to go in, and they would definitely get snapped
 2   at at one point, not necessarily by all of them but definitely
 3   heard it, so I knew better than to be one of those people.
 4   Q.  While waiting for your appointment with Dr. Pompy, did you
 5   ever hear patients discuss selling pills?
 6   A.  Yeah, I -- I -- I heard people referring to it.  I didn't
 7   see it happen.
 8   Q.  Were these people referring to it, were they talking to
 9   each other or were they talking on the phone or both?
10   A.  Both.  My husband, not that that matters but --
11           MR. DONNINI:  Your Honor, I don't think she should be
12   talking about her husband.
13           THE COURT:  Sustained.  Move on.
14           MR. LIEVENSE:  I'm sorry.  What was the objection?
15           THE COURT:  The objection was she was testifying to
16   something you didn't ask her about.
17           MR. LIEVENSE:  All right.
18           THE WITNESS:  I apologize.
19           THE COURT:  And it's not responsive to any question
20   before the jury.  Go -- go ahead please.
21   BY MR. LIEVENSE:
22   Q.  All right.  With respect to people who were talking about
23   selling pills on the phone, what did you hear?
24           MR. DONNINI:  Your Honor, I'm going to object.  He's
25   calling for hearsay.
```

```
1          THE COURT:  What was your response, Mr. Lievense?
2          MR. LIEVENSE:  Your Honor, my followup questions will
3   be that --
4          THE COURT:  Well, we need to understand why she could
5   testify to what she heard other people say.
6          MR. LIEVENSE:  Your Honor, I'm asking for the
7   non-hearsay purpose of showing what she subsequently did and to
8   show the effect on -- on this listener.
9          THE COURT:  Okay.  Jury, don't take the statement of
10  this witness as to the statements of others for the truth of
11  those statements, but rather it will set up and put in context
12  forthcoming testimony.
13         Go right ahead.
14  BY MR. LIEVENSE:
15  Q.  Again, the question was what did you hear the patients
16  say, other patients say on the phone when they were on the
17  phone?
18  A.  They would tell people what person, whomever, what they
19  were going -- what -- what the patient was going to receive and
20  what was available and the time frame that they would be done.
21  Q.  In other words, how long they would -- it would take if
22  they --
23  A.  How much longer it was going to take before they could get
24  their prescription and fill it.
25  Q.  And when you heard these conversations, did you do
```

1    anything such as tell a staff member?

2    A.   No.

3    Q.   Did you ever -- at one point did you -- did you ever raise

4    what you heard in the waiting room with anybody in Dr. Pompy's

5    office?

6    A.   I'm sorry, I was moving around.  Could you say that again?

7    Q.   Did you ever raise what you heard in Dr. Pompy's office

8    with any staff member or Dr. Pompy directly?

9    A.   Yeah.  I -- I did mention some of the -- you can't help

10   but hear conversations all around you when you're stuck in

11   there shoulder to shoulder, and, yes, I, you know, would hear

12   things that I didn't necessarily want to hear.  And when it was

13   obvious that there should be some concern about a patient

14   misusing their prescriptions, I would bring it up.  It wasn't

15   like a regular thing; it was a few times.

16   Q.   Did you raise it with an older nurse at one point?

17   A.   Yep.

18   Q.   And what was the response you got from that employee?

19   A.   I was shut down.

20   Q.   What do you mean, shut down?

21   A.   She didn't want to hear it.

22   Q.   And did you ever raise it with Dr. -- these issues with

23   Dr. Pompy directly?

24   A.   No, I didn't because I was shut down.

25   Q.   Were you worried that if you raised this issue with Dr.

1  Pompy, he might stop prescribing you medication?

2  A.  I did not want attention drawn to me because once I really

3  needed the pills for -- you know, once I really needed the

4  pills, I didn't want to draw attention to myself so that it

5  could cause me to need to change mine.

6  Q.  How would you describe the other patients you saw in the

7  waiting room?

8  A.  They were eclectic as well.  There were people in torn

9  clothes 'cuz that's all they had.  They -- there were, you

10  know -- they were -- let me -- let me just think here a minute.

11  There was a range of people that were well educated, well

12  dressed, et cetera, to middle class, you know, where you're

13  comfortable, and then, of course, there were people like --

14  that weren't, that, you know, they -- poverty level, lack of

15  education, and sadly, you know, they just -- they didn't have

16  much of a life as far as what was available to them because of

17  their -- their situation with finances.  So everybody was

18  there.

19  Q.  I want to ask you briefly, or I think I already asked

20  you -- well, then I'm not going to ask you that.  Sorry.

21          During your time with Dr. Pompy did he ever refuse to

22  prescribe you medication?

23  A.  Well, I have to bring something up that I was about to.

24  Q.  I'll -- I'll ask you about that.

25          THE COURT:  Just answer the question.

```
 1   A.   Okay.
 2          THE COURT:  Did Dr. Pompy ever refuse to give you
 3   medicine?
 4          THE WITNESS:  No.
 5          THE COURT:  Okay.
 6          THE WITNESS:  He never refused to give me medicine.
 7          THE COURT:  Next question please.
 8   BY MR. LIEVENSE:
 9   Q.   All right.
10   A.   Thank you.
11   Q.   Since -- well, I'll just ask you since it's been on the
12   tip of your tongue a couple of times, was there one time that
13   he found out that you had gotten pain medication from another
14   doctor?
15   A.   Yes.
16   Q.   And what happened there?
17   A.   I had surgery.  My husband received the prescription and
18   went and filled it.
19   Q.   It was a prescription in your name?
20   A.   You bet.
21   Q.   And what happened then?
22   A.   While I was -- the first day after -- during like the day
23   of the surgery he gave me one of the pills before I realized it
24   wasn't mine.
25   Q.   Your husband gave you one of the pills?
```

1    A.   Yeah.

2    Q.   Okay.

3    A.   And I brought -- after that I -- I stuck with only what

4    Dr. Pompy had given me, and it was the same thing I think that

5    I was taking that Dr. Pompy was prescribing.  And so anyhow, I

6    brought it to the attention of whoever it was that kept track

7    of pills.  There was a person that was in charge of all the --

8    I don't know if he was in charge of all the prescriptions,

9    but -- but if -- if you had any issues with pills such as the

10   too many, too less, too whatever, he's the one who would come

11   and talk to you.  So he came and talked to me about the extra

12   medication.  I explained what happened.  They put me into a

13   six-week program I guess where they reduced medication and then

14   I worked my way back up.

15   Q.   By reduced medication, did they lower the number of pills

16   per day?

17   A.   They lowered the dose.

18   Q.   They lowered the dose?

19   A.   (Nods in the affirmative.)

20   Q.   And did Dr. Pompy make you come back, come in more --

21   A.   Every week.

22   Q.   Every week.

23        And -- but each week you came in did he continue to

24   prescribe for you?

25   A.   Yep.

1    Q.  And if you know, each time you went in did he bill for an

2    office visit for that?

3    A.  Yeah.

4    Q.  And so that was a time when you had to start coming in

5    more often?

6    A.  Yes.

7    Q.  But he didn't stop prescribing?

8    A.  Correct.

9    Q.  Ms. Bunker, you described obvious various injuries you've

10   sustained over your life.  What types of medications are you

11   taking now?

12   A.  Fioricet.  Let me think.  I'm on a muscle relaxer.  I'm

13   not coming up with the name, I'm sorry.  Xanax.  I mean that --

14   those are the -- the only med -- not the only medications I

15   take but the only ones that would possibly be watched.  The

16   rest of the medication that I take has to do with heart, blood

17   pressure, that kind of stuff.

18   Q.  All right.  So those are the only -- the ones you've

19   mentioned are the only ones you take related to sort of

20   managing --

21   A.  Oh, and Neurontin.

22   Q.  And Neurontin?

23   A.  But I don't think that's watched.

24   Q.  Okay.  By watched, you mean something that's tracked?

25   A.  Yes.

1   Q.   Do you regularly take any opioid pain medication?

2   A.   No, although last month I did.

3   Q.   How -- you don't -- you don't regularly take any but --

4   A.   No, I --

5   Q.   -- you received some last month?

6   A.   -- had a really rough procedure done.

7   Q.   Okay.  So it was in response to a procedure?

8   A.   Yeah.

9   Q.   Okay.

10          MR. LIEVENSE:  Thank you, Your Honor.

11          (Excerpt 5 concluded at 10:00 a.m.)

12                      _   _   _

```
 1            Excerpt 6:
 2            (Proceedings in progress at 11:08 a.m., all parties
 3            present, jury present)
 4            THE COURT:  Brief, if any, redirect from the
 5    government?
 6            MR. LIEVENSE:  Thank you, Your Honor.
 7                           REDIRECT EXAMINATION
 8    BY MR. LIEVENSE:
 9    Q.  Ms. Bunker, I think you said after your first knee surgery
10    and the surgeon prescribed additional pain medication, that you
11    brought those pills in with you to see Dr. Pompy.  Is that what
12    you said?
13    A.  I did.
14    Q.  Did you bring those pills home with you?
15    A.  I don't believe so.
16            THE COURT REPORTER:  Keep your voice up please,
17    ma'am.
18    A.  I -- I do not believe so.
19    Q.  Where did they go?
20    A.  I left them at the office.
21    Q.  Did you give them to Dr. Pompy?
22    A.  I'm not sure if it was Dr. Pompy or if he had one of the
23    MAs pick them up.
24            MR. LIEVENSE:  Thank you, Your Honor.  Nothing
25    further.
```

