```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5      vs.                              Case No. 18-20454
                                         Hon. Stephen J. Murphy, III
 6      LESLY POMPY,

 7                        Defendant.
      _____/
 8                        JURY TRIAL EXCERPTS: VOLUME 5

 9
             BEFORE THE HONORABLE STEPHEN J. MURPHY, III
10                   United States District Judge
            Theodore Levin United States Courthouse
11                 231 West Lafayette Boulevard
                     Detroit, Michigan  48226
12                 Thursday, December 1, 2022

13    APPEARANCES:

14    For the Plaintiff          WAYNE F. PRATT
      United States of America:  ANDREW J. LIEVENSE
15                               U.S. Attorney's Office
                                 211 W. Fort Street
16                               Suite 2001
                                 Detroit, Michigan  48226
17                               313-226-9100

18    Also Present:             CHRISTINE OUELLETTE
                                Paralegal Specialist
19
      For the Defendant         GEORGE B. DONNINI
20    Lesly Pompy:              JOSEPH E. RICHOTTE
                                Butzel Long
21                              201 W. Big Beaver
                                Suite 1200
22                              Troy, Michigan 48084
                                313-225-7000
23
                                (Appearances continued next page)
24

25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant         RONALD WILLIAM CHAPMAN, II
      Lesly Pompy:              Chapman Law Group
 3                              1441 West Long Lake Road
                                Suite 310
 4                              Troy, Michigan 48098
                                248-644-6326
 5
      Also Present:            VICTORIA MURDOCH
 6                             Senior Paralegal

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            To obtain a certified copy of this transcript, contact:
24           Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
                         Official Court Reporter
25               (313) 234-2616 • www.transcriptorders.com
```

1          TABLE OF CONTENTS

2     Government Witnesses Continued:                    Page

3     Excerpts 8 and 9:

4     LISA KOHLER

5        Direct Examination by Mr. Lievense              7
         Redirect Examination by Mr. Lievense           37
6
7     Excerpts 10 and 11:

      JOEY SHINEVARRE
8
9        Direct Examination by Mr. Pratt               39
         Redirect Examination by Mr. Pratt             77

10    Excerpt 12:

11    JUDY SHINEVARRE

12       Direct Examination by Mr. Lievense            81

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           EXHIBITS

 2     Identification                  Offered    Received

 3     Government Exhibit 17              97          98
       Medical records for
 4     Judy Shinevarre

 5     Government Exhibit 85H              8           8
       Prescription record for
 6     Lisa Kohler

 7     Government Exhibit 85J             50          51
       Prescription record for
 8     Joey Shinevarre

 9     Government Exhibit 85P             83          83
       Prescription record for
10     Judy Shinevarre

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           Detroit, Michigan

2           Thursday, December 1, 2022

3                     —   —   —

4           Excerpt 8:

5           (Proceedings commenced at 8:48 a.m., all parties

6           present)

7           THE LAW CLERK:  All rise for the jury.  United States

8    District Court for the Eastern District of Michigan is now in

9    session, the Honorable Stephen J. Murphy presiding.

10          (Jury entered the courtroom at 8:49 a.m.)

11          THE COURT:  All right.  Jurors are here.  Everybody

12   is in their spots.  Everyone are in their spots.  Go ahead and

13   have a seat.

14          THE LAW CLERK:  Calling Case 18-20454, United States

15   of America versus Lesly Pompy.

16          Counsel, please state your names for the record.

17          MR. LIEVENSE:  Good morning, Your Honor.  Andrew

18   Lievense on behalf of the United States.  My colleague, Mr.

19   Pratt, is in the hallway, and I think I'm going to proceed with

20   the first witness while -- and he may be absent.

21          THE COURT:  That's great.  Thank you.

22          MR. DONNINI:  Good morning, Your Honor.  George

23   Donnini appearing on behalf of Dr. Lesly Pompy who's here.

24          MR. RICHOTTE:  And good morning, Your Honor.  Joe

25   Richotte appearing on behalf of Dr. Pompy as well.

1      MR. CHAPMAN:  Good morning, Your Honor.  Ronald

2   Chapman on behalf of Dr. Pompy.

3      THE COURT:  Okay.  Good morning, one and all.

4   Everybody may be seated.

5      Thank you, lawyers, for being here right on time.

6   Thanks to our jurors.  Notwithstanding my bad behavior on our

7   first day of the week, you've been our best jury in a long,

8   long -- we've tried five cases this year.  This is our fifth --

9   fifth case.  As I mentioned, we're trying to clear up the

10  backlog from COVID.  And in terms of timeliness and appearance,

11  you've been our best jury and we're grateful to you.

12      I also want to mention how grateful I am to Mr.

13  Philbrick.  He's working silently and without much recognition

14  and thanks.  He's got a hard job.  He's got to get everybody

15  together early in the morning and he's doing a great job.

16      He went to Michigan State Law School, and you

17  wouldn't know this by looking at him but -- but Philbrick is a

18  world-class musician, literally.  He's played at Carnegie Hall

19  and he -- he doesn't need the law and he certainly doesn't need

20  Murphy, but here he is doing a great job for all of us, so

21  thank you, Mr. Philbrick.

22      And let us move to Mr. Lievense now.

23      MR. LIEVENSE:  Yes, Your Honor.  The government calls

24  Lisa Kohlman to the stand.

25      THE COURT:  Okay.  Right this way, ma'am.

1           THE WITNESS:  Oh, farther?

2           THE COURT:  Come on up.  You're going to sit in this

3     chair here.  So before you sit down, just look at me and raise

4     your hand.

5                     L I S A   K O H L M A N

6     was called as a witness herein, and after being first duly

7     sworn to tell the truth and nothing but the truth, testified on

8     her oath as follows:

9           THE COURT:  Okay.  Go ahead and have a seat in the

10    chair.  It's a little compact but so are you, so you'll sit

11    and -- and -- and relax nicely, and speak toward the mic, not

12    too close.

13          Mr. Lievense, go right ahead.

14          MR. LIEVENSE:  Thank you, Your Honor.

15                     DIRECT EXAMINATION

16    BY MR. LIEVENSE:

17    Q.  Ms. Kohlman, can you please state and spell your first and

18    last name for the court reporter?

19    A.  It's Lisa Kohlman, K-o-h-l-m-a-n.

20    Q.  And is Lisa spelled L-i-s-a?

21    A.  L-i-s-a.

22    Q.  Great.

23          MR. LIEVENSE:  I'd like to put up on the screen

24    Government's Exhibit 85H.  Your Honor, this is -- was not

25    preadmitted --

```
 1              THE COURT:  Right.
 2              MR. LIEVENSE:  -- but Mr. Donnini indicated that he
 3   would stipulate to its admission, and I would so move for it to
 4   be admitted at this point.
 5              THE COURT:  That's correct, Mr. Donnini?
 6              MR. DONNINI:  Yes.  No objections, Your Honor.
 7              THE COURT:  Okay.  For identification, this is the
 8   prescription material of this witness, which we've seen
 9   previously in other witnesses' testimony.
10              Go right ahead.
11   BY MR. LIEVENSE:
12   Q.   Ms. Kohlman, I -- did there come a point where you sought
13   medical treatment from Dr. Lesly Pompy?
14   A.   Yes.
15   Q.   And if I could direct your attention to this document on
16   the screen, in October of 2012 did there come a point where Dr.
17   Pompy prescribed medication to you?
18   A.   Yes.
19   Q.   And what did he prescribe?
20   A.   Methadone.
21   Q.   And if you could move about halfway down the chart into
22   November of 2013, did Dr. Pompy add an additional medication
23   for you?
24   A.   Yes.
25   Q.   And what month was that?
```

```
1    A.   November 19th I think.

2    Q.   That was 2013?

3    A.   It may have been up one.  November 19th, 2000 --

4    Q.   And what medication was that?

5    A.   Nucynta.

6    Q.   And when -- when Dr. Pompy added that medication, did he

7    reduce or change any medication or did he also prescribe the

8    methadone?

9    A.   It got added.

10   Q.   So he prescribed both?

11   A.   Yes.

12   Q.   And if you could direct your attention to the bottom of

13   that chart, did your -- Dr. Pompy's prescribing to you change

14   in July of 2014?

15   A.   Yeah.  He added tramadol.

16   Q.   And I'd like to -- for the methadone, how many pills for

17   that month in July of 2014 did Dr. Pompy prescribe for you,

18   just the methadone?

19   A.   Sixty.

20   Q.   And how many pills of the Nucynta 75 milligrams did he

21   prescribe?

22   A.   Ninety.

23   Q.   And how many pills of the tramadol 50 milligrams did he

24   prescribe?

25   A.   [Indiscernible].
```

1    Q.   A hundred and eighty?

2    A.   Yes.

3         MR. LIEVENSE:  And if you could go to page 2 of this

4    exhibit, Ms. Ouellette, to the bottom.

5    BY MR. LIEVENSE:

6    Q.   This is a little clunky 'cuz -- June 4th, 2015, did Dr.

7    Pompy prescribe again this 60 methadone pills and the 90

8    Nucynta pills?

9    A.   Yes.

10   Q.   And if you go to page 3, it's the top, also on June 4th,

11   2015, did Dr. Pompy prescribe the tramadol 50 milligrams, 180

12   pills?

13   A.   Yes.

14   Q.   And on June 4th of 2015 did Dr. Pompy add another

15   medication?

16   A.   Lyrica.

17   Q.   And would that be 60 pills?

18   A.   Yes.

19        MR. LIEVENSE:  And then going to the bottom of that

20   page please.  I'm sorry, the next page, the bottom.

21   BY MR. LIEVENSE:

22   Q.   On August 25th, 2016 did Dr. Pompy prescribe the Nucynta

23   75 milligrams and the methadone 5 milligrams again?

24   A.   Yes.

25        MR. LIEVENSE:  And then unfortunately we have to go

1  to last page at the top.

2  BY MR. LIEVENSE:

3  Q.  And is this also on August 25th, 2016?

4  A.  For Lyrica --

5  Q.  Is it --

6  A.  -- and tramadol?

7  Q.  Apologies.  But in -- you said Lyrica and tramadol, and

8  those are also on August 25th, 2016?

9  A.  Yes.

10  Q.  And the Lyrica, is that -- did the dosage, the amount of

11  milligrams, is that higher?

12  A.  Yes.

13  Q.  Is that 200 milligrams?

14  A.  Two hundred.

15  Q.  All right.  In reviewing this chart, it looks like Dr.

16  Pompy gradually added medications for you, is that correct?

17  A.  Yes.

18  Q.  Did he ever decrease the dosage or number of pills of the

19  other medications he gave to you?

20  A.  No.

21  Q.  Did there ever come a point where you were on too much

22  medication?

23  A.  I felt like I was on a lot of different meds, yes.

24  Q.  And did there ever come a point where the medications you

25  were on made you -- made you feel -- let me -- let me -- based

1    on that last page --

2          MR. LIEVENSE:  I'm sorry, Your Honor, Ms. Ouellette

3    as well.

4    BY MR. LIEVENSE:

5    Q.   On August 25th, 2016, if you were on 90 -- if you received

6    90 Nucynta pills, how many pills a day were you taking?

7    A.   Three.

8    Q.   And if you received 60 methadone pills, how many pills

9    were you taking?

10   A.   I think back then it was in the morning and in the night.

11   Q.   So two?

12   A.   Mm-hmm, yes.

13         MR. LIEVENSE:  And if you go to the next page.

14   BY MR. LIEVENSE:

15   Q.   It looks like you received 180 tramadol pills.  How many

16   pills a day were you taking?

17   A.   I think it was two, two of those, three times a day,

18   whatever equaled the 50.

19   Q.   Was 180 a one-month supply?

20   A.   Yes.

21   Q.   So 180 divided by 30, would that be six pills a day?

22   A.   Yeah, two every time.

23   Q.   Two.  Okay.

24         And then the 63 pills of Lyrica, is that also a

25   one-month supply?

1    A.   (Inaudible)

2    Q.   Was that a yes?

3    A.   Yes.

4    Q.   So that would be two additional pills per day?  I'm sorry.

5    A.   I believe I took those three times a day.

6    Q.   Okay.  So you were taking just for pain medications

7    approximately 13 pills a day?

8    A.   Yes.

9    Q.   Ms. Kohlman, I want to back up a little bit.  Where were

10   you born and raised?

11   A.   Monroe.

12   Q.   Have you lived there your whole life?

13   A.   My whole life.

14   Q.   And what type of job, jobs did you typically have in your

15   younger years?

16   A.   Waitressing.

17   Q.   And in the last 15 years or so what type of job did you

18   have?

19   A.   In a factory.

20   Q.   And more recently what -- how were you employed?

21   A.   As a cashier.

22   Q.   Is that at a grocery store?

23   A.   Yes.

24   Q.   Now, in your late 20s did you develop a -- a health

25   condition that caused you some pain in your right leg?

```
 1    A.   Yes.
 2    Q.   Could you tell the jury and give them a brief discussion
 3    of what occurred?
 4    A.   I felt like my leg was in a bonfire or like
 5    electrocution-type burning feel.
 6    Q.   What was the condition?  You said -- did you develop a
 7    sort of lump or something?
 8    A.   I -- I started with one lump and it got removed and then
 9    it grew back and then it got removed.  And then they sent me to
10    Henry Ford and it's been operated a lot and they took out two
11    nerves and they're full -- full of lumps, my whole leg is full
12    of lumps.
13    Q.   All right.  And those lumps cause you some pain?
14    A.   Yeah, all nerve pain.
15    Q.   Nerve pain?
16    A.   Mm-hmm.
17    Q.   Is that a yes?
18    A.   Yes.
19    Q.   All right.  And do you know what your condition is called?
20    A.   They -- I guess neurofibromatosis, but it's only in my
21    leg.
22    Q.   Only in your leg.
23         And it's nerve pain?
24    A.   Yes.
25    Q.   Were you receiving any -- do you recall whether you were
```

1    receiving any prescription narcotics before seeing Dr. Pompy?

