```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                        Plaintiff,
 5       vs.                            Case No. 18-20454
                                        Hon. Stephen J. Murphy, III
 6       LESLY POMPY,

 7                      Defendant.
      _____/
 8
                    JURY TRIAL EXCERPTS: VOLUME 10
 9
             BEFORE THE HONORABLE STEPHEN J. MURPHY, III
10                   United States District Judge
              Theodore Levin United States Courthouse
11                  231 West Lafayette Boulevard
                      Detroit, Michigan  48226
12                   Thursday, December 8, 2022

13    APPEARANCES:

14    For the Plaintiff          WAYNE F. PRATT
      United States of America:  ANDREW J. LIEVENSE
15                               U.S. Attorney's Office
                                 211 W. Fort Street
16                               Suite 2001
                                 Detroit, Michigan  48226
17                               313-226-9100

18    Also Present:             CHRISTINE OUELLETTE
                                Paralegal Specialist
19
      For the Defendant         GEORGE B. DONNINI
20    Lesly Pompy:              JOSEPH E. RICHOTTE
                                Butzel Long
21                              201 W. Big Beaver
                                Suite 1200
22                              Troy, Michigan 48084
                                313-225-7000
23
                                (Appearances continued next page)
24

25
```

```
 1   APPEARANCES:  Continued

 2   For the Defendant          RONALD WILLIAM CHAPMAN, II
     Lesly Pompy:               Chapman Law Group
 3                              1441 West Long Lake Road
                                Suite 310
 4                              Troy, Michigan 48098
                                248-644-6326
 5
     Also Present:             VICTORIA MURDOCH
 6                             Senior Paralegal

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
           To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
                        Official Court Reporter
25             (313) 234-2616 • www.transcriptorders.com
```

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1573   Filed 12/12/22   Page 3 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

3

1

<u>TABLE OF CONTENTS</u>

2    <u>Government Witnesses Continued</u>:                <u>Page</u>

3    <u>Excerpt 13</u>:

4    ABBY HIGGINS

5       Direct Examination by Mr. Pratt              5
        Cross-Examination by Mr. Donnini            41
6       Redirect Examination by Mr. Pratt           66

7    DIANA KNIGHT

8       Direct Examination by Mr. Lievense           69

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | EXHIBITS | | |
|---|---|---|---|
| 1 | | | |
| 2 | Identification | Offered | Received |
| 3 | Government Exhibit 166 | 94 | 94 |
| 4 | Email from Diana Knight to Lesly Pompy dated 9-20-12 | | |
| 5 | Government Exhibit 167 | | 97 |
| 6 | Email from Diana Knight to Lesly Pompy dated 7-30-14 | | |
| 7 | Government Exhibit 168 | | 97 |
| 8 | Email from Diana Knight to "Debbie" and Lesly Pompy dated 9-18-12 | | |

```
1              Detroit, Michigan
2              Thursday, December 8, 2022
3                        —   —   —
4              Excerpt 13:
5              (Proceedings in progress at 11:27 a.m., all parties
6              present, jury present)
7              THE COURT:  Next government witness please.
8              MR. PRATT:  Yes, Your Honor.  The United States calls
9    Abby Higgins.
10             THE COURT:  Right this way, young lady.  Take a --
11   take a pause by the chair there and raise your right hand.
12                        A B B Y   H I G G I N S
13   was called as a witness herein, and after being first duly
14   sworn to tell the truth and nothing but the truth, testified on
15   her oath as follows:
16             THE WITNESS:  I swear.
17             THE COURT:  Okay.  Go ahead and have a seat.  Relax
18   as best you can in that chair, and then speak toward the mic
19   but just don't get too close to it.
20             Mr. Pratt, go right ahead.
21                        DIRECT EXAMINATION
22   BY MR. PRATT:
23   Q.  Good morning, Ms. Higgins.
24   A.  Hi.
25   Q.  Yes, try to keep your voice up.  Is this the first time
```

1    you've testified in federal court?

2    A.  Yeah.

3    Q.  Tell us your full name and spell it for the court

4    reporter.

5    A.  Abby Lynn Higgins, A-b-b-y L-y-n-n H-i-g-g-i-n-s.

6    Q.  Ms. Higgins, can you tell us a little bit about yourself?

7    Where were you born and raised?

8    A.  I was born in Downriver Michigan so I'm from Flat Rock,

9    Michigan, recently moved not too far to Brownstown Township,

10   Michigan.  Currently I just work as a travel ICU nurse and I --

11   I'm also in nurse practitioner school.

12   Q.  Okay.  So we'll -- we'll get to that.  So right now you're

13   a nurse, so what -- what education did you have to become a

14   nurse?

15   A.  I went to University of Detroit Mercy to get my

16   bachelor's, recently graduated this past year in June for my

17   master's in the science and nursing, and then now I'm

18   furthering my education and going to acute care nurse

19   practitioner.

20   Q.  Okay.  And if could you explain to us, what's the

21   difference between a registered nurse and a nurse practitioner?

22   A.  So a registered nurse you're more at the bedside with

23   patients compared to where nurse practitioner you be could

24   working alongside with a provider or also working in a hospital

25   setting, which is ideally what I eventually want to do and

1    become like a trauma nurse practitioner so I would be working

2    alongside with providers in an emergency department or an ICU

3    setting.

4    Q.  Okay.  And so I'm going to take yourself back a little bit

5    before this all started.  Where did you -- where did you go to

6    high school?

7    A.  Flat Rock Community High School.

8    Q.  All right.  And while you were in high school did you have

9    an opportunity to obtain some employment?

10   A.  Yes, I did.

11   Q.  And where did you work?

12   A.  I -- my first job I worked at the local racetrack, Flat

13   Rock Speedway, and then I also started working for Dr. Pompy.

14   Q.  Okay.  And what -- what -- how old were you when you

15   started working in Dr. Pompy's office?

16   A.  I had --

17   Q.  Or what year in school, maybe that's easier.

18   A.  I was a senior in high school.

19   Q.  Okay.

20   A.  I started that summer before my senior year, so in 2014.

21   Q.  Okay.  So 2014.

22          You started the summer of 2014, and how long did you

23   work in Dr. Pompy's office?

24   A.  Roughly two years.

25   Q.  Okay.  Did you work there -- what -- what ended your

1  employment in Dr. Pompy's office?

2  A.  The raid.

3  Q.  Okay.  So that -- we all know that's September 20 --

4  September 2016?

5  A.  Correct.

6  Q.  Correct.  All right.  Let's -- let's talk back to the

7  beginning of your work for Dr. Pompy.  How did you find out

8  about the job?

9  A.  My sister was working there at the time and she knew that

10  I wanted to go into the medical field.  I was applying for

11  nursing -- to go to school for nursing at that time, so she

12  thought I -- it would be a good way for me to get some exposure

13  to go to a medical practice, so she had me come in one day to

14  speak with Dr. Pompy and bring my resumé.

15  Q.  Okay.  And so tell us about the interview process.  Was

16  this a formal process or what happened?

17  A.  I just came in.  My sister mentioned to him that I was

18  there to speak with him about potential employment.  I gave him

19  a copy of my resumé, he talked to me for a little bit, and then

20  he asked when I could start.

21  Q.  Okay.  And what was your -- what was your role when you

22  started, what was your -- what was your job?

23  A.  They gave me the title of a medical assistant so I was --

24  when I started it would be, you know, calling patients back

25  into the room, taking their vitals and everything and entering

1   the chart that they had.  They would fill out like a paper of

2   like their chief complaints, what their symptoms were and

3   everything, and we would enter that into the computer, as well

4   as if they were there for refills, either print off

5   prescriptions that Dr. Pompy would want printed off, or if it

6   was like an electronic send over to the pharmacy, we would

7   write that up, send it to Dr. Pompy for him to verify and send

8   it to the pharmacy.

9   Q.  Okay.  Had you had any -- I know you've had quite a bit of

10  medical training now.  Had you had any medical training before

11  you were a senior in high school?

12  A.  No.

13  Q.  Okay.  So what was your training to be a medical assistant

14  for Dr. Pompy?

15  A.  Just that we had someone in the office that would train

16  us, so like a preceptor type deal.  They would sit down with

17  you, go through all the information of what you need to do,

18  what your role is, what task we would be performing,

19  what's like within our given scope of practice and what's not.

20  Q.  Okay.

21  A.  But our scope of practice was just, like I said, taking

22  the blood pressure, entering and everything.

23  Q.  So in terms of what the MA did, what you did as an MA, you

24  would just basically you said do what, what was your role?

25  A.   I would, you know, take the patient's vitals, enter in the

1    information that they provided us, whether it was new patient,

2    recurring patient.

3    Q.  And what was the expectation or direction if the patient

4    was just recording -- requesting a renewal or refill of

5    medications, what were you expected to do before the visit?

6    A.  Talk to them, ask them what they were there for.  And

7    prior -- like, when you were asking about before the patient

8    visit, are you talking about like what we prepared for?

9    Q.  Yes.

10   A.  Um --

11   Q.  And I'm talking about specifically the paperwork you would

12   prepare if you see that they're requesting a refill or renewal.

13   A.  So it just -- it depended on what medication it was.  If

14   it was your typical medication refill, we could print off the

15   prescription, update like if they were doing a month, a couple

16   weeks.  Typically I would wait to print off the prescriptions

17   though until Dr. Pompy came in to see like how long of a refill

18   they wanted, he wanted to give the patient, just because

19   some -- it varied patient to patient, if it was a two-week

20   refill, if it was a one-week refill, if it was a month, that

21   type deal.

22   Q.  Okay.  And I want to talk to you some questions a little

23   bit focused on the -- on the refills.  What -- what -- what

24   bulk of the practice, what percentage of the visits you would

25   handle would be these refill or renewal visits?

Case 2:18-cr-20454-SJM-RSW  ECF No. 86, PageID.1581  Filed 12/12/22  Page 11 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

11

1   A.   About 95 percent.

2   Q.   Okay.  So day in and day out, that's mostly --

3   A.   Yeah.

4   Q.   -- that's mostly what you're seeing?

5   A.   Yeah.  There's only a handful of patients that came there

6   that didn't want any medication and just wanted to go over to

7   his other clinic and get the pain procedures done.

8   Q.   Okay.  So when you talk about a handful of patients, we

9   would call those non-narcotic patients?

10   A.   Yeah.

11   Q.   Okay.  And as to the ones that wanted the narcotic

12   refills, was there a typical procedure as to whether or not

13   there would be a physical examination by Dr. Pompy?

14   A.   Yeah.  So if it was a typical refill, I mean he would do a

15   little focused exam, ask them like where their pain is, if

16   they're having any improvement.  But from there, I mean unless

17   there was a new pain that the patient was have -- having or

18   whatnot, there wouldn't be too much of a physical exam.

19   Q.   Okay.  And let me ask you, I -- I -- you know, we can get

20   your -- we can get your take on this, but tell us, tell us

21   what -- how many days you worked and did that -- did that vary

22   depending whether it was summer or school year?  Tell us what

23   your work schedule was.

24   A.   So my work schedules varied.  When I was in high school,

25   if he had later hours, I might -- I -- let me rephrase that.  I

1   would go to school -- not to school -- to work after school,

2   but that also depended if I had any extracurricular activities

3   'cuz I was heavily involved in a lot of things and would

4   stretch myself very thin in high school.  So typically I would

5   work the Saturdays or days off that I had from school.

6         And then when I started college, I was actually going

7   to college year round all four years.  So I would -- my first

8   year, so that 2015 fall and 2016 spring or winter semester, I

9   didn't work for him.  I came back that summer of 2016 and

10  worked just a couple days a week because I was going to school

11  at that time.  And then when I started school back up full time

12  in the fall, I was only working when I could, which is once or

13  twice a week.

14  Q.  Okay.  And so when you would work, would you -- would

15  you -- how -- how many hours a day would you work?  Would it

16  depend again on -- on which -- on which time period we're

17  talking about?

18  A.  Yeah, it depended.  So I mean the fall of 2016 I would --

19  some of my classes were only in the afternoon, so I would work

20  in the morning until around noon, or if I only had morning

21  classes, then I would potentially go to the office after class.

22  It just depended on how much homework I had to do because I was

23  also double majoring at that time so my credit and school load

24  was significantly high.  But it just varied on my schedule.

25  There was some weeks I wasn't working because I had too much

1  going on.

2  Q.  Okay.

3  A.  And mainly again like on those Saturdays when he was

4  practicing, whether it was at just his regular office or the

5  Interventional Center, I would work.

6  Q.  Okay.  I guess what I want to get at is did you work --

7  did you work full eight or ten more hour days, was that your

8  typical schedule, or did you typically work less except if it

9  was a Saturday?

10  A.  It varied.  My off days I would work more of the -- it

11  would be anywhere from I would say 10 to 12 hours those days.

12  Q.  Okay.

13  A.  Sometimes longer.

14  Q.  Okay.

15  A.  Just depended.

16  Q.  And I want to ask you because -- to get to the question of

17  how busy -- how busy was Dr. Pompy's practice?

18  A.  Busy.

19  Q.  Okay.

20  A.  There was a lot of patients.

21  Q.  All right.  Lot of patients.  And then we always try to

22  find some way -- some way to quantify that, and I guess one way

23  to break it down is how many other MAs would be working along

24  with you at Dr. Pompy's practice?

25  A.  There would be -- let me count in my head.

1  Q.  I don't mean total but I mean on any particular day.

2  A.  Anywhere -- there would be several of us, so anywhere from

3  like eight to ten of us would be working.

4  Q.  Okay.  And obviously you -- you don't take every patient

5  back, right?  They have -- they have to do their share of the

6  workload too, right?

7  A.  Correct.

8  Q.  So if you can tell us, on the busy days how many of the

9  patients would you handle, how many patients would you be the

10  MA for?

11  A.  Anywhere from -- I'm trying to think.  There was one day

12  that some of us just decided to keep count of how many patients

13  we seen, and that day it was particularly one of the busier

14  days.  I believe I had anywhere from 20 to 33 charts that day.

15  Q.  Okay.  Just you had 20 to 33 charts?

16  A.  Yeah, and I know other people there had more charts too

17  than that.

18  Q.  You're talking seven or eight others?

19  A.  Yeah.

20  Q.  Okay.

21  A.  Would have more.

22  Q.  Okay.  So lot of people.

23        And I guess that goes a little bit back then to the

24  question about these refill visits.  I don't want you to

25  necessarily give me a time, but, you know, were these refill

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

1   visits, were they -- were they fast or were they -- were they

2   15 or half hour visits?

3   A.   They were fast.

4   Q.   Okay.

5   A.   Max amount of time would be five minutes if they would get

6   chit-chatting about something, but it was more like in and out

7   to see as many patients as we could.

8   Q.   As a matter of fact, did Dr. Pompy ever say anything to

9   you about how fast he wanted these visits to go?

10  A.   Yeah.  He wanted us to get everything flowing so he could

11  have more patients and be able to help people, but it would

12  just be -- it was a lot of patients to see.

13  Q.   All right.  And so did he specifically say that he wanted

14  to see more patients?

15  A.   Yes.

16  Q.   And did he describe the turnaround he wanted?

17  A.   He wanted a fast turnaround.

18  Q.   Now, I want to know, I want to ask you, and I know you

19  indicate that he saw -- there were a lot of patients that were

20  there for refills, but among the patients that were there for

21  refills, was there two different basic categories of patients?

22  A.   Yeah.  There was your pain management patients and then

23  there were those who were drug abusers trying to actively get

24  help at that point.

25  Q.   All right.  And that would be what -- I don't know if you

1   would call them the Suboxone patients?

2   A.   Yes.

3   Q.   Okay.  And tell us about that part of his practice, the

4   ones that were there get -- the -- you know, getting -- to get

5   off the drugs, to take the Suboxone.

6   A.   So that part of the practice he always told us that there

7   was a specific number of Suboxone patients that he was allowed

8   to take.

9   Q.   Okay.  He always told you.  And -- and so this was a limit

10  that he had to stay within his practice?

11  A.   Correct.

12  Q.   And did he ever tell you what that limit was?

13  A.   No.

14  Q.   Okay.  What did he tell you about -- but -- but he told

15  you there was a limit?