```
 1            THE COURT:  Okay.  Thank you very much.  Nothing else
 2    from the defense?
 3            MR. DONNINI:  Correct.
 4            THE COURT:  All right.  And Ms. Bunker, your
 5    testimony is complete.  Thank you for being here this morning.
 6            THE WITNESS:  Thank you.
 7            THE COURT:  All right.  Have a safe trip back to
 8    Temperance or wherever you're going to and a good afternoon.
 9            THE WITNESS:  You as well.
10            THE COURT:  Okay.  Thank you.
11            (Witness excused at 11:09 a.m.)
12            Next government witness.
13            MR. PRATT:  Yes, Your Honor.  At this time the United
14    States called Brianna Lindhorst.
15            THE COURT:  Okay.  Good.  Right this way, Ms.
16    Lindhorst.  You want to come on up to the box and pause when
17    you get there, I'll give you your oath.
18              B R I A N N A   L I N D H O R S T
19    was called as a witness herein, and after being first duly
20    sworn to tell the truth and nothing but the truth, testified on
21    her oath as follows:
22            THE WITNESS:  I do.
23            THE COURT:  Great.  Have a seat.  Relax as best you
24    can in that small space.  Speak toward the mic, not too close
25    though.
```

| | |
|---|---|
| 1 | And Mr. Pratt may begin.  Go right ahead. |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. PRATT: |
| 4 | Q.  Good morning.  Will you please state your full name for |
| 5 | the record? |
| 6 | A.  Brianna Lindhorst. |
| 7 | Q.  And please spell your first and last name for the court |
| 8 | reporter, and if she does -- you do it very slowly, she will |
| 9 | appreciate that. |
| 10 | A.  Okay.  It's B-r-i-a-n-n-a and Lindhorst is |
| 11 | L-i-n-d-h-o-r-s-t. |
| 12 | Q.  All right.  Ms. Lindhorst, let's start talking about you a |
| 13 | little bit.  Can you tell us where you were born and then the |
| 14 | places you were raised? |
| 15 | A.  I was born in Orlando, Florida and I was raised -- I was |
| 16 | there until I was three and then raised in Toledo, Ohio until I |
| 17 | was about 13, and then I moved to Monroe, Michigan where I |
| 18 | stayed. |
| 19 | Q.  Okay.  So except for those first three years, it's either |
| 20 | been Toledo or Monroe? |
| 21 | A.  Yes.  Yes. |
| 22 | Q.  All right.  Tell us a little bit about your educational |
| 23 | background.  How -- what -- what's your education level and how |
| 24 | did you obtain that education? |
| 25 | A.  My education level is -- is some college.  I did not |

1   graduate from college.  I got my GED when I was 17.  And in --

2   in 2008 I attended a community college in Monroe, Michigan for

3   a couple years.  I did -- I left college and then went back a

4   few times, breaks in, you know, having my -- my children and

5   working a job.

6   Q.  Okay.  When you did go to high school, where did you go to

7   high school?

8   A.  So I attended Jefferson High School in Monroe, Michigan.

9   I did that until 10th grade, and then I transferred to a

10  alternative high school which was Orchard Center High School

11  for -- briefly to try to make up credits and which I just

12  dropped out.

13  Q.  And you ended up getting your GED.

14          What -- when you went to -- when you went to -- when

15  you took those college classes, what were you studying, what

16  were you trying to learn?

17  A.  So I was majoring in business management and accounting.

18  Q.  Okay.  And you never ended up completing your -- your

19  degree?

20  A.  No, I did not.

21  Q.  All right.  Tell us the type of -- the various types of

22  jobs, the various types of work that you did from the time

23  you -- you know, from the time you were finished with your

24  stint in high school and the time -- and going forward.

25  A.  So my first job was working at a pizza place where --

```
 1   Tiffany's Pizza where I was a manager in training at one point,
 2   I was a delivery driver at one point, and I was a crew member
 3   at one point.  And then I also worked as an accounting
 4   assistant in -- at Sigma in Monroe.  We worked in the
 5   accounting department as a transportation assistant doing data
 6   entry and -- and payroll and things like that, which is what I
 7   was majoring in in college.  And I also worked at Kohl's as a
 8   head cashier, did that briefly, and stopped doing that to go
 9   back to college at one point.
10   Q.  Okay.  And I want to, if we can -- if we can be -- if -- I
11   want go to time frames.  Was there a first time you became
12   aware of or became a patient of Dr. Lesly Pompy?
13   A.  Yeah.  I -- I -- I was seen by him after I had my first
14   son.  I had an epidural done and -- and was having constant
15   pain, and so I -- I sought out -- Dr. Pompy was who I saw to be
16   diagnosed with a degenerative disk disease and --
17   Q.  And when was your first son born?
18   A.  I don't -- I don't remember.
19   Q.  Okay.  You don't remember the year?
20   A.  I...
21   Q.  You're -- you're really under a lot of pressure, aren't
22   you?
23   A.  I'm sorry, I am.  I'm sorry.
24   Q.  All right.  Take a breath.  All right.  What -- if you can
25   put an approximate date on when you would have seen -- seen --
```

1  first seen Dr. Pompy maybe in terms of how old you were and we

2  can work from there.

3  A.  So I -- I became a regular patient of his in 2014.

4  Q.  Right.  And I'm trying to do the before that part.

5  A.  The before that?  So I believe --

6  Q.  There was some period of time before that that you saw him

7  after your son, first son was born, right?

8  A.  I -- I want to say it was in 2011.

9  Q.  Okay.  And how long did that relationship with Dr. Pompy

10  last that was based after the birth of your first son?

11  A.  It wasn't long.  It -- it -- I only saw him maybe a few

12  times at that point.  I didn't become a regular patient until

13  2014.

14  Q.  Okay.  And when it came around -- and let me -- let me ask

15  you, might as well cover that now, you say you had a painful

16  condition related to the birth of your son, correct?

17  A.  Yes.

18  Q.  And did you have -- you're -- you're a relatively young

19  woman at that point, correct?

20  A.  Right, correct.

21  Q.  And did you have any other -- did you have any other

22  medical conditions, any other painful medical conditions?  I

23  guess in 2011 that would make you in your early 20s?

24  A.  Yeah.

25  Q.  Correct.