2    A.   I wasn't.

3    Q.   And at some point did a doctor you were seeing suggest

4    that you --

5    A.   Dr. Szymanski.

6    Q.   And what did Dr. Szymanski suggest for you?

7    A.   Dr. Pompy.

8    Q.   And do you recall when you first saw Dr. Pompy?

9    A.   Yes.

10   Q.   What year was that?

11   A.   Long time ago.

12   Q.   Well, I showed you the prescription record that goes back

13   to October of 2012.  Would it be --

14   A.   If that's what you found, that's when I started.

15   Q.   All right.  Well, I -- I'm not saying that that was when

16   you first went but I just -- would that be in the range of when

17   you started going?

18   A.   Ten, 12 years, it's -- yeah, it's -- I -- yeah.

19   Q.   All right.  And when you went to see Dr. Pompy, did you

20   make an appointment?

21   A.   I did.

22   Q.   And do you remember Dr. Pompy sending you for any tests?

23   A.   Yes.

24   Q.   And --

25   A.   I went for an MRI and I -- I think it's called an EKG

1    where they put the needles in and electrocute you.

2    Q.   Any other tests that you recall?

3    A.   That's all I got.

4    Q.   Do you recall whether anyone ever gave you a physical

5    examination during your visit, first maybe one or two visits to

6    Dr. Pompy?

7    A.   Not really.

8    Q.   You don't think it happened or you don't recall?

9    A.   I don't recall.

10   Q.   All right.  And what was the first medication Dr. Pompy

11   prescribed for you, pain medication, if you recall?

12   A.   I think it was methadone.

13   Q.   Okay.  And do you remember the first time you took a

14   methadone pill?

15   A.   Yes.

16   Q.   How did it make you feel?

17   A.   I couldn't carry my own trays as a waitress.

18   Q.   You were a waitress?

19   A.   (Nods in the affirmative.)

20   Q.   And so how did it make -- like, would it -- I'm sorry.

21   A.   I felt dizzy.

22   Q.   So you were waitressing at the time?

23   A.   Yes.

24   Q.   You took the pills while on the job or before?

25   A.   I took it when I was supposed to.

1    Q.   So you took one that day and then went to work?

2    A.   Yes.

3    Q.   And it made you feel...

4    A.   Dizzy.

5    Q.   All right.  Were you able to work that day?

6    A.   I could work.  I just had other people carry my bigger

7    trays.

8    Q.   Did you talk to Dr. Pompy about how you felt after?

9    A.   I told him it made me feel dizzy.

10   Q.   What was his response?

11   A.   He said I'll get used to it, and I did.

12   Q.   Did the methadone assist you at all, help you at all?

13   A.   Absolutely.

14   Q.   I'd like to talk to you about your typical followup visits

15   with Dr. Pompy.  How often would you go to him?

16   A.   Every month.

17   Q.   And describe the -- describe Dr. Pompy's office for you --

18   for me.

19   A.   Busy.

20   Q.   Was there a waiting room?

21   A.   Yes.

22   Q.   And where were -- when you arrived, where would patients

23   be?

24   A.   The waiting room would be full and they'd be all down the

25   hallway.

Jury Trial Excerpts: Volume 5 • Thursday, December 1, 2022

1   Q.   And would they be all sitting in chairs or were some of

2   them --

3   A.   On the floor.

4   Q.   They would be sitting on the floor?

5   A.   There wasn't chairs in the hallway.

6   Q.   And given the number of people in the waiting room and the

7   hallway, approximately how long did you typically wait before

8   being called back into the exam room?

9   A.   If it was in the daytime, it was anywhere from one to two

10  hours, but if you had a night visit, it was four hours

11  probably.  He was there a long time.

12  Q.   And when you were waiting those long periods of time, did

13  you ever have a chance to interact with or hear other patients?

14  A.   Everybody interacted.

15  Q.   So you would talk to each other?

16  A.   Yes.

17  Q.   And even people you didn't talk to, would you hear what

18  they were saying?

19  A.   Yes.

20  Q.   Did you ever hear other patients get upset or complain?

21  A.   There was people that would complain if they went up to

22  the window and their visit wasn't that day.

23  Q.   You mean people would show up on the wrong day?

24  A.   Yes.

25  Q.   Based on your conversations with people, did you ever get

1    a sense that more than one person had the same appointment

2    time?

3    A.   Yeah.  Yes.

4    Q.   Approximately, based on those conversations, what was your

5    sense of how many -- up to how many people would have the same

6    appointment time?

7    A.   Four or five.

8    Q.   I want to fast forward.  When you went back to the exam

9    room, did you typically have a -- would -- a medical assistant

10   would bring you back to the exam room, is that correct?

11   A.   Sometimes they just stood at the door and called your name

12   and you just jumped up and went.

13   Q.   All right.  And was it back in the exam room would you see

14   Dr. Pompy?

15   A.   You seen him running around.

16   Q.   All right.  You would see him moving from patient to

17   patient?

18   A.   Yes.

19   Q.   And then when you got to your -- I'll call it an exam

20   room, is that fair?

21   A.   Yes.

22   Q.   At some point did Dr. Pompy come in and see you?

23   A.   He did.

24   Q.   Describe a typical interaction with Dr. Pompy.

25   A.   He come in and shook your hand and was very nice.

1   Q.   And what would -- what would he say?

2   A.   Asked if I had any other issues.

3   Q.   Would he ask you how you were feeling?

4   A.   I don't recall.

5   Q.   Is that the type of thing he might say?  If you don't

6   recall, that's okay.

7   A.   I don't recall.

8   Q.   All right.  Now, would you typically -- well, if he looked

9   at the chart, you would typically leave with prescriptions,

10   correct?

11   A.   Yes.

12   Q.   Now, those prescriptions, who prepared them, like who

13   printed them out?

14   A.   His staff.

15   Q.   Were they already printed out before Dr. Pompy would get

16   into the exam room?

17   A.   They was already printed when he would come in.

18   Q.   All right.  So when Dr. Pompy would come in, you said he

19   was very nice to you?

20   A.   Yes.

21   Q.   What would he do after greeting you?

22   A.   Sign my scripts.

23   Q.   And then what?

24   A.   I left.

25   Q.   But who had left first?  So he came in, he greeted you?

1   A.   (Nods in the affirmative), signed my scripts.

2   Q.   And then?

3   A.   And he went to his next person.

4   Q.   Approximately on these typical -- would it be fair to call

5   them kind of a refill visit?

6   A.   Refill visit.

7   Q.   On a typical refill visit, approximately how much time

8   would Dr. Pompy spend in the exam area with you?

9   A.   If I had my grandson, it was longer 'cuz he interacted

10  with my grandson, but if it was just me, it was about probably

11  30 seconds.  I was -- yeah.

12  Q.   So you would have waited, you know, up to four hours?

13  A.   Yes.

14  Q.   And he typically spent about -- if your grandson wasn't

15  there, about 30 seconds with you?

16  A.   Yes.

17  Q.   And he signed those prescriptions?

18  A.   Mm-hmm.

19  Q.   That's a yes?

20  A.   Yes.

21  Q.   Now, we went over that chart that showed how over time Dr.

22  Pompy added medications for you?

23  A.   Yes.

24  Q.   What was your experience if you wanted him to add more

25  medications?

1   A.   If I wanted him to add?

2   Q.   Yeah.  How would it come about that he would add those

3   medications, was that something that you suggested?

4   A.   Yeah, I hurt more.

5   Q.   You'd say you hurt more?

6   A.   Mm-hmm, yes.

7   Q.   And if you wanted additional medications, could you get

8   them?

9   A.   Yes.

10  Q.   Was he -- did he typically ask questions about why?

11  A.   I think he already knew how I felt.  I was different than

12  everybody else in there.

13  Q.   Why do you think that?

14  A.   'Cuz I think everybody else had like back pain and, you

15  know, had stuff that happened to them to make them hurt.

16  Mine --

17  Q.   In other words, your leg condition was different?

18  A.   Yes.

19  Q.   And you didn't -- did you ever go into the exam rooms with

20  the other patients?

21  A.   At the same time?

22  Q.   I'll talk about that one instance later, but as a general

23  matter, you were saying how you were different than other

24  people.

25  A.   I felt different.

1   Q.   You just felt different 'cuz you had a leg condition, you

2   had pain in your leg?

3   A.   Yes.

4   Q.   Okay.  Did -- did you ever review kind of the medical

5   charts of any of the other patients?

6   A.   No.

7   Q.   All right.  If you wanted additional medication, you know,

8   did you ever ask for medication by name?

9   A.   I never asked for medication by name.

10  Q.   When you were on -- and we talked about how you were on

11  the various medications and the number of pills that you were

12  on.  How did being on that number of pills make you feel?

13  A.   That my insides were getting ate out.

14  Q.   What do you mean by that?

15  A.   'Cuz they say if you take a Tylenol a day it eats your

16  insides, and I just couldn't imagine what 13 pills were doing

17  to me every single day.

18  Q.   And as those medications were increasing, did Dr. Pompy

19  ever send you out for additional tests like MRIs or things like

20  that?

21  A.   I might have had a second MRI.

22  Q.   So maybe one?

23  A.   One more.

24  Q.   Did Dr. Pompy ever provide any other options besides

25  medication for you?

1    A.   We tried one of his procedures.

2    Q.   And how did that work?

3    A.   It didn't.

4    Q.   Did you ever make an effort to try to reduce your

5    medication?

6    A.   No.

7    Q.   Did Dr. Pompy?

8    A.   Oh, yes, we did.  Sorry, yes.  They had a sign on the wall

9    about a stimulater.

10   Q.   And did you try that?

11   A.   I did.

12   Q.   And did that allow you to reduce your medication?

13   A.   No.

14   Q.   Did Dr. Pompy ever discuss the risks of being on all of

15   these drugs for so long?

16   A.   No.

17   Q.   I want to talk to you about urine drug screens.  Did Dr.

18   Pompy have you do a urine drug screen?

19   A.   Yes.

20   Q.   How -- how frequently?

21   A.   I wasn't one of the frequent ones.

22   Q.   Was it about once a -- was it -- it wasn't every visit?

23   A.   No.

24   Q.   About once a year?

25   A.   For me.

Jury Trial Excerpts: Volume 5 • Thursday, December 1, 2022

1    Q.   And do you know what the purpose of the urine drug screen

2    is?

3    A.   To make sure his medication was in your system.

4    Q.   And would a urine drug screen also determine whether

5    something that wasn't supposed to be in your system was in

6    there?

7    A.   Correct.

8    Q.   Are you aware of one time where you were told you had an

9    abnormal urine drug screen?

10   A.   Yes.

11        MR. LIEVENSE:  Ms. Ouellette, if you could pull up

12   Government's Exhibit 8, page 117, on the top half please.

13   BY MR. LIEVENSE:

14   Q.   What is this document we're looking at?

15   A.   This is the paperwork we filled out every time we came.

16   Q.   And is -- what's the date of this specific paperwork?

17   A.   August 25th, 2016.

18   Q.   And is that your handwriting on the top half, for the most

19   part?

20   A.   Yes, it is.

21   Q.   And what did you check under "Reason For Today's Visit"?

22   A.   "Renew current medication."

23   Q.   And did you also check something else?

24   A.   And "Request change to medication."

25   Q.   And in the bottom right-hand corner of what we're looking

1   on the screen under -- just above where it says "Date Pain

2   Began" in the bottom right-hand corner, who -- do you know

3   whose handwriting that is?

4   A.   I do not.

5   Q.   And next to "Drug counseling," is "Drug counseling"

6   checked?  Do you see where it says "Drug counseling"?

7   A.   It has a V, looks like a V.

8   Q.   Looks like a V?

9   A.   Yeah.

10  Q.   And what's written next to that?

11  A.   "Increase of Lyrica."

12  Q.   So is this one of those visits where you were asking for a

13  medication change, and would that change be an increase to some

14  medication?

15  A.   It was asking for more help for the pain.

16  Q.   All right.  Now, I want to direct your attention to --

17           MR. LIEVENSE:  Or excuse me.  Ms. Ouellette, if you

18  could pull up Exhibit 8, page 145.  Actually, if you could do

19  the first -- the top.

20  BY MR. LIEVENSE:

21  Q.   What is the -- this is a document relating to a urine drug

22  screen, and do you see where it says "Collection Date"?

23  A.   Yes.

24  Q.   And what is the collection date?

25  A.   August 25th of 2016.

1   Q.  And that's the same day as the questionnaire we were just

2   looking at, is that right?

3   A.  Yes.

4   Q.  And now the middle half, under "Toxicology Screen" at the

5   bottom, do you see where it says you tested positive for

6   methadone?

7   A.  I don't see the word "methadone."  Oh, way at the bottom,

8   yes.

9   Q.  All right.  And that would be accurate 'cuz you were on

10  methadone?

11  A.  Yes.

12  Q.  Okay.  And about a little bit further there's a bolded

13  area that says "Buprenorphine."  Do you see that?

14  A.  Yes.

15  Q.  And what did you test for Buprenorphine?

16  A.  I have no idea what that is.

17  Q.  No, but what did the results show?

18  A.  It says that I was positive.

19  Q.  And is that a drug that you were being prescribed by Dr.

20  Pompy or everybody -- anybody else?

21  A.  No.

22  Q.  When you would go with -- for your urine drug screens,

23  which I understand weren't regular -- actually I'll strike

24  that.