16  A.   Correct.

17  Q.   All right.  Was there something he specifically asked you

18  to do in light of this limit that he had?

19  A.   Can you repeat that?  I'm sorry.

20  Q.   Yes.  What did he ask you to do in your working with the

21  patients because of this limit?

22  A.   He would -- these patients, they would have to, you know,

23  do a drug test, but we didn't do anything completely different

24  with these patients if they were a drug addict or they were

25  there for like pain management.  It was just they were there

1    for prescription refill.

2    Q.   Okay.  And was there some kind of notation or some kind of

3    labeling that would indicate whether they were getting the

4    Suboxone for pain or whether they were these people that were

5    using it for addiction purposes?

6    A.   Yeah, there were those who were labeled for pain and then

7    those who were used for addiction, but there was also some

8    there that were also pain and addiction mixed.

9    Q.   All right.  And what did Pompy have -- Dr. Pompy have you

10   do about some of those patients that were actually addiction

11   patients?

12   A.   He would -- those patients, they would have to go do a

13   urine drug screen, and then as long as their test came back

14   fine and it showed that it was in their system, he would just

15   write the prescription.

16   Q.   All right.  And how would he ask you to label them?

17   A.   Some were labeled as pain patients and some were labeled

18   as addiction patients.

19   Q.   And why did he want you to label people as pain patients

20   even though they were addiction patients?

21   A.   That part I'm not too sure about why he wanted us to do

22   that.  It was just he was having us do that, label addiction as

23   pain.  Some could come in for new complaints of pain, but he

24   wanted -- he would prescribe them the Suboxone.  And I would

25   question, if there's a limit on the amount of people that you

1   can have for Suboxone, why are we, you know, giving this

2   patient Suboxone when there's other people out there that do

3   want help, like, that are addicted to that?

4   Q.  All right.  And when your response was why are we

5   giving -- calling these addicted people pain patients, what did

6   he say to you when you questioned him on that?

7   A.  He didn't say anything.

8   Q.  All right.  You were relatively young when that was

9   happening, correct?

10  A.  Yeah.  I was only 17 at the time when this stuff was

11  happening, no medical background prior to any of that.

12  Q.  All right.  Was this labeling them of pain patients, was

13  that actually false then?

14  A.  From what I know now, I would say yes.

15  Q.  Okay.  And let me ask you, given your -- given your

16  training and experience now, let me ask you this.  Did you

17  ever -- did you do anything beyond that, beyond asking Dr.

18  Pompy about it, did you do anything else to question this

19  labeling at the time?

20  A.  No, because I did not know what else you could do at that

21  time or anything, you know.  I was young, didn't know a lot

22  about that.

23  Q.  Okay.  You've had a lot of years of education now in --

24  in -- in medicine and nursing, correct?

25  A.  Correct.

```
 1   Q.  All right.  If you had that training back then, would you
 2   have done anything different?
 3   A.  Yes.  I would report it.
 4            MR. DONNINI:  I'm going to object.  Calls for
 5   speculation.
 6            MR. PRATT:  I think she has a -- I think I've laid a
 7   foundation of her experience and training, Your Honor, that
 8   allows her to answer without speculating.
 9            THE COURT:  Well, I would ask it a different way
10   and -- and maybe ask, you know, what -- what would be proper
11   practice in light of her -- the training and knowledge,
12   training and experience and education that she's received, but
13   otherwise I'll sustain the objection as -- in the manner it was
14   asked.
15            Go ahead, Mr. Pratt.
16   BY MR. PRATT:
17   Q.  All right.  Just tell us what the proper procedure would
18   be if a doctor asked you to falsely label an addiction patient
19   as a pain patient.
20   A.  Now you would --
21            MR. DONNINI:  Your Honor, I'm just going to object.
22   That mischaracterizes the testimony.
23            THE COURT:  Okay.  All right.  You can answer that if
24   you -- if you're able, witness.  Go ahead.
25            THE WITNESS:  I would -- now you would report that to
```

1    the state so that they can investigate as to what is going on.

2    BY MR. PRATT:

3    Q.   If -- if you recall -- if you recall, were there any --

4    was there a group of patients in Dr. Pompy's practice that were

5    related to a drug called Subsys?

6    A.   Yes.

7    Q.   Tell us what you know or what you saw about that.

8    A.   I personally didn't handle Subsys too often because there

9    was a lot of moving parts that went with getting patients

10   Subsys.  I know that they were using it for pain on these

11   patients, but other than that, there was drug reps coming in,

12   like trying to get us to give patients Subsys, saying this is

13   the new medication out there to help with these pain patients,

14   but there's a lot of different moving parts with that.  So...

15   Q.   Okay.  And do you recall -- you say the drug

16   representatives that were trying to get you to -- to prescribe

17   that.  Do you recall who their names were?

18   A.   There was I want to say Darcy and then John Bae were both

19   in there.

20   Q.   Okay.  And when you say were in there, did they just like

21   come in and say hi and come out or were they actually allowed

22   to work there?

23   A.   They would come in and speak with the employees of the

24   practice and with Dr. Pompy himself.  They wouldn't come in and

25   like see the patients, but that's it --

1    Q.   Okay.

2    A.   -- from what I can recall.

3    Q.   All right.  I want to talk about then the -- the other

4    pain patients, so that -- can you describe -- I know you said

5    95 percent of the visits were there for refills, but I want to

6    now talk about specifically the pain patients that were there

7    for refills.  What were they -- what were they typically being

8    prescribed before they got their refills?

9    A.   It varied.  Some of them were on medications like Percocet

10   or Norco, also Neurontin.  Other patient -- it varied patient

11   to patient.  Some patients just only wanted Tylenol for their

12   pain.

13   Q.   All right.  And I guess that leads me to sort of the

14   question is that did the patients -- did the patients indicate

15   some kind of desire for particular medications and particular

16   types of medications when talking to you?

17   A.   Can you repeat that?  I'm sorry.

18   Q.   Yes.  Would they -- would they ask for particular

19   medications or particular types of medications?

20   A.   Yeah.  Some patients would come in and say they want

21   their -- they want Norco 7.5-325.  They would come in already

22   knowing what medication they wanted at that time.  Or if they

23   wanted to increase their dosage, they would come in knowing

24   exactly what they wanted at that particular time.  Or if there

25   is a new medication they wanted to try to help out with their

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1592   Filed 12/12/22   Page 22 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

22

```
1   pain, they would come in, know exactly what the med's name was
2   and would mention it.
3   Q.  All right.  And when you were in high school, did that
4   have any kind of significance or importance to you?
5   A.  At that time, not really.  I was just there, thought this
6   was normal, a normal, everyday practice 'cuz, again, no medical
7   background, thought I was cool for working at a medical
8   practice, and at that time in high school I didn't think
9   anything of it.
10  Q.  Okay.  You used the word normal.  Do you -- would you
11  still apply that word today knowing what you know now?
12  A.  No.
13  Q.  Are you familiar with -- are you familiar with something
14  called a doctor shop -- doctor hopping and pharmacy hopping?
15  A.  Yes.
16  Q.  Did that ever come up when you were working at Dr. Pompy's
17  office?
18  A.  Yes.
19  Q.  Tell us about that.
20  A.  If patients were thought to be doctor hopping or doctor
21  shopping or pharmacy hopping, someone would, you know, call up
22  to the practice or somehow let a front desk lady or Dr. Pompy
23  know that this was happening.  So just on a regular Post-it
24  note, if we knew the patient was coming in that day, the front
25  desk lady would write this patient needs a drug screen or also
```

1    needs a MAPS report done and would just put the Post-it note on

2    that paper chart so that it could be done.  And typically the

3    MAPS report was already done prior to the patient coming in so

4    that they could see where the patient had been or what was

5    going on at that time.

6    Q.   Okay.  Would you say that was rare or would you say you

7    had these kinds of calls on a regular basis?

8    A.   It would be a regular basis.

9    Q.   All right.  And what about any -- if you recall, were

10   there any complaints like people might be -- people might be

11   selling their drugs?

12   A.   Yeah, there would be some calls like that.  And again, the

13   patient, same thing, just a Post-it note would be out there

14   that this patient needs to have a urine drug screen to see if

15   they are testing positive for the medications that they are

16   prescribed.  Again, same -- they would also potentially run a

17   MAPS report on the patient.

18   Q.   All right.  And was this -- again, was this handled by

19   sticky note or was this handled by putting it directly into the

20   permanent record?

21   A.   It would be handled -- as far as I know from what I seen,

22   it was just handled with a sticky note on that paper chart that

23   we got to indicate the patient needs to go for a urine test.

24   Q.   Okay.

25             MR. PRATT:  Your Honor, I think -- I think I may have

```
 1    come to a point where -- or at least close to a point where we
 2    may have a matter, a legal matter for the Court to consider
 3    before I complete this examination.
 4              THE COURT:  Okay.
 5              MR. PRATT:  And I know we're a little early, but I
 6    apologize.
 7              THE COURT:  No, that's fine.  Let's break here at
 8    11:54.  Let's have the lawyers back at 12:20 and we can take up
 9    a legal matter.  And then, ladies and gentlemen, if you want to
10    take till about 12:25 or 12:30, we'll -- we'll get the issue we
11    need to deal with out of the way and then resume for our
12    afternoon session at about 12:30, okay?
13              I don't know what the weather is, but if you go
14    outside, remember to wear your jury badge.  Don't talk about
15    the case among yourselves or with anybody.  We'll see you in
16    about 35 minutes.
17              And let's all rise for our jurors now.
18              (Jury excused at 11:54 a.m.)
19              THE COURT:  Okay.  We'll go on recess and try to
20    gather in about 25 minutes or so.  Thank you.
21              THE LAW CLERK:  The Court is now in recess.
22              (Court in recess at 11:55 a.m.)
23              (Proceedings resumed at 12:26 p.m., all parties
24              present, jury not present)
25              THE LAW CLERK:  All rise.
```

```
 1          THE COURT:  Court is back in session.  Everybody may
 2    be seated.
 3          While we have a minute, I -- I just want to
 4    reconfirm, 'cuz this has been on my mind, I don't know why,
 5    the -- the young man, Henderson, I -- I believe he should be
 6    dismissed as an alternate on the -- on the motion of the
 7    defense because of his -- his issues.  And even though he said
 8    he can be fair and impartial, I think he said that because he
 9    was -- he had been taken -- or at least awakened by my -- my
10    soliloquy a week and a half ago.
11          And then Juror No. 13 is -- he would normally be our
12    first alternate, Fields [sic], No. 13, and then we can give him
13    a dismissal as an alternate as well because he -- he has some
14    time conflict running his own business or something like that.
15          So those are our two presumptive alternates, and the
16    question is when we're going to let them go.  I would say
17    probably at the end of all of the evidence, but I -- I don't
18    know why but I thought about that today and -- and I wanted to
19    confirm we're all on the same page with that.
20          Mr. Pratt, is that...
21          MR. PRATT:  That's an acceptable procedure for the
22    government, although I'm not totally conceding that --
23          THE COURT:  Yes.
24          MR. PRATT:  Certainly -- certainly the second one.
25    It's not -- it's not that he's ineligible.  It would be for
```

1   courtesy of the juror.  I -- you know, I don't think the

2   jury's -- the judge is saying -- you're saying he's

3   disqualified.

4           THE COURT:  Right.

5           MR. PRATT:  I would agree that Mr. Landon is a much

6   closer question and I do think he's probably going to have to

7   be dismissed eventually.

8           THE COURT:  Okay.  All right.  Good.  Well, then

9   we're all on the same page on the government's side.

10          Mr. Chapman or...

11          MR. CHAPMAN:  Your Honor, I -- I still support

12  immediate dismissal of the first witness or the first juror

13  because I don't think there's any conceivable way that he

14  deliberates in this case.  Hanging him on to put ourselves in a

15  dilemma where if we lose more we have to have him deliberate as

16  an alternate, I don't think it's a realistic possibility for

17  us.  So I would say just save this person the time and let him

18  go home, Your Honor, but I do -- I understand the Court's

19  approach.

20          THE COURT:  Okay.  All right.  Well, maybe we'll do

21  that -- maybe we'll do that at the end of tomorrow with Mr.

22  Landon Henderson because of everything that the lawyers just

23  said, and it all -- it seems like we're all eye to eye on that.

24  I think your arguments are all very good and supportable and I

25  need to make a decision and that's the one that I'm leaning

```
 1     towards.  So all right, good, I'm glad we discussed that.

 2          The government made a motion in limine to admit an

 3     attempt to influence testimony.  The doctor presumably sent a

 4     Facebook Messenger to a group called We Support Dr. Pompy.  The

 5     issue is the doctor apparently said in this posting that he is

 6     waiting to see and hear on the videocam the screaming children

 7     of September 26, 2016.  That was the date the search warrant

 8     was executed.  The government posits that this witness,

 9     Higgins -- that there was no screaming and that this was a

10     false communication from Pompy to the people on this group, We

11     Support Dr. Pompy.

12          Higgins must have gotten it and feels like the

13     falsehood of the screaming was an effort to -- an influence --

14     to influence her testimony, not to testify truthfully, and

15     that -- and that -- and that Dr. Pompy's false statement on

16     that group evidences the fact that he thinks he's guilty of the

17     charges by wanting to influence testimony.

18          And I ordered -- I think I saw -- I don't know if Mr.

19     Philbrick docketed this or not, but I saw a -- a written order

20     we made to have the defense respond to this by 9:00 o'clock

21     tonight in writing, but it's -- it's -- it doesn't matter

22     because the witness has testified and we're about to take the

23     issue up now.  That's how I understand things, Mr. Pratt, is

24     that correct?

25          MR. PRATT:  One -- one correction, Your Honor, and I
```

1    think it's -- because I -- because I'm not on Facebook, and

2    that shows how old I am, but my understanding, and I confirmed

3    that with -- this is the witness's understanding --

4              THE COURT:  Yeah.

5              MR. PRATT:  -- this may have been a post to a group,

6    but then this specific one was specifically Facebook message --

7    messaged directly to this witness.  So it's the -- not the step

8    of "I'm posting to the group.  I'm sending you" and who knows

9    else -- who else, but "I'm specifically sending you a Facebook

10   message that included this," not that it -- not that she got it

11   because she was part of some group, but a -- but she

12   specifically got it as a message directly from Dr. Pompy.

13             THE COURT:  Okay.  All right.  Response, defense, Mr.

14   Donnini?

15             MR. DONNINI:  Thank you, Your Honor.

16             Your Honor, I've looked at this document and I think

17   the Court has it right.  There -- it's three sentences long.  I

18   think the only objectionable piece from the government's

19   perspective is this last sentence that says something about the

20   videocam of the screaming children on the day of the raid.  To

21   my knowledge, there is no video camera of the raid at all.  So

22   they -- yes, they came in and we talked about it extensively

23   through this trial and will continue to do so, but there is no

24   videocam.

25             So I don't see this the same way the government does.

1    I think this is much ado about nothing.  There is no attempt at

2    trying to influence testimony.  This is a post that was put up

3    by Dr. Pompy on a We Support Dr. Pompy Facebook page, which, by

4    the way, has 960 members.  Ms. Higgins was a member voluntarily

5    of that Facebook page.  She joined that Facebook page six years

6    ago, and this is a post and a messenger, an instant messenger,

7    yes, on October 5th, over two months ago, again, that went to

8    her as part of a group of 960 on a page that she was

9    voluntarily on and also direct messaged.  So I think that the

10   fact that it was direct messaged is a true statement, but it's

11   kind of a distinction without a difference because she was on

12   the Facebook page voluntarily.

13           THE COURT:  Okay.

14           MR. DONNINI:  Your Honor, my -- my basic opinion is

15   that this is a sideshow.  It's going to require me to

16   cross-examine extensively about this Facebook page, and I just

17   don't think we need to waste the Court's time or the jurors'

18   time on this.

19           THE COURT:  Okay.  All right.  Anything else from Mr.

20   Pratt?

21           MR. PRATT:  Just the only thing, Your Honor, is that

22   in addition to the -- to -- and, of course, to say there's no

23   videocam, I -- I -- I just really want to draw out the

24   significance a little bit about that because the witness, it

25   isn't that, you know -- when they're saying there's -- there's

1    screaming children and there's a videocam, which obviously the

2    witness has not seen, it suggests that the witness better --

3    you know, better not deny it because they're going to be shown

4    to be a liar by this nonexistent videocam, and -- and so that's

5    the inference there.