```
1    A.   That's correct.
2    Q.   Okay.  How were you doing other than the pain from the
3    pregnancy?
4    A.   I was -- I was fine.
5    Q.   Okay.
6    A.   Yeah.
7    Q.   All right.  Let's go to -- let's go forward to 2000 --
8    roughly 2014.  I'm going to ask you a little bit first of all
9    about your own personal background with using drugs at that
10   point, okay?
11   A.   Okay.
12   Q.   And if you would please tell us, at that point did you
13   have any experience or did you use drugs before 2014?
14   A.   Um, recreationally, yeah, I had taken medication at some
15   point.
16   Q.   All right.  So --
17             THE COURT REPORTER:  I'm just going to ask you to
18   please keep your voice up.  You can move the mic a little
19   closer to you or sit back if you're more comfortable.
20             THE WITNESS:  Okay.  I feel like it's like right in
21   my face.
22             THE COURT REPORTER:  Please keep your voice up.
23             THE WITNESS:  Okay.  I gotcha.
24             THE COURT REPORTER:  Thank you.
25   Q.   All right.  So you used pills recreationally at that
```

1   point?

2   A.  Yeah.  Yes.

3   Q.  And can you tell us what kind of pills you would take?

4   A.  Um, it was -- it was opiates.  It was the various forms

5   of -- of the opiate pills that were out at that point,

6   painkillers.

7   Q.  Okay.  And did you -- you take them at a level that you

8   were like addicted to them at that point?

9   A.  No.  No.

10  Q.  How did you obtain access to them to use them

11  recreationally?

12  A.  Well, I was -- I was in a co-dependent relationship and

13  from him or people we knew, yeah.

14  Q.  Okay.  When you say a co-dependent relationship, this is a

15  boyfriend type of situation?

16  A.  Yes, the father of my two youngest children.

17  Q.  And I take it -- I'm not sure what co-dependent is but is

18  that a good word or a bad word?

19  A.  So it's a bad word.  It's -- it's where you're both

20  addicted and you rely on each other to -- you know, to go back

21  and forth with -- with -- obtain whatever it is that you want.

22  Q.  Okay.  So we're talking 2014 you have some experience with

23  pills but you're not addicted?

24  A.  Right.

25  Q.  And what do you decide to do, what do you decide to do at

1  that point regarding getting pills?

2  A.  I sought out Dr. Pompy.

3  Q.  Okay.  Was there a reason that you sought out Dr. Pompy as

4  opposed to Dr. Smith or Dr. Joe or was there anyone else in the

5  area?

6  A.  Yes, because it was common knowledge it was easy to -- to

7  get medication from him.

8  Q.  That it was what?

9  A.  It was easy to get prescription pills from him.  It was

10  common knowledge amongst everybody that we knew.

11  Q.  All right.  So your goal going -- going in is to -- is to

12  get some medication.  Is that going to be -- and what do you

13  intend to do, what's your purpose of going to Dr. Pompy or what

14  is your primary purpose?

15  A.  So -- so I did -- I sought him out because of my back

16  condition.  So my back condition I knew would get me in the

17  door, so to speak, but it was not the only reason I went.

18  Q.  Okay.  So you wanted pills but you also had a back

19  condition, correct?

20  A.  Yes.

21  Q.  Tell us -- tell us what your back condition was.

22  A.  So I was degenerative disk disease and, you know, I was

23  told by also a back surgeon and Dr. Pompy and whatnot that what

24  was wrong with my back, which was, from what I understood,

25  there was, you know, a disk that was like partially dissolved

1    and there was another that may have been herniated and I would

2    get sciatica sometimes.

3    Q.  All right.  And in your consultations with doctors was --

4    was surgery every considered?

5    A.  So -- so we reviewed it but it was never recommended

6    because I was too young.

7    Q.  Okay.  Even in 2014, let's see, that makes you about --

8    you're still in your mid-20s, right?

9    A.  Right, yeah.  I was young, yeah.

10   Q.  Like 25, 26, something like that?

11   A.  Yeah, yeah, correct.

12   Q.  Okay.  So you've got a way to get in the door and you

13   choose Dr. Pompy.  Did anyone else have any relationship with

14   Dr. Pompy that gave you information about him?

15   A.  Yes.  My mother was a patient of his.

16   Q.  Okay.  And did she get controlled substance medications

17   from him as well?

18   A.  She did.

19   Q.  All right.  So directing your attention to 2014, what do

20   you do, what do you do when you go and see Dr. Pompy, how does

21   the -- how does a visit -- how does a -- how does an initial

22   visit work?

23   A.  So -- so when you get there you're required to fill out a

24   pretty long packet of information.  And from there you give

25   it -- you would give it to the front desk and they would give

1   you a paper to send you to get a urine screen.  So then you

2   would then take that paper and go to a neighboring room where

3   you'd have to walk through the door and give them the paper to

4   show them to do the urine screen, in which case you would get

5   the urine screen done, and then you would just be waiting at

6   that point.  Eventually, you know, which is -- the wait times

7   were really long.  Eventually you'd be put in a room and you'd

8   wait some more.

9   Q.  Okay.  Let -- let's stop a minute and talk about that a

10  little bit.  When you say the wait times were really long, that

11  doesn't -- that doesn't tell us everything.  Can you give us

12  estimates of how long you would wait first and -- outside and

13  then inside before you'd see Dr. Pompy?

14  A.  So outside you could be waiting, um, there -- there was --

15  the times were long.  The shortest time I would say would be

16  like two hours, but there were plenty of times where it was

17  like a four-hour wait.

18  Q.  All right.  When you were -- when you had all that time on

19  your hands, did you ever make any observations about the other

20  patients that were going to Dr. Pompy's office?

21  A.  Yeah.  I mean I -- I observed people that I knew or have

22  seen in similar circles of friends or people that we -- that we

23  would know each other.  My observations were these were fellow

24  drug addicts, I knew them.

25  Q.  And was that everyone there or were there some people that

1    were also openly in wheel --

2    A.  No, there were people that were legitimately there, had

3    conditions, people with walkers or canes or whatever.

4    Q.  But there was a portion of people that were in your group?

5    A.  In -- what do you mean, can you clarify?

6    Q.  I mean your age group, your --

7    A.  Oh, yeah, yeah, there were people around my age group,

8    yeah, definitely.

9    Q.  And based on your observation, they were there for the

10   same reason?

11   A.  Yes.

12   Q.  All right.  And in any event, if you can differentiate,

13   can you -- you were describing what happens on a visit.  Can

14   you tell us, describe to us what kind of time and what kind of

15   things Dr. Pompy would do on like an initial visit as opposed

16   to what he did in the later visits?

17   A.  So in the initial visit, what -- once he came into the

18   room, he would -- he would have you do a series of movements

19   to -- to check out your body, to check out your spine.  You'd

20   have to bend over and squeeze things and whatnot.  And once --

21   once he was done with that, he would ask you what you wanted.

22   Q.  Okay.  When you say ask you what he wanted, can you give

23   us as close as you can to the essential words that he was

24   saying to you?

25   A.  Yeah.  He was referencing did I want pain medication, what

1    medications would they be or what other -- what other would I

2    be looking for, whether it's maybe service or whatever I was

3    there for.

4    Q.   So when he asks you what you want, what do you say?

5    A.   Well, I told him I -- I made a recommendation for -- for

6    painkillers, which is what I was there for.

7    Q.   All right.  And did he eventually start giving you

8    painkillers?

9    A.   Yeah, he gave them to me immediately, no problem.

10   Q.   Okay.  And do you recall thinking -- do you recall

11   anything in terms of the -- do you recall anything in terms of

12   how -- how much -- how much and what dosage you were getting

13   initially?

14           MR. PRATT:  And for that, I'm going to put -- can you

15   put Government's Exhibit 58L?  And, Your Honor, if it hasn't

16   been admitted, I would move its provisional admission at this

17   time.

18           THE COURT:  58L?

19           MR. PRATT:  Yes.  I mean, sorry, 85L.  I'm

20   dyslexic -- I'm apparently dyslexic this morning.

21           THE COURT:  Well, that's all right.  85L was

22   presented to me this morning.  It's not received.  Do you have

23   any objection preliminarily, Mr. -- Mr. -- well, I don't have

24   L.  I have J --

25           MR. PRATT:  I've got it --

1           THE COURT:  Oh, here it is.  This -- this is what

2    appears to be a prescription history of this witness.

3    Objection, if any, from the defense?

4           MR. RICHOTTE:  No objection at this time, Your Honor.

5           THE COURT:  Okay.  Thank you.  85L is received.  Go

6    right ahead.

7           MR. PRATT:  Could you please display the first lines

8    of 85L, the Brianna Lindhorst prescription, MAPS prescription

9    history?

10   BY MR. PRATT:

11   Q.  Okay.  And so if we see this, it indicates an issue date

12   of February 7, 2014, you got oxycodone-acetaminophen 5 mg 30.

13   What do you know that drug to be?

14   A.  So that's Percocet.

15   Q.  Okay.  And what was your -- what was your reaction to

16   getting Percocet right off the bat from him?

17   A.  I was happy.  I mean I was -- I got what I wanted.

18   Q.  Okay.  I think you described the -- the first visit.  I

19   want you to describe whether the -- was there something called

20   a renewal or a refill visit --

21   A.  Yes.

22   Q.  -- that would happen after that?

23          How was that different, if any, from the earlier

24   visits as far as your interaction with Dr. Pompy?

25   A.  So the -- the following visits were -- were -- although

 1   prior to getting into the room where you actually see him, the

 2   waits were always the same, you know, extensive wait time, but

 3   once he got in the room with you, it -- it was very quick.

 4   When you were there for refills, whoever the medical -- either

 5   medical assistant or nurse, whoever is assisting Dr. Pompy

 6   would ask you what you were there for, and she would take --

 7   and I was on two different medications.  She would take those

 8   prescriptions and she'd get them printed out and ready and set

 9   them on the counter side by side for him to sign.

10         He would come in.  I -- although I -- I -- I don't

11   remember the exact conversation, conversing.  I just remember