25          Do you recall -- I mean this is August of 2016.  Did

1   you actually -- did you have an appointment with Dr. Pompy on

2   September 26th, 2016, the date he was -- the search warrant was

3   executed?

4   A.   The day he was raided?

5   Q.   Yeah.

6   A.   I had appointment that day.

7   Q.   All right.  So if the medical records show that this was

8   your -- August 25th, 2016 was your last day of seeing Dr.

9   Pompy, would that sound about right?

10  A.   Yes.

11  Q.   All right.  On that day when you saw Dr. Pompy and -- and

12  went to his office on August 25th, 2016, were you informed that

13  you had been -- that you had tested positive for Buprenorphine?

14  A.   Yes.

15  Q.   And what was your reaction?

16  A.   I was irate.

17  Q.   Why were you irate?

18  A.   Because I take my medication, exactly what he prescribed

19  me and nothing more, and I knew that test was wrong and I

20  demanded to have another test.

21  Q.   And did you indeed demand something else with respect to

22  the test that showed you were positive?

23  A.   I wanted to know why it was wrong.

24  Q.   All right.  Did Dr. --

25  A.   I think I even cried that day.

1   Q.   In the office?

2   A.   Yes.

3   Q.   With the medical assistant or with Dr. Pompy?

4   A.   With the older lady that used to be there sometimes.

5   Q.   So not Dr. Pompy?

6   A.   No.

7   Q.   And did Dr. Pompy talk to you about this positive test for

8   Buprenorphine?

9   A.   No, the older lady did.

10   Q.   But my question, so Dr. Pompy did not?

11   A.   He did not.

12   Q.   And it looks like when we spoke before about that chart of

13   the prescriptions you got on August 25th, did you still get

14   your full 30-day supply of medications on August 25th, 2016?

15   A.   I did.

16   Q.   So he didn't change his prescribing for you after testing

17   positive for Buprenorphine?

18   A.   No.

19   Q.   Did he make you come back sooner, maybe two -- did he only

20   give you a two-week supply instead of a full 30-day supply?

21   A.   No, I got my regular.

22   Q.   And, in fact, I think we looked, he actually increased one

23   of your medications, didn't he?

24   A.   Yes.

25   Q.   The dosage from 150 milligrams to 200?

1    A.   Yes.

2    Q.   I think -- did you ask to take another drug test that day?

3    A.   I did.

4    Q.   Did you take another drug test that day?

5    A.   I did.

6    Q.   When did you get the results of that other drug test?

7    A.   I never did.

8    Q.   Did you -- did you call the next day to -- to find out?

9    A.   I didn't.

10   Q.   You didn't.

11   A.   I figured I would find out on my next visit that never

12   happened.

13   Q.   Was there ever a point in time when you saw Dr. Pompy that

14   you and another patient saw him at the same time?

15   A.   Yes.

16   Q.   Tell the jury what happened that day.

17   A.   It was a guy that I worked with at the factory, and I

18   don't -- I think I was -- my time slot was --

19         MR. DONNINI:  Your Honor, I'm just going to object on

20   relevance grounds.

21         THE COURT:  Well, I think it's relevant as to part of

22   the government's theory on Counts -- on the health care fraud

23   count.  However, witness, if you just, you know, summarize

24   what -- what happened in there and why you were in with another

25   patient at the same time, that would be sufficient.

```
 1            Go right ahead please.
 2            THE WITNESS:  We knew each other 'cuz we worked
 3   together, and we got up at 4:30 in the morning and my
 4   appointment was earlier and so he slipped in with me so he
 5   could get out.
 6   BY MR. LIEVENSE:
 7   Q.   And so did the medical assistant call you back first?
 8   A.   I got called back.
 9   Q.   And your coworker said, "Hey, can I join you?"
10   A.   Yes.
11   Q.   And the medical assistant took you back together?
12   A.   Yes.
13   Q.   Did you go to the same exam room?
14   A.   Yes.
15   Q.   Did Dr. Pompy arrive -- when -- after Dr. Pompy arrived,
16   did he discuss your patient issues with both of you?
17   A.   Yes.
18   Q.   And was this a typical, a normal refill visit where he
19   spent about 30 seconds with you and just --
20            MR. DONNINI:  Your Honor, I don't think she ever said
21   30 seconds, so...
22            THE COURT:  I agree with that.  Short period of time.
23   With that modification, witness, if you can answer, go right
24   ahead.  Was this -- was this appointment where the individual
25   joined you a short refill visit.
```

```
 1              THE WITNESS:  It was.
 2              THE COURT:  Okay.
 3   BY MR. LIEVENSE:
 4   Q.   Why did you agree to share an exam with your coworker?
 5   A.   We worked together and he -- we get up early and I let him
 6   come in.
 7   Q.   Were you concerned Dr. Pompy was going to ask you
 8   questions about your personal medical history?
 9   A.   I thought about it for a minute.
10   Q.   Based on your experience, did you expect he was just going
11   to sign your prescriptions and leave?
12   A.   Yes, because that's why we were both there is for a refill
13   day, yeah.
14   Q.   And based on your observations, did Dr. Pompy just sign
15   your colleague's prescriptions?
16   A.   He did.  He did.
17   Q.   Did you ever -- I'd like -- you -- you mentioned how you
18   observed other patients in the waiting area and your
19   interactions with them.  Did you ever observe any other
20   patients falling out of their chairs?
21   A.   Yes.
22   Q.   Describe that.  What would you observe?
23   A.   You could tell the ones that was overmedicated.
24   Q.   And so they would literally just...
25   A.   Fall out of their chair.
```

1   Q.   And did you ever alert anybody on --

2   A.   I did go up to the window, and they already knew 'cuz

3   somebody beat me to it.

4   Q.   So someone -- they told you they had already knew about

5   that?

6   A.   Yes.

7   Q.   Was this a -- a one-time occurrence or did this happen

8   often?

9   A.   I've seen it a few times.

10  Q.   Also during your interactions with the patients, did you

11  see -- did other patients ever talk about selling their pills?

12  A.   Yes.

13  Q.   Could you describe what conversations you overheard?

14  A.   They just sold all their pills, and I remember asking one,

15  "Well, how do you get away with it if you have to do a urine

16  test?" and they said they hold three pills back.

17  Q.   So they can take those pills --

18  A.   So they can take those pills when it's time for their

19  appointment and they will show up in their urine test.

20  Q.   And did you hear about that inside the waiting room or

21  hallway, is that --

22  A.   Yes.

23  Q.   Where did this --

24  A.   In the hallway.

25  Q.   And did you also observe anything outside the hospital

1    where Dr. Pompy's office was that led you to believe people

2    were selling their pills?

3    A.   Yes.  People came out of the pharmacy with their bag and

4    would hand it to somebody else.

5    Q.   Was there a pharmacy inside the hospital?

6    A.   Yes.

7    Q.   Okay.  So you're saying outside the hospital where?

8    A.   Outside.

9    Q.   Where Dr. Pompy's office was and there was also a

10   pharmacy?

11   A.   Yes, and across the street.

12   Q.   And you saw in -- so you saw in both locations, both of

13   the pharmacies?

14   A.   In both locations.

15   Q.   And how do you know they were Dr. Pompy's patients?

16   A.   Because I seen them in the waiting room.  That's what we

17   do is we had our scripts and went straight to the pharmacy.

18   Q.   Did you ever tell anybody at Dr. Pompy's staff or himself

19   about what you observed?

20   A.   I didn't.

21   Q.   Why not?

22   A.   I didn't think it would matter.

23   Q.   Ma'am, are you still seeking treatment for your condition

24   today?

25   A.   I am.

1    Q.   All right.  And you did find another doctor to go to?

2    A.   I did.

3    Q.   And did that doctor -- was that experience with that

4    doctor in terms of the interaction with -- was it a him or her?

5    A.   It was a him.

6    Q.   Was that similar to your experience with Dr. Pompy?

7    A.   No.

8    Q.   And are you still prescribed methadone today?

9    A.   I am.

10   Q.   How -- how was your experience different with that doctor

11   in terms of your interactions with him?

12   A.   There was empty chairs, it wasn't overpacked.

13   Q.   It wasn't as busy?

14   A.   No.

15   Q.   And did that doctor spend more time with you?

16   A.   He spent a long time with me, but I came in there crying

17   the day he got -- it was the same day.

18           THE COURT:  Okay.  I don't -- I don't think this is

19   relevant so let's move on.

20           MR. LIEVENSE:  I understand.

21           THE COURT:  Go ahead.

22   BY MR. LIEVENSE:

23   Q.   And you -- you did say you still take methadone today?

24   A.   I do.

25   Q.   And you still take tramadol today?

1   A.   I do.

2   Q.   Do you take -- still take 13 pills a day for your pain?

3   A.   I don't.

4   Q.   You take fewer or...

5   A.   Less.

6   Q.   And are you able to manage your day-to-day life?

7   A.   I am.

8           MR. LIEVENSE:  One moment, Your Honor.

9           THE COURT:  Okay.

10          MR. LIEVENSE:  No further questions at this time.

11          THE COURT:  Okay.  Thank you, sir.

12          (Excerpt 8 concluded at 9:27 a.m.)

13                         —  —  —

14

15

16

17

18

19

20

21

22

23

24

25

 1              Excerpt 9:

 2              (Proceedings in progress at 9:53 a.m., all parties

 3              present, jury present)

 4                      REDIRECT EXAMINATION

 5    BY MR. LIEVENSE:

 6    Q.   Ma'am, were the medications that you're currently

 7    prescribed, do you still feel like your insides are being eaten

 8    out?

 9    A.   I still get a lot of pills if that's what you're asking,

10    yes.

11    Q.   I understand.  I didn't ask about the number of pills.  Do

12    you still feel like your insides are being eaten out?

13    A.   Yes.

14    Q.   You do.

15              MR. LIEVENSE:  Like to pull up Government's Exhibit

16    8, page 304.  Sorry, 301.

17    BY MR. LIEVENSE:

18    Q.   Mr. Donnini asked you on cross-examination whether you

19    were ever referred for physical therapy.

20    A.   Yes.

21              MR. LIEVENSE:  If you could highlight "Subjective

22    Notes."

23    BY MR. LIEVENSE:

24    Q.   This is the office visit on August 25th, 2016.  Could you

25    read the last line of the Subjective Notes about -- about you?

1   Does that say "PT is currently working"?

2   A.   It says I'm going to physical therapy.

3   Q.   And so that would be false, wouldn't it?

4   A.   I did not go to physical therapy.

5          MR. LIEVENSE:  No further questions.  Thank you.

6          (Excerpt 9 concluded at 9:54 a.m.)

7                          —  —  —

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              Excerpt 10:

 2              (Proceedings in progress at 9:55 a.m., all parties

 3              present, jury present)

 4              THE COURT:  Thank you.  Who -- who's next, Mr.

 5    Shinevarre?  Come on up.  You should hear what I call

 6    Philbrick.  Come on up, Mr. Shinevarre.  How are you today?

 7              THE WITNESS:  Good.  Thank you, sir.

 8              THE COURT:  Raise your right hand.

 9                   J O E Y   S H I N E V A R R E

10    was called as a witness herein, and after being first duly

11    sworn to tell the truth and nothing but the truth, testified on

12    his oath as follows:

13              THE WITNESS:  Yes, sir.

14              THE COURT:  Okay.  Go ahead and have a seat.  Relax,

15    be comfortable.  Speak toward the mic, not too close.

16              Mr. Pratt, you have the floor.

17                        DIRECT EXAMINATION

18    BY MR. PRATT:

19    Q.   Good morning.  Will you please state your full name for

20    the ladies and gentlemen of the jury?

21    A.   Joey Shinevarre.

22    Q.   Okay.  And please spell it.

23    A.   J-o-e-y S-h-i-n-e-v-a-r-r-e.

24    Q.   All right.  Now, Mr. Shinevarre, I do understand that you

25    have a -- you have a hearing aid issue, is that correct?
```

1   A.   Yes, sir, I do.

2   Q.   All right.  If ever you can't hear me or can't understand

3   me, and I know -- I know I talk too softly, just tell me, all

4   right?

5   A.   Yes, sir.

6   Q.   All right.  I'll try to keep my voice up.

7          Tell us a little bit about yourself, sir, where

8   you -- where were you born and raised?

9   A.   What was the question?

10  Q.   Where were you born and raised?

11  A.   I didn't hear you.

12  Q.   Where were you born and raised, what city?

13  A.   Monroe, Michigan.

14  Q.   Okay.  What type of -- how far did you go in school?  Did

15  you graduate high school?

16  A.   I can't hear you, I'm sorry.

17  Q.   All right.  How -- how far did you go in school?

18  A.   Okay.  I went to Jefferson High School.

19  Q.   Where is that located?

20  A.   In Monroe, Michigan.  I went to 12th grade, I graduated.

21  Q.   All right.  What areas or what kind of -- what kind of

22  work have you been employed in since you graduated from high

23  school?

24  A.   I was a truck driver.

25  Q.   All right.  Can you explain what kind of truck driving

```
 1   work you've been doing over the years?
 2   A.   Yes, sir.  We actually deliver food product for Sysco,
 3   like delivering to restaurants, Wendy's, Applebee's, and
 4   stuff -- Tim Horton's, stuff like that.
 5   Q.   Can you explain how physical that kind of work is for you
 6   when you do the delivery work?
 7   A.   It's very, very physical.
 8   Q.   How is that, what do you have to do?
 9   A.   What was the question?
10   Q.   What do you have to do?  Why is it physical?
11   A.   Okay.  We have to drive the semi and then we have to
12   actually unload the food product and go up and down a ramp and
13   deliver it into the actual store.
14   Q.   How -- and how do you -- how do you deliver the food to
15   the actual store, what do you use?
16   A.   With a dolly.
17   Q.   How heavy -- how heavy is the dolly when you load it up?
18   A.   Well, the whole truck is about 40,000 pounds of product,
19   so each dolly would weigh anywhere from 250 to 400 pounds
20   per -- per dolly.
21   Q.   So you're a man that works -- you're a man that works
22   physical labor?
23   A.   Absolutely.
24   Q.   All right.  Over the years of working physical labor, did
25   you have some -- did you have some medical issues, did you have
```

1    some issues that caused you some pain?

2    A.   Yes, sir.

3    Q.   What issues do you recall having and when?

4    A.   What was the question?  I'm sorry.

5    Q.   When -- what issues did you have in your job?

6    A.   I had a herniated disk.  I have shoulder -- tendonitis in

7    both shoulders, I had a knee replacement, a ACL tear and a

8    meniscus tear.

9    Q.   And going back to when -- if you recall, when did some of

10   those issues first start?

11   A.   When?

12   Q.   What years?

13   A.   Oh, I would say like 2008.

14   Q.   Okay.  Did you -- did you seek medical treatment for any

15   of those issues?

16   A.   Yes.

17   Q.   And what kind of medical treatment did you get initially?

18   A.   I've had therapy and then I've seen Mr. -- Dr. Pompy.

19   Q.   Okay.  And let me ask you, did you -- can -- do you recall

20   approximately when you started to see Dr. Pompy?

21   A.   I believe, sir, it was in 2010.

22   Q.   All right.  And I'm sorry, I don't have the exhibit.

23          MR. PRATT:  Do we have the patient file for Mr.

24   Shinevarre?

25          MR. LIEVENSE:  The exhibit number?