6            And I would say the reference to 11-22-22 is also

7    important at the beginning because that's the first day of

8    trial, that was the date on her trial subpoena.  And so she

9    understood this to be a direct reference to her testimony, not

10   just some sort of musing, musing in the air about what did or

11   didn't happen.

12           THE COURT:  Okay.  All right.  I respect the

13   arguments of both parties and by and large I -- I -- I see the

14   support for the arguments, but my instinct and my ruling will

15   be to exclude this based on the following analysis.

16           First of all, this is clearly a statement of the

17   defendant made prior to trial and after the investigation and

18   would normally be admissible as a -- as a statement of a party

19   opponent.  So we don't have a problem there.

20           The question then becomes to me what its probative

21   value is.  And as I mentioned, I certainly understand the

22   concern and the argument of the United States, more so as to

23   the screaming children on the videocam as of 9-26-16, but

24   I'm -- I'm more persuaded by Mr. Donnini's argument that it

25   would take several steps for the government to get there.  We'd

1    have to get the witness to acknowledge that she received this,

2    testify about what her construction of it was, and then give

3    Mr. Donnini the opportunity to demonstrate that there was no --

4    no videocam and maybe get into the state of mind of the

5    defendant, and I just think its -- its probative value is well

6    outweighed by the concerns of time and the lack of value it --

7    it would have.

8           So I'm grateful for the United States bringing this

9    up, but -- not to go too far but the word sideshow was used by

10   one of you, and I tend to -- I tend to see this as something

11   that would distract the jury more than helping them and I'll

12   exclude it on that basis.  So that'll be the ruling of the

13   Court on the government's motion in limine to admit attempt to

14   influence testimony, No. 80 -- ECF No. 81, okay?  All right.

15   Good.

16          And I think we're ready for the jury now, right?  All

17   right.  Good.  And Ms. Higgins can come back -- come -- come on

18   back up to the -- to the stand.

19          THE LAW CLERK:  All rise for the jury.

20          (Jury entered the courtroom at 12:39 p.m.)

21          THE COURT:  Okay.  All of our jurors are here,

22   they're in their spots.  Everybody may be seated.

23          Ms. Higgins is back from her short lunch break and

24   you can retake the stand.

25          Mr. Pratt is approaching the microphone and 12:39

1    we're ready to get back into it.  Go right ahead.

2    BY MR. PRATT:

3    Q.  Ms. Higgins, I want to ask you about some patient visit --

4    type of patient visit that's a little bit different than the

5    renew visits, okay, or refill visits.  Were there occasions

6    where someone would request a -- a patient would request a

7    change in their opiate medication like more pills or stronger

8    pills or a higher strength pill?

9    A.  Yes.

10   Q.  And can you describe Dr. Pompy's approach or his response

11   to those sorts of patients?

12   A.  It -- it varied, it depended.  If the patient was maxed

13   out on a certain dose of a medication per se, like Norco

14   10-325, he wouldn't -- you can't, you know, increase that too

15   much because you can't hurt the patient's body.  He may add on

16   another pain medication for the patient or say, okay, let's try

17   a pain procedure.

18           If a patient was requesting a medication change, the

19   patient would have to go for a urine drug screen from there

20   just to make sure there wasn't any illicit substances in their

21   body along with ensuring that they were taking their

22   medications.

23   Q.  All right.  What would -- what would Dr. Pompy at times

24   ask the patient in that situation?

25   A.  "What -- where is the pain, what's hurting, why do you

1   want more pain medication?"

2   Q.   And what about whether -- whether they -- what they --

3   what they needed?

4   A.   He would ask, "What medication do you think that you

5   need?"

6   Q.   And then after that conversation, what would happen?

7   A.   As long as the patient, you know, was doing what they were

8   supposed to, he would write the prescription for them.

9   Q.   Okay.  During your -- during your years of working Dr. --

10  at Dr. Pompy's, did you ever -- did you ever hear him actually

11  discharge a patient?  And let me define that as discharge

12  meaning "we're done with you, you can't come back, don't make

13  any more appointments."

14  A.   I never had a patient that that happened to.  There was

15  only hearsay of it happening in the office and it was only a

16  few patients that I heard ever happen to, but I was never there

17  when this happened.

18  Q.   Okay.  And that would be true even if -- even if the --

19  even if the pain patients were having a bad drug screen?

20       MR. DONNINI:  Objection.  Leading.

21  BY MR. PRATT:

22  Q.   Okay.  Well, let me ask you this.  Did -- did you ever --

23  did you ever see patients had one of these bad drug screens,

24  for example, negative for the drug prescribed?

25  A.   Yes.

1  Q.  Would you describe that as rare or would you describe that

2  as happening fairly often?

3  A.  I wouldn't describe it as rare or happening fairly often.

4  It was like in the middle of their -- it was more than just

5  like once every -- once in a while and it was less than

6  happening, you know, a few every day.

7  Q.  Okay.  And just so we're clear, I want to relate that.  So

8  did -- did you ever personally have a thing where the bad drug

9  screens were related to a patient discharge?

10 A.  I never seen that.

11 Q.  Okay.  I think you talked a little bit about Dr. Pompy had

12 a different office, is that correct?

13 A.  Correct.

14 Q.  Tell us about -- tell us about that.  What was that called

15 and what happened there?

16 A.  That was the Interventional Center, so it was separate

17 from his office in the hospital.  It's where he would actually

18 do the pain procedures for the patients such as pain

19 injections, the radiofrequency.  Sometimes he would on occasion

20 have kyphoplasties that he would do at that office, or even if

21 the patient was coming for Ketamine infusions, so a med that

22 just ran over a certain amount of time to help with their pain.

23 He only had just some days in the morning he would work there

24 and then a Saturday.

25 Q.  All right.  So I take it by your describing that, what was

1   your role at working at the pain -- at the procedure clinic?

2   A.   At first it started with just working the front desk of --

3   seeing that the patient had arrived for their procedure, and

4   then it went to me actually bringing back the patient, getting

5   them prepped and ready to go in for their procedure, so taking

6   their vitals and everything and entering that into the

7   computer.  And then after that it swapped to me actually being

8   in the room and writing down like what time the procedure chart

9   started as well as like when certain medications were

10  administered, when the procedure ended.

11  Q.   Okay.  So charting though, did you ever progress to

12  actually assisting him, or -- or was that the farthest you got

13  was just writing down the --

14  A.   That's the farthest I got.

15  Q.   Okay.  And you mentioned -- you mentioned Ketamine being

16  administered.  Did you happen to see while you were there where

17  and how the Ketamine was being stored?

18  A.   No.

19  Q.   Okay.  I want to ask you a little bit, and sorry getting

20  personal, but personally have you ever had any chronic pain

21  episodes or acute pain episodes?

22  A.   Have I?

23  Q.   Yes, you personally.

24  A.   Yes.

25  Q.   Which one?

```
 1   A.  Well, now it's more chronic, but back when I was younger
 2   it was acute.  So I have ankle where I've had five different
 3   ankle surgeries and still dealing with that to this day.
 4   Q.  Okay.  And I want to ask you again personally, back when
 5   you were working for Dr. Pompy, was there an occasion that
 6   he -- he saw you for the ankle pain you were having?
 7   A.  Yes.  My mom and dad, 'cuz I was only 17 at the time and,
 8   you know, parents like to hold that you're not an adult yet
 9   against you, so they had me see him to see if he could figure
10   out what else was going on, and I seen him one time for that.
11   I believe just an MRI was ordered but I can't remember if he
12   prescribed me any medication or not.  And then following that,
13   I never went back to see him as a patient.
14   Q.  Okay.
15   A.  I found a different foot doctor to help me.
16   Q.  Okay.  So if he did prescribe you medication, it was one
17   time?
18   A.  I can't remember that far back if he did or not.
19   Q.  Okay.  And how about subsequently?  You say you've had
20   worsening pain.  Do you -- do you take -- do you regularly take
21   pain medication to treat -- narcotic pain medication to treat
22   your pain?
23   A.  No.
24   Q.  Okay.  Are you -- are you actually related to someone
25   who's employed in the U.S. Attorney's Office?
```

1   A.   Yes, I am.

2   Q.   And who's that?

3   A.   Sandra Palazzolo.  She is the Victim Witness Coordinator.

4   Q.   And when you're related to her, how -- how are you related

5   to her?

6   A.   That is my aunt.

7   Q.   Okay.  And have you discussed your testimony here today

8   with your aunt who's the Victim Witness Coordinator?

9   A.   No, I have not.

10  Q.   We have met before and I've asked you questions, correct?

11  A.   Correct.

12  Q.   All right.  Does your relationship with your aunt -- I

13  assume that's -- is that a positive relationship or a negative

14  one?

15  A.   It's a positive one.

16  Q.   Okay.  Does that affect your testimony here today?

17  A.   No, it does not.

18  Q.   Were you -- were you working at Dr. Pompy's office on

19  September 26th, 2016?  And you may not remember the date but

20  it's the last day the office was open.

21  A.   I was there.

22  Q.   Okay.  Tell us what -- tell us what you saw that day and

23  first in terms of what happened early on and then what happened

24  later.

25  A.   So when I got to the office that day, I was actually only

1    supposed to be there in the morning because I had class that

2    afternoon, and subsequently I missed class and my professor was

3    not happy with me 'cuz there was a mandatory class we had to be

4    in.  But I -- the day started off as a normal day, got to work.

5    We hadn't started seeing patients yet, but we were already

6    behind and there was a waiting room filled with patients and

7    some in the hallway as well.

8    Q.  Was that -- was that uncommon to have patients in the

9    waiting room and patients in the hallways?

10   A.  No, it was a very common thing.

11   Q.  Okay.  Please continue.

12   A.  But I -- someone had told me that Dr. Pompy was in a

13   meeting with a D -- the DEA discussing like Suboxone numbers or

14   something along those lines.  And then he came back up and said

15   okay, it's time to start seeing patients.

16          As some people are starting to, you know, call back

17   patients, all of a sudden we heard a bunch of yelling and then

18   some pounding.  But there was people with the battery rams

19   coming in from, you know, the different doors 'cuz there was

20   several different ways to come in and out of the office.

21   Q.  You say they had battering rams.  Were they actually using

22   them or just carrying them?

23   A.  No, just holding them.  They weren't using them.  There

24   was just a lot of yelling but that's all.  I was back in the --

25   our little office, just heard yelling, nothing crazy to my --

1   that I can recall.  And then they had us all come out in the

2   hallway, like normal, just to ensure that we don't have

3   anything on us, and that was --

4   Q.  Anything on you, you mean...

5   A.  I'm assuming just, you know, any guns or anything like

6   that, or the patients as well.  Then they pulled us into the

7   waiting room to sit and wait so we could go talk to agents and

8   then be let go to go home.

9   Q.  Okay.  And they gave -- you -- you interviewed with them

10  and they asked you some questions up to that day, is that

11  correct?

12  A.  Correct.

13  Q.  All right.  Let me ask you this.  Did you hear any

14  children screaming or crying that day?

15  A.  I don't remember hearing children screaming or crying that

16  day.

17  Q.  Okay.  And what about guns, did you see any guns drawn?

18  A.  I don't remember seeing any guns drawn.

19  Q.  Were some of the officers carrying -- carrying guns?

20  A.  Yeah.

21  Q.  Holstered?

22  A.  Yeah.

23  Q.  Okay.  All right.  Did you ever see a video camera that

24  day recording -- recording all the events?

25  A.  No, I don't -- didn't.

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1610   Filed 12/12/22   Page 40 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

40

1    Q.   Okay.  That was the last day you worked in the office.

2    Did you have -- did you work for Dr. Pompy for -- with him for

3    a brief time after that?

4    A.   I did not.  I know he was still trying to do some of his

5    pain procedures out of the Interventional Center, but I didn't

6    work for him at that time.  I just carried on with going to

7    school and working at the little racetrack after that.

8    Q.   Oh, back to the racetrack?

9    A.   I still work there sometimes.

10   Q.   Okay.  Would you say that you left on bad terms or had any

11   kind of hard feelings toward Dr. Pompy?

12   A.   I wouldn't say any hard feelings or bad terms.  It just

13   came to an abrupt end, and at that point when it was happening

14   I was looking for another job to get into a hospital to further

15   my career.  I mean I was early on in college, still didn't know

16   too much right from wrong with the medical practice, so...

17   Q.   Okay.

18   A.   But I mean I was confused about what was happening at that

19   time, not understanding.

20   Q.   Okay.  All right.

21           MR. PRATT:  Thank you very much, Your Honor.

22           THE COURT:  Thank you very much, Mr. Pratt.

23           Mr. Donnini is going to question the witness now.  Go

24   right ahead.

25           MR. DONNINI:  Thank you, Your Honor.

```
 1                     CROSS-EXAMINATION
 2   BY MR. DONNINI:
 3   Q.  Good afternoon, Ms. Higgins.
 4   A.  Good afternoon.
 5   Q.  I just want to walk through some of your direct testimony
 6   and then I've got some other questions, okay?
 7   A.  Okay.
 8   Q.  All right, ma'am.  You said that you are -- you were a
 9   travel ICU nurse, correct?
10   A.  Yes.
11   Q.  And you've got -- you got your 40-year -- four-year
12   college degree from UDM?
13   A.  Correct.
14   Q.  In nursing?
15   A.  Mm-hmm.
16   Q.  And you also got your master's in science and nursing?
17   A.  Correct.
18          THE COURT REPORTER:  Mr. Donnini, would you pull the
19   mic toward you?
20          MR. DONNINI:  Sure.
21   Q.  And ma'am, when you're -- when you were doing your travel
22   ICU nursing job after graduation, sounds like you were working
23   while you were in school, you're not doing pain management,
24   right?
25   A.  I mean --
```

1    Q.  You're not working at a pain management, Interventional

2    Pain Management office?

3    A.  Correct.

4    Q.  Okay.  And, you know, you testified that the raid ended

5    your appoint -- your employment abruptly, right?

6    A.  Correct.

7    Q.  Okay.  We're going to get back to that toward the end.

8           And you said your sister also worked at Dr. Pompy's

9    office?

10   A.  Correct.

11   Q.  Your sister's quite a bit older than you, about ten years

12   older?

13   A.  Eleven years older.

14   Q.  Eleven years older.

15          And you said that she said after her experience

16   working at Dr. Pompy's office that it'd be a good thing for you

17   to do to get a -- some experience in the medical field?

18   A.  Correct.

19   Q.  To get exposure?

20   A.  Yeah, exposure.

21   Q.  Worked, didn't it?

22   A.  It did.

23   Q.  You're a very successful medical professional currently,

24   right?

25   A.  Currently, yes.

```
1    Q.   Ma'am, I want to talk about the testimony about how
2    95 percent of patients were refill patients.  Do you recall
3    that testimony?
4    A.   Yes.
5    Q.   Okay.  Dr. Pompy had a large practice, right?
6    A.   Correct.
7    Q.   Had an established practice?
8    A.   Correct.
9    Q.   A referral only practice?
10   A.   I -- there were some patients there that came without
11   referrals.
12   Q.   Those were the patients that Dr. Pompy was rounding in the
13   ER and treated them in the hospital and then he might take them
14   on as patients, right?
15   A.   From -- from what I remember, some of them, yes, but some
16   were sent that he knew and said that, "Oh, you can come in and
17   see me."
18   Q.   Okay.  Maybe he had a personal relationship with somebody
19   and was willing to take on a patient without a referral?
20   A.   Correct.
21   Q.   But the vast majority were referral only patients, right?
22   A.   I wouldn't say vast majority were referral only.
23   Q.   That's fine.  But again, you were there as a high school
24   student.  You really didn't have insight into the inner
25   workings of the practice, did you?
```

 1    A.   Not insight, but, you know, when they bring in paperwork

 2    and everything, usually that referral is with that because it

 3    has to be scanned into their chart.  I wouldn't see that

 4    referral too often.  So I guess my question is I'm -- not

 5    question.  It's -- to me I can't say that it's a referral only

 6    clinic when we're not seeing that referral too often.