12   it was very quick.  And there were many times where he would --

13   he would come in and have a stack of papers or something he was

14   holding, he was always holding something, and he wouldn't even

15   set it down.  He would sign the prescriptions and then I'd be

16   on my way.

17   Q.  Okay.  And were you -- were you fine with that?

18   A.  I'm sorry?

19   Q.  Were you fine with that setup?

20   A.  Absolutely.

21   Q.  Okay.  Because you were there basically for what?

22   A.  For drugs.  I was there for -- for prescription

23   medication, yes.

24   Q.  Okay.  Now, you've indicated as far as -- you've indicated

25   as far as when you had the visits, you had to fill out all this

1   paperwork.

2           MR. PRATT:  I'm going to ask Ms. Ouellette to show us

3   some of the paperwork particularly for -- if you could turn to

4   Ms. Lindhorst, which is Government Exhibit 13 I believe, 13,

5   page 120, if you could blow up the top where we could see who

6   this is, the first half maybe.  Okay.

7   BY MR. PRATT:

8   Q.  Do you recognize that?

9   A.  I do.

10  Q.  What is that?

11  A.  That's the packet we used to fill out.

12  Q.  Okay.  And although unfortunately I think we'll see that

13  the -- the part that's blocked off on the date there is

14  April -- is April 27, 2015.  I'd like you to look down in the

15  middle section there, see "Reason For Today's Visit."  Do you

16  see that?

17  A.  Yes.

18  Q.  And what did you check?

19  A.  "Renew medication."

20  Q.  All right.  Would it be fair to say that that was pretty

21  much what you usually checked?

22  A.  Yeah, absolutely.

23  Q.  All right.  And if you checked "Renew previous

24  medication," what would that mean in terms of your interaction

25  with Dr. Pompy?

1   A.   That there would be nothing changed.  You would just get

2   your refills and be on your way.

3   Q.   Okay.  Now, as part of the paperwork you'd have to fill

4   out, you'd have to answer questions, you'd have to indicate

5   things like your pain level and how it was affecting you, is

6   that correct?

7   A.   Correct.

8   Q.   All right.  And that would be on this form we're talking

9   about?

10  A.   Correct.

11  Q.   And I can ask you this.  What did you indicate on the form

12  in terms of your pain levels, your affect -- how it was

13  affecting you and all that sort of stuff?

14  A.   I -- I would -- I would indicate that the pain was always

15  present, and I -- I would fluctuate what my highest level would

16  be for pain and where.  And there was a picture of a person in

17  different areas and you'd have to circle where you're having

18  more pain or where your pain's primarily coming from.  So --

19  but I always said that there was pain.

20  Q.   Okay.  And why did you do that?

21  A.   To make sure that I -- I continued to get the -- the

22  prescriptions I was getting, yeah.

23  Q.   Okay.

24       MR. PRATT:  I'm going to go back for a minute to 85L

25  if you could, and then we're going to flip back and forth

1    through these quite a bit.  But particularly there's the part

2    from 2014 to 2015, so if you can do the first half.

3    BY MR. PRATT:

4    Q.  I notice that on this, once you started seeing him in

5    2014, you're seeing him every month or every other month for a

6    while through -- through 2014, correct?

7    A.  Correct.

8    Q.  And I noticed that at some point in 2000 -- actually

9    fairly early on, you got an increase from the 30 Percocets to

10   63 Percocets.  Do you see that?

11   A.  Yes.

12   Q.  And how -- how or why did you get that?

13   A.  Well, he -- he increased what he was giving me, and the 63

14   Percocets, that was -- that was just a three-week supply.  It

15   would have been 90.

16   Q.  If it was the full month, it would --

17   A.  He made me come back every -- every three weeks.

18   Q.  Okay.  And I see in September of 2014 there's something

19   called tramadol added on.  Do you see that?

20   A.  Yes.

21   Q.  And how did you get that added on?

22   A.  I requested it.

23   Q.  By name?

24   A.  Yes.

25   Q.  Okay.  And why did you request it by name?

1  A.  That was a medication that my stepmom was on and -- and

2  she had given me some and -- and I fared well with the way that

3  it -- it -- it worked for me, and so I asked for it and he gave

4  it to me.

5  Q.  Okay.  I notice in terms of your prescription history you

6  went fairly consistently through December of 2014 and then

7  there's about a four-month break until -- until April of 2015.

8  You see that?  Your -- your last one filled was December 18th,

9  2000 --

10  A.  Oh, from -- okay, December to April.

11          THE COURT REPORTER:  Wait, you're both talking at the

12  same time.  "Your last one filled was December 18, 2000..."

13  Q.  14, correct?

14          And then you don't get one again until April 25th,

15  2015, correct?

16  A.  Correct, yeah.  It says April 27th.

17  Q.  Okay.  So -- so I guess the question I have about that

18  kind of break is that was that -- if you recall, was that a

19  break that like Dr. Pompy imposed on you, said, "Hey, you can't

20  come back for a while," or was that just you not going there

21  for a while?

22  A.  That was me not going, yeah

23  Q.  Okay.  So you started back up, you started back up April

24  of 2014.

25          MR. PRATT:  And if we could look again at that -- at

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1359   Filed 12/05/22   Page 74 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

74

1   that visit, I think we had that one up, but April 27th, 2015

2   rather, the visit is page 120, the visit note in Exhibit 13.

3   BY MR. PRATT:

4   Q.  And even though you haven't been there for a few months,

5   if we can look at the top half, you're just asking renewal of

6   what you'd been getting in December, correct?

7   A.  Correct.

8   Q.  And was there any problem with just having a renewal

9   visit?

10  A.  No.

11  Q.  Now, ma'am, something -- something important happened to

12  you in 2015, correct?

13  A.  Correct.

14  Q.  What -- what happened in 2015?

15  A.  I had my daughter.

16  Q.  Okay.  And I'm sorry.  When was your daughter born in

17  2015?

18  A.  She was born November 3rd.

19          (Brief pause)

20          Thank you.

21  Q.  All right.  So your daughter was born November 3rd, 2015?

22  A.  She was.

23  Q.  All right.  Was that a -- was that a full-term pregnancy?

24  A.  She was.

25  Q.  So that's -- you said -- that's how many weeks?

1    A.   She was born at 39 weeks.

2    Q.   Okay.

3    A.   C-section.

4    Q.   All right.  39 weeks, C-section.

5          So if we go back, if we do the math, that means you

6    were probably pregnant around on or about April 3rd of 2015?

7    A.   Yes.

8    Q.   All right.  So at the time of this visit we're seeing

9    right here, you're in the first few weeks of your pregnancy, is

10   that correct?

11   A.   Correct.

12   Q.   All right.  Let me ask you, did -- and I don't know if you

13   recall or remember exactly when you found out you were

14   pregnant.  This is only a few weeks later.

15   A.   I don't recall exactly when, no.

16   Q.   All right.  Did -- did the forms you filled out, did they

17   have -- did they have several pregnancy questions on them?

18   A.   Yes, they did.

19   Q.   All right.  As you went through -- and I'm going to really

20   ask you this general question, but as you went through 2015,

21   did you sometimes answer those pregnancy questions?

22   A.   Sometimes, yes.

23   Q.   And what did you do the other times?

24   A.   I just skipped over them.

25   Q.   All right.  And why did you either answer them -- and how

1    did you answer them all the time?

2    A.  I was -- when I did answer them, I answered them that I

3    was not pregnant.

4    Q.  Okay.  And why would you answer the question "No, I'm not

5    pregnant" or just leave it blank, especially after once you

6    found out that you were pregnant?

7    A.  To not disrupt my ability to get my medication.

8    Q.  All right.  And as you went through 2015, did you have a

9    growing dependence or addiction to the pills?

10   A.  Yes, it -- I was dependent.

11   Q.  Okay.

12          MR. PRATT:  Let's look at the next page.  I think

13   it's going to be page 121 and -- nope, I'm wrong, try 122,

14   all -- look all the way at the top, if we can highlight that.

15   All right.

16   BY MR. PRATT:

17   Q.  And then we see at the top left it says "Currently

18   pregnant."  You checked no, correct?

19   A.  Correct.

20          MR. PRATT:  If we look at the next page of this visit

21   note, 123, it's a part at the bottom above the signature, if

22   you can highlight that, Ms. Ouellette.

23   BY MR. PRATT:

24   Q.  All right.  And it says "Pregnant, yes or no," and what

25   did you do to that?

1   A.  I left it blank.

2   Q.  And right above that it says "Last menstrual period."

3   What did you do there?

4   A.  I left that blank too.

5   Q.  Okay.  And did you walk out with your prescriptions?

6   A.  I did.

7   Q.  All right.  Your next visit was --

8           MR. PRATT:  Ms. Ouellette, if you could stay in

9   Exhibit 13 and move to page 230.  I'm sorry, wrong -- wrong

10  one.

11  BY MR. PRATT:

12  Q.  On your next visit was --

13          MR. PRATT:  Let's stay with 230 then.

14  BY MR. PRATT:

15  Q.  Next visit on May 14th, 2015 you had to do the regular

16  urine test?

17  A.  Correct.

18  Q.  All right.

19          MR. PRATT:  And the document from that date,

20  May 14th, 2015, if you could blow up the middle, little lower,

21  little lower.  There you go.

22  BY MR. PRATT:

23  Q.  All right.  Record says that you have a 2a problem.  In

24  the middle it says "Negative for appropriate prescribed

25  substances."  You see that?

1   A.   Yes.

2   Q.   All right.  So you'd been there a few -- a few weeks

3   before, you'd gotten your medication, your opiate medications,

4   correct?

5   A.   Correct.

6   Q.   And a few weeks later they're not in your urine, right?

7   A.   Correct.

8   Q.   All right.  Why aren't they in your urine?

9   A.   Because I was sharing with my co-dependent boyfriend and I

10  was not taking them appropriately so I would run out.

11  Q.   Okay.  So you'd either share -- let -- let's break those

12  down.  If you share them with him, he's taking some of them,

13  right?

14  A.   Correct.

15  Q.   All right.  And if you're also not taking them

16  appropriately, tell us -- tell us what that means.

17  A.   So just not taking them as -- as prescribed.  So I was

18  supposed to take them three times a day.  I would take them

19  whenever I felt like it and it would often be more than three

20  times a day.

21  Q.   All right.  And would you be taking them more than three

22  times a day because you were in such intense pain or would

23  you --

24  A.   No.

25  Q.   -- be taking --