```
 1              MR. PRATT:  Yeah, the exhibit number.  Would you
 2   please pull up Government's Exhibit No. 11, page 729?
 3   A.   Pardon me?
 4   BY MR. PRATT:
 5   Q.   I'm sorry, I was talking --
 6   A.   Oh, okay.
 7   Q.   -- to Ms. Ouellette.
 8              MR. PRATT:  All right.  And if we can highlight
 9   the -- would be the middle part here.
10   BY MR. PRATT:
11   Q.   All right.  All right.  You see in middle of this where it
12   says under "Causation," could you read that for the record?
13   A.   "From lifting a boat."
14   Q.   "Causation."  All right.  About where you were initially
15   seen, do you see that line?
16   A.   Yes.  Yes.  Yes.  I'm sorry, I do.
17   Q.   All right.  Could you please read that into the record for
18   us?
19   A.   Yes.  "11-15-2010."
20   Q.   All right.  And what does it say -- so it says that's when
21   you were initially seen by Dr. Pompy.  Does that sound about
22   right?
23   A.   Yes, sir, it does.
24   Q.   All right.  And it says something about 2009 pain from
25   lifting a boat?
```

```
 1   A.   Yes.

 2   Q.   Did that happen too?

 3   A.   Pardon me?

 4   Q.   Did you get pain from lifting a boat in 2009?

 5   A.   Did I get pain from it?

 6   Q.   Yes.

 7   A.   Yes.  That's when it originally started and I reinjured it

 8   at work.

 9   Q.   Okay.  So let me ask you, how is it -- you've had --

10   you've had -- you've been a hard-working man, you've had some

11   injuries.  Before you go see Dr. Pompy, do you have -- do you

12   have any problems with addiction from prescription drugs?

13   A.   No, sir.

14   Q.   How long did you see -- if you saw Dr. Pompy from 2010,

15   how long did you see him?

16   A.   Approximately till 2016.

17   Q.   By the time you got to the end, did you have a pill

18   problem, an addiction problem?

19   A.   Yes, sir, I did.

20   Q.   Let me ask you about how you -- how you got referred or

21   how -- why you went to Dr. Pompy.  How did you know about Dr.

22   Pompy?

23   A.   I was -- heard from Dr. Pompy, I believe from my aunt told

24   me about him.

25   Q.   All right.  And was that a positive recommendation, you
```

1    should go to him?

2    A.   Yeah.  She was a nurse for 30 years so I took her word.

3    Q.   All right.  Did you -- did you also get a negative

4    recommendation for Dr. Pompy?

5    A.   I have not got a negative, no.

6    Q.   Okay.  So you went there, you were initially seen.  Tell

7    us what you recall.  Was there a first -- was -- tell us what

8    you recall the first time you went to his office, what

9    happened?

10   A.   Okay.  The very first time I went there I recall I believe

11   I had to fill a bunch of paperwork out and then they told me to

12   come back.  I -- I can't remember but I believe it was a week

13   or two weeks come back to actually see the doctor.

14   Q.   Okay.  And when you came back after all the paperwork was

15   done and actually saw the doctor, what happened?

16   A.   They -- I believe they told me to bring my X-rays, and I

17   come back after the -- the week or two weeks.  I actually seen

18   the doctor.  He read the X-rays.  He told me what was herniated

19   on L-something, all that, I don't know the medical terms.  But

20   he then proceeded to tell me we can do procedures on it, we

21   can -- and he explained all that.  I can't remember the exact

22   words, but he set up the procedures.

23           And then he said, "Is there anything else I can do

24   for you?" and I said, "Can I get something for the pain?" and

25   he said, "Yes, sir," and he turned to the nurse and he told her

1    to write me three scripts, and that was basically the -- the

2    initial first appointment.

3    Q.   Okay.  And when you say three scripts, these were -- these

4    were the opiate pain pills, correct?

5    A.   I believe 90 of them were.  The other two I believe were

6    like anti-inflammatories.  I can't really remember.

7    Q.   All right.  And do you recall which drug he started you

8    out on?

9    A.   Pardon me?

10   Q.   Do you recall which drug he started you out on?

11   A.   I still didn't hear.  I'm so sorry.

12   Q.   I know.  Do you recall which drug he started you out on?

13   A.   Yes.  I -- I believe it was Lortab or Lorcet.  I don't

14   know the difference but I believe it was one of the two,

15   Lortabs.

16   Q.   Did this -- did this start a period of you going to Dr.

17   Pompy's on a regular basis?

18   A.   Yes, I did.

19   Q.   All right.  So from about the end of 2010, 2011, 2012,

20   were you going to him regularly?

21   A.   Yes, I was.

22   Q.   Would he give you controlled substance prescription, pain

23   medication regularly?

24   A.   Yes.

25   Q.   Can you describe what these later visits are like, what we

1  would call a refill or renewal visits?  What would happen when

2  Dr. Pompy actually came in the room with you?

3  A.   You would -- you would get there and you would sit in the

4  waiting room.  It was a rather long wait sometimes, sometimes

5  hours, sometimes two hours, and you would get back into the

6  actual room and then there would be -- always be a person in

7  there.  I don't know what to call her, wasn't a nurse, but she

8  would actually check your blood pressure.  Then she would --

9  she would ask refill or what and I would say yeah, and she

10 would print it all out and put it on the table and we would

11 wait for the doctor to come in.  Then the doctor would come in

12 and he would ask questions, everything good, everything fine.

13 If -- if everything was fine, he would sign the script and then

14 I would be on my way.

15 Q.   Okay.  And that went on then for I guess couple of years

16 into 2012, correct?

17 A.   Yes.

18 Q.   All right.  Did that start causing a problem for you to

19 get these pain pills every month for a couple of years?

20 A.   What was the question?

21 Q.   Did that cause any problems for you to get these pain

22 pills every month for a couple of years?

23 A.   Did they cause problems?

24 Q.   Yes.

25 A.   Yes.  Yes, sir.

1   Q.   All right.  Tell us what problems it caused you.

2   A.   Well, I -- I ended up having a bowel obstruction because

3   the backup from the pain medicine.

4   Q.   That was -- that was one of the side effects that

5   it caused?

6   A.   It was.

7   Q.   Had Dr. Pompy discussed with you verbally that this was

8   one of the things that might happen if you took this pain --

9   these opiates, this pain medication?

10   A.   No, sir.

11   Q.   Did he discuss verbally with you that there might be a

12   risk of addiction from taking these pills?

13   A.   No, sir.

14   Q.   So you were on them for a couple of years, you had to have

15   a surgery.  Was there anything else going on with these pain

16   pills other than causing you to have bowel obstruction surgery?

17   A.   Not that I recall.

18   Q.   All right.  How did it affect your life?

19   A.   It was -- it was a nightmare.  Being on that stuff, it's a

20   nightmare.

21   Q.   Can you be more specific?  How did it affect, for example,

22   your family?

23   A.   I -- I almost ended up in a divorce over that.

24   Q.   And why is that, how would the -- how would the pain

25   medication affect you?

Jury Trial Excerpts: Volume 5 • Thursday, December 1, 2022

1    A.   What was the question, sir?

2    Q.   How would the pain medication affect you?

3    A.   Affect me personally?

4    Q.   Yes.

5    A.   Um, I was sleep deprived.  I would -- I mean they -- they

6    worked at first, but then your body gets immune to them and

7    they just -- they just don't work anymore.

8    Q.   All right.  So you experienced something called tolerance

9    basically?

10   A.   Yes.

11   Q.   All right.  Meaning what, you were taking the same

12   amount --

13   A.   Yes.

14   Q.   -- as before?

15        And what kind of relief were you getting?

16   A.   Pardon me?

17   Q.   What kind of pain relief would the same amount give you?

18   A.   It worked for a few years and then it just stopped

19   working.

20   Q.   All right.

21   A.   I mean it would take the pain away, but the longer you

22   were on it, the less it would be effective, more or less.

23   Q.   All right.  Did you have any kind of dependence, did you

24   have any issues where if you didn't take it, what would happen

25   to your body?

1    A.   Did I have any dependency to it?

2    Q.   Yes.

3    A.   Yes.

4    Q.   All right.  What happened if you didn't take it?

5    A.   I got sick.

6    Q.   Can you describe how you'd get sick?

7    A.   Yeah.  I went into withdrawal, sleep deprived, sweating,

8    nausea, irritable bowel -- bowels, just sleep -- just

9    withdrawals.  I don't know how to explain it unless you were

10   actually in them.

11   Q.   Was it -- was it pretty bad?

12   A.   Yeah.

13   Q.   All right.  Did it affect -- so it affected your family.

14   Did it affect your job as well?

15   A.   It didn't really affect my job too much but it affected my

16   family.

17   Q.   Okay.  Can you give us some -- some kind of idea, can you

18   tell us, can you compare being in pain with being addicted to

19   pills?

20   A.   I would rather be in pain.

21        MR. PRATT:  So I'm going to -- I'm going to pull up

22   Government's Exhibit 85J.  It's not been preadmitted.

23        MR. DONNINI:  No objection.

24        MR. PRATT:  I would like to move its admission at

25   this time.

1        THE COURT:  Thank you.  85J is received.  Go right

2   ahead.

3        MR. PRATT:  Can we pull up the top of page 1?

4   Just -- just do the top part.

5        And for the record, Your Honor, this is the -- this

6   is the MAPS summary of -- of Mr. Shinevarre for Dr. Pompy

7   prescriptions starting in January of 2012.

8        THE COURT:  Okay.

9        MR. PRATT:  That's when the data starts.

10  BY MR. PRATT:

11  Q.  So I guess I'd like to point your -- point you to the

12  first line on the screen.  You were seeing Dr. Pompy before

13  January of 2012, correct?

14  A.  That's correct.

15  Q.  And you were regularly getting pain medications from him

16  before January of 2012?

17  A.  That's correct.

18  Q.  All right.  We just don't have -- we just don't have the

19  data here, right?

20  A.  Yes, I understand.

21  Q.  Okay.  And -- and so we can look and we see that he

22  prescribed you -- here we can see specifically he prescribed

23  you in the first line what?  Do you know what that drug is?

24  They call it APAP/Hydrocodone Bitartrate.  Do you know what the

25  name of that drug is?

1    A.   Yes, sir.

2    Q.   What is that?

3    A.   It's hydrocodone.  It would be Vicodin I believe.

4    Q.   Okay.  And then there's also another drug you were being

5    prescribed same time, right?

6    A.   Yes, that was methadone.  He called that as a bridger.

7    Q.   Okay.  And so you're getting these two drugs.  You're

8    getting a month's supply basically pretty regularly here

9    through 2012?

10   A.   Yes, sir.

11   Q.   All right.  And I notice you getting it every month

12   through August of 2012.

13          MR. PRATT:  If we can go down through there, yeah,

14   the middle.

15   BY MR. PRATT:

16   Q.   August, August of 2012, and then I see there's -- there's

17   a jump.  The next one is -- is April 4, 2013.  Can you explain

18   what happened there in the end of 2012 that caused you to go

19   about I guess, I don't know, six, seven months, six, seven

20   months without pills?

21   A.   Yeah, I went into detox.

22   Q.   Okay.  Can you explain what it is to -- what -- what you

23   mean by going into detox?

24   A.   Yeah.  I went to a doctor to -- to get me off the pain

25   pills.

1    Q.   All right.  A different doctor?

2    A.   Yes, sir.

3    Q.   All right.  And what did that other doctor do to get you

4    off of your pill addiction?

5    A.   He put me on Suboxone and I was on a program.  Every two

6    weeks I would go down.

7    Q.   Okay.

8    A.   I don't remember the milligrams he started me off.  It

9    was -- I don't remember that.

10   Q.   Okay.  So you had the medication that would help you get

11   off your addiction?

12   A.   Yes.

13   Q.   And there was also a treatment program with that as well?

14   A.   Yes, sir.

15   Q.   And what was involved in the treatment program?

16   A.   For him?

17   Q.   Yes.

18   A.   Just to keep going back until I was completely off of it.

19   Q.   So he was trying to wean you off even of that drug, even

20   of the Suboxone?

21   A.   Yes, sir.  Suboxone is just a temporary -- supposed to be

22   a temporary thing to keep you out of withdrawals.

23   Q.   Okay.  And it kept you out of withdrawals, correct?

24   A.   Yes.  Yes, it did.

25   Q.   All right.  So what -- so was everything going well in

1    your drug treatment program?

2    A.   It -- it was.

3    Q.   And then what happened?

4    A.   Well, during the time that I had the bowel obstruction, me

5    and my wife were going through a divorce and she said detox or

6    divorce, so that's when I went to -- I came clean with her, I

7    went to detox.  And we couldn't work it out so she decided to

8    go ahead and leave.  We are together today though.  But after

9    that I quit going to detox.  I went back to Dr. Pompy.

10   Q.   So you went back to Dr. Pompy, you went back to the

11   addiction of drugs?

12   A.   Yes, sir.

13        MR. DONNINI:  Your Honor, I'm going to object to

14   that.

15        THE COURT:  Sustained.

16   BY MR. PRATT:

17   Q.   Well, let me -- let me -- let me break it down then.  You

18   went back to him to get what type of drugs?

19   A.   I went back to him 'cuz I had pain.

20   Q.   And what kind of drugs did you expect to get?

21   A.   To be honest, I didn't expect -- I wasn't expecting to get

22   any drugs.  I just went back 'cuz I had pain, and he ended up

23   putting me right back on the medicine that I was on.

24   Q.   And that medicine you had been on, had you been addicted

25   to that medicine before?

1   A.   I -- I had, yes.

2   Q.   So he put you back on the same medicine you were addicted

3   to?

4   A.   Yes, sir.

5   Q.   All right.  When you came back to Dr. Pompy -- and I know

6   we're going back a long time here to 2013 so I'm not asking for

7   a direct quote, but you come in with the pain.  What's his

8   basic approach to you, what's his question to you?  When you

9   come back after being gone for six months, what's his question

10  to you about why you're here and what you expect?

11  A.   There really wasn't any questions when I came back.

12  Q.   Okay.  What did you tell him?

13  A.   I talked to the nurse.  I said I've been out for a while

14  and I would like to come back on the medication, and she says

15  okay, we need to do a physical.  So they did a physical for me

16  and then that day I walked back out with a script.

17  Q.   All right.  So you wanted more medication?

18  A.   Pardon me?

19  Q.   You say -- you said you wanted to go back on the

20  medication?

21  A.   Yes.

22  Q.   And you basically asked for it?

23  A.   I didn't ask for it but I told them that I was in pain and

24  I wanted to go back on the medication, yes.

25  Q.   All right.  And --

1    A.   I guess I would be asking for it, yeah.

2    Q.   Okay.  And what did Dr. Pompy do, what did he -- what did

3    he prescribe for you?

4    A.   That day?

5    Q.   Yes.

6    A.   I can't remember, to tell you the truth.

7    Q.   All right.  If we look here on -- on the April 4th, 2013.

8    A.   I believe it was hydrocodone.

9    Q.   Okay.  I'm sorry, the -- the -- I'm sorry, the April --

10   the August 8th, 2013.  My mistake.  Yeah, hydrocodone.

11          And if we look at the chart, you also -- he also

12   started you right up on the methadone too, is that correct?

13   A.   That's correct.

14   Q.   And you came back, you came back later in August, is that

15   correct, a week later?  If we look at the -- if you look at the

16   exhibit, you can see you came back in August, like only a week

17   later, August 15th, 2013?

18   A.   That's correct.

19   Q.   And he gave you more pain medication?

20   A.   Yes.

21   Q.   All right.  You -- in looking down the list then, you came

22   back a couple times in September, correct?

23   A.   That's correct.

24   Q.   And then we've got October 2014, correct?  I'm sorry, it's

25   October 2013.  So we're going --

1          MR. PRATT:  If we could go to page 2, Ms. Ouellette,

2     and do the top half.

3     BY MR. PRATT:

4     Q.   So we're in 2013, we have prescriptions.  You're going --

5     you're going every month now, correct, again?

6     A.   That's correct.

7     Q.   All right.  And let me ask you, now that you're starting

8     back up on the opiates again, are you experiencing some of the

9     same problems you did when he was prescribing for you before?

10    Are you getting -- are you getting tolerance again?

11    A.   At that time?

12    Q.   Yes.

13    A.   Yeah.  The -- the tolerance wasn't the same.  You mean

14    from going from Suboxone back to the medication?

15    Q.   Yes.

16    A.   Yeah, it -- my body was a little messed up.  It -- there

17    wasn't -- it really wasn't working.  I was kind of -- after

18    that I was -- the pain medicine really wasn't working very

19    well.

20    Q.   Okay.  And so I want to ask you, did -- did Dr. Pompy talk

21    with you about -- at all about whether there's going to be any

22    issues or any side effects moving from the Suboxone back to the

23    pain medication?

24    A.   No, sir.

25    Q.   What kind of -- did you have any problems or side effects

1    when you changed from one to the other?

2    A.   From going from the Suboxone to the pain medicine?

3    Q.   Yes.

4    A.   I mean, yeah, my body was messed up.  I was sleep deprived

5    sometimes and -- and it just -- my body was -- wasn't balanced.

6    I was out of whack.  I don't know how to fully...

7    Q.   All right.  And what about as you're going through -- as

8    you're going through these months of getting the methadone and

9    hydrocodone, you getting that dependence built back up again?

10   A.   I -- I don't fully understand the question.

11   Q.   Were you subject to withdrawals again?

12   A.   Um, you only go in withdrawals if you don't have the

13   medication, so I can't go into withdrawals if I have the

14   medication, so...

15   Q.   And you were getting the medication all the time?

16   A.   Yes.

17   Q.   All right.  Did there come a point in your life --

18        MR. PRATT:  And I guess it looks -- if we could go

19   down toward August 18th of 2014.

20   BY MR. PRATT:

21   Q.   All right.  There came a time I guess in August of 2014

22   Dr. Pompy prescribed you something different, is that right?

23   A.   What was the date, sir?

24   Q.   August 14th -- August 18th of 2014.

25   A.   It says oxycodone, Suboxone.

1    Q.   Okay.  What happens here?

2    A.   I was really wanting to get off of -- to quit it, but then

3    I would be in pain and I would go back and he would put me back

4    on it.

5    Q.   All right.

6    A.   I was really battling with it trying to -- trying to put

7    it down.

8    Q.   Okay.  So at this point, at August 18th, 2014, how does

9    this happen that you go on Suboxone?  Is it Dr. Pompy saying,

10   "I think you have a problem," or is it you saying you have a

11   problem?

12   A.   No, sir, I didn't say it neither.

13   Q.   All right.  How did you get switched to Suboxone?

14   A.   I just told him I wanted to stop taking the pain pills, so

15   he had asked me, "I can wean you off or I can -- we can do a

16   treatment plan," and that was Suboxone, and I chose the

17   treatment plan.

18   Q.   Okay.  So he knew you wanted to get off the pills?

19   A.   Yes.

20   Q.   And so August of 2014 he gives you the drug that's going

21   to get you off the pills, right?

22   A.   Yes, sir.

23   Q.   All right.  It looks like it was about 12 or 13 days

24   later.  What happened 12 or 13 days later?

25   A.   From what date to what day?

1    Q.   From August 18th, 2014 to September 1st, 2014.

2    A.   It looks like he put me right back on it.

3    Q.   Okay.  Did you have any of the side effects from going to

4    one drug to the other again?

5    A.   Yeah.  I mean that was a long time ago but I'm sure my

6    body was all out of whack, yes.

7    Q.   Okay.  So even though you wanted to get off the pain

8    pills, he gave you the prescription.

9         What happened in that 12 days that made you change

10   your mind?

11   A.   Probably the pain and the -- the addiction part.

12   Q.   All right.  So it wasn't only the pain; it was the

13   addiction too, wasn't it?

14   A.   Yes, sir.

15   Q.   Tell me what the addiction made you do or made you want.

16   A.   Pardon me?

17   Q.   Tell me -- tell me how -- what -- how -- how the addiction

18   made you -- made you need the pills.

19   A.   Well, because when you're constantly taking it and then

20   you always have that relief, anytime you hurt you can just take

21   a pill and you don't hurt anymore.  That's the kind of relief

22   that you want.

23   Q.   Okay.  And it's the relief from -- the relief from -- the

24   addiction relief?

25        MR. DONNINI:  Your Honor, I've been allowing a lot of