 7    Q.   All right.  That's fine.  And ma'am, you said 95 percent.

 8    Isn't it true that a new patient is that five percent category,

 9    right?

10    A.   Yes.

11    Q.   And the 95 percent category are the established patients,

12    isn't that right?

13    A.   Correct.

14    Q.   Okay.  So if you're a new patient, you can only be a new

15    patient once, right?

16    A.   Yeah.  He had a significant amount of new patients coming

17    into that office.

18    Q.   Right.  About five percent?

19    A.   Yeah, but --

20    Q.   The other -- hold on a minute.  The other 95 percent are

21    the established patients?

22    A.   Mm-hmm.

23    Q.   You're aware that some of his patients were patients of

24    Dr. Pompy's for more than a decade?

25    A.   Correct.

1   Q.  Okay.  You talked about the refill visits were fast.  I

2   think you said on average two or three minutes and some were

3   five minutes or at most five minutes, was that your testimony?

4   A.  Yes, it was -- he was in and out of the room.  I

5   personally didn't like to print off the prescriptions right

6   away, and I know he would get a little annoyed by that and it

7   would slow him down, but also what if there's a medication

8   change?  I'd rather not waste paper and have to reprint or mess

9   up at that point.

10  Q.  Sure.

11  A.  I'd rather be thorough.

12  Q.  Of course.  Save a tree?

13  A.  Yeah.

14  Q.  All right.  And I think you said that you -- you said, in

15  response to some questions, that he wanted to see more patients

16  and he wanted a fast turnaround.  Is that what you said in

17  response to some questions?

18  A.  Correct.

19  Q.  Okay.  He got you to say that twice, Mr. Pratt, but the

20  thing that you said that he didn't have you repeat and I'm

21  going to have you repeat is you didn't -- he wanted to see a

22  lot of patients because he wanted to be able to help people.

23  Is that your testimony?

24  A.  That's what he told us he wanted to do.

25  Q.  Do you -- I'm sorry.  Fair enough.  Do you believe that

1    Dr. Pompy wanted to help his patients?

2    A.   I mean at that time I believed he wanted to help his

3    patients.

4    Q.   Do you believe that his -- okay.  That's enough.

5         Okay.  Now, you talked a little bit about Suboxone

6    patients.  You remember that?

7    A.   Yes.

8    Q.   And Suboxone in your mind is the addiction patients,

9    right?

10   A.   Correct.

11   Q.   And you said that there was some limit that you didn't

12   know the number on, right?

13   A.   Correct.

14   Q.   And you also said that because there was some limit, that

15   you were told to write down pain for that patient, is that

16   right?

17   A.   Correct.

18   Q.   And I think you went as far as saying, in response to a

19   question, that that labeling of that patient who was on

20   Suboxone for pain was false?

21   A.   Some patients, yes, they were there for addiction but we

22   would label them as pain patients so that they could get

23   Suboxone.

24   Q.   Okay, ma'am.  And what I'm going to ask you to do is

25   answer my questions.  You can -- but let's -- let's do this for

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

```
1    a second.  Are you aware -- you have a bachelor's in nursing,
2    you have a master's in nursing, you've done a bunch of work not
3    in the pain management space except for working for Dr. Pompy,
4    but are you aware that Suboxone can be used to treat a
5    patient's pain?
6    A.  I am aware of that.
7    Q.  Are you aware that Suboxone can treat pain but only up to
8    a certain ceiling?
9    A.  I am aware of that.
10   Q.  And so when Dr. Pompy is putting some of his patients on
11   Suboxone, it may very well be he's doing that to treat their
12   pain, is that correct?
13   A.  I am aware and that is correct.
14   Q.  The allegation of labeling something as false is pretty
15   serious.
16   A.  I am aware of that.
17   Q.  And you're saying from what you know now, you would say
18   that?
19   A.  There was things I questioned, like I had stated
20   previously, about why are we giving this patient pain
21   medication when they have been there for addiction recovery.
22   Q.  Okay.  You're aware that Dr. Pompy is a triple board
23   certified doctor?
24   A.  I am aware of that.
25   Q.  Okay.  And you're giving some testimony here today based
```

1   upon what you think you know now reflecting back upon a time

2   when you're 18 years old and you're claiming that he's

3   falsifying his documentation about his patients?

4   A.  I am telling you what I seen back then, not tying it into

5   what I know now, and how I was questioning back then, but

6   things were shuffled away from me when I was asking these

7   questions.

8   Q.  Shuffled away from you?

9   A.  They would just ignore me because they were -- you know, I

10  was the young one there.

11  Q.  You were the new one, ma'am.  You're a -- you were a high

12  school student, right?

13  A.  Yes.

14  Q.  Dr. Pompy was trying to give you exposure to the medical

15  profession?

16  A.  Correct.

17  Q.  You were certainly being helpful.

18  A.  Yes, and that's why I would ask questions about certain

19  things.

20  Q.  And you would ask questions because you wanted to learn?

21  A.  Correct.

22  Q.  Okay.  But, ma'am, you were 18.  He's a 25-year, triple

23  board certified pain and addiction specialist.  Do you think he

24  knows his patients a little bit better than you as an

25  18-year-old?

1    A.  I mean he should know his patients, but that's why I was

2    asking, so I could learn about it.

3    Q.  Okay.  And you said they wouldn't answer your questions?

4    A.  No.  I would just get shut down at that point or --

5    Q.  That would frustrate you 'cuz you wanted to learn?

6    A.  It would, yes.

7    Q.  Okay.  You talked about how patients expressed a desire

8    for particular types of medications.  Do you remember that

9    testimony?

10   A.  Correct.

11   Q.  And you said they'd ask specifically for Norco 7.5-325.

12   Do you remember that?

13   A.  I was giving an example what that --

14   Q.  Right.  No, I'm saying --

15   A.  Yeah.

16   Q.  -- others too, but that was an example?

17   A.  Yes.

18   Q.  Ma'am, isn't it true that if a patient has been treated by

19   Dr. Pompy for three years and is taking Norco 7.5-325, it

20   wouldn't be all that strange for that patient to come in and

21   say "I'd like a refill of Norco 7.5-325"?

22   A.  They would ask for that, but also there are times where

23   patients -- it might not be someone who's been there for three

24   years or he hadn't seen the patient in six months but they're

25   coming in asking for that medication.

1   Q.  Okay.  Ma'am, I'm -- I'm letting you kind of go on.  I'd

2   like you to answer my questions and not elaborate.  If you want

3   to elaborate, Mr. Pratt can ask you those followup questions,

4   okay?  All right.

5          And same -- by the same token, if a patient who's

6   been in chronic pain for let's say a decade and knows their

7   body very well and is on a particular pain pill, pain

8   medication, and says, "Doc, this isn't doing the job anymore, I

9   need to go from Norco 5 to Norco 7.5," is there anything wrong

10  with that?

11  A.  No, there's not anything wrong with that.

12  Q.  Is there anything wrong with that same patient coming in

13  and saying, "Doc, you giving me Norco.  I think Percocet might

14  help a little better.  Would you mind switching me to

15  Percocet?"  Is there anything wrong with that?

16  A.  No, they do know their bodies, but these also --

17  Q.  Ma'am, that's enough.  Thank you.

18          Okay.  You talked about these Post-it notes.  Do you

19  remember that?

20  A.  Yes.

21  Q.  And that was in response to some testimony about doctor

22  shopping or pharmacy shopping, remember that?

23  A.  Mm-hmm.

24          THE COURT REPORTER:  You have to answer out loud.

25  A.  Yes.

| | |
|---|---|
| 1 | THE COURT REPORTER:  Thank you. |
| 2 | Q.  Okay.  And you said that there would be a Post-it note on |
| 3 | the hard copy documentation that you had when you were taking |
| 4 | the patient back into the exam room, is that right? |
| 5 | A.  Mm-hmm. |
| 6 | Q.  Ma'am, are you okay? |
| 7 | A.  Yeah. |
| 8 | (Brief pause) |
| 9 | Q.  Ma'am, I'm sorry if I'm upsetting you but I need to ask |
| 10 | these questions, okay? |
| 11 | A.  That's fine.  Carry on. |
| 12 | Q.  I'm sorry? |
| 13 | A.  Carry on. |
| 14 | Q.  And there seemed to be some suggestion I think in the |
| 15 | questioning that there was something wrong with these Post-it |
| 16 | notes.  Do you remember that? |
| 17 | A.  Yes. |
| 18 | Q.  Do you think there was something wrong with the Post-it |
| 19 | notes? |
| 20 | A.  I mean back then it was just normal for these Post-it |
| 21 | notes to say like there's like accusation against a patient. |
| 22 | Q.  Sure. |
| 23 | A.  Patient. |
| 24 | Q.  So let's -- let's try to talk about that for a minute. |
| 25 | Okay.  So there is some information that a patient is doctor |

1   shopping, right?

2   A.  Mm-hmm.

3   Q.  And I think we all kind of know but let me just do it.

4   Doctor shopping means Dr. Pompy is prescribing a prescription

5   to this patient and there's information that another doctor is

6   also prescribing, right?

7   A.  Correct.

8   Q.  That's doctor shopping, we're on the same page?

9   A.  Or they would be at one pain doctor and want to go to a

10  different pain doctor.

11  Q.  Okay.  But the idea is two doctors are prescribing --

12  A.  Yes.

13  Q.  -- similar medications?

14  A.  Or the same medication, yes.

15  Q.  Or the same medication.  Very good.

16          And there would be a phone call that was made to Dr.

17  Pompy's practice, right?

18  A.  Correct.

19  Q.  Okay.  And the person who took that phone call would write

20  on the Post-it note, "We have this information."

21  A.  Mm-hmm.

22  Q.  "You need to run a MAPS report," right?

23  A.  Or a urine drug screen.

24  Q.  And a urine drug screen?

25  A.  Mm-hmm.

```
1   Q.   Okay.  So we're going to run a MAPS report --
2           THE COURT REPORTER:  You need to say yes or no
3   instead of mm-hmm, okay?
4           THE WITNESS:  Okay.
5           THE COURT REPORTER:  Thank you.
6   Q.   Okay.  So we run a MAPS report because we want to verify
7   are there two doctors prescribing, right?
8   A.   Correct.
9   Q.   Okay.  And the second thing we want to do is we want to
10  run a urine drug test on that patient, correct?
11  A.   Correct.
12  Q.   Especially where Dr. Pompy may be describing medication A
13  and another doctor prescribe medication B?
14  A.   Correct.
15  Q.   Because Dr. Pompy wants to know is medication B in your
16  system.
17  A.   Yes, that or to see if they are taking both medications.
18  Q.   Or also that if he's -- the patient's properly taking
19  medication A?
20  A.   Correct.
21  Q.   All right.  And I think the testimony that was elicited
22  was the sticky note doesn't make it into the medical record, is
23  that right?
24  A.   Correct.
25  Q.   All right.  The MAPS report sure as heck does, doesn't it?
```

1   A.   It does.

2   Q.   The urine drug test sure as heck does, doesn't it?

3   A.   It does.

4   Q.   If there's a confirmation urine drug test done, that's

5   sure in the medical report, right?

6   A.   It does.

7   Q.   I think you said -- I'm going to do this real fast.  You

8   said patients coming in who wanted to change medications, they

9   could get that change in medication, right?

10  A.   Yes.

11  Q.   But the doctor's approach varied was your testimony?

12  A.   Correct.

13  Q.   And that he might try a non-narcotic approach to deal with

14  the patient's increased pain like a pain procedure?

15  A.   Yes.

16  Q.   And if he determined that he was going to change the

17  prescription, you said that that patient would have to do a

18  UDT, correct?

19  A.   Correct.

20  Q.   All right, ma'am.  You said you don't recall ever seeing a

21  patient discharged.  Do you remember that testimony?

22  A.   I don't recall ever seeing a patient discharged.

23  Q.   Okay.  But you --

24  A.   I've only heard about it.

25  Q.   Okay.  Do remember an incident where one time a patient

1    who was on Suboxone but for whatever reason Dr. Pompy decided

2    not to prescribe it became agitated and cornered you?

3    A.   I don't fully remember that.  There was several patients

4    that they would get agitated and come at staff and corner.

5    Q.   So patients would become agitated and come at staff --

6    A.   Yes.

7    Q.   -- when Dr. Pompy said, "I'm not prescribing you what

8    you -- what you're asking for"?

9    A.   Or they would be cut down on their dosage.

10   Q.   All right.  And -- but you don't remember this incident

11   where he, Dr. Pompy, saw this patient corner you and he came

12   and got the guy away from you and kicked him out of his

13   practice?

14   A.   I -- that patient ended up coming back into the practice

15   when he was able to not do that anymore, but I don't --

16   Q.   Okay.  But I really want you to answer the question, so I

17   appreciate that, that apparently somehow this patient who did

18   this terrible thing to you was permitted to come back to the

19   practice once he could prove to Dr. Pompy that he could get his

20   act together?

21   A.   Yeah.

22   Q.   But let's just come back.  Did this incident happen that I

23   just described?

24   A.   There was several times these incidents happened, it

25   wasn't just to me, but there was several times with these

1   patients.

2   Q.  Okay.  So you've seen that happen to other patients, other

3   employees?

4   A.  Yes, and it's happened to me as well.  It was one of the

5   normal things that unfortunately was happening in the practice

6   with these patients.  They would get agitated.

7   Q.  Okay.  So let's just -- I just want you to answer this so

8   we can move on.  A patient became agitated because Dr. Pompy

9   wouldn't prescribe a particular medication, correct?

10  A.  Correct.

11  Q.  That patient cornered you?

12  A.  Correct.

13  Q.  You were scared?

14  A.  Yeah.  I mean anyone would be scared in that situation.

15  Q.  Dr. Pompy came in and said, "Get the hell out of here"?

16  A.  It -- there was Dr. Pompy and several other staff in there

17  trying to get the patient to calm down, yes.

18  Q.  Sure, 'cuz, you know, it's a -- it's a -- you know, it's

19  not a good situation, so if he had some help, that -- I

20  understand that, but that happened, right?

21  A.  Yeah.  The patient was not discharged though.

22  Q.  I understand.  He was kicked out that day?

23  A.  That day but not discharged from the practice.

24  Q.  All right.

25  A.  It was very rare that patients were discharged.

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

```
 1   Q.   Okay.  But, ma'am, not to be too picky, but your direct
 2   testimony was, "I never had a patient who was discharged, I
 3   never seen that."  Do you remember testifying to that on
 4   direct?
 5   A.   Correct.
 6   Q.   You did though?
 7   A.   I -- he was not discharged.
 8   Q.   Oh.
 9   A.   Discharged means --
10   Q.   I see.
11   A.   -- that they are not welcome back in the practice.  He was
12   just told to get out for that day.
13   Q.   I understand.  Fair enough.
14            Ma'am, just real quick, in your role as a medical
15   assistant, you said your job was to retrieve the patient from
16   the waiting room?
17   A.   Mm-hmm.
18   Q.   And --
19   A.   Yes.
20   Q.   -- prep the -- yes, yeah, that's good, yes.
21   A.   Yes.
22   Q.   Prep the patients?
23   A.   Yes.
24   Q.   Take their vitals?
25   A.   Yes.
```

1    Q.  And you did that routinely, right?

2    A.  Yes.

3    Q.  And part of their vitals is blood pressure, height and

4    weight?

5    A.  Yes.

6    Q.  Did that all the time, right?

7    A.  All the time, yes.

8    Q.  You saw all the medical assistants take height and weight

9    and blood pressure of patients that came into the practice,

10   right?

11   A.  When I -- yes.

12   Q.  When you were there?

13   A.  Yes.

14   Q.  Yeah.  And you saw -- and you always wrote that down into

15   the medical record, right?

16   A.  Yes.

17   Q.  That was important information for Dr. Pompy to have?

18   A.  Yes.

19   Q.  Okay.  So if there was some notion that people are just

20   writing random weights into a people -- a person -- a patient's

21   weight randomly into the medical chart, you certainly never did

22   that, right?