```
 1   A.  No, it was because I was addicted to them.  It was to keep
 2   the withdrawals away and -- and to be high, yeah
 3   Q.  Okay.
 4         MR. PRATT:  I want to -- I want -- if we could look
 5   at page 231 in the patient chart just to confirm this May --
 6   May 14, 2015 date, and if you could highlight...
 7         (Brief pause)
 8   BY MR. PRATT:
 9   Q.  All right.  And so I'm just going to ask you briefly, so
10   if this report says again for May 14th, 2015 you're negative
11   for all your prescribed drugs including oxycodone, the reason
12   for that is what you've already explained?
13   A.  Correct.
14   Q.  Okay.  All right.  And let's look for this particular
15   visit.  Let's look at page 130 of the chart and up at the top.
16   And what did you do this -- on -- on this date for the first
17   pregnancy question?
18   A.  I left it blank.
19   Q.  Okay.
20         MR. PRATT:  And if we could go to page 131 and go to
21   the -- I'm sorry, it's going to be 132 probably, at the bottom
22   above the signature.
23         (Brief pause)
24         Okay.  We're trying to get to the last page of the
25   packet.  There we go, bottom section.
```

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1365   Filed 12/05/22   Page 80 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

80

 1   BY MR. PRATT:

 2   Q.  So this is the second place of the pregnancy question for

 3   the May -- the May 14th, and what did you indicate there?

 4   A.  I left it blank.

 5   Q.  Okay.  Now, I want to ask you, this point we're talking

 6   May.  If you became pregnant around April 3rd, you're talking

 7   May 14th, so you're five weeks -- you're five weeks or so

 8   pregnant here, right?

 9   A.  Uh --

10   Q.  And again, you don't -- do you -- you don't have a memory

11   of --

12   A.  No.

13   Q.  -- of when it was.  Okay.

14         MR. PRATT:  I want you to look at page -- pull up

15   page 231.

16   BY MR. PRATT:

17   Q.  Did anyone at -- if you recall, and I know you're going

18   back to a time, do you recall whether they addressed possible

19   pregnancy with you at any time in Dr. Pompy's office?

20   A.  I -- I don't.

21   Q.  Okay.  If we have a report here, this lab report...

22         (Brief pause)

23         Okay.  If the lab report says they ordered a

24   pregnancy test, let's see, "Other: Pregnancy" right there at

25   the bottom, you see that?

1    A.  I do.

2    Q.  All right.  That still does -- does that or does not that

3    ring a bell with you?

4    A.  It doesn't.  I --

5    Q.  Okay.

6    A.  -- I just don't recall that.

7    Q.  Okay.  It's in there.

8            But in any event, this is an order, May 14th,

9    correct?

10   A.  Correct.

11   Q.  And did you walk out -- did you walk out of there on

12   May 14th with your regular opiate prescriptions?

13   A.  I did.

14   Q.  Okay.

15           MR. PRATT:  And if you could go to page 1244.  Okay.

16   BY MR. PRATT:

17   Q.  Okay.  And according to their records, four days later

18   they got a result back that said you weren't pregnant?

19   A.  Correct, that's what it says.

20   Q.  That's what it says.  Was that -- was that accurate?

21   A.  No, it was not accurate.

22   Q.  All right.  Do you know if anyone ever discussed that with

23   you?  Can you remember if anyone ever discussed that with you?

24   A.  I don't recall anybody discussing that with me.

25   Q.  Okay.  So you came back for your next visit on -- on

1    June 8th, 2015?

2    A.   Yes.

3            MR. PRATT:   And that would be page 136.

4    BY MR. PRATT:

5    Q.   All right.  You came back and you asked for a renewal, is

6    that correct?

7    A.   Correct.

8    Q.   And at this -- at this point you're a little over two

9    months pregnant, is that correct?

10   A.   Correct.

11   Q.   All right.  Let's look at -- let's look at page 230 --

12   let's look at 234.  And for this visit date it shows you're

13   positive for an illicit substance?

14   A.   Correct.

15   Q.   What would that have been likely to have been at that

16   time?

17   A.   I think it might have been marijuana.

18   Q.   Okay.  That was part of what you would use at that time?

19   A.   Correct, yeah.

20   Q.   All right.  This wasn't the only time you would test

21   positive for marijuana during the time you were at Dr. Pompy's?

22   A.   I believe so.

23   Q.   Okay.  What would happen or do you know if anything

24   happened --

25   A.   No.