```
1    leading but it's getting too much.
2              THE COURT:  All right.
3    BY MR. PRATT:
4    Q.   Which kind of hurt are you talking about?
5    A.   I'm -- I'm sorry?
6    Q.   Which type of hurt are you talking about that the pain
7    pills take care of?
8    A.   Like when you're in pain.  If you take a pain pill, you
9    don't hurt anymore.
10   Q.   Okay.  Any other kind of thing that pain pills do for you,
11   any other relief they give you?
12   A.   Any other kind of relief?
13   Q.   Yes.
14   A.   No, sir.
15   Q.   Okay.  So if we go through here, you tried again, you went
16   back on the opiate pain pills.  If we could go to the next page
17   to the top section, top couple of lines, looks like -- looks
18   like right before Christmas 2014 you tried again, correct?
19   A.   Yes, sir.
20   Q.   And it says this drug Zubsolv.  What is -- what is that?
21   A.   I believe that you're talking 4-16 or 4-16-15, correct?
22   Q.   Talking 12-23-14, second line.
23   A.   Oxymorphone, is that what you're talking?
24   Q.   The second line, second line.
25   A.   That's Zub -- that's Zubsolv.
```

1    Q.   Okay.

2    A.   That is -- that is a -- that's like Suboxone but it's --

3    it's a different form of it.  They say that Zubsolv is not as

4    addicting as Suboxone so we tried that.

5    Q.   Okay.  And I want to ask you, so you're making another

6    attempt to get off the drugs?

7    A.   Yes, sir.  But the insurance wouldn't cover that I believe

8    so I had to go back to the Suboxone.

9    Q.   Okay.  And I -- and I want to -- just so I want to make

10   clear and I don't want to belabor it, but who is -- who is

11   bringing up the idea of you need to get off the pain pills and

12   on to this?  Is this something Dr. Pompy is bringing up to you

13   or is this something you're walking in and bringing up to

14   the -- to him?

15   A.   No, it's my doing.

16   Q.   So this time you -- you stayed on the -- you stayed on

17   the -- the addiction medicine from December, January, February,

18   and so you lasted about three months.  And then if we look for

19   March 2nd, 2015, what happened?

20   A.   Okay.  I -- I lost you, I'm sorry.

21   Q.   All right.  If you could go down to March 2nd, 2015.

22   A.   Can you highlight that?

23   Q.   You just look at the left, the far left column.  The dates

24   are on the far left column, sir.  See 3-2-15?

25   A.   Okay.

1    Q.   And what happened to your medication?

2    A.   From the oxycodone to the Zubsolv?

3    Q.   Yeah.

4    A.   And then the Zubsolv to the -- whatever that other stuff

5    is?  I believe that was Opana.

6    Q.   All right.

7    A.   I -- that's stronger than oxycodone, but I can't recall

8    why I -- I went on that, I can't recall.

9    Q.   All right.  You may not recall why, but again I want you

10   to tell me who was it that initiated these changes.  Was it the

11   doctor looking at your medical condition or was it you coming

12   in and saying "I want to switch"?

13   A.   It would always be on my recommendation.

14         THE COURT:  How much more time total with this

15   witness do you think you have on direct, Mr. Pratt?

16         MR. PRATT:  Probably 15 or 20 minutes.

17         THE COURT:  Okay.  Then I think we should have our

18   ten-minute mid-morning break.  It's 10:27 a.m. at this point,

19   ladies and gentlemen.  Let me recommend you take a short

20   comfort break.  Don't talk about the case on your break, and

21   we'll be back here in about ten minutes to complete the

22   testimony of Mr. Shinevarre.

23         Let's all rise for our jurors please.

24         (Jury excused at 10:28 a.m.)

25         THE COURT:  Okay.  Everybody may be seated.

1        My position or at least my ruling was that the

2    statement of the DEA agents who confronted -- you can step

3    down, by the way, Mr. Shinevarre.

4        THE WITNESS:  Oh.

5        (Witness excused at 10:28 a.m.)

6        The agents who confronted Kohlman in her front yard

7    prepared a statement or -- or a DEA-2 or whatever it is of --

8    of the interview on that day when they took her by surprise in

9    her front yard and there were inaccuracies in it.  However, the

10   inaccuracies did not, in my view, evidence inconsistency that

11   this witness had stated to the jury in her testimony, and I

12   precluded Mr. -- Mr. Donnini from going into that particular

13   document further and he wanted to make a record as to why I was

14   wrong and I invite you to do that right now.  Go right ahead,

15   Mr. Donnini, if you choose.

16       MR. DONNINI:  Yes, thank you.

17       So again this refers to a June 8th, 2018 DEA-6, which

18   is a memorandum prepared by Diversion Investigator Brian Bishop

19   who was I'll call him the lead investigator or maybe the second

20   lead investigator in this investigation back in 2016.

21   Actually, no, that's not true.  He came on board pretty late in

22   the game, but he was -- he was involved at the time of the

23   raid.

24       He went out and unannounced went and interviewed Ms.

25   Kohlman, and there are two statements in this DEA-6 which are

1    particularly troublesome, Your Honor.

2         THE COURT:  Okay.

3         MR. DONNINI:  First says that Ms. Kohlman said,

4    quote, she thinks Pompy got, quote, "money hungry."  When I

5    interviewed Ms. Kohlman, she said she absolutely did not say

6    that to the agents.  She also said that in her prep sessions

7    with the government, which included Mr. Pratt, Mr. Lievense and

8    Lieutenant Mark Moore, that she told them that she did not say

9    that in any way, shape or form.

10        Second statement is that she -- that Ms. Kohlman went

11   on to state, quote, "Don't bring him back," close quote,

12   referring to allowing Dr. Pompy to start practicing again.  The

13   clear implication of that statement, Your Honor, is that she

14   was happy that Dr. Pompy got raided, that she was pleased that

15   he no longer was practicing, that she was in favor of the raid

16   that occurred on September 26th, 2016.  And Your Honor heard

17   her testimony; that couldn't be farther from the truth.  She

18   told the government that in her prep sessions, and the only way

19   we knew it is because she took it upon herself to contact us.

20   The government, as we agreed, provided Ms. Murdock's name to

21   the various witnesses who would be called.  She happened to be

22   one of those witnesses who reached out to us, we interviewed

23   her.

24        So there are some issues here.  We probably should

25   have been told about that, and so that's an issue that needs to

1    be put on the record.

2            THE COURT:  Okay.

3            MR. DONNINI:  And secondly, I believe the jury should

4    have known about that.

5            THE COURT:  Okay.  All right.  Very good.  Thank you

6    very much, and the argument is noted and -- for the record and

7    appreciated.

8            I would only say the following.  Number one, I think

9    she told the jury that she did not believe the doctor was money

10   hungry, and it was very clear from her emotional, explicit

11   testimony that she loved the doctor.  So notwithstanding the

12   incorrect characterizations of the -- of the agents, the jury

13   now knows what her feelings were, and the side issue of the --

14   of the agent's characterizations were not put before the jury.

15   So I think the ruling was correct.

16           On the other hand, should -- should the issue of --

17   of misconduct or the set-up, if you will, of this witness to

18   inflame or improperly convict Dr. Pompy be outside of the work

19   of the DEA agents, I think that's a separate issue that would

20   not be germane for our trial and can be addressed in different

21   ways.

22           But I do understand what Mr. Donnini was getting at,

23   and for -- for completeness my -- my ruling is what it -- what

24   it is.  And maybe the Court of Appeals will disagree, maybe

25   there will be an acquittal and it won't matter, but I think