23   A.  No.

24   Q.  You took their weight and you recorded what you saw?

25   A.  Correct.

```
 1   Q.  Ma'am, you said you have your own ankle issues, yes?
 2   A.  Yes.
 3   Q.  And that currently today you actually suffer from chronic
 4   pain?
 5   A.  Yes.
 6   Q.  Back then you had some -- back then when you worked for
 7   Dr. Pompy you had some issues but they were -- they were much
 8   more minimal than they are today, right?
 9   A.  Correct.
10   Q.  And you said you were only 17 so your parents had you see
11   Dr. Pompy?
12   A.  Yeah, to see if at that point he could potentially help my
13   pain and set me on the right path, but then I ended up not
14   going that path and found a different doctor to actually help
15   me.
16   Q.  Okay.  But your parents thought it was wise for you to at
17   least consult with Dr. Pompy, right?
18   A.  At that time, yes.
19   Q.  And you did one time?
20   A.  Yes.
21   Q.  And you say you don't remember if he -- you got
22   medications.  You never got a prescription from Dr. Pompy, you
23   know that, right?
24   A.  I can't remember if I did at that time or not.
25   Q.  Okay.
```

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

```
 1   A.  I know I got a prescription to have an MRI done of my
 2   ankle and foot.
 3   Q.  Right, 'cuz he wanted to -- you -- you complained about
 4   pain in your foot and your ankle, right?
 5   A.  Yes.
 6   Q.  And so he wanted to do a test --
 7   A.  Yes.
 8   Q.  -- to see if there was anything objectively wrong with
 9   your foot or ankle?
10   A.  Correct.
11   Q.  Pretty reasonable thing to do, right?
12   A.  Yes.
13   Q.  Ma'am, you're aware of -- I'll just use one example.  Sue
14   Welker was a registered nurse who worked at Dr. Pompy's
15   practice, correct?
16   A.  Yes.
17   Q.  She was there for several -- many years, I think it's
18   eight or nine years?
19   A.  Yes.
20   Q.  She was a very experienced nurse?
21   A.  Correct.
22   Q.  They -- she would do physical exam on patients?
23   A.  Yes.
24   Q.  And even when Sue Welker would do physical exams on
25   patients, Dr. Pompy would still come in and confirm those
```

1   nurse's examinations, right?

2   A.   Correct.

3   Q.   Okay.  You talked to us about the recurring patients or

4   the -- the refill patients.  New patients, do you have a -- do

5   you have an estimate about how much time Dr. Pompy spent with

6   new patients?

7   A.   It would be anywhere from 10 to 15 minutes, nothing too --

8   Q.   Okay.  Not 20?

9   A.   Not 20, no.  It could be max 20 depending if they were

10  complex or not.  I just -- I don't recall them ever being

11  significantly long.

12  Q.   Okay.  And again, you -- you were new so you primarily

13  handled the returning patients, right?

14  A.   It just depended what patient's chart was on top there or

15  not.

16  Q.   Ma'am, you believe that Dr. Pompy cared about every single

17  one of his patients, don't you?

18  A.   I believe then, yes, he did.

19  Q.   Do you believe he worked hard to figure out where their

20  pain was coming from?

21  A.   Um, I do believe at times he would.  Other times it felt

22  as though he was just trying to be in and out of the patient's

23  room.

24  Q.   You're aware that he referred his patients out to other

25  doctors on frequent occasions for other types of treatment?

1    A.  Correct.  If their blood pressure was elevated, he would

2    refer them back to their primary doctors just to ensure that it

3    wasn't something just that day or...

4    Q.  Physical therapy?

5    A.  Sometimes physical therapy, yes.

6    Q.  For evaluations for surgery?

7    A.  Some -- yeah, sometimes if there was, you know, a

8    significant issue wrong with a patient's spinal column where

9    they do need surgery, yes, he would refer them to a

10   neurosurgeon.

11   Q.  For things like spinal cord stimulaters, intrathecal

12   pumps, you ever see that?

13   A.  On occasion, yes.

14   Q.  Ma'am, didn't you see an instance where Dr. Pompy saw a

15   patient who had tested positive for cocaine and he tried to

16   work with the patient but told him about the significant risks

17   associated with taking that illegal drug and the drugs he was

18   prescribing him?

19   A.  Yes, that happened very often.

20   Q.  Didn't -- didn't he even tell that patient that if he

21   didn't stop using the illegal drugs, that he could die?

22   A.  Yes.

23   Q.  And didn't he monitor him very closely to try to keep him

24   to stay as a patient as opposed to just kicking him out?

25   A.  Yes, he did, but at that time he was also still

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1633   Filed 12/12/22   Page 63 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

63

```
 1   prescribing, you know --
 2           THE COURT:  All right.  Look, there's no question.
 3   Just answer the question and wait for the next one.
 4           Go ahead, Mr. Donnini.
 5           MR. DONNINI:  Thank you.
 6   BY MR. DONNINI:
 7   Q.  Okay.  Let's talk about the day of the raid.  You were
 8   there, right?
 9   A.  Yes.
10   Q.  September 26th, 2016?
11   A.  Correct.
12   Q.  I think you said you were -- you were a student at that
13   time?
14   A.  Yes.
15   Q.  But you happened to be there that morning?
16   A.  Correct.  I was working in the morning before class.
17   Q.  Because you had classes in the afternoon that day?
18   A.  Yes.
19   Q.  You weren't able to make it to those classes, right?
20   A.  No.
21   Q.  It was a mandatory class?
22   A.  Yes.
23   Q.  And you couldn't go?
24   A.  Nope.
25   Q.  'Cuz the police weren't going to let you leave, right?
```

1    A.  Correct.

2    Q.  You were there and you were staying there until they said

3    you could go?

4    A.  Correct.

5    Q.  It wasn't a choice?

6    A.  Correct.

7    Q.  Ma'am, did that experience cause you a lot of fear?

8    A.  During that time, yes, but eventually as I was seeing and

9    things were updated, it turned -- it -- you know, it was

10   something that just happened and I was able to move on, carry

11   on with my life.

12   Q.  And as I remember, you've recovered from that traumatic

13   event, right?

14   A.  Yeah.  I wouldn't necessarily call it traumatic for me.

15   It was just I happened to be there at that time and place.  It

16   scared me at first.

17   Q.  Didn't you say -- didn't -- couldn't you just not even

18   drive home that day because you were terrified?

19   A.  That day, yes, I was scared because I didn't know what was

20   going on.  My dad had come and get -- got me, my dad or sister.

21   I was scared that day, but then after that I've -- you know, my

22   life carried on.

23   Q.  You were scared 'cuz you testified on direct the cops came

24   in from all different directions, right?

25   A.  Yes.

1   Q.   They had battering rams that they were going to come in,

2   and you said they didn't use them to break through the doors

3   but they could have?

4   A.   They could have but they did not use them.

5   Q.   Okay.  And they told you get down on the ground?

6   A.   No.

7   Q.   No?

8   A.   We did not get down on the ground.  They just --

9   Q.   Get up against the wall?

10  A.   "Hands up, come out where we can see you, get against the

11  wall."

12  Q.   Get off your phones?

13  A.   Our phones were away.

14  Q.   Confiscated?

15  A.   No.

16  Q.   Just you couldn't touch your phone?

17  A.   Just not in our pocket, no.

18  Q.   Couldn't go to the bathroom even?

19  A.   We could go to the bathroom, just an agent had to stand

20  outside the door.

21  Q.   So you had to be accompanied to even go to the bathroom,

22  right?

23  A.   Correct.

24  Q.   Pretty scary day?

25  A.   Yeah.

1          MR. DONNINI:  Nothing further, Your Honor.

2          THE COURT:  Okay.  Thank you very much.

3          Anything else from Mr. Pratt?

4                    REDIRECT EXAMINATION

5    BY MR. PRATT:

6    Q.  I'll just -- I'll just follow up on a couple of questions

7    that maybe you didn't get the chance to completely answer.  You

8    were -- you were asked a question about those -- we talked

9    about those patients that were saying they wanted more drugs or

10   increased drugs and were asking drugs -- for drugs by name.  Do

11   you remember that?

12   A.  Yes.

13   Q.  And you were asked on cross-examination, well, if these

14   people are patients who know -- know about their bodies, you

15   remember that question?

16   A.  Yes.

17   Q.  And you were -- you said, "They do know about their bodies

18   but," and then you were cut off.  Could you please explain to

19   us what you wanted to say to answer more fully the question

20   about patients who are asking for more and increased drugs?

21   A.  Yes.  They -- I mean the patients did know about their

22   bodies, but I'm not -- in that instance I wasn't talking, as he

23   was saying, you know, patients who are established, had been

24   there for several years.  I was talking about the ones who were

25   newer, like not as established as those patients who were

1    coming in asking for these new medications.  They could have

2    been there less than a year and asking for more.

3    Q.  Okay.  And I think some of what you were asked about,

4    patients that were testing positive for cocaine, and -- and you

5    testified that Dr. Pompy continued to treat them and then you

6    wanted to say something else about their treatment.  I'd like

7    you to -- and were cut off.  I'd like to give you the -- if you

8    could give us the rest of that answer.

9    A.  He would continue with their treatment such as like if

10   they were prescribed the Suboxone, they might not get their

11   month's supply.  They might have to come weekly or, you know, a

12   couple times during the week to ensure that they are doing what

13   they're supposed to such as come and do a drug screen, see Dr.

14   Pompy, get another couple days or another week's worth of the

15   medication.

16   Q.  Was that a frequent response to cut people's -- when you

17   say cut people's medication, I want to be very clear.  It's not

18   like you're getting -- going from four pills a day to two pills

19   a day or not like you're going from 10 milligram to 5

20   milligram.  Shorter supply, is that what you're talking --

21   A.  Shorter supply, yes.

22   Q.  Okay.  Same -- same drug, same...

23   A.  Same drug, yes.

24   Q.  Okay.  And -- and I know, because we have a court

25   reporter, wonderful court reporter who takes it down, but she

1   isn't -- she isn't able to catch intonation.  I wrote down you

2   responded to one of the questions by Mr. Donnini, "At that time

3   I believe he wanted to help his patients."  Do you recall

4   answering that?

5   A.   Yes.

6   Q.   And we can't tell the emphasis in it, but can you tell us

7   and can you answer the other half of that question: what do you

8   think now?

9   A.   I do think still at that time he wanted to help his

10  patients, but now after going through my experience and stuff,

11  that I don't know what his intentions were at that time.

12  Q.   You have some questions?

13  A.   What was --

14          MR. DONNINI:  Leading.

15  BY MR. PRATT:

16  Q.   Do you have any questions?

17  A.   I do not.

18          MR. PRATT:  Okay.  Thank you, Your Honor.

19          THE COURT:  All right.  Great.  Thank you.

20          Anything else from Mr. Donnini there?

21          MR. DONNINI:  No, sir.

22          THE COURT:  All right.  Great.  Okay, Ms. Higgins,

23  you may step down and be on your way.  Thanks for being on time

24  and staying with us over the break and safe driving to your

25  return destination.

```
 1                (Witness excused at 1:22 p.m.)

 2           Okay.  1:22.  Who's next from the United States?

 3           MR. LIEVENSE:  United States calls Diana Knight, Your

 4   Honor.

 5           THE COURT:  Okay.

 6           (Brief pause)

 7           You're going to sit here.  Before you do, if you'd

 8   look at me and raise your right hand.

 9                    D I A N A   K N I G H T

10   was called as a witness herein, and after being first duly

11   sworn to tell the truth and nothing but the truth, testified on

12   her oath as follows:

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Okay.  Great.  Have a seat in the black

15   chair, relax as best you can.  Speak toward the mic but don't

16   get too close to it, and Mr. Lievense will question you.

17           Go right ahead, sir.

18                    DIRECT EXAMINATION

19   BY MR. LIEVENSE:

20   Q.  Ms. Knight, can you please state your first and last name

21   and spell them for the record?

22   A.  Spell it?  Diana Knight, D-i-a-n-a K-n-i-g-h-t.

23   Q.  All right.  I'm going to ask you to slow down just a

24   little bit.  I know you're a little nervous, but we do have a

25   court reporter who needs to -- I have to remind myself
```

1    sometimes to slow down.

2    A.   Okay.  Want me to do it again?

3    Q.   No.

4         THE COURT REPORTER:  No, that's okay, but you know

5    what?  The microphone moves.  Can you just move the mic closer

6    to you please?  There you go.

7    A.   Yeah, my voice is...

8    Q.   And I know the judge says don't -- didn't -- not to keep

9    it too close to you, but in my past conversations with you I

10   think sometimes you do talk a little softer, so the court

11   reporter will let you know if she can't hear, okay?

12   A.   Okay.

13   Q.   Ma'am, could you tell us a little bit about yourself in

14   terms of where were you born and raised?

15   A.   I was born in Monroe, and when we -- when I was five we

16   moved to Kentucky, and I came back here 25 years ago.

17   Q.   And so that time in Kentucky, is that why perhaps you have

18   a slightly different accent than you or I?  You -- sound

19   like you have a little -- did you live most of your life in

20   Kentucky before moving back?

21   A.   Yeah.

22   Q.   Yes?

23   A.   Yes.

24   Q.   Maybe just I can hear it.

25   A.   Mm-hmm.

1    Q.  Did there come a point in time you began working for Dr.

2    Pompy?

3    A.  Yes.

4    Q.  And I'd like to tell -- bring you back to that.  How is it

5    that you first went and met Dr. Pompy?

6    A.  I went to him for -- as a patient.  I have a bad back,

7    sciatic nerve pain, and the doctor that I was working for told

8    me to go see Dr. Pompy.

9    Q.  And at that point you said it was a doctor you were

10   working for, not a doctor you were treating with?

11   A.  The doctor, my family doctor was a different doctor and

12   she knows him also.

13   Q.  All right.  So was it -- at the time you were working for

14   a Dr. Steward?

15   A.  I was working for Dr. Steward, but when I was told to go

16   see Dr. Pompy, it was a different doctor, Dr. Nair.

17   Q.  Dr. Nair?

18   A.  Yes.

19   Q.  And you were working for Dr. Nair?

20   A.  Yes.

21   Q.  And what were you doing for Dr. Nair?

22   A.  Billing.

23   Q.  You were part of his billing.  Is it a he or she?

24   A.  It's a man.

25   Q.  Man?

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1642   Filed 12/12/22   Page 72 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

72

1    A.   Uh-huh.

2    Q.   You were doing his billing?

3    A.   Yes.

4    Q.   Or involved in his billing?

5    A.   Yes.

6    Q.   And so -- but Dr. Nair wasn't your doctor?

7    A.   Well, I saw him as a patient also.

8    Q.   Oh, you did?

9    A.   Yes.

10   Q.   In addition to working for him?

11   A.   Yep.

12   Q.   Oh, okay.  Now, when you went to -- when was this, if you

13   recall, that you first went to see Dr. Pompy as a patient?

14   A.   I can't remember, to be honest.

15   Q.   All right.  If I told you, looking at some of your medical

16   records, it was around 2012, would that be in the range?

17   A.   I guess if it's in my records.

18   Q.   Well, I don't -- I guess --

19   A.   I really don't remember when it was.

20   Q.   Okay.

21   A.   Too much has happened.

22   Q.   Well, and I'm going to ask you about that.  So not only

23   has too much happened in terms of time has passed, I guess I

24   just want to draw this out and not to go into too much detail,

25   but has other things happened in recent years that has impacted

1    your memory somewhat?

2    A.   I have COVID brain, COVID fog --

3    Q.   Okay.

4    A.   -- where I had COVID so bad, and I'm on oxygen but I

5    didn't bring it in here with me.

6    Q.   Okay.  So, yeah, when we met before, you actually had an

7    oxygen --

8    A.   Yeah, I left it in the car.  I saw a specialist for my

9    lungs and they want me to build up my lung capacity, so when my

10   voice goes low I'm out of air.

11   Q.   Okay.  Well, let us know if you need us to pause.

12   A.   Okay.

13   Q.   And as a general matter, you said you have COVID fog?

14   A.   Yeah, COVID brain, COVID fog brain.

15   Q.   That's what you --

16   A.   That's what they say.

17   Q.   That's what it's -- you've been told?

18   A.   Yes.

19   Q.   All right.  Obviously if as a result of whatever reason,

20   if you don't remember anything, just let me know, okay?