```
1   Q.  -- if you tested positive for marijuana?

2   A.  No, nothing happened.  I -- I still got my script.

3   Q.  Yeah, I'm sorry, you have to keep your voice up.

4   A.  I'm -- I'm sorry.  Nothing happened.  I still got my

5   prescription.

6   Q.  Okay.  All right.

7           MR. PRATT:  Let's go to the next visit date, which is

8   June 22nd, 2015, at page 144.

9   BY MR. PRATT:

10  Q.  And I noticed you checked a different box here, is that

11  correct?

12  A.  Correct.

13  Q.  And what did you want on this occasion?

14  A.  I -- I would assume to either add a medication or increase

15  dosage would be the only reason I would have done that.

16  Q.  Okay.  All right.  And, in fact, you had told us you

17  started out on the oxycodone 5 mgs, but actually at some point

18  earlier in this you'd been increased to the 7.5s, correct?

19  A.  Correct.

20  Q.  And added the tramadols in, correct?

21  A.  Correct.

22  Q.  And how did you get -- how did you go about getting those

23  increases?

24  A.  I just told them I had more pain and asked for an

25  increase.
```

1    Q.   Okay.

2             MR. PRATT:   I'm going to ask you to look at page 75

3    of the chart, Ms. Ouellette, and if you could highlight the

4    middle section there on the right.   I'm sorry.

5    BY MR. PRATT:

6    Q.   All right.   You were still being prescribed Percocet and

7    tramadol, is that correct?

8    A.   Correct.

9             MR. PRATT:   And if you could go to the results

10   section.   That may be the next page, 76; should be for

11   oxycodone.   Can you highlight the oxycodone section?

12   BY MR. PRATT:

13   Q.   Says "Oxycodone Not Detected," correct?

14   A.   Correct.

15   Q.   And what again was the reason for that?

16   A.   Because I wasn't taking it properly.   I was probably

17   taking more than prescribed and also sharing with my

18   co-dependent boyfriend.

19   Q.   Okay.   And did that fact ever interfere with you getting

20   your next prescription from Dr. Pompy?

21   A.   No, it never stopped him prescribing it, no.

22   Q.   All right.   On some occasions did he change how long your

23   prescription was?

24   A.   He did.   He would make me come back more frequently, a

25   week, two weeks, three weeks, to get my prescriptions to do --

1    monitor me closer.

2    Q.  All right.  And by monitor means take another urine test?

3    A.  Correct.

4    Q.  But if the result of the urine test was that you weren't

5    taking it, did he ever cut you off?

6    A.  No.

7    Q.  Did you sign a -- if you recall, did you sign some kind of

8    narcotics contract or agreement as part of your package?

9    A.  I -- I -- I can't remember.

10   Q.  Okay.

11   A.  I'm sorry.

12           THE COURT:  Before you get into that, do you have

13   documents on that, Mr. Pratt, or are you going to go to the

14   next topic?

15           MR. PRATT:  I'm -- I'm going to go to the next -- I

16   can go to a new topic, Your Honor

17           THE COURT:  Okay.  It's 11:52.  I think this would be

18   a great time for our lunch break.  Let's take 30 minutes and

19   try to be back by about 12:20 or 12:25.  Then with luck we can

20   push through for an hour and a half and finish our afternoon

21   session or we can take a short break then.  But for now we'll

22   have our lunch break, get some food and drink, relax.  If you

23   want to go outside, make sure you wear your jury badge.  Don't

24   talk about the case among yourselves or with others.  We'll see

25   you in about 30 minutes.

```
 1                    Let's all rise for our luncheon recess.

 2                    (Jury excused at 11:53 a.m.)

 3               THE COURT:  Okay.  See you all in a little bit.

 4               MR. PRATT:  Your Honor, we will have an issue,

 5     whether we did it now or before the jury comes back.  We have

 6     an argument on the 609 and impeachment of this witness.  I mean

 7     it should be brief, but I don't know whether --

 8               THE COURT:  We'll come back about 12:20 and we can

 9     address that.

10               MR. PRATT:  All right.  Thank you.  I just wanted to

11     be, you know, careful of the jury's time.

12               THE COURT:  Yep.  Understood.  Thank you.

13               THE LAW CLERK:  Court is now in recess.

14               (Court in recess at 11:54 a.m.)

15               (Proceedings resumed at 12:28 p.m., all parties

16               present, jury not present)

17               THE LAW CLERK:  All rise.  Court is now back in

18     session.

19               THE COURT:  Okay.  Everybody may be seated.  And why

20     don't we have Mr. Parker start lining up our jury, Thomas, if

21     you would so we can...

22               What's your 609 issue, Mr. Pratt?

23               MR. PRATT:  Your Honor, this witness has -- has a

24     2018 conviction for shoplifting.  She paid $420 in fines and

25     costs.  It is within the time period, although it's a
```

1    misdemeanor, and so I'm going to go into that one with her and

2    put that in front of the jury.

3         THE COURT:  Good.

4         MR. PRATT:  There's also a situation where she was

5    arrested for a day for a domestic violence -- violence charge

6    and pled guilty to that and then actually did I think seven to

7    21 days on a release violation for the misdemeanor domestic

8    violence.  And I would ordinarily not go into that except that

9    when she was in the jail there are some medical things that

10   happened with her pregnancy, and so there's no way that I can

11   go into what happened, what her treatment was in jail, without

12   revealing what she's in for.

13        THE COURT:  Okay.

14        MR. PRATT:  So I'm going to go into that but it's not

15   for impeachment purposes.

16        THE COURT:  Okay.  All right.  Well, you know, I

17   think the defense can confirm it on their cross-examination.

18   If you want to suggest in closing argument that she's

19   dishonest, I'm sure you will.  But the young woman has a long

20   history of addiction to powerful narcotics, a shoplifting

21   charge, violence or domestic violence.  You would expect those

22   things as an outcrop of addiction, so let's just, you know,

23   raise it, confirm it, and then we'll move on, okay?

24        MR. PRATT:  Now we have -- we have three additional

25   arrests, Your Honor, and the government does not believe those

1    are admissible, including the most recent one apparently she's

2    charged -- she's under a felony charge for a welfare offense.

3    Apparently the charge is she accepted benefits for her children

4    from both Ohio and Michigan.  And so that's a pending charge.

5            She has been told by me personally she's getting no

6    benefit or getting no help.  I've confirmed with Lieutenant

7    Moore, no one's promised her anything.  It's not the MANTIS

8    Police that are doing it.  She has no expectation of benefit

9    for that.

10           Similarly, the other two arrests, there was no

11   contact from our office or anyone on this case.  I don't even

12   know what the facts were with the other arrests.

13           So our argument is that the arrest in the pending

14   charge should be excluded.

15           THE COURT:  Mr. Ra-shot [phonetic], am I pronouncing

16   that correctly?

17           MR. RICHOTTE:  You are, Your Honor.  Thank you.

18           So the arrest that Mr. Pratt is -- is -- is speaking

19   to is a 2018 domestic violence and/or knowingly assaulting a

20   pregnant individual, third offense.  That's a felony under

21   Michigan law.  And the disposition that we received from the

22   criminal history notice is that it was not prosecuted.  That

23   would have arisen out of the 38th Circuit Court, which is

24   Monroe County.  And the reason that that is of interest to us,

25   Your Honor, is this case originated out of the Macomb County

Case 2:18-cr-20454-SJM-RSW  ECF No. 79, PageID.1374  Filed 12/05/22  Page 89 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

89

1    Prosecutor's Office.

2            MR. DONNINI:  No.

3            MR. RICHOTTE:  What did I say?

4            MR. DONNINI:  Macomb.

5            MR. RICHOTTE:  Sorry, Monroe County -- thank you --

6    Monroe County Prosecutor's Office.

7            THE COURT:  I understand.

8            MR. RICHOTTE:  Appreciate the correction from

9    co-counsel.

10            The elected prosecutor in that case, Prosecutor

11    Nichols, was actively involved in the investigation of Dr.

12    Pompy.  In fact, how even Mr. Donnini was involved --

13            THE COURT:  This is -- it's -- it's -- it's --

14    it's -- it's too much.  If you want to -- if you want to, you

15    know, suggest substantively that she did something to -- you

16    know, it's just -- it's too much.  It -- and -- and it's --

17    it's confusing.  The -- the witness has got all kinds of

18    problems.  It's going to take too long and distract from the

19    issues that she has.  You've got two criminal issues coming up

20    that'll give you plenty of fodder to take issue with her

21    honesty or dishonesty, and I don't see the ground for a mere

22    arrest --

23            MR. RICHOTTE:  Well --

24            THE COURT:  -- with -- with further -- that's not

25    further prosecuted.

Case 2:18-cr-20454-SJM-RSW  ECF No. 79, PageID.1375  Filed 12/05/22  Page 90 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

90

1        MR. RICHOTTE:  And I appreciate that, Your Honor, but

2   I need to build up to why these are relevant and it crosses

3   several of these prosecutions.

4        THE COURT:  Yeah, but, see, it's so complex for you

5   to build up to that for me to understand it, I know it's going

6   to waste jury time to get her to that point, so I'm not -- I'm

7   not inclined to go into this stuff.

8        MR. RICHOTTE:  I appreciate that.

9        THE COURT:  Unless it's more than an arrest.

10       MR. RICHOTTE:  It is more than an arrest, Your Honor,

11  and I'm -- I'm trying to get to that point.  So the -- the

12  prosecutor on that case ended up becoming an elected judge in

13  that circuit.  Shortly after this case was indicted here, this

14  arrest was in front of that judge after he was the prosecutor

15  on this case and it gets dismissed.  Then we move on --

16       THE COURT:  So there's no evidence and he dismisses

17  it.  What do you want to do, bring him in and cross -- no.

18       MR. RICHOTTE:  No, no, no, no, Judge.  Judge, if

19  you'll bear with me --

20       THE COURT:  I -- well, you're -- you're -- don't you

21  understand what you're doing?  You're making this so complex

22  that I can't understand it and neither will the jury.  This is

23  not cross-examination.  She was arrested.  I don't care why it

24  was dismissed.  If you want to get Pratt to file a public

25  corruption charge against this guy, go ahead, but you're not

1    going to cross-examine this woman about an arrest that didn't

2    get resolved by any conviction, all right?

3            MR. RICHOTTE:  Very well, Your Honor

4            THE COURT:  All right.

5            MR. RICHOTTE:  There is at least another conviction

6    as Mr. -- or excuse me, another arrest that Mr. Pratt has

7    discussed.

8            THE COURT:  Yes.

9            MR. RICHOTTE:  That is the current charge that's

10   pending in front of that same judge --

11           THE COURT:  Right.

12           MR. RICHOTTE:  -- in Monroe County.

13           THE COURT:  Right.

14           MR. RICHOTTE:  The bindover occurred at the beginning

15   of October.

16           THE COURT:  Right.

17           MR. RICHOTTE:  The next pretrial is scheduled for

18   December 16th after she testifies.

19           THE COURT:  Call the judge and -- call him and get

20   him to tell this jury that he dismissed these two cases because

21   he wanted to support Pratt's prosecution, but not her.  It's

22   improper --

23           MR. RICHOTTE:  But I --

24           THE COURT:  -- cross-examination.  It's trying to get

25   an arrest out with underlying evidence and a mini-trial on this

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1377   Filed 12/05/22   Page 92 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

92