```
 1   we've thrashed through the issue pretty well, all right?
 2          Okay.  Thank you all very much.  We'll be in a
 3   ten-minute break.
 4          THE LAW CLERK:  Court is now in recess.
 5          (Court in recess at 10:33 a.m.)
 6          (Proceedings resumed at 10:43 a.m., all parties
 7          present)
 8          THE LAW CLERK:  All rise for the jury.
 9          (Jury entered the courtroom at 10:43 a.m.)
10          THE COURT:  Okay.  Jurors are back, right on time as
11   usual.  Everybody may be seated.
12          Mr. Shinevarre is returning and we're doing great
13   today.  Come on up, Mr. Shinevarre.  Doing really great.  Okay.
14   Go ahead and have a seat.
15          THE WITNESS:  Thank you.
16          THE COURT:  You're still under oath, of course.
17          And Mr. Pratt, go right ahead.
18          MR. PRATT:  Ms. Ouellette, could you please put up
19   page 3 of the same exhibit, 85J?
20   BY MR. PRATT:
21   Q.  All right.  Mr. Shinevarre, I'm not going to go through
22   every prescription, but is it fair to say that he kept shifting
23   you from the pain medication to the addiction medication back
24   and forth at least six times?
25   A.  That's fair to say.
```

```
 1    Q.  All right.
 2          MR. PRATT:  And I'm going -- I would like you to put
 3    the -- if you could blow up, Ms. Ouellette, the third line from
 4    the bottom where we talk about -- where it says October 29,
 5    2015.
 6    BY MR. PRATT:
 7    Q.  And we see on October 29, 2015 you started again to try to
 8    beat the addiction, is that correct?
 9    A.  Yes, sir.
10    Q.  Okay.  So if we go to from October 29 of 2015 and go to
11    the next page, I want to figure out how many months you stayed
12    on the addiction medicine.  It looks like going from October of
13    2015 all the way up to April of 2016, does that seem right?
14          MR. PRATT:  Blow up the middle of the page.
15    A.   I can't really recall but that seems right.
16          MR. PRATT:  Ms. Ouellette, could you please blow up
17    the middle of the page which includes April of 2016?
18    BY MR. PRATT:
19    Q.  All right.  So you would agree with me you've gone October
20    to April, you've gone six months on the addiction medicine,
21    correct?
22    A.  Yes, sir.
23    Q.  All right.  Things are going okay for a while, right?
24    You -- have you made some progress or not?  If you've been six
25    months, is that progress?
```

1    A.   Yeah, that's progress but that's not there.

2    Q.   All right.  And -- and then we see -- we see on the chart

3    April 12th, 2016 you went back to the opiate medication,

4    correct?

5    A.   That's correct.

6    Q.   All right.  You got both oxycodone with acetaminophen,

7    which might be Percocet, is that right?

8    A.   I believe that is Norco.

9    Q.   Okay.

10   A.   Oh, no.  It could be.  It could be.  I'm not for certain,

11   sir.

12   Q.   All right.  But it's the 10 milligram too, right?

13   A.   Pardon me.

14   Q.   It's the 10 milligram version it says?

15   A.   I still didn't hear you.

16   Q.   It's the 10 milligram version?

17   A.   Yes, sir, three times a day.

18   Q.   All right.  Is that -- that's not the weakest dose, that's

19   the higher dose of Percocet?

20   A.   I'm not a doctor.  I'm not for sure.

21   Q.   Okay.  And also the methadone, right?

22   A.   Correct.

23   Q.   All right.  I assume when you went into that doctor -- let

24   me ask you this.  Did Dr. Pompy know that you were -- that you

25   were opioid dependent, that you had a pill problem?

1   A.   I can't say for certain.

2   Q.   All right.

3        MR. PRATT:   If we could look at the patient chart,

4   if -- Ms. Ouellette, if we could look on page 832, and if you

5   could --

6        MS. OUELLETTE:   Bottom?

7        MR. PRATT:   Yes, blow up...

8   BY MR. PRATT:

9   Q.   If we look about the fifth, the fifth line down where it

10  says "Detoxification Stage," do you see that line?

11  A.   Yes, sir, "Opiate dependence."

12  Q.   It says "Opiate dependence" in his record, doesn't it?

13  A.   Yes, sir.

14  Q.   And were you, in fact, opioid dependent?

15  A.   Yes, sir.

16  Q.   All right.  And -- and so despite the fact that you were

17  opioid dependent, you went in and you probably had some pain

18  that day, right?

19  A.   I'm -- it's ten years ago but I'm sure.

20  Q.   Yeah.  As a matter of fact, it might have been 10 out of

21  10 pain, correct?

22  A.   Yes, sir.

23  Q.   You were honest with Dr. Pompy about your issues, correct?

24  A.   As far as I recall, yes, sir.

25  Q.   Sometimes you'd be 10 pain, correct?

1   A.   Yes, sir.

2   Q.   Sometimes you'd be 3 pain?

3   A.   Sometimes what?

4   Q.   Your -- your pain would only be a 3?

5   A.   I'm sure that's possible.

6   Q.   All right.  And you could still get the pain pills though,

7   right?

8   A.   Yes.

9   Q.   And if he asked you any questions about your opioid

10   dependence, you were honest about those as well?

11   A.   Yes, sir.

12   Q.   Did he ask many questions about your opioid dependence?

13   A.   I -- I -- I don't know if I can answer that.

14   Q.   Okay.  In any event, April of 2016 you go in, you got six

15   months of progress, you say "I'm in pain," and what does he do

16   for you?

17   A.   He puts me back on the pain medicine.

18   Q.   All right.  Did you -- did you go back on the addiction

19   medicine while you were still with Dr. Pompy?

20   A.   After seeing Dr. Pompy?

21   Q.   Yes.

22   A.   Yes.

23   Q.   All right.  Tell us what -- tell us how you did that.

24   A.   How that --

25   Q.   Tell us how that happened.

1    A.    I went and seen another doctor.

2    Q.    And what did the other doctor do for you?

3    A.    He put me on a program of Suboxone of starting me off on a

4    higher dose and working down to a lower dose.  I'm on the

5    lowest dose now.

6    Q.    So you've been working -- you've been working with an

7    addiction, getting off of this for the last six years?

8    A.    It -- yes, yes, sir.

9    Q.    All right.  At any time in those six years is it like "Oh,

10   I'm in pain so I'm going to go back on the pills"?

11   A.    No, I'm -- no, no, sir.

12   Q.    All right.  You -- you still have -- do you still have

13   issues with your back and stuff like that?

14   A.    Yes, sir.  I'm having surgery Monday on my shoulder so I'm

15   still having issues, yes.

16   Q.    All right.  How do you deal with the pain that you have on

17   your back or your shoulder?  You're still a working man, right?

18   A.    Yes, sir.

19   Q.    All right.  How do you deal with the pain issues you have?

20   A.    Over-the-counter or I'll get an injection from my

21   specialist, and other than that, I deal with it.

22   Q.    All right.  Did Dr. Pompy ever try those -- any injections

23   with you?

24   A.    He did, yes.

25   Q.    All right.  Did you get quite a few of those?

1    A.   Pardon me?

2    Q.   Did you get quite a few of those injections?

3    A.   Um, in the back not too many, but in the shoulders, yes,

4    he did quite a few on both shoulders.

5    Q.   All right.  Did some of those work for you?

6    A.   Yeah, absolutely.

7    Q.   All right.  And did some of them not work for you?

8    A.   They're starting not to work anymore 'cuz I've had so many

9    of them.  That's why they had to do surgeries.  But his

10   injections worked wonderful.

11   Q.   Okay.  And did the injections ever mean that he took you

12   off the pain pills?

13   A.   No, that was never the intent.

14   Q.   Okay.

15   A.   I don't believe so.

16   Q.   All right.  You mentioned sometimes you spent a lot of

17   time in the waiting room at Dr. Pompy's office?

18   A.   Waiting?

19   Q.   In the waiting room, yes.

20   A.   Oh, sometimes, yes.

21   Q.   All right.  All right.  Did you ever have a chance to see

22   what the other patients in the office were like?

23   A.   What was the question?

24   Q.   Did you see what the other patients in the office were

25   like?

```
1    A.   What did they seem like?

2    Q.   Yes.

3    A.   People.

4    Q.   Okay.  Can you describe them by age, were some of them

5    older, some of them younger?

6    A.   I would -- all ages, from wheelchairs to younger people.

7    Q.   All right.  And if you --

8    A.   I didn't mean that rude, that first answer.  Just I --

9              THE COURT:  No, we --

10             THE WITNESS:  -- didn't know how to --

11             THE COURT:  -- we under -- we understand.

12             THE WITNESS:  Thank you.

13             THE COURT:  Yep.  Go ahead.

14   BY MR. PRATT:

15   Q.   All right.  And those people were there for -- for what --

16   from what you could tell, any of those people there for the

17   same reasons you were?

18   A.   I'm sure, yes.

19   Q.   And how do -- how -- what made you think that?

20   A.   Pardon me?

21   Q.   What made you think that about those other folks?

22   A.   Well, he's a pain specialist so I imagine they went there

23   to get help for pain.

24   Q.   Okay.  You've been -- you've been six years since you've

25   been addicted to pills, correct?
```

```
 1   A.   Yes, sir.
 2   Q.   All right.  Do you have any kind of personal feelings or
 3   bad feelings toward Dr. Pompy for his treatment of you?
 4   A.   Absolutely not.
 5   Q.   Can you explain why not?
 6   A.   Because I love that man.  I have no hard feelings against
 7   him.  I know him personally.
 8   Q.   All right.  And how do you know -- in what context do you
 9   know him personally?
10   A.   He used to go to our church.
11   Q.   Okay.  Let me ask you this.  By agreeing to testify here
12   today, is it costing you anything?  And I don't mean money.  I
13   mean is it costing you something?
14   A.   To what?
15   Q.   To you.  Any -- any bad feelings towards you by
16   testifying?
17   A.   I -- I -- I don't understand the question.
18   Q.   All right.  The question is whether any -- there's any --
19   whether there's any repercussions, whether there's any
20   consequences for you in your personal life because of you
21   testifying here.
22   A.   No, sir.
23   Q.   All right.  And so as to your feelings about Dr. Pompy,
24   have they affected your testimony today?
25            MR. DONNINI:  Your Honor, I'll object to that.
```

```
 1              THE COURT:  Sustained.
 2    BY MR. PRATT:
 3    Q.  All right.  You told us today -- let -- let me ask you
 4    this.  Have you testified today truthfully to the best of your
 5    ability?
 6    A.  Yes, sir.
 7    Q.  And has anything affected your testimony, any personal
 8    feelings about anybody.
 9              MR. DONNINI:  Same objection.
10              THE COURT REPORTER:  Mr. Donnini, you need to pull
11    the microphone closer to you.
12              MR. DONNINI:  Oh, I'm sorry.
13              THE COURT:  I think that's sustained.
14              THE WITNESS:  Oh, I'm sorry.
15              THE COURT:  We're not going to vouch for the witness
16    and we don't know what went on, but he's testified truthfully,
17    he took his oath, and go right ahead, Mr. Pratt.
18              MR. PRATT:  That's all, Your Honor.  I have nothing
19    further for this witness.
20              THE COURT:  Okay.  All right.  Thank you very much.
21              (Excerpt 10 concluded at 10:55 a.m.)
22                            —  —  —
23
24
25
```