21   A.   Okay.

22   Q.   Now, while you were visiting Dr. Pompy as a patient, did

23   you mention to him that you had some expertise in medical

24   billing?

25   A.   Yeah, we talked about it.

```
1    Q.  Was that your first visit or later on, if you recall?

2    A.  I think it was my first visit.

3    Q.  And I guess fast forwarding a little bit, was there

4    something going on -- I'm sorry, let me back up.  Was there

5    something going on in Dr. Pompy's practice with respect to his

6    electronic medical records at the time that was also something

7    you discussed with him at the time?

8    A.  We were -- he was changing over from paper charts to

9    electronic, and the billing system that he had, she was paper

10   and she didn't want to transfer over to electronic.

11   Q.  So he needed a new person to help him with that?

12   A.  Yeah.  Yes, sir.

13   Q.  And at some point then did Dr. Pompy hire you on a

14   part-time basis to do --

15   A.  Yes, sir, I was part time.

16          THE COURT REPORTER:  Wait, wait, wait.  You've got to

17   let him finish his question first.

18          "... on a part-time basis to do..."

19   Q.  To do billing work for him?

20   A.  Yes.

21   Q.  And eventually did that become a full-time job?

22   A.  Yes, sir.

23   Q.  And did you stop working for Dr. Steward and Dr. Nair?

24   A.  I stopped working for Dr. Nair, yes.

25   Q.  Okay.  And eventually did you take on more than just a
```

1   billing role in Dr. Pompy's office?

2   A.  Can you elaborate?

3   Q.  Yeah.  Were you kind of almost an office manager?

4   A.  I did stuff, but we didn't have an office manager, there

5   wasn't a title.

6   Q.  Okay.  So you had -- you were involved in the billing?

7   A.  Yes.

8   Q.  And you also assisted in other ways?

9   A.  Like if the printer was out of paper, put paper in the

10  printer.  If computer was messed up, I'd help call IT or

11  whatever that I needed to do to assist the office.

12  Q.  And did you work for Dr. Pompy -- when -- when did you

13  stop working for Dr. Pompy?

14  A.  At the raid.  That's when the office closed.

15  Q.  Well, that's when the hospital office was closed, right?

16  A.  Yes, the hospital.

17  Q.  You actually kept working for him longer than that?

18  A.  Yes, in the IC.

19  Q.  In the IC.  Is that the Interventional Center?

20  A.  Interventional Center.

21  Q.  So Dr. Pompy didn't stop working after the raid; he

22  continued working at the Interventional Center?

23  A.  Yes.

24  Q.  Now, before the raid did you work for Dr. Pompy at both

25  locations or just one?

1    A.  I just worked in the hospital location.

2    Q.  And then after the raid where did you start working for

3    him?

4    A.  We started seeing patients in the Interventional Center.

5    Q.  And so that's where you worked?

6    A.  Yeah, so that's when I went over there.

7    Q.  When -- going back to when you first hired on then, who

8    interviewed you?  Did anyone interview you for the job?

9    A.  Dr. Pompy did.

10   Q.  And who made the decision to hire you?

11   A.  Dr. Pompy did.

12   Q.  And during the approximately -- the time you worked there,

13   from whatever that was in -- around 2012 until the end, which

14   was -- when was the end, if you recall?

15   A.  The end?

16   Q.  Yeah.

17   A.  Of the IC?

18   Q.  Yes.

19   A.  When they took his license and he was no longer able to

20   work.

21   Q.  Was that sometime in 2017?

22   A.  I really don't remember.

23   Q.  Okay.  I guess what I'm getting at is when -- when you

24   were employed with -- by Dr. Pompy, I guess who was the boss,

25   who was in charge at both locations?

1    A.  Dr. Pompy.

2    Q.  And for some of the procedures were there controlled

3    substances ordered for the locations, do you know?

4    A.  Say that again.

5    Q.  Things like whether it's Ketamine or...

6    A.  Yeah, that would be for the [indiscernible].

7    Q.  Okay.

8    A.  The Interventional Center.

9          THE COURT REPORTER:  I'm sorry, I didn't get that.

10   "... for the..."

11         THE WITNESS:  That was at the Interventional Center.

12   That's where he did procedures.

13   Q.  Okay.  And were any of those medications also at the

14   hospital, if you recall?

15   A.  No, not that I recall.

16   Q.  Who was involved in the ordering of those medications?

17   A.  Dr. Pompy.

18   Q.  Do you recall -- at the hospital location clinic, do you

19   recall how many exam rooms Dr. Pompy had?

20   A.  I would say 13, maybe more.  I'd have to count them.

21   Q.  And we've heard testimony that there were potentially on

22   some days more than ten medical assistants working on a

23   potential day.  Would they then work out of all of the

24   different 13 exam rooms?

25   A.  Yes.

1  Q.  And patients would be seen by Dr. Pompy in all of those

2  rooms?

3  A.  Yes.

4          MR. LIEVENSE:  I'd like to pull up Government's

5  Exhibit 130.

6  BY MR. LIEVENSE:

7  Q.  We've had -- well, let me first ask, in order to get to

8  Dr. Pompy's office, what floor was it on?

9  A.  Second floor.

10  Q.  And so you would walk down a hallway, is that right?

11  A.  Get on the elevator.  Get on the elevator.

12  Q.  Sorry.  Get on the elevator, go to the second floor and

13  you'd walk down a hallway?

14  A.  Yes.

15  Q.  And there'd be a reception room?

16  A.  Yes, sir.

17  Q.  Or waiting room?

18  A.  Waiting room.

19  Q.  And then would there then be a door you'd have to go

20  through to get to the exam area?

21  A.  Yes, and that was locked.

22  Q.  And it was locked?

23  A.  Yeah.

24  Q.  Okay.  And back behind there, behind the front desk, were

25  there office areas?

1   A.   Yes.

2   Q.   And do you remember or can you recognize this photograph,

3   and if you can, identify where this photograph would have been

4   taken?

5   A.   I can't really tell.  Looks like my office but I'm not

6   really for sure.

7   Q.   But it looks like a desk area in the -- in the office area

8   of Dr. Pompy's practice in the hospital?

9   A.   Yes.  Yes.

10  Q.   Okay.  And I'm going to ask you if you can identify any

11  additional photographs.

12           MR. LIEVENSE:  My understanding, Your Honor, is there

13  were no objections to these and they were preadmitted.

14  BY MR. LIEVENSE:

15  Q.   Government's Exhibit 131, can you identify what's shown in

16  that picture?

17  A.   I think that's the door to Dr. Pompy's office.

18  Q.   All right.

19           MR. LIEVENSE:  And if we could show Government's

20  Exhibit 132.

21  BY MR. LIEVENSE:

22  Q.   Can you -- do you recognize what's depicted there?

23  A.   That's Dr. Pompy's office.

24  Q.   And Government's Exhibit 133?

25  A.   Dr. Pompy's office.

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1650   Filed 12/12/22   Page 80 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

80

1    Q.  All right.  Just so there's a question on the record, can

2    you identify what's on that picture?

3    A.  Dr. Pompy's office.

4    Q.  Thank you.

5         Now, when would you typically -- how many days a week

6    did you typically work for Dr. Pompy?

7    A.  Five, sometimes four, sometimes four and five.

8    Q.  It would depend on the week?

9    A.  Yes.

10   Q.  And approximately what were your hours like on those days

11   that you worked?

12   A.  7:30 to 6:30, 7:30, 8:30.  It's according to the day.

13   Q.  So you said in the morning you would start around what

14   time?

15   A.  7:30, 8:00 o'clock.

16   Q.  And you would go until how long into the evening?

17   A.  Mostly 4:30, 5:00 o'clock on most days, but sometimes we

18   worked over, longer than that.

19   Q.  And I think you said 6:30 or 7:30 at night even?

20   A.  Yes.

21   Q.  All right.  And if you recall, do you remember how many

22   employees Dr. Pompy would have working at any one time?

23   A.  At one time?  We had two facilities.

24   Q.  I mean just at the hospital.

25   A.  Oh, just at the hospital?  Probably 15, 16 'cuz we had

1    receptions also.

2    Q.  That's what I was going to go over.  So you had a

3    reception?

4    A.  We had two.

5    Q.  Two reception people?

6    A.  Mm-hmm.

7    Q.  And were they responsible for kind of scheduling and

8    greeting patients?

9    A.  I'm sorry?

10   Q.  Maybe answering the phone and scheduling patients?

11   A.  Yes.

12   Q.  And greeting patients that may come in?

13   A.  Yes.

14   Q.  All right.  And were there nurses?

15   A.  Yep.

16   Q.  How many nurses, if you recall?

17   A.  Can you tell me what kind of nurse are you talking about,

18   RN or LPN.

19   Q.  RN.

20   A.  RN?  We had at our office two.

21   Q.  And did -- was there also an LPN?

22   A.  Yeah, there was LPNs.  There was also kids going to school

23   to be LPNs.

24   Q.  LPNs are -- we've been using the word medical assistant.

25   Is that different?

1    A.   Yes.  The -- the RNs would do a physical exam on the

2    patients.  MAs did medical exam -- you know, medical people

3    didn't.  If they needed an exam --

4    Q.   Okay.

5    A.   -- RNs would do it.

6    Q.   And the medical assistants, is it fair to say not all of

7    them had a medical assistant training or certificate?

8    A.   No, they didn't, some of them didn't.

9    Q.   And I think you said some of them were -- were students?

10   A.   Yes.

11   Q.   Were some of them even high school students?

12   A.   Yes.

13   Q.   And I want to go back to the front desk person.  Was it

14   also their responsibility to accept payments or co-pays from

15   the patients?

16   A.   No, they didn't take money at the front desk.

17   Q.   Oh, who took the money at the front desk?

18   A.   It was another window and that was when you checked in and

19   took a co-pay or a balance or a payment.

20   Q.   Would -- that would be the reception area?

21        Do you remember the name of the person who took the

22   money?

23   A.   One was Angela.

24   Q.   Okay.  I was -- I may have confused you.  I was talking

25   about medical assistants and then I went back to that.

1    A.   Yeah.

2    Q.   So the medical assistants didn't take the money?

3    A.   No, they didn't take money.

4    Q.   The reception folks took the money?

5    A.   The ones that answered the phones did not.

6    Q.   Okay.  And what was your role when you arrived?

7    A.   I was in billing.

8    Q.   You were in billing?

9    A.   Yes.

10   Q.   So how did billing work at Interventional Pain Management

11   Associates working for Dr. Pompy?

12   A.   How did it work?

13   Q.   What did you do, yes.

14   A.   The MAs would see the patients and put in the office visit

15   code, diagnosis, and then they would call it a batch, and when

16   we had electronic records everything came in a big batch.

17   Q.   Let me stop you.  So like at the end of the day --

18   A.   Yes.

19   Q.   -- would you -- would you submit the billing for that day

20   on the same day?

21   A.   No.

22   Q.   The next day?

23   A.   Sometimes.

24   Q.   Sometime after?

25   A.   Yeah, sometime.

```
 1    Q.  So when you say a batch, when you came in the morning
 2    would you have a batch of -- of billing codes to review?
 3    A.  I didn't review them.  I sent them to a clearing house.
 4    Everything was electronic.  So I always sent them to the
 5    clearing house that we had, and if there was a problem, say
 6    someone's insurance wasn't in there or maybe their date of
 7    birth was wrong, it would kick it back to me as an error.
 8    Q.  And was it your job to address those errors?
 9    A.  Yeah.
10    Q.  And -- and you were doing the billing.  Did you decide
11    what code to bill to the insurance company?
12    A.  No, they were already put in there.
13    Q.  All right.
14    A.  I didn't do that.
15    Q.  And this process of -- of how the billing worked and
16    the -- and the submission -- let me back up here.
17          You're aware there are a lot of different codes that
18    can be billed, is that...
19    A.  Yeah.
20    Q.  And there's different codes depending --
21    A.  (Witness coughing) I'm sorry.
22    Q.  And there may be different codes depending on what
23    happened in terms of the service that day?
24    A.  Sure.  Yes.
25    Q.  And you're aware that the insurance company or whoever
```

1    would pay based on the code that was submitted?

2    A.  Yes, sir.

3    Q.  Who -- what was the name of the electronic medical records

4    system that was involved that you used?

5    A.  [Indiscernible]

6    Q.  And was that the --

7           THE COURT REPORTER:  I'm sorry, I'm sorry.  What?

8           THE WITNESS:  i[indiscernible]Care.

9           THE COURT REPORTER:  iPensionCare?

10          THE WITNESS:  Patient.

11          THE COURT REPORTER:  Oh, okay.  Thank you.

12   Q.  Is that both the system for the electronic medical record

13   and the billing?

14   A.  Yes.

15   Q.  And who picked that system to use?

16   A.  Dr. Pompy.

17   Q.  And who -- who -- this procedure that you just described

18   where you would take these batches of codes and maybe submit

19   them, who created that process for how those codes got billed?

20   A.  iPatientCare created it.

21   Q.  And who picked iPatientCare?

22   A.  Dr. Pompy.

23   Q.  And so all the data that you would submit through

24   iPatientCare to the insurance companies, who set up that

25   procedure that you've just talked about, who was the ultimate

1  person in charge at Interventional Pain Management Associates?

2  A.  Dr. Pompy.

3  Q.  Now, you saw -- well, and I guess I want to explore this a

4  little bit more.  You said occasionally you would see

5  duplicates or mistakes or something that would be kicked back

6  to you?

7  A.  Yes, through the clearing house.

8  Q.  And if there were mistakes, how would you address those?

9  A.  That would come back as either the insurance was wrong or

10 a patient's date of birth wasn't on the claim or maybe it was a

11 post-op and it would just come back as an error.

12 Q.  And so then you might have to investigate what was wrong?

13 A.  Yes.

14 Q.  Okay.  And would you check with Dr. Pompy about how to

15 correct those errors?

16 A.  No.

17 Q.  Who would you check with?

18 A.  I would call the patient.

19 Q.  Okay.  If there was a problem I suppose?

20 A.  Yeah, yeah, yeah.

21 Q.  If it -- it might be a patient problem, it might be a Dr.

22 Pompy question?

23 A.  Not normally.  It's always -- when it's an office visit,

24 it's always to do with a patient.  It's either a date of birth

25 wrong or --

1   Q.   Okay.  So it would just depend -- it would depend on the

2   error though who you went to to correct the error?

3   A.   Yes.  Yes.

4   Q.   Now, you saw Dr. Pompy -- after you started working for

5   him, did you also continue seeing him as a patient?

6   A.   Yes, I did.

7   Q.   So you have experience on both sides of things?

8   A.   I do.

9   Q.   But it sounds like you weren't involved -- were you ever

10  involved in treating the patients?

11  A.   No.

12  Q.   You didn't ever -- did you ever fill in as a medical

13  assistant?

14  A.   No.

15  Q.   You weren't a registered nurse?

16  A.   No, I am not.

17  Q.   What types of patients -- is it fair to say that Dr. Pompy

18  had two categories or types of patients, pain patients and

19  addiction patients?

20  A.   Yes, we did.

21  Q.   Okay.  And are you aware of the type of medication that

22  addiction patients were on?

23  A.   Suboxone.

24  Q.   All right.  And was there a limit to the number of

25  addiction patients that Dr. Pompy could see?

1    A.   Yes, there is.

2    Q.   Do you know what that limit was?

3    A.   I can't remember.  I can guess.

4    Q.   You can guess.

5    A.   I'm thinking it was a hundred.

6    Q.   You think it was a hundred?

7    A.   I think it was.

8    Q.   And based on your recollection of the practice, did Dr.

9    Pompy normally or did he ever go above that limit?

10   A.   I don't think so.

11   Q.   Do you recall being asked about this at a prior hearing?

12   A.   Yes.

13   Q.   And if I showed you the transcript from that hearing,

14   would that refresh your memory as to whether he ever went above

15   the 100 limit?

16        MR. CHAPMAN:  Your Honor, objection.  She didn't

17   testify that she couldn't remember.

18        THE COURT:  That's right.

19        MR. CHAPMAN:  She testified he didn't go above it.

20   If they want to impeach their witness, that's a different

21   process.