```
 1  witness that's going to waste time and not get any further than
 2  the two convictions and drug addiction that she has to impeach
 3  her, and I'm not going to allow it, okay?
 4          MR. RICHOTTE:  Your Honor, if I could make one
 5  additional --
 6          THE COURT:  Yep, please do.
 7          MR. RICHOTTE:  -- basis for the record.
 8          THE COURT:  Please do.
 9          MR. RICHOTTE:  There is a question that I -- I think
10  we can ask her about that --
11          THE COURT:  Yes.
12          MR. RICHOTTE:  -- which is whether she has been made
13  any promises by the Monroe County Prosecutor's Office regarding
14  her testimony here.
15          THE COURT:  I would agree.  I would agree.
16          MR. RICHOTTE:  Thank you, Your Honor.
17          THE COURT:  Okay.  All right.  Thank you all very
18  much.  All right.  Let's get going here.  And I want the
19  government to speed it up please.  This is, you know, too much
20  time with these witnesses.
21          Let's go.  Let's all rise for our jurors.
22          (Jury entered the courtroom at 12:36 p.m.)
23          THE COURT:  Okay.  All our jurors are back.  They
24  look like they're positive and happy and well fed.  Everybody
25  may be seated.
```

1          And let's go with Mr. Pratt and resume our testimony

2     of Ms. Lindhorst.  You're still under oath and you go right

3     ahead.

4     BY MR. PRATT:

5     Q.  All right.  Ms. Lindhorst, I do want to -- I do want to

6     pick it up a little bit as we're going through this pregnancy,

7     but July of 2015, so let's see, at this point you're going to

8     be -- you're going to be four -- four months-plus pregnant, is

9     that correct?

10    A.  Correct.

11    Q.  And I'm going to ask you, to the best of your

12    recollection, did Dr. Pompy ever discuss with you taking these

13    controlled substances while you were pregnant?

14    A.  No.

15    Q.  And nothing in the -- none of the MAs, nothing in the

16    medical record indicated -- the medical record indicated you'd

17    sometimes do no, correct?

18    A.  Correct.

19    Q.  So at least to your knowledge, you had not explicitly

20    discussed with him your pregnancy?

21    A.  Correct.

22    Q.  All right.  Let's go forward to -- I think we have your

23    next visit.

24          MR. PRATT:  If we could put up 85L please again, if

25    we could go through the middle section of July of 2015 and

1   going forward from that.

2   BY MR. PRATT:

3   Q.   All right.  So then in July you've got your -- you got

4   your usual two prescriptions, tramadol and Percocet, correct?

5   A.   Correct.

6   Q.   All right.  And -- and there's a -- then there's a visit

7   in I believe August, August 10th, 2015, and you got your -- you

8   got some Percocets, is that correct?

9   A.   Correct.

10  Q.   And so at this point by August, let's see, April, May,

11  June, July, August, you're five months pregnant, is that

12  correct?

13  A.   Correct.

14  Q.   Did you do anything during your visits to like, you know,

15  hide your pregnancy, like wear a big coat or something?

16  A.   Not particularly, no.

17  Q.   Were you given the kind of physical examinations you

18  described on your very first visit by either Dr. Pompy or

19  anyone else?

20  A.   No.

21  Q.   By five months, what was the baby -- how active was the

22  baby?

23  A.   She was active.

24  Q.   Kicking?

25  A.   You could -- yeah, you could -- you could see her -- my

1    stomach jumping at times.

2    Q.   Okay.  And it never came up during any of the visits?

3    A.   No.

4    Q.   All right.  We have August -- August 24th I believe you

5    had another visit and you got more prescriptions, correct?

6    A.   Correct.

7    Q.   And then August 31st, so that's going to be seven months

8    pregnant, is that correct?

9    A.   Correct.

10   Q.   And let me ask you, I'll go over these in a little bit,

11   but were you continuing to test negative for the prescribed

12   drugs during the time you were seeing him?

13   A.   Correct.

14   Q.   And let me ask you this.  I guess there would be an

15   issue -- there can be an issue of taking drugs if you don't

16   want to go through withdrawal with your baby, is that correct?

17   A.   Correct.

18   Q.   All right.  And as a matter of fact, during -- during one

19   period of time, was it this pregnancy or don't you recall which

20   one it was, that you had an incident where you -- where you

21   received medical care in a -- in the -- in the Monroe County

22   Jail?

23   A.   Yes.  Yes.  It was during this pregnancy.

24   Q.   All right.  And that was during the summer -- during the

25   summer months as you recall?

1   A.   Yes.

2   Q.   And why were you in the Monroe County Jail?

3   A.   I was in there for -- it was violating probation for a

4   domestic violence charge I had got maybe a year prior, so I --

5   Q.   This was a misdemeanor domestic violence?

6   A.   It was a misdemeanor domestic violence, yes.

7   Q.   And this was involving who?

8   A.   The father of -- of my children, my two youngest.

9   Q.   The co-dependent guy?

10  A.   The co-dependent guy, yeah.   Okay.

11  Q.   And so to the best of your recollection, how long were you

12  in -- how long were you in the jail for that violation?

13  A.   I recall being in there for a few weeks, a couple weeks.

14  It was a 21-day sentence.

15  Q.   Okay.   And what happened?   Obviously they don't let you

16  take your Dr. Pompy prescriptions to the jail with you, do

17  they?

18  A.   Right.

19  Q.   What -- what happened during the time you were in the jail

20  in terms of your medical care?

21  A.   So I notified them that I was pregnant and I was also on

22  pain -- prescription painkillers.   I was opiate dependent.   And

23  so they sought out the doctor who I saw when I was in there and

24  prescribed me Tylenol with codeine in it to stop withdrawals.

25  Q.   And that discussion with you was, for at least the days

1   you were going to be there, that was going to be safer for you

2   and the child than going through withdrawals?

3   A.  Right.  Right.

4   Q.  Okay.  And when you got out of prison or out of jail for

5   those weeks, what did you do as far as getting pills?

6   A.  I went and saw Dr. Pompy again.

7   Q.  And what did he do, what did he prescribe?

8   A.  He started the same prescriptions again, Percocet and

9   tramadol.

10   Q.  Okay.  Let's move forward.  We have -- we have some

11   business on September 8th, 2015.  I think those are -- those

12   would be around seven months.  You still got your medication,

13   is that correct?

14   A.  Correct.

15   Q.  And then we have September 24th, we have another visit,

16   you got your medications again, correct?

17   A.  Correct.

18   Q.  And if you're negative for the prescribed drugs, it would

19   mean what?

20   A.  That I ran out of them from sharing and taking more than I

21   should.

22   Q.  Okay.  October 8th, 2015, we have a visit there, is that

23   correct?

24   A.  Correct.

25   Q.  And at this point we're over eight months, your -- your

1  son's going to be born on November 3rd?

2  A.  My daughter.

3  Q.  Your daughter, sorry.

4       So it would have been obvious that --

5  A.  Yes, it was obvious.

6  Q.  Obvious before -- do you think it was obvious before then?

7  A.  Prior to --

8  Q.  Yes.

9  A.  Clarify.

10  Q.  Eight months?

11  A.  Prior to eight months I think was that?  Yeah, it was

12  obvious fairly quickly.  It was my third child.  I started

13  showing really quickly.

14  Q.  All right.

15       MR. PRATT:  And if you could pull up page 200 please

16  of the patient chart for this visit and at the top.

17  BY MR. PRATT:

18  Q.  Here you're -- here you're eight months-plus pregnant.

19  You're checking the box says "Currently pregnant."  Which did

20  you check?

21  A.  I checked no.

22  Q.  Anyone challenge you on that?

23  A.  No.

24  Q.  You did see Dr. Pompy that day, right?  It was a visit

25  that you got prescriptions?

1   A.   Yeah, I -- yeah, if I got refills, I saw him briefly, yep.

2   Q.   Okay.  All right.  And then -- and then on November 3rd

3   you had your daughter, is that correct?

4   A.   Correct.

5   Q.   All right.  And what -- and I'm sorry to have to ask you

6   this, but what was her -- what was her condition when she was

7   born?

8   A.   Hope was born addicted to opiates.

9   Q.   And where did you get the opiates that she was addicted

10  to?

11  A.   Dr. Pompy.

12  Q.   Did Dr. Pompy actually visit you in the hospital?

13  A.   I believe he did.

14       MR. PRATT:  Could you put up page 1413 please?

15  A.   Okay.

16  BY MR. PRATT:

17  Q.   And this is a patient record for a Dr. -- in Dr. -- in

18  your chart and Dr. Pompy's for consulting, for providing

19  consulting service in the hospital, correct?

20  A.   Correct.

21  Q.   And for the record, the "History of Present Illness,"

22  second line, "s/p, c-section," you see that?

23  A.   Yes.

24  Q.   And that is the procedure you had on the date of service,

25  November 3rd, 2015?

1   A.   Correct.

2   Q.   Not only did he consult about your C-section, but the line

3   below the C-section, is there an indication there as to what

4   your position is regarding the use of opioids?

5   A.   Yes, said I was opioid dependent.

6   Q.   Was that true?

7   A.   It was true.

8   Q.   And at this point Dr. -- at -- at this point Dr. Pompy

9   knew that, is that correct?

10  A.   Correct.

11  Q.   So you didn't see -- you -- you didn't have a regular

12  office visit with Dr. Pompy in November, did you?

13  A.   No.

14  Q.   All right.

15          MR. PRATT:  If you could turn to page 202 of the

16  patient chart and do the top part where you have the date.

17  BY MR. PRATT:

18  Q.   December 7th, 2015, basically a month after the delivery,

19  what did you do?

20  A.   I went and saw Dr. Pompy.

21  Q.   All right.  And what kind of visit did you ask him for?

22  A.   A renewal of my medication.

23  Q.   All right.

24          MR. PRATT:  Could you open that up a little more and

25  see what kind of...

1   BY MR. PRATT:

2   Q.  You checked the box for "Renew current medication," is

3   that correct?

4   A.  Correct.

5   Q.  All right.  And so what kind of visit did you have with

6   Dr. Pompy since it was a renew visit?

7   A.  It was just a refill visit.

8   Q.  If you recall, any discussion of the pregnancy?

9   A.  I don't recall.

10  Q.  Any discussion of whether or not it's a good idea to --

11  you're a month after.  Any discussion of whether or not you're

12  breastfeeding and if that's a good idea with these medications?

13  A.  No.

14  Q.  Did he go ahead and prescribe you your usual opiates?

15  A.  Yes, he did.

16  Q.  Now, on or about Christmas of that year did you have --

17  did you have some -- something unfortunate happen to you?

18  A.  Car accident, yeah

19  Q.  Okay.  Yeah.  And did you -- did you -- what -- where did

20  you initially go for treatment from the auto accident?

21  A.  If I went for treatment, it would have been at the

22  hospital in Monroe which was -- I believe it was Mercy Memorial

23  Hospital at the time but they changed their name to ProMedica,

24  so I'm not a hundred percent on that.

25  Q.  Okay.  So it's either Mercy or ProMedica, depending on the

1  name?

2  A.  It would have been the main hospital, yes

3  Q.  All right.  So you went there and they checked you out.

4       MR. PRATT:  And I'm going to ask you if you can look

5  in the patient chart for page 62.  I guess it was called

6  ProMedica.

7  BY MR. PRATT:

8  Q.  This is a -- for the record, a discharge note, correct?

9  A.  Correct.

10  Q.  And according to the discharge note in Dr. Pompy's file,

11  what medication did they discharge you with?

12  A.  Ibuprofen.

13  Q.  As needed?

14  A.  As needed for -- yeah, for pain.

15  Q.  All right.  I want you to look back at Government's

16  Exhibit 85L, the part regard -- involving December of 2015.

17  You'd already been in to Dr. Pompy's December 21st, 2015,

18  right, before the accident?

19  A.  Correct.

20  Q.  And according to the records of filled, you got 42 of the

21  Percocets, is that right?

22  A.  Correct.

23  Q.  That's a how -- how many week supply?

24  A.  That would have been two weeks I believe.

25  Q.  Okay.  And so you had two weeks supply, you had a -- you

Case 2:18-cr-20454-SJM-RSW    ECF No. 79, PageID.1388    Filed 12/05/22    Page 103 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

103

1   had the accident on or around Christmas, and you went back in

2   one week later, correct?

3   A.   Correct.

4   Q.   And what happened when you went in one week later?

5   A.   Got another two-week supply.

6   Q.   Okay.  And even though it's in your chart that you were

7   having Ibuprofen for the pain?

8   A.   Correct.

9   Q.   And you continued to have regular visits with Dr. Pompy

10  during 2016?

11  A.   Correct.

12  Q.   And pretty much went the way you've described?

13  A.   Correct.

14  Q.   Did you become pregnant again in 2016?

15  A.   I did.

16  Q.   All right.  And when was your son born?

17  A.   He was born January 16th of 2017.

18  Q.   Okay.  Was he also a full-term 39-week baby?

19  A.   Yes, he was.

20  Q.   All right.  So if we do the math back, that means we're

21  talking about mid-April, 18, 17 or 18 of 2016?

22  A.   Yes.

23  Q.   Okay.  And according to the -- your patient chart, you had

24  visits in April, is that correct?

25  A.   Correct.

1          MR. PRATT:  And then if we could look at page 124 of

2     the patient chart.

3     BY MR. PRATT:

4     Q.  May -- May 9th, 2016, so you'd be only about three weeks

5     pregnant, is that correct?

6     A.  Correct.

7     Q.  And do you have a memory as to when you learned out --

8     when you learned you were pregnant?

9     A.  No, I don't.

10    Q.  But on this date you wanted a renewal, is that correct?

11    A.  Correct.

12    Q.  And let's look at the -- let's look at what you did for

13    the pregnancy questions.

14         MR. PRATT:  If you could go to the page 126 and then

15    127.

16    BY MR. PRATT:

17    Q.  "Currently pregnant," what did you do?

18    A.  I left it blank.

19    Q.  Okay.

20         MR. PRATT:  And then if you'd go to page 127.

21    BY MR. PRATT:

22    Q.  What about the "Last menstrual period" or the "Pregnant"

23    there?

24    A.  I left it blank.

25    Q.  Anyone ever raise anything with you?

1    A.  No.

2    Q.  And you were a person who a few months before had been

3    saying no when they had been pregnant?

4    A.  Correct.

5    Q.  Didn't cause any change?  Was there any change?