```
 1            Excerpt 11:
 2            (Proceedings in progress at 11:21 a.m., all parties
 3            present, jury present)
 4            THE COURT:  Okay.  Thank you very much.
 5            Any followup from Mr. Pratt?
 6                        REDIRECT EXAMINATION
 7   BY MR. PRATT:
 8   Q.   Sir, you were shown -- you were shown a paperwork, a
 9   narcotics contract that you signed back for Dr. Pompy, correct?
10   A.   Yes, sir.
11   Q.   Are you -- are you much of a paperwork guy?
12   A.   I'm a truck driver.
13   Q.   Okay.  And so you didn't hide the fact you were a truck
14   driver from Dr. Pompy, did you?
15   A.   I'm just saying I'm not very good at paperwork, no.
16   Q.   All right.  And that's why I asked you.  Did he give you
17   verbally these kinds of warnings that you wish you'd had?  Did
18   he give you orally, did he tell you these warnings that you
19   know about now?
20   A.   Not verbally.
21   Q.   No.  And -- and what about drug counseling?  I saw he
22   checked the box on the form that there was drug counseling, but
23   what kind of drug counseling did he give you about your pill
24   addiction?
25   A.   He -- he let that for me to do, to seek drug counseling
```

1    and to --

2    Q.   Okay.

3    A.   -- kick the habit.

4    Q.   So he -- so he didn't do that with you?

5    A.   No, that was the patient's responsibility that I -- that I

6    understood.

7    Q.   All right.  And you knew it -- you knew at some point, at

8    least by the time you -- at least by 2012 when you went for

9    addiction treatment, at least by then you knew that you had --

10   that you were a pill addict, correct?

11          MR. DONNINI:  Your Honor, objection, leading.

12   Objection the way he's characterizing it.

13          MR. PRATT:  I'm trying to be efficient on redirect,

14   Your Honor.

15          THE COURT:  Okay.

16          MR. PRATT:  If I need to break it down, I will.

17          THE COURT:  Okay.  I think you can ask him -- okay.

18   If -- if you want to get to the fact that he knew he had to get

19   addiction treatment by 2012 and confirm that, that would be

20   fine.  Go right ahead.

21   BY MR. PRATT:

22   Q.   You knew you needed addiction treatment by 2012, correct?

23   A.   What was the question?

24   Q.   You knew you needed addiction treatment by 2012?

25   A.   That would be a fair statement.

1    Q.   And you went and got that treatment, correct?

2    A.   That -- I believe so, yes.

3    Q.   All right.  And we saw that, we saw that because of the

4    six-month gap, right?

5    A.   Yeah.  I'm just getting all confused here, I'm sorry.

6    Q.   No, you're doing fine.  Okay.

7         So by 2012 what were you trying to do as far as the

8    pills, the pain pills?

9    A.   What was I trying to do?

10   Q.   Yes.

11   A.   Get off of them.

12   Q.   All right.  And between 2012 and 2016 Dr. Pompy brought

13   you back in the pills at least six different times, is that

14   correct?

15   A.   That is correct.

16   Q.   And just so we're clear, I'm sort of generalizing about

17   pain pills, the pain pills he kept bringing you back to, were

18   those the type that you were addicted to?

19   A.   Yes, they were.

20        MR. PRATT:  Thank you, Your Honor.  I have nothing

21   further.

22        THE COURT:  All right.  Thank you very much.

23        (Excerpt 11 concluded at 11:24 a.m.)

24                     —  —  —

25

```
 1            Excerpt 12:
 2            (Proceedings in progress at 11:26 a.m., all parties
 3       present, jury present)
 4            MR. LIEVENSE:  The government's prepared to call Judy
 5       Shinevarre.
 6            THE COURT:  Okay.  Let's get Ms. Shinevarre here, and
 7       we'll try to shoot for our lunch break in about 20 minutes or
 8       11:45.
 9            (Brief pause)
10            Give our witness a little space to pass through if we
11       could.
12            (Brief pause)
13            Right this way, ma'am, if you come right here by the
14       court reporter.  Can you hear me okay?
15            THE WITNESS:  Yes, sir.
16            THE COURT:  Okay.  Good.  Okay.  Now we're going to
17       ask you to pause right there, just pause and raise your right
18       hand.
19                 J U D Y   S H I N E V A R R E
20       was called as a witness herein, and after being first duly
21       sworn to tell the truth and nothing but the truth, testified on
22       her oath as follows:
23            THE WITNESS:  I do.
24            THE COURT:  Okay.  Thank you.  Go ahead and take your
25       time.
```

 1              (Brief pause)

 2              Doing all right?  Can you pull that -- yes, that's

 3      very good, excellent.  That's what I was going to suggest.

 4      Speak at that microphone and it'll pick you up nicely.

 5              THE WITNESS:  Okay.

 6              THE COURT:  You all ready to go?

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  All right.  Go ahead, Mr. Lievense.

 9                      DIRECT EXAMINATION

10      BY MR. LIEVENSE:

11      Q.  Ma'am, could you please state your name?

12      A.  Judy Shinevarre.

13              THE COURT REPORTER:  She's going to have to speak up.

14              (Brief pause)

15      A.  Judy Shinevarre.

16              THE COURT:  Perfect.

17      Q.  And it's the same spelling as your son?

18      A.  Yes.

19      Q.  Was your son here to testify before, Joey Shinevarre?

20      A.  Yes.

21      Q.  Ma'am, did there come a point in time that you became a

22      patient of Dr. Pompy?

23      A.  Yes.

24      Q.  And did you become a patient of Dr. Pompy -- how did you

25      learn about Dr. Pompy?

1   A.   Through another physician.

2   Q.   Was your son Joey also seeing him at the time?

3   A.   I believe so.

4   Q.   When you learned about Dr. Pompy from another physician,

5   did that physician talk to you about what your experience would

6   be like if you went to Dr. Pompy's office?

7   A.   Yes.

8   Q.   Was there any particular warning that you were provided?

9   A.   Yes.

10  Q.   What was that?

11  A.   He told me not to be alarmed.

12  Q.   Did you know what that meant?

13  A.   No, I did not.

14  Q.   When you went to Dr. Pompy's office the first time, were

15  you alarmed?

16  A.   Yes, I was.

17  Q.   Why were you alarmed?

18  A.   There were so many people that was in his office lined up,

19  and I knew right away what the doctor, the other doctor meant

20  by the look of the people.

21  Q.   What was the look of the people that you saw?

22  A.   They were there for one reason.

23  Q.   What was that?

24  A.   Drugs.

25  Q.   Did you eventually -- I'm going to show you -- have Ms.

1    Ouellette bring up on the screen --

2            MR. LIEVENSE:  Your Honor, my understanding is Mr.

3    Donnini has agreed to admit Government's Exhibit 85P, which is

4    the prescription record for Judy Shinevarre.

5            MR. DONNINI:  That's correct.  No objection, Your

6    Honor.

7            THE COURT:  All right.  Thank you.  Without

8    objection, 85P is received.

9            Go right ahead.

10           MR. LIEVENSE:  And Ms. Ouellette, if you could

11   highlight the first third or so.

12   BY MR. LIEVENSE:

13   Q.  Do you see that on the screen, Ms. Shinevarre?

14   A.  Yes, I do.

15   Q.  And when you began treating with Dr. Pompy, what

16   prescription did he give you, do you recall?

17   A.  Oxycodone.

18   Q.  Could you speak into the microphone?

19   A.  Oxycodone.

20   Q.  And is that a mixture with acetaminophen also known as

21   Percocet, does that sound familiar?

22   A.  I'm not sure, honey.

23   Q.  You recall it as oxycodone?

24   A.  Mm-hmm.

25   Q.  Yes?

1    A.   Yes.

2    Q.   All right.  And if you look to the far -- at the end of

3    where it says oxycodone, does that say 10 mg?

4    A.   Yes, it does.

5    Q.   And if you go further along, does that say -- under

6    "Quantity," what was the quantity of oxycodone 10 mg Dr. Pompy

7    prescribed?

8    A.   Ninety.

9    Q.   And was that a 30-day supply?

10   A.   Yes, it was.

11   Q.   And so that would be three pills a day?

12   A.   Yes, it -- mm-hmm.

13   Q.   When Dr. Pompy prescribed you three pills a day, these 90

14   pills, did you typically take all three pills a day?

15   A.   No, I did not.

16   Q.   Did you take them more often or less?

17   A.   Less.

18   Q.   So at the end of the month would you have pills left over?

19   A.   Yes, I did.

20   Q.   Pardon?

21   A.   Yes, I did.

22   Q.   Did you tell Dr. Pompy that you had extra pills left over

23   each month?

24   A.   No, I did not.

25   Q.   And did Dr. Pompy I guess continue to prescribe you the

1   same monthly refill over the course of your treatment with him?

2   A.   Yes, he did.

3   Q.   What did you do with the extra pills?

4   A.   I kept them.

5   Q.   When you went to see Dr. Pompy, you mentioned that it was

6   a full area, a full waiting room?

7   A.   Oh, yes.  Even outside they put benches.

8   Q.   In the hallway, was that where the benches were?

9   A.   Yes.

10  Q.   Now, when you would see Dr. Pompy for what I'll call a

11  refill visit where he would give you a new prescription, about

12  how much time did Dr. Pompy spend with you during those refill

13  visits?

14  A.   He himself?

15  Q.   Yes.

16  A.   Um, mostly five minutes.

17  Q.   All right.  Now, did you ever tell anybody on Dr. Pompy's

18  staff that you weren't taking all of the medication that you

19  were prescribed?

20  A.   Yes.

21  Q.   And who did you tell?

22  A.   Someone on his staff.

23  Q.   Was that woman named Donna?

24  A.   Yes.

25  Q.   And you understood that Donna worked for Dr. Pompy?

```
1    A.   Yes.

2    Q.   Do you know if Donna's last name is Ellison?

3    A.   Yes.

4    Q.   Do you know if -- if Donna ever did anything, ever alerted

5    anybody else that you told her you weren't taking all the

6    medication?

7    A.   Not as far as I know.

8    Q.   Now, we've talked about how your son Joey was also a

9    patient of Dr. Pompy.

10   A.   Yes.

11   Q.   At some point did your son Joey develop an addiction to

12   the opioid pills?

13   A.   Yes.

14   Q.   Are you close with your son Joey?

15   A.   Yes.

16   Q.   Did you have conversations with him about his addiction?

17   A.   Yes.

18   Q.   Could you describe how his addiction was impacting his

19   life?

20        MR. DONNINI:  Your Honor, I guess I'm just going to

21   object.  We just had Mr. Shinevarre here.  Why do we need

22   another witness to talk about what he could have testified to?

23        THE COURT:  It's a bit cumulative but we can get her

24   state of mind briefly for the jury how her -- and it might be

25   relevant to further questioning.
```

1          But briefly, witness, go ahead.  If you want to

2     discuss how -- how that issue in your life affected you, please

3     do.  Go right ahead.

4          THE WITNESS:  It was heartbreaking.  There was

5     nothing I could really help him do 'cuz I knew that he didn't

6     want to be like that, but he had to reach out to someone.  And

7     he tried several times and he couldn't do it on his own, and it

8     made life miserable for himself, his wife, his child.  It was a

9     nightmare, a nightmare.

10    BY MR. LIEVENSE:

11    Q.  And you said he couldn't do it himself.  Did there come a

12    point in time that he went -- stopped seeing Dr. Pompy and went

13    somewhere else to try to get help?

14    A.  Yes.

15    Q.  And are you aware of that, that he went to that program?

16    A.  Yes.

17    Q.  Meanwhile, did you continue to see Dr. Pompy --

18    A.  Yes.

19    Q.  -- at his office?

20    A.  Yes.

21    Q.  Okay.  During one of your office visits with Dr. Pompy,

22    did Dr. Pompy ask you about your son Joey?

23    A.  Yes.

24    Q.  And what did he ask you about?

25    A.  [Indiscernible].

```
1    Q.   And what did you tell him?
2             THE COURT REPORTER:  I'm sorry, I didn't understand
3    that.  Would you say that again?
4             THE WITNESS:  Where Joey's been.
5             THE COURT REPORTER:  Thank you.
6    Q.   So he asked you, "Where's Joey been?"
7    A.   And I said in detox.
8    Q.   And what was his response?
9    A.   "Well, I could have helped him with that."
10   Q.   Did he ask you any questions about where he was doing
11   detox?
12   A.   No.
13   Q.   Did you tell Dr. Pompy that the detox -- whether or not
14   the detox was related to any particular type of addiction?
15   A.   Excuse me?
16   Q.   When you mentioned he was in detox, did you say what he
17   was in detox from?
18   A.   I don't believe so.
19   Q.   Now, Joey did do detox for a while, is that right?
20   A.   Yes.
21   Q.   And did you eventually learn that Joey stopped doing
22   detox?
23   A.   Yes.
24   Q.   Did Joey go back to see Dr. Pompy?
25   A.   Yes.
```

1    Q.   Ma'am, I want to talk briefly about --

2            MR. LIEVENSE:   We can take that down.

3    BY MR. LIEVENSE:

4    Q.   -- about your own medication.  You mentioned that you --

5    and we talked about you being on Percocets, right?

6    A.   Yes.

7    Q.   Did there come a point in time where Dr. Pompy added some

8    medication for you?

9    A.   Yes.

10   Q.   And did you come to learn that that medication was called

11   Subsys?

12   A.   I don't know what that is.

13   Q.   Okay.  Do you remember a time that a box was delivered to

14   your house?

15   A.   Yes.

16   Q.   Could you tell the jury about that time?

17   A.   Um, it was in the summertime and my son Joe was at my

18   house and I checked, either it was the front door or the back

19   door, and there was a box, and I got the box and we put it on

20   the kitchen table, or I did, and opened it and it had this

21   medicine in it and it had that first name that you mentioned,

22   that first name.

23   Q.   Subsys?

24   A.   Yeah.  Yeah.  And neither one of us knew what that was,

25   and he looked it up and it said fentanyl.  Well, I had never

1    really heard of fentanyl before except for one time when I was

2    in the hospital and they put a patch on me and I thought was a

3    smoker's patch, you know.  So he says no, that's fentanyl

4    and --

5    Q.   He meaning was that Joey?

6    A.   Yes, I'm sorry.

7    Q.   It's okay.

8    A.   But this was a spray that went underneath the -- your

9    tongue.  And I says -- it didn't have no information, didn't

10   have anything, where it come from, what doctor it was from or

11   anything, and it just said spray I don't know how many times

12   underneath your tongue and it said it was for pain.  Well, I'm

13   allergic to a lot of medication, a lot of pain medication and a

14   lot of allergies, penicillin and stuff like that.  But anyway,

15   I was afraid to take it and I says, "Joe, will you stay with me

16   while I try it?"  And I opened it and I put it on -- just one

17   spray underneath my tongue and I goes whoa.  I says I'm not

18   taking that.  And Joey says, "Well, why don't you talk to

19   Eddie?"  That's my oldest son.  So --

20   Q.   Let me pause right there.  Thank you.  So you sprayed just

21   one time in your mouth and you said you felt whoa?

22   A.   I did.

23   Q.   Correct.  Okay.  When you say whoa, what did you mean,

24   what was the feeling you were feeling?

25   A.   High.