22        THE COURT:  Right, agreed.

23   BY MR. LIEVENSE:

24   Q.   As part of your duties, did you regularly track how many

25   Suboxone or addiction patients Dr. Pompy had?

1   A.   Someone in the office was in charge of running that.  It
2   was a report that they ran.
3   Q.   I guess my question is were you involved in that?
4   A.   No, I didn't do that.
5   Q.   That was somebody else?
6   A.   Yes.
7   Q.   I want to ask you about a medication called Subsys and a
8   company called Insys.  Do you remember -- do those names ring a
9   bell to you?
10  A.   Subsys?  Yes.
11  Q.   And the company Insys?
12  A.   I'm not sure of the company name.
13  Q.   Okay.  Do you know anything about what was involved in
14  patients being prescribed Subsys?
15  A.   They were normally cancer patients or high pain patients.
16  Q.   Do you know what Subsys treats?
17  A.   Cancer pain, very bad pain.
18  Q.   Does the name John Bae ring a bell?
19  A.   Yes.
20  Q.   Do you know who he was?
21  A.   He was the representative for Subsys.
22  Q.   And did he occasionally work out of Dr. Pompy's office?
23  A.   Yes, sir.
24  Q.   And did he occasionally provide meals for the staff?
25  A.   Yes, sir.

1          (Brief pause)

2          MR. LIEVENSE:  Your Honor, I want to go back to the

3    question that drew an objection on before.

4          THE COURT:  Okay.

5    BY MR. LIEVENSE:

6    Q.  Ma'am, I think I asked you did you testify previously or

7    provide a statement previously in a -- related to Dr. Pompy?

8    A.  Say it again, sir.

9    Q.  Did -- were you -- did you previously answer questions

10   about Dr. Pompy at a -- at a proceeding?

11   A.  Yes, at another trial, yes.

12   Q.  And during that proceeding were you asked about the number

13   of patients, of Suboxone addiction patients that Dr. Pompy

14   treated at times?

15   A.  I'm assuming if you have the paper, I'm guessing I did.

16          MR. CHAPMAN:  Your Honor, may I see what's being

17   handed to the witness first?

18          THE COURT:  Yes.

19          MR. CHAPMAN:  Thank you.

20          (Brief pause)

21          MR. LIEVENSE:  May I approach the witness?

22          THE COURT:  Yes.

23          THE WITNESS:  I don't have my glasses.  My husband

24   has them.

25          MR. LIEVENSE:  Your Honor, may we get the witness's

1    glasses.

2            THE COURT:  Yes, indeed.

3            (Brief pause)

4            THE WITNESS:  I'm sorry.

5    BY MR. LIEVENSE:

6    Q.  Ma'am, were you asked whether on September 26th, 2016,

7    whether Dr. Pompy was over a hundred addiction patients?

8    A.  I answered, "Yes, we were.  We were 126."

9    Q.  And then I think later on you clarified, "Approximately

10   126," is that right?

11   A.  It says I said that, "Approximately 126."

12   Q.  Ma'am, I want to talk to you -- ask you some questions

13   about how many patients Dr. Pompy would typically see in a day.

14           THE COURT:  Well, let's get -- let's get clarity.

15   Are you incorrect in your testimony today, ma'am, that you did

16   not go over a hundred addiction patients?

17           THE WITNESS:  I can clarify.  At the time they raised

18   the numbers on the state to over a hundred.  I don't remember

19   the number.

20   BY MR. LIEVENSE:

21   Q.  Okay.

22   A.  I'm sorry.

23           THE COURT:  All right.  But you testified in 2016 the

24   number was 126 and you testified today that the number was not

25   over a hundred.  So I'd like you to think this over and tell

 1   the jury which is the correct number.

 2           THE WITNESS:  That was closer to when we were closed.

 3   A lot has happened in seven years.  So, yes, it was 126.  If I

 4   said it then, then I was more alert to know the number.

 5           THE COURT:  Okay.  Very good.

 6           THE WITNESS:  Because I worked closer to that day.

 7           THE COURT:  Okay.  That's very good.

 8           MR. LIEVENSE:  We understand.

 9           THE COURT:  All right.  We have your answer.  Go

10   ahead, Mr. Lievense.

11   BY MR. LIEVENSE:

12   Q.  And ma'am, and I wasn't meaning to suggest that you were

13   intentionally trying to say anything different.  I just --

14   A.  That's all right.

15   Q.  Ma'am, I'd like to talk to you about the number of

16   patients.  Approximately how many patients would Dr. Pompy see

17   on some days?

18   A.  It was according to the day.  Hmm, 50, 60, 70.

19   Q.  Were there some -- were there some days he saw more than

20   that in a day?

21   A.  Honestly, I cannot remember the numbers.

22   Q.  All right.

23           MR. LIEVENSE:  Your Honor, if you could turn off the

24   screen for the jury 'cuz I'd like to show the witness

25   Government's Exhibit 166.

1    THE COURT:  Okay.  All righty.  Do you have

2  Government Exhibit 166 on the screen in front of you there,

3  witness?

4    THE WITNESS:  Yes.

5    THE COURT:  It's very, very small type, so Ms.

6  Ouellette is blowing it up and Mr. Lievense is going to ask

7  about that document.  Go right ahead.

8    THE WITNESS:  You want me to read it?

9    MR. LIEVENSE:  No, ma'am.

10    THE COURT:  No, just look at it but don't say

11  anything.  Mr. Lievense will ask you a question.  Go ahead.

12  BY MR. LIEVENSE:

13  Q.  Ma'am, would you say this appears to be an email?

14  A.  Yes, sir.

15  Q.  And the email address lmpx9999 at the top, do you know

16  whose email address that was?

17  A.  That's mine for the office.

18  Q.  That was your office email?

19  A.  Yes.

20  Q.  And in the To: line, who is that email addressed to?

21  A.  To Dr. Pompy.

22  Q.  And what was the date on that email?

23  A.  September 20, 2012.

24  Q.  And this is going to be a silly question.  Do you remember

25  sending this specific email?

1    A.   Lord no.

2    Q.   Based on seeing the From:, To: and Sent: lines, do you

3    have any reason to dispute that -- that you sent this email?

4    A.   No, sir.

5            MR. LIEVENSE:  And, in fact, if Ms. Ouellette could

6    highlight the signature block at the bottom.

7    BY MR. LIEVENSE:

8    Q.   Who signed this email?

9    A.   It's automatic and it's my name, Diana Knight.

10   Q.   And your role as in the billing department for IPMA?

11   A.   Yes, sir.

12   Q.   All right.

13           MR. LIEVENSE:  Based on this foundation, Your Honor,

14   the government would seek to move to admit Government's

15   Exhibit 166.

16           MR. CHAPMAN:  No objection, Your Honor.

17           THE COURT:  Okay.  166 is received and I'm going to

18   publish it to the jury.

19           MR. LIEVENSE:  And while I'm doing this, I can give

20   notice to the defense that there are two additional emails, 167

21   and 168, with similar characteristics.  I can go through this

22   process again, but --

23           THE COURT:  Well, let's -- let's work with 166 and

24   get what you want from that, and then we can see where we go

25   with 167 and 68.

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1665   Filed 12/12/22   Page 95 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

95

 1           MR. LIEVENSE:  All right.

 2           THE COURT:  Go right ahead.

 3           MR. LIEVENSE:  Ms. Ouellette, could you please

 4    highlight or expand the -- the top, the -- the part that we

 5    just highlighted there, right there.  Thank you.  Just so the

 6    jury can now see.

 7    BY MR. LIEVENSE:

 8    Q.  So just to quickly summarize now that the jury can see it,

 9    this is an email from you is your testimony to Dr. Pompy in

10    September of 2012?

11    A.  Yes.

12    Q.  And it looks like you start the email, "Hi Dr. Pompy," is

13    that right?

14    A.  Yes, sir.

15    Q.  And it's a rather lengthy email but I would just like

16    the -- Ms. Ouellette to highlight a part in the middle 'cuz I

17    was asking you about the number of patients that were seen by

18    Dr. Pompy.

19           (Brief pause)

20           Is it fair to say that at some point sometimes Dr.

21    Pompy would see over 200 in a day?

22    A.  That's what I wrote.

23    Q.  Well, I'm asking you what you remember.

24    A.  I really don't remember.

25    Q.  All right.  But it --

1    A.  I really don't.

2    Q.  You do see where it says there on September 20 you wrote,

3    "It's not that you can't see over 200 patients a day and still

4    have less confusion in the office if the time slots were not so

5    full"?

6    A.  Yes, sir.

7    Q.  All right.  Was there a problem in Dr. Pompy's office or

8    issues that you were seeking to address with the number of

9    patients being scheduled in a day, if you recall?

10   A.  According to the email, yes, sir.

11   Q.  Was that a typical problem in the office?

12   A.  It started to be a problem at the end.

13   Q.  Well, this was in 2012, right?

14   A.  Yeah.

15   Q.  All right.

16        MR. LIEVENSE:  Let's go to Government's Exhibit 168.

17        THE COURT:  Okay.  All right.  So it looks from my

18   list as if 167 and 168 are going to be similar business records

19   presumably from the practice in which Ms. Knight wrote emails

20   dated July 30, 2014 and -- and September 18th, 2012, in the one

21   instance to the doctor and the other instance to the doctor and

22   someone known as Debbie.

23        I know Mr. Lievense is going to have these identified

24   and ultimately detailed as to date and foundation.  Will there

25   be an objection from the defense to 167 and 168?

97

```
 1              MR. CHAPMAN:  No, Your Honor.
 2              THE COURT:  Okay.  So as to foundation and
 3   authenticity, 166 through 168 are now received, and without
 4   having to get into those matters, you can question the witness
 5   about those exhibits, Mr. Lievense.  Go right ahead.
 6              MR. LIEVENSE:  Thank you, Your Honor.
 7              THE COURT:  Yep.
 8              MR. LIEVENSE:  And thank you to Mr. Chapman.
 9              Government's Exhibit 168, we will -- can you then
10   highlight the top?
11   BY MR. LIEVENSE:
12   Q.  And again I would ask you the same questions.  Can you
13   kind of recite and summarize what this appears to be and how
14   you know that?
15   A.  It's an email.
16   Q.  From who to who?
17   A.  It's from me to -- Dr. Pompy is cc'd on.
18   Q.  It looks like it's to someone, endosareus?
19   A.  I don't know.  I can't remember.
20   Q.  Okay.  But it looks like lpompy@earthlink.net is --
21   A.  Yeah.
22   Q.  -- is a bcc, a blind carbon copy, is that right?
23   A.  Yes.
24   Q.  All right.  And do you again remember sending this email?
25   A.  No, I do not remember.
```

1   Q.  But if we a highlight the bottom part, the signature

2   block, does that look like --

3   A.  Yeah, that's from my office.

4   Q.  Okay.

5           MR. LIEVENSE:  And if we could highlight...

6   BY MR. LIEVENSE:

7   Q.  It looks like in this email it's addressed "Hi Debbie."

8   A.  Yes.

9   Q.  Does that refresh your memory who the email was to?

10  A.  No.

11  Q.  Okay.

12  A.  I can't read it all.

13  Q.  Now, what -- if you could please read the first couple

14  lines to yourself and I'm going to ask you what your purpose

15  was in sending this email.

16          (Brief pause)

17  A.  Okay.  Can you question me again?

18  Q.  Sure.  Based on reviewing the first couple of sentences,

19  what was your purpose, why were you sending this email to

20  Debbie?

21  A.  She was more or less over the MAs and she would address

22  something to them, and if the billing was short, iPatientCare

23  would send me an error message.

24  Q.  So billing was short meaning you had a certain number of

25  patients who checked in as though they arrived?

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1669   Filed 12/12/22   Page 99 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

99

1    A.   Right.

2    Q.   But then the number of patients you billed for was less?

3    A.   Yes.

4    Q.   And you would get an alert?

5    A.   Yes.

6    Q.   And so it looks like on this day in September of 2012,

7    what were you reporting to Debbie in terms of what had happened

8    on the 6th of September?

9    A.   I was reporting shortage on the billing.

10   Q.   How many patients had arrived that day?

11   A.   We had 242 patients arrive on the 6th.

12   Q.   And how many did you get billings for?

13   A.   235.

14   Q.   And so you were alerting Debbie that you were short seven

15   people?

16   A.   Yes.

17   Q.   And how about on the 10th, how many patients arrived?

18   A.   196 arrived.

19   Q.   And how many had you already billed for?

20   A.   176.

21   Q.   And so how many was your -- how many were you short that

22   day?

23   A.   20.

24   Q.   And how about on the 11th, how many patients arrived?

25   A.   We had 106 patients arrive.

1   Q.  And how many were billed that day?

2   A.  92.

3   Q.  And were -- so were you short again?

4   A.  14 short.

5   Q.  That was 14?

6   A.  Yes.

7   Q.  All right.  I'd like to now go to Government's Exhibit 167

8   and I'll be very short with this one.  Can you please identify

9   again from the -- the top what this appears to be.

10  A.  It says a schedule but it looks like an email.

11  Q.  All right.  So it looks like an email from who to who?

12  A.  Oh, from me, I'm sorry.  It's from me to Dr. Pompy.

13  Q.  And when was this email?  The two other emails we looked

14  at were 2012.  Do you recall that?

15  A.  No, I don't recall.  I'm only looking at them 'cuz...

16  Q.  Okay.  You're looking at this one.  Okay.  What -- when is

17  this email sent?

18  A.  2014, July 30th.

19          MR. LIEVENSE:  And if we could highlight again the --

20  the signature block at the bottom.

21  BY MR. LIEVENSE:

22  Q.  Does that look like your signature block?

23  A.  Yes, it is.

24  Q.  And again, silly question, do you specifically recall

25  sending -- sending this email?

1   A.   No.

2   Q.   All right.

3   A.   Been too long ago.

4   Q.   Based on the attributes I've -- we've shown you, does it

5   look like an email that you sent to Dr. Pompy?

6   A.   Yes.

7   Q.   And near the bottom, I think in this email you're talking

8   about again his billing 'cuz that was your job, right, billing?

9   A.   Yes, that was my job.

10  Q.   And you wrote -- what did you write where -- the sentence

11  that started "Never"?

12  A.   Want me to read it all?

13  Q.   Yes please.

14  A.   "Never pay out more than you make on any day.  Sure you

15  make up monies on the days that you have 150 patients, but why

16  go in the hole on any given day?  You're a doctor and you

17  should make money on any day that you work.  I don't work for

18  free nor does anyone else in the office, why would you?"

19  Q.   And so when I -- when I first asked you about how many

20  patients that Dr. Pompy would see in a day, you'd said around

21  60 but it depended on the day?

22  A.   Yes.

23  Q.   Were there days that Dr. Pompy saw more than 200 patients?

24  A.   Yes.

25  Q.   And how many times a month would he see more than 200

Case 2:18-cr-20454-SJM-RSW  ECF No. 86, PageID.1672  Filed 12/12/22  Page 102 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

102

1  patients, if you recall?

2  A.  To be honest, I don't recall.  It's been too long ago.

3  Q.  All right.  I'd like to -- as a patient and also as a

4  biller, was there something called an appointment where someone

5  was just there for a refill, was that a common occurrence?

6  A.  Yeah, you had to come in for refills.

7  Q.  And I'd like to show you Government's Exhibit 148.

8        MR. LIEVENSE:  And I can't -- I don't believe there's

9  an objection to this one but I will double-check.

10        THE COURT:  What number?

11        MR. LIEVENSE:  No, I believe this one was

12  preadmitted.

13        THE COURT:  Yep.  Go ahead.

14        MR. LIEVENSE:  So we can publish to the jury, Your

15  Honor?

16        THE COURT:  If it's received already and in evidence,

17  you can definitely publish to the jury.

18        MR. LIEVENSE:  Thank you.

19        THE COURT:  Yep.

20  BY MR. LIEVENSE:

21  Q.  Do you recall, what are we looking at here?

22  A.  It says "Attention All Patients:"

23  Q.  Do you remember this sign being posted at Dr. Pompy's

24  office in the hospital?