6    A.  I'm sorry, repeat the question.

7    Q.  Did it cause any change?  Did that history cause any

8    change in how you were treated or dealt with at Dr. Pompy's --

9    A.  No.

10   Q.  -- office?

11   A.  No, it stayed the same.

12   Q.  How about the fact that you were affirmatively identified

13   as someone who was opioid dependent, did that cause any change

14   as how you were treated there?

15   A.  No.

16   Q.  Okay.

17        MR. PRATT:  Let's move forward on -- back on the

18   Government's Exhibit 85L.  So if we could go forward from --

19   from July -- from June.

20   BY MR. PRATT:

21   Q.  Okay.  So you had a visit June, June -- June 7.  You got a

22   prescription at least on June 7th, correct?

23   A.  Correct.

24   Q.  So you're coming close to three months at that point?

25   A.  Correct.

1   Q.  All right.  And you're still getting the -- still getting

2   the medication, the opiates?

3   A.  Correct.

4   Q.  And then July, July 5th, we're coming to four months,

5   correct?

6   A.  Correct.

7   Q.  And any change in terms of how you're dealt with?

8   A.  No.

9   Q.  Any recognition in your interactions with Dr. Pompy that

10  you might be pregnant again?

11  A.  No.

12  Q.  And as a matter of fact, by this time --

13          MR. PRATT:  If we could look at page 150 for the

14  July 5th, 2016 visit, if we could look at the top of the page.

15  BY MR. PRATT:

16  Q.  "Currently pregnant," what did you do?

17  A.  I left it blank.

18  Q.  And look at page 151 at the bottom.  "Last menstrual

19  period" or "Pregnancy"?

20  A.  I left it blank.

21  Q.  Anyone raise -- Dr. Pompy raise any questions with you

22  about that?

23  A.  No, he did not.

24          MR. PRATT:  Let's look at August 8th, 2016, page 163.

25  BY MR. PRATT:

1    Q.  What did you indicate for pregnancy status?

2    A.  I left it blank.

3    Q.  And this is your fourth month?

4    A.  Correct.

5    Q.  All right.  And how about the next page, 164, the bottom?

6    A.  I left that blank as well.

7    Q.  Okay.  And you continued to get your opiate prescriptions,

8    is that correct?

9    A.  Correct.

10         MR. PRATT:  Let's -- let's go to page 190, the visit

11   on September 12th, 2016.

12   BY MR. PRATT:

13   Q.  So at this point you're about five months pregnant, is

14   that correct?

15   A.  Correct.

16   Q.  All right.  Is the baby going to be kicking by this point?

17   A.  Yes.

18   Q.  How big are you at this point?

19   A.  Decent size.  Definitely tell something's up.

20   Q.  Okay.  And I notice -- I notice on the right side, if we

21   could go down a little bit, you asked to renew medication,

22   correct?

23   A.  Correct.

24   Q.  All right.

25         MR. PRATT:  If we could do a little bit more of the

1   form, middle, the middle of the form.

2   BY MR. PRATT:

3   Q.  There's an indication at the top, "Drug counseling: No

4   Pill Bottle."  Do you see how that was checked?

5   A.  Yes.

6   Q.  What, if anything, would -- what, if anything, was done

7   with you about drug counseling?

8   A.  Nothing.  The only thing I remember is just the -- having

9   to come more frequently.

10  Q.  All right.  So if there's a problem with your urine,

11  they'd make you come more frequently?

12  A.  Correct.

13  Q.  Okay.  And I want to talk specifically about the

14  September 12th, 2016.  I want to ask you particularly a couple

15  things.  First of all, how confident are you that you were

16  definitely showing by this time?

17  A.  I'm really confident, yeah

18  Q.  If Dr. Pompy or anyone had given you a physical exam, what

19  would that have revealed?

20  A.  They would have figured it out.

21  Q.  Okay.  So you can be pretty confident that there was no

22  physical exam on this particular date, September 12th, 2016?

23  A.  Correct.

24  Q.  All right.  And what about the other fact that you -- the

25  fact that you clicked that this was a renewal request, what

 1   does that tell you about how much time and what Dr. Pompy did
 2   with you on that date?
 3   A.   He didn't -- he didn't spend any time with me.  It was
 4   minimal, minutes, couple minutes.
 5   Q.   Okay.  All right.  Did you come back -- did you come back
 6   one more time in September, is that correct?
 7   A.   Correct.
 8           MR. PRATT:  Let's look at page 956.
 9   BY MR. PRATT:
10   Q.   And are you familiar with this document that says it's a
11   visit letter?  Did you ever get any of those --
12   A.   Um --
13   Q.   -- if you recall?
14           Did they give you paperwork when you left after a
15   visit or not?
16   A.   They -- they did.  I can't -- I can't particularly recall
17   this document but I do remember them giving us paperwork, yes.
18   Q.   Okay.  I guess I'm going to ask you, and in the interests
19   of -- the interests of time, maybe it's -- you know, in the
20   interests of time, I know I mentioned a number of -- a number
21   of times where they -- you were coming up negative for the
22   prescribed drugs.  I guess I want to ask you rather than show
23   you one by one, if I did a little count here, in the time
24   period we've been talking about, 2014 to 2016, if there were 23
25   different times in the patient chart where you were either

1   negative for prescribed drugs or positive for marijuana or

2   both, would that surprise you or would that seem that that was

3   consistent with what was going on?

4   A.  No, that was consistent with what was going on.

5   Q.  Twenty-three times in a little over two years?

6   A.  That's correct.

7   Q.  And in all of those inconsistent drug times, did Dr. Pompy

8   ever -- did he ever do anything to tell you he was going to

9   take you off the pills?

10  A.  No.

11  Q.  Now, there was a time -- and then what happened, what

12  ended your -- what ended your time working -- getting

13  controlled drugs from -- opiates from Dr. Pompy?

14  A.  His office was shut down.

15  Q.  Okay.  When his office was shut down in September of 2016,

16  where were you in terms of using pills and being addicted?

17  A.  So I was absolutely addicted, I was physically addicted,

18  and -- and I would just have to kind of figure it out to stop

19  the withdrawals.

20  Q.  Okay.  Tell us at this point, by the time you've been

21  seeing Dr. Pompy for this long, tell us what it meant to be

22  worried about going through withdrawals.

23  A.  It -- withdrawal just wasn't a thing I could afford to go

24  through.  I had other children to take care of.

25  Q.  Explain what you mean, you had -- you had -- you had

1    younger children to take care of even though you were pregnant,

2    that's right?

3    A.  Correct.

4    Q.  All right.  And at this point, for whatever pain you had

5    at this point, were the pills actually helping the pain?

6    A.  No, they didn't.

7    Q.  Then why did you want to take the medication in the

8    morning?

9    A.  I -- I had to because I was physically addicted to it.

10   Q.  And what would happen if you didn't?

11   A.  If I didn't take it, I would get nauseated, I would get

12   diarrhea, I would get hot and cold sweats, I would not eat,

13   couldn't -- fatigue, couldn't get out of the bed, couldn't take

14   care of my kids.

15   Q.  Okay.  So you were taking the pills to do what basically?

16   A.  To stop the withdrawals.

17   Q.  Okay.  Now, in September you're basically -- you're

18   five -- five, six months pregnant.  What happened once Dr.

19   Pompy's place was closed down?

20   A.  I -- I can't remember exact details of everything.  I just

21   know I had to figure it out, and it was -- I was under a lot of

22   stress and I started seeking out ways to figure out how to get

23   treatment.

24   Q.  Did you also -- like before you started going to Pompy,

25   Dr. Pompy, did you get pills from other places, from the street

1  too basically?

2  A.  Yeah, yeah, there was times.

3  Q.  All right.  And when your son was born in January of 2017,

4  what was his condition?

5  A.  He was addicted as well.

6  Q.  Both of your children are okay now?

7  A.  Yes, they're good.

8  Q.  And they're -- and they're with you?

9  A.  They are.

10 Q.  Okay.  So you realized you were addicted.  At some point

11 then did you -- did you try to do something positive about

12 that?

13 A.  Yes.  After I had my son I sought out treatment and went

14 to a place called Passion of the Mind.

15 Q.  Okay.  And what did they do for you there?

16 A.  They prescribed me Suboxone.

17 Q.  Okay.  And Suboxone is a drug, also -- also a narcotic,

18 correct?

19 A.  Yes.

20 Q.  Also a controlled drug?

21 A.  Yes.

22 Q.  But what does it do for you as far as your addiction?

23 A.  Well, it -- it -- it stabilizes you, it stops the

24 withdrawals.

25 Q.  Okay.  And you stayed on Suboxone regularly for a while,

1  correct?

2  A.  Yes, it was for a while, over a year.

3  Q.  And after going through that withdrawal program were you

4  able to actually get off the Suboxone?

5  A.  I was.  I -- well, yeah, at -- at some point I did.  In

6  2019 I was able to finally get off of it, yeah.

7  Q.  Okay.  How about other medical issues since then, anything

8  you've had to take controlled substances for from 2019 forward

9  to now?  What other medical issues do you have?

10  A.  Yes, I -- I have ADHD.  I also have anxiety and depression

11  and PTSD.  So I've been treated with Adderall for my ADHD, and

12  then I also have been treated with Xanax for my anxiety and

13  panic attack disorder at times.

14  Q.  At times.  But that's not -- that's not been the same

15  drugs all the way through?

16  A.  No.  No.  It was just periods of time where the symptoms

17  of those disorders were increasingly difficult for me to deal

18  with.

19  Q.  Okay.  And -- and how about the pain, how do you handle

20  the pain related to your bad back?

21  A.  So I handle the pain with techniques I was taught in

22  physical therapy, I handle it with hot and cold treatment, I

23  handle it with Motrin, and I handle it more above with prayer.

24  Q.  Okay.  So you're not on opiate treatment for your back?

25  A.  No, I'm not.

1  Q.  And haven't been since when?

2  A.  2000 and -- well, I wouldn't even say I was in treatment

3  for my back.  The last time I was in treatment for any of this

4  was in 2019.

5  Q.  Okay.  You -- in 2018 did you have a situation where you

6  had a problem with the legal system?

7  A.  Yes.

8  Q.  Okay.  What -- what did you get -- what did you get

9  charged with and what -- what did you plead guilty to?

10  A.  In 2018 or 2019?

11  Q.  I could have the year wrong.

12  A.  Yeah, I think it's 2019.  And in 2019 I was arrested for a

13  retail fraud.

14  Q.  Okay.  Was that -- was that at a Kohl's store?

15  A.  It was at Kohl's, yes.

16  Q.  Okay.  And not the best decision you made?

17  A.  No.

18  Q.  All right.  Was that a -- were you -- did you plead guilty

19  to a misdemeanor offense?

20  A.  I did.

21  Q.  All right.  And how much did they fine you for that?

22  A.  It was a little over $400.

23  Q.  Fines and costs?

24  A.  Yes.  Yeah

25  Q.  Okay.  You getting your life back together after all this?

1   A.  It's together.

2   Q.  Okay.  Are you working now?

3   A.  I am.

4   Q.  What kind of job are you working?

5   A.  I work at a plant that builds drive shafts for Ford, GM

6   and Chrysler.  I'm a forklift operator.

7   Q.  Okay.

8           MR. PRATT:  One moment, Your Honor

9           THE COURT:  Mm-hmm.

10          MR. PRATT:  Thank you, Ms. Lindhorst.  I have nothing

11   more.

12          (Excerpt 6 concluded at 1:09 p.m.)

13                      —   —   —

14

15

16

17

18

19

20

21

22

23

24

25

1        Excerpt 7:

2            (Proceedings in progress at 2:15 p.m., all parties

3            present, jury present)

4            THE COURT:  You want to respond to any of that, Mr.

5    Pratt?

6            MR. PRATT:  Yes, Your Honor.  Just very briefly.

7            THE COURT:  Okay.  Go right ahead.

8                    REDIRECT EXAMINATION

9    BY MR. PRATT:

10   Q.  Ma'am, I similarly am cautious to tread on weight gained

11   during pregnancy, but, you know, you -- you -- you -- you have

12   experienced four times.  When you say you gain weight, isn't

13   that -- isn't that 30 to 40 pounds usually?

14   A.  Yeah, it's not -- it's -- it's weight gain from the baby

15   and the -- and the fluid and whatnot.

16   Q.  Okay.  So when we went through all those ones in the

17   patient charts on those weights and you said correct, were you

18   saying that that's actually what happened or you're just

19   assuming that the people writing the record got it right?

20   A.  I -- I'm assuming because I don't remember.

21   Q.  Okay.  And so if, in fact, that wasn't accurately weighed,

22   either they were just copying what -- from before or

23   estimating, I guess I'm asking you do you really think you went

24   from -- you really think you gained five pounds during an

25   entire pregnancy, does that make any sense to you?

1    A.   No, I don't think I gained only five pounds.

2    Q.   If you do, I think there's a lot of people that'd like to

3    know how, right?

4    A.   Yeah

5    Q.   Okay.  And after the first pregnancy at least, did Dr.

6    Pompy know that you were not open and honest about your

7    pregnancy question?

8    A.   He -- he did.  I mean after -- once I had Hope, he -- he

9    knew.

10   Q.   And he also knew you were opioid dependent, you were an

11   addict?

12   A.   Yes, he did.

13   Q.   He did?

14   A.   And he didn't -- he -- or -- or, well, yes, he knew I was

15   dependent and he knew my baby was born addicted.

16   Q.   And did he change anything about his treatment for you

17   after that?

18   A.   No, he did not.

19            MR. PRATT:  Thank you.

20            THE COURT:  Thank you.

21            (Excerpt 7 concluded at 2:17 p.m.)

22                        —  —  —

23

24

25

Case 2:18-cr-20454-SJM-RSW   ECF No. 79, PageID.1403   Filed 12/05/22   Page 118 of 118
Jury Trial Excerpts: Volume 4 • Wednesday, November 30, 2022

118

1          C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 117 comprise full, true and correct excerpts of

7    proceedings taken in the matter of United States of America vs.

8    Lesly Pompy, Case No. 18-20454, on Wednesday, November 30,

9    2022.

10

11                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, CRR, RMR, RDR, CRC
12                         Federal Official Court Reporter
                           United States District Court
13                         Eastern District of Michigan

14

15

16

17

18   Date: December 5, 2022
     Detroit, Michigan
19

20

21

22

23

24

25