```
 1   Q.   What impact was it having on your body?
 2   A.   Um, I don't like to feel something having control over me,
 3   not something having --
 4   Q.   Not you having control over it?
 5   A.   Yes.  Yes.
 6   Q.   And that was from one spray?
 7   A.   Yes.
 8   Q.   And just to be clear, you didn't -- you weren't expecting
 9   this box?
10   A.   No.
11   Q.   And no one had explained to you what it was?
12   A.   No.
13   Q.   Or how -- sounds like there was instructions in the box.
14   A.   Yeah.
15   Q.   But before that no one had explained to you how to take
16   it?
17   A.   No, sir, or it was coming.
18   Q.   At this time in your life --
19            MR. LIEVENSE:  And actually if we could pull up 85P,
20   Ms. Ouellette, and October of 2015.
21   BY MR. LIEVENSE:
22   Q.   Do you see in the middle on October 1st, 2015, do you see
23   what Dr. Pompy prescribed?
24   A.   Yes, I do.
25   Q.   What does that say?
```

1    A.   Subsys.

2    Q.   Could you speak into the microphone?

3    A.   Subsys, I think that's what it is.

4    Q.   Is it spelled S-u-b-s-y-s?

5    A.   Yes.

6    Q.   And does that say 200 after it?

7    A.   Yes.

8    Q.   That's a yes?

9    A.   Yes.  But see, he's got it down as 10.  That is October.

10   Q.   That's October.  You said your memory was summer?

11   A.   Uh-huh.

12   Q.   And this says October?

13   A.   Yes.

14   Q.   All right.  Now, in October of 2015 did you have cancer?

15   A.   No, sir.

16   Q.   And, in fact, in October of 2015 you weren't even taking

17   all 90 of your Percocets each month, were you?

18   A.   No.

19   Q.   Now, I think you started to talk about your other son

20   Eddie.

21   A.   Yes.

22   Q.   So after you had this initial experience with the Subsys,

23   you said you wanted to talk to Eddie about this?

24   A.   Yes.

25   Q.   What did you do with the -- with the box with the Subsys?

1    A.   Well, I told him.

2    Q.   Did you go to Eddie's house?

3    A.   Yes, I did.

4    Q.   Did you bring it with you, if you recall?

5    A.   I don't recall if I did or not once I knew what it was,

6    but I went to Eddie's house and I said, "Eddie," I says,

7    "Somebody sent me this box of medicine, and I said Joey looked

8    it up and it's fentanyl."  And he got very upset and he says,

9    "Someone wants you to get hooked on this and then you'll lose

10   your home and everything like that."  He goes, "Bradley just

11   wrote an essay on this."

12   Q.   Who is Bradley?

13   A.   He's my middle grandson.

14   Q.   All right.

15   A.   And he says, "I'm giving you a choice."  He says, "You

16   either" --

17             MR. DONNINI:  Your Honor --

18   A.   -- "take this back" --

19             THE COURT:  Yes.

20             MR. DONNINI:  -- I don't mean to interrupt Ms.

21   Shinevarre --

22             THE COURT:  Go ahead.

23             MR. DONNINI:  -- but she's testifying about what

24   others say, so it's all hearsay.

25             THE COURT:  True.  And I'm going to instruct the jury

 1    to only consider the statement she's making about her son

 2    Eddie's statement as it may affect steps she took next.

 3           It appears Eddie gave you a warning, and why don't

 4    you finish talking about that and we'll move ahead, Mrs.

 5    Shinevarre.  Go right ahead please.

 6    BY MR. LIEVENSE:

 7    Q.   You can continue.  So he gave you a warning?

 8    A.   Yes.

 9    Q.   And what was --

10    A.   That either I take that medication back or I wasn't

11    allowed to see my grandchildren, and to me my grandchildren

12    mean everything.  So I put that medication in a gift bag and

13    put it -- like stuff on top because I knew if those people in

14    that office knew what I had in that bag, they would have killed

15    me for it.

16    Q.   So just -- I think you jumped ahead a little bit.

17    A.   I'm sorry.

18    Q.   That's okay.  You -- you finished the conversation with

19    Eddie?

20    A.   Yes, sir.

21    Q.   All right.  And you made a decision that you were going to

22    do what?

23    A.   Take it back.  I wanted to see my grandkids.

24    Q.   You were going to give the -- that medication, that

25    fentanyl/Subsys medication back to whom?

1    A.   Dr. Pompy.

2    Q.   And you said you put it in a gift bag.  Is that like, you

3    know, like you go to a birthday party?

4    A.   Mm-hmm.

5    Q.   Is that right?

6    A.   Yes.

7    Q.   And I think you -- did you put like tissue paper on top?

8    A.   Yes.

9    Q.   And by putting the tissue paper on top, were you trying to

10   hide what it was?

11   A.   Yes.

12   Q.   Did you go back to Dr. Pompy's office with that bag -- did

13   you wait until your next visit or did you go sooner?

14   A.   I went sooner.

15   Q.   Did you go alone or did anybody go with you?

16   A.   I went alone.

17   Q.   And when you went to Dr. Pompy's office, what did you do,

18   did you go to the -- did you go to the reception area?

19   A.   Yes.

20   Q.   And what happened?

21   A.   I says, "I want to see Donna now."

22   Q.   Is that the same Donna we were talking about before?

23   A.   And she says, "She's busy," and I says, "I want to see

24   Donna now."  And so Donna came to the door and let me in, and I

25   gave her the bag and I told her what happened between my

| | |
|---|---|
| 1 | grandkids, you know, I had the grandkids or the medicine. |
| 2 | Q.  And did you tell -- what did you tell Donna about whether |
| 3 | you wanted the medication?  What did you tell Donna about |
| 4 | whether you wanted that Subsys? |
| 5 | A.   I told her, I says Eddie gave me a choice. |
| 6 | Q.  I'm not -- I'm not trying to ask you about that.  What did |
| 7 | you tell Donna about whether you wanted it, not why you wanted |
| 8 | it, whether you wanted it. |
| 9 | A.  Oh, I didn't want it. |
| 10 | Q.  Did you give it back to her? |
| 11 | A.  Yes, I did. |
| 12 | Q.  And what was her reaction? |
| 13 | A.  "Do you know how hard that that rep worked to get that for |
| 14 | you?" |
| 15 | Q.  By "that rep," do you know what she meant by that? |
| 16 | A.  The representative that gets medicine for Dr. Pompy. |
| 17 | Q.  So your understanding is there's a drug representative who |
| 18 | worked with Dr. Pompy to help get medications? |
| 19 | A.  Yes. |
| 20 | Q.  Was that drug representative there that day? |
| 21 | A.  Yes. |
| 22 | Q.  Do you -- was it a man or a woman? |
| 23 | A.  Man. |
| 24 | Q.  Did you talk to him as well? |
| 25 | A.  I told him I was sorry. |

1   Q.   About -- what do you mean, sorry?

2   A.   That I was sorry that he worked so hard to get the

3   medication and, you know, I had a choice to make, the

4   medication or my grandkids.

5   Q.   Who made -- I think you said was it Donna who made the

6   statement about "Do you know how hard the representative

7   worked?"

8   A.   (Nods in the affirmative.)

9   Q.   Yes?

10  A.   Yes.

11  Q.   Did the representative make any statements to you about

12  how hard he had worked?

13  A.   He just said, "It's all right."

14  Q.   All right.  So was the conversation between -- it was you,

15  Donna and the representative?

16  A.   Mm-hmm.

17  Q.   Yes?

18  A.   Yes.

19         MR. LIEVENSE: Your Honor, I'd like to refer to

20  Government's Exhibit 17, page 559; actually 115.  This is not a

21  document that's been preadmitted, but my understanding is Mr.

22  Donnini is now agreeing to its admission.

23         THE COURT:  All right.  No. 17 is the pack of records

24  as to this witness.  What's your position, Mr. Donnini?

25         MR. DONNINI:  Just the medical records, Your Honor?

1        THE COURT:  Yeah.

2        MR. DONNINI:  Yes, that's fine, Your Honor.

3        THE COURT:  Okay.  17 is received.

4        How much longer in total do you have, Mr. Lievense?

5        MR. LIEVENSE:  Less than five minutes.

6        THE COURT:  Okay.  Let's finish up and then we'll

7    take our lunch break.  Go right ahead.  17 is received.

8        MR. LIEVENSE:  And if you -- if Ms. Ouellette could

9    expand the top half please.

10   BY MR. LIEVENSE:

11   Q.  So we -- we looked at that other record that showed the

12   prescription was issued or filled in October of 2015.  Do you

13   recall that?

14   A.  Do I recall that?

15   Q.  Remember the -- the list of prescriptions and we saw that

16   Subsys on October of 2015?

17   A.  (Nods in the affirmative.)

18   Q.  Right?

19   A.  That we seen earlier?

20   Q.  Correct.  And now what is the date of this visit that you

21   had with Dr. Pompy?

22   A.  10-29-15.

23   Q.  So this would have been after you received that -- the

24   Subsys in the mail, is that right?

25   A.  If that's what the other one said.

1   Q.   Okay.  Under "Reason For Today's" -- is this the -- is

2   this the form that you would fill out during your visits to Dr.

3   Pompy?

4   A.   Yes.

5   Q.   And under "Reason For Today's Visit," it looks like there

6   are two things checked.  What -- what two things are checked?

7   A.   "Renew current medication at same dose.  Request change to

8   medication, no..."

9   Q.   And that -- and that thing again right, that medication?

10  A.   Yes.

11  Q.   It says --

12  A.   "Will explain to doctor."

13  Q.   Is that "No S-u-b-s-y-s"?

14  A.   Yes.

15  Q.   All right.  Do you recall ever talking to Dr. Pompy about

16  the Subsys?

17  A.   No.

18  Q.   Like to now show you page 559 of Exhibit 17, and this is

19  the Visit Note from October 29, 2015.  Do you see that at the

20  top?

21  A.   Here's the October 6th.

22       MR. LIEVENSE:  Highlight the Visit Note, Ms.

23  Ouellette.

24  A.   Oh, okay, I see it.

25       MR. LIEVENSE:  And if we could now move to page 561,

1    two pages later, and highlight the top there, top half.

2    BY MR. LIEVENSE:

3    Q.   And do you see just above where it says "Allergies"?

4    A.   Yes.

5    Q.   And it says "Subsys 200"?

6    A.   Yes.

7    Q.   And if you go two lines down, right above that it says

8    "Discontinue," is that right?

9    A.   Yes.

10   Q.   So it says "Discontinue Subsys 200"?

11   A.   Yes.

12   Q.   And if you go two lines down, does it give a reason that

13   your Subsys was being discontinued?

14   A.   It says "Patient states too expensive."

15   Q.   Is that true?

16   A.   No, it's not.

17   Q.   Do you even know how much it cost?

18   A.   No, I don't.

19   Q.   Was the cost the reason you returned it?

20   A.   No, it was not.

21   Q.   Did Dr. Pompy ever talk to you about the Subsys

22   medication?

23   A.   No, he did not.

24   Q.   Did he tell you what it was for?

25   A.   No, he did not.

1    Q.   Did he tell you what it treated?

2    A.   No, he did not.

3    Q.   Did he talk to you about how to use it?

4    A.   No, he did not.

5    Q.   Did he talk to you about the risks associated with it in

6    terms of addiction or overdose?

7    A.   No, he did not.

8             MR. LIEVENSE:  One moment.

9             (Brief pause)

10            Nothing further right now, Your Honor.

11            THE COURT:  All right.  Thank you.

12            (Excerpt 12 concluded at 11:58 a.m.)

13                         —  —  —

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2              I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 101 comprise full, true and correct excerpts of

7    proceedings taken in the matter of United States of America vs.

8    Lesly Pompy, Case No. 18-20454, on Thursday, December 1, 2022.

9

10                          s/Linda M. Cavanagh
                            Linda M. Cavanagh, CRR, RMR, RDR, CRC
11                          Federal Official Court Reporter
                            United States District Court
12                          Eastern District of Michigan

13

14

15

16

17   Date: December 8, 2022
     Detroit, Michigan
18

19

20

21

22

23

24

25