25  A.  Do I remember it?  No.

Case 2:18-cr-20454-SJM-RSW   ECF No. 86, PageID.1673   Filed 12/12/22   Page 103 of 117
Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

103

1    Q.  All right.  We'll move on from it then.

2         Now, you were -- as we've mentioned, even though you

3    were an employee, you were also a patient, is that right?

4    A.  Yes, sir.

5    Q.  And how did that work, did you have to make an appointment

6    like anybody else?

7    A.  Yes, sir.

8    Q.  And so you had to make an appointment?

9    A.  Yes.

10   Q.  Did you have to fill out a questionnaire?

11   A.  Yes.

12   Q.  Did you have to meet with a medical assistant?

13   A.  I'm sorry?

14   Q.  Did you have to meet with a medical assistant --

15   A.  Yes.

16   Q.  -- just like everybody else?

17   A.  Yes.

18   Q.  Would you occasionally have to do urine drug screens like

19   everybody else?

20   A.  I think I did a couple.

21   Q.  All right.  And would -- your insurance would be billed

22   just like everybody else?

23   A.  Yes, sir.

24   Q.  All right.  And I think you said you went there for back

25   pain?

1    A.   Yes, sir.

2    Q.   And you continued to see Dr. Pompy for several years?

3    A.   Yes, sir.

4    Q.   And over time did Dr. Pompy do injections for you?

5    A.   Yes, sir.

6    Q.   And about these urine drug screens, I think -- who else

7    had to do urine drug screens?  Did all patients have to do them

8    on every visit?

9    A.   Not on every visit and not all drug -- all patients.

10   Q.   So new patients would -- would new patients have to?

11   A.   They'd have to, yeah.

12   Q.   And perhaps addiction patients?

13   A.   Yes.

14   Q.   And were you aware of times when people would have to do

15   urine drug screens more frequently if perhaps they were coming

16   back to visit the doctor more frequently?

17   A.   I wouldn't be in charge of that.

18   Q.   You weren't in charge of that?

19   A.   No.

20   Q.   Okay.  Did you ever hear of anyone having a bad or an

21   abnormal drug screen have to come back and do another drug

22   screen on the next visit?

23   A.   Did I hear it?  That's hearsay.

24   Q.   Do you know?

25   A.   Do I know for a fact?

1  Q.  You weren't involved in care?

2  A.  I was not involved in that.

3  Q.  All right.  When a patient would come back for each visit,

4  would you then receive a billing code to bill for each visit?

5  A.  Yes, I received billing codes to visit to bill.

6  Q.  Ma'am, I'd like to show you Defense Exhibit 527A, page 49.

7  Are you able to see what that is or the date on that?

8  A.  Yes.

9  Q.  Looks like it's a -- the results of a drug screen from

10  May 7, 2012.

11  A.  Okay.

12  Q.  Does this refresh your memory at all if that was around

13  the first time you saw Dr. Pompy?

14  A.  I can't tell you when I saw him.

15  Q.  And it looks like you were tested for a series of

16  medications, is that right?

17  A.  Yes.

18  Q.  And you were negative for them all?

19  A.  Yes.  No, I wasn't.  There was a positive on two.

20  Q.  I'm sorry, that's right.  You were positive -- you were

21  negative for the few on the top and the couple at the bottom?

22  A.  Yes.

23  Q.  All right.  And I'd like to also show Government --

24  Defendant's Exhibit 527A, page 910.  If we could -- do you see

25  the date?  Do you -- do you -- can you -- do you know what this

1    is?

2    A.  Do I know what it is?

3    Q.  Yeah.

4    A.  That's a urine drug screen report.

5    Q.  And what was the date of collection on that one on the

6    right-hand side, do you see that?

7    A.  5-7-12.

8    Q.  All right.

9            MR. LIEVENSE:  And if we could highlight the bottom

10   left.  Sorry, just above there where it says --

11   BY MR. LIEVENSE:

12   Q.  Do you see where it says "Inconsistent Results," do you

13   see where it says that?

14   A.  Do I see?  Yes.

15   Q.  Were you ever advised that -- by Dr. Pompy or anyone else

16   that you had an inconsistent drug screen result?

17   A.  Yes, I was.

18   Q.  Was it back then?

19   A.  Yeah, if it says that, he -- went over it with me.

20   Q.  On your first visit?

21   A.  On my first visit?

22   Q.  Sorry, in May of 2012?

23   A.  Yeah, that's what it says.

24   Q.  Okay.  Now, I've looked at your chart from May of 2012

25   through the end in 2016, and if I told you I didn't see any

1    additional urine drug screens that you underwent, would --

2    would you have any reason to disagree with me?

3            MR. CHAPMAN:  Objection to counsel's testimony and

4    leading.

5            THE COURT:  Well, I agree with the -- yeah, that's

6    improper as -- as to form.  You can ask her if she has had --

7    if she had any other screens in the time frame you just

8    mentioned.  Go ahead.

9    BY MR. LIEVENSE:

10   Q.  Ms. Knight, from May of 2012 through September of 2016,

11   did Dr. Pompy ever require you to do another drug test?

12   A.  I don't know.

13   Q.  On June 2nd, 2016 --

14           MR. LIEVENSE:  If we could pull up -- could we pull

15   up Government's Exhibit 85D?

16   BY MR. LIEVENSE:

17   Q.  Ma'am, this has been --

18   A.  A long time ago.

19   Q.  We've been referring to documents like this.  This is a

20   summary of your MAPS.  Do you know what MAPS is?

21   A.  Yes.

22   Q.  A summary of your MAPS, of medications prescribed by Dr.

23   Pompy that goes back to September of 2013.  Do you see that at

24   the top?

25   A.  Yes.

1    Q.  And all the way to the bottom goes to August of 2016.  Do

2    you see that?

3    A.  Yes.

4    Q.  And what medications was Dr. Pompy prescribing you during

5    this time period?

6    A.  Looks like a pain pill.

7    Q.  Is that Norco, hydrocodone-acetaminophen?

8    A.  Yes, sir.

9    Q.  That's the one on line -- the top line?

10   A.  Yes, sir.

11   Q.  And what's the other drug?

12   A.  I really don't know what the name of the drugs are.

13   Q.  Dextroamp-amphetamine?

14   A.  I really don't know the name of them.

15   Q.  Are you familiar with a drug called Adderall?

16   A.  Yes, it's for ADD.

17   Q.  For ADD?

18   A.  Yes.

19   Q.  All right.

20        MR. LIEVENSE:  I'd like to pull up Government's

21   Exhibit 4, page 59.  Actually, I'm sorry, could we go back to

22   85D?

23   BY MR. LIEVENSE:

24   Q.  Looks like there's a -- Dr. Pompy had prescribed you a

25   series of prescriptions of the hydrocodone as well as that what

1  I'll call amphetamine in 2014 as well, is that correct?

2  A.  Yes.

3  Q.  And I'd like to direct your attention to June 2nd, 2016.

4  Did Dr. Pompy prescribe you any medications on June 2nd, 2016?

5  A.  Yes.

6  Q.  And what did he prescribe you that day?

7  A.  Hydrocodone, hydrocodone and dextroamp.  Is that Adderall?

8  Q.  It looks like, yeah, hydrocodone and the

9  dextroamphetamine, and you're not an expert on medications but

10  that says amphetamine, right?  Well --

11  A.  I don't know what you mean.

12        THE COURT:  Can we all agree that

13  dextroamp-amphetamine is Adderall?

14        MR. CHAPMAN:  We're willing to stipulate, Your Honor.

15        THE COURT:  Okay.

16        MR. LIEVENSE:  Thank you.

17        THE COURT:  Maybe that'll help the witness.  Go

18  ahead.

19  BY MR. LIEVENSE:

20  Q.  If that is indeed Adderall, all right, for what condition

21  was Dr. Pompy treating you with Adderall?

22  A.  ADD.

23  Q.  And if he was treating you for ADD, that would be

24  documented in his medical record of you, wouldn't it?

25  A.  Should be.

```
1            MR. CHAPMAN:  Objection.  Leading.
2    BY MR. LIEVENSE:
3    Q.  I'll rephrase.  In your experience with Dr. Pompy, he
4    documents -- does he document what people's medical conditions
5    are in the medical record?
6    A.  The MAs would document.
7    Q.  So Dr. Pompy doesn't document in the medical records?
8    A.  He documents -- he would like write stuff down and they
9    would put it in the chart.
10   Q.  Based on what he decides?
11   A.  Yes.
12   Q.  Because he's in charge?
13   A.  Yes.
14   Q.  And he's the doctor?
15   A.  Yeah.
16   Q.  And so if he's treating someone for ADD, what would Dr.
17   Pompy do?
18   A.  I'm sorry?
19   Q.  Would he make sure it was in the medical record?
20   A.  Would he make sure it's in the medical records?  It should
21   be.
22            MR. CHAPMAN:  Your Honor, counsel's continuing to
23   lead the witness.  That's like the fourth question in a row.
24            THE COURT:  Okay.
25            MR. LIEVENSE:  Your Honor, I believe it's a yes or no
```

```
 1   question.  She can say no.
 2          THE COURT:  Well, yeah, but, you know, the -- the
 3   question really is does she know what's in the medical
 4   record --
 5          THE WITNESS:  No, I don't.
 6          THE COURT:  -- and does she know whether or not ADD
 7   treatment was -- was documented.  The answer to that is
 8   probably no, and then you'd have to, you know, use the --
 9   the -- the -- the documents or get a stipulation from the other
10   side as to the absence.  But --
11   BY MR. LIEVENSE:
12   Q.  I guess my ultimate question --
13          THE COURT:  -- but anyway, go -- go ahead.
14   Q.  -- is do you know what condition Dr. Pompy was treating
15   you for when he prescribed you Adderall?
16   A.  ADD is what it's prescribed for.
17   Q.  And do you know whether he documented it in the record?
18   A.  No, I do not know whether it's in my chart or not.
19   Q.  Okay.  Are you currently being prescribed any prescription
20   opioids?
21   A.  Right now?  No.  Wait, I don't think it is.
22   Q.  What are you being prescribed that you're not sure about?
23   A.  Wellbutrin.
24   Q.  Wellbutrin?
25   A.  Yeah.  I have severe anxiety attacks and depression.
```

1    Q.   Okay.

2           THE COURT:  Okay.  That's not an opiate, is it,

3    ma'am?

4           THE WITNESS:  Not that I know of.  I really don't

5    know.

6           THE COURT:  Go ahead, Mr. Lievense.

7           I'm no doctor, but I think I can take judicial notice

8    that Wellbutrin is not -- is not an opiate.  Go ahead.

9           MR. CHAPMAN:  Agree with that, Your Honor.

10          THE COURT:  Yep.

11   BY MR. LIEVENSE:

12   Q.   Ma'am, I've already mentioned that we had a chance to --

13   to talk before today, right?

14   A.   Yes, we did.

15   Q.   In fact, I even saw you briefly earlier today?

16   A.   Yes, sir.

17   Q.   And when we met and even today you -- I think you

18   mentioned something how I was on the other side.  Do you

19   remember that?

20   A.   Yeah, I told you twice I'm not on your side, I'm on Dr.

21   Pompy's side.

22   Q.   And, in fact, you -- and I wanted to explore that.  So

23   you -- you said you're on Dr. Pompy's side.  Does that mean --

24   is that based on because you were his patient?

25   A.   No, I worked for him and I stand by him.

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

113

1  Q.  Okay.

2  A.  He's my friend.

3  Q.  I was going to get to that.  So you were his patient and

4  you were his employee?

5  A.  Yes.

6  Q.  And you're his friend?

7  A.  Yes.  We go to church together also.

8  Q.  And you've remained loyal to him?

9  A.  What do you mean, loyal?

10  Q.  Well, you said you're his friend?

11  A.  Yes, I'm his friend.

12  Q.  You stayed in touch with him?

13  A.  Yes.

14  Q.  You go to church with him?

15  A.  Yes, we do.

16  Q.  You're loyal to him?

17  A.  I don't know what you mean by loyal.

18  Q.  Did you create a Facebook page about supporters of Dr.

19  Pompy?

20  A.  Did I create?  No.

21  Q.  You didn't.

22       Are you aware of one?

23  A.  Yes.

24  Q.  Are you a member of it?

25  A.  Yes, I am.

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

```
 1    Q.   Ma'am, have you already come to a decision about whether
 2    you think Dr. Pompy did anything wrong?
 3    A.   Ask me one more time please.
 4    Q.   Have you already come to a decision about whether you
 5    think Dr. Pompy did anything wrong?
 6    A.   I don't think he did anything wrong, no.
 7    Q.   Now, is that based on your faith in him?
 8    A.   No, that's based on me working with him for so many years.
 9    Q.   All right.  And you haven't been able to sit in the
10    gallery here and listen to the evidence during the trial, have
11    you?
12    A.   No, I haven't.
13    Q.   And you haven't seen or heard any of the evidence that's
14    presented to the jury?
15    A.   (Nods in the negative.)
16    Q.   You haven't been in court to see any of the evidence
17    that's been presented to the jury?
18    A.   No, I haven't been in court.
19    Q.   And so you've -- you've come to this conclusion without
20    seeing any of the evidence that's been presented in court?
21    A.   Yeah, it's my own -- my own thought because I worked for
22    him for so long and I trusted him not only as a doctor but as
23    my friend.  You're supposed to trust your doctor.
24    Q.   And would it change your opinion of Dr. Pompy if that --
25    if you knew he was --
```

Jury Trial Excerpts: Volume 10 • Thursday, December 8, 2022

115

1      MR. CHAPMAN:  Your Honor, I -- I believe I just heard

2  the government elicit an opinion as to character and is now

3  attempting to impeach that opinion.

4      THE COURT:  Well --

5      MR. CHAPMAN:  It's very bizarre and objectionable.

6      THE COURT:  Okay.  What -- what -- I think -- I --

7  yeah.  All right.  I think we have to stop that line of

8  questioning --

9      MR. LIEVENSE:  I'm done, Your Honor.

10      THE COURT:  -- for the following reason.

11      MR. LIEVENSE:  I'm sorry.

12      THE COURT:  The witness has testified -- you have in

13  some ways elicited testimony that you're going to put in front

14  of the jury and argue.  On the other hand, you have given the

15  jury some information about the motives and the -- the -- the

16  state of mind for her testimony, which I think will be relevant

17  to cross-examination, and beyond that I don't think we should

18  get into character evidence.  That would be my ruling on that.

19      MR. LIEVENSE:  Understood.

20      THE COURT:  Go right ahead, Mr. Lievense.

21      MR. LIEVENSE:  I have no further questions, Your

22  Honor.

23      THE COURT:  Okay.  All right.  Very good.  Now, it's

24  2:17 p.m. and I want to thank the jurors very much for their

25  patience.  I thought it would be good to get through the direct

1    exam of this witness so that we could start fresh tomorrow with

2    Mr. Chapman's cross-examination, so I apologize for being a

3    little bit late.  I think it's 2:17 p.m.  So why don't we make

4    up for it by starting extra early tomorrow morning and --

5    that's just a joke.

6            If you would get home safely tonight, don't think

7    about the case, don't talk about it with your neighbors,

8    friends or yourselves.  Let's get back to it tomorrow morning

9    at 8:30 and we will finish up what's been a highly productive

10   week.

11           Let's all rise for our jurors now please.

12           (Jury excused at 2:18 p.m.)

13           THE COURT:  Okay.  We'll be in recess until tomorrow

14   morning.  You can step down, ma'am.

15           (Witness excused at 2:18 p.m.)

16           THE LAW CLERK:  Court's in recess.

17           (Court in recess at 2:18 p.m.)

18           (Proceedings in the above-entitled matter continued

19           to Friday, December 9, 2022)

20           (Excerpt 13 concluded)

21                             —  —  —

22

23

24

25

1        C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 116 comprise full, true and correct excerpts of

7    proceedings taken in the matter of United States of America vs.

8    Lesly Pompy, Case No. 18-20454, on Thursday, December 8, 2022.

9

10                         s/Linda M. Cavanagh
                          _____
                          Linda M. Cavanagh, CRR, RMR, RDR, CRC
11                        Federal Official Court Reporter
                          United States District Court
12                        Eastern District of Michigan

13

14

15

16

17   Date: December 12, 2022
     Detroit, Michigan
18

19

20

21

22

23

24